MISC 19 - 1638

DeARCY HALL, J.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 2 5 2019 ★

BROOKLYN OFFICE

# Exhibit A

INTERNATIONAL CHAMBER OF COMMERCE

International Court of Arbitration

Case No 21880/ZF/AYZ

**DOOSAN HEAVY INDUSTRIES & CONSTRUCTION CO., LTD.**
Claimant (Republic of Korea)

versus

**DAMIETTA INTERNATIONAL PORT COMPANY S.A.E.**
Respondent 1 (Egypt)

**KUWAIT GULF LINK PORTS INTERNATIONAL**

also known as **KGL INTERNATIONAL FOR PORTS, WAREHOUSING AND TRANSPORT K.S.C.C.**
Respondent 2 (Kuwait)

---

**FINAL AWARD**

---

Dr Christian Dorda, President
Philippe Pinsolle, Co-Arbitrator
Pr Nabil N. Antaki, Co-Arbitrator

Place of Arbitration: Paris, France

Date of Award: 15 January 2018

# TABLE OF CONTENTS

Commonly Used Terms ................................................................................... 7

A.    The Parties .......................................................................................10

    1.    Claimant ...................................................................................10

    2.    Respondents..............................................................................10

B.    The Tribunal ....................................................................................12

    1.    Chairman – Dr Christian Dorda ....................................................12

    2.    Co-Arbitrator appointed by Claimant – Philippe Pinsolle...................12

    3.    Co-Arbitrator appointed by Respondent – Pr Nabil N. Antaki ............12

C.    Framework of the Arbitration ............................................................13

    1.    Arbitration Agreement.................................................................13

    2.    Place of Arbitration ....................................................................14

    3.    Language of Arbitration...............................................................14

    4.    Applicable ICC Rules ..................................................................15

    5.    Applicable Substantive Law..........................................................15

    6.    Relief Requested by the Parties ....................................................15

       6.1 Claimant's Requested Relief ....................................................15

       6.2 Respondents' Requested Relief ................................................21

D.    Procedural History ...........................................................................24

E.    Underlying facts...............................................................................32

    1.    Brief Narrative of the Case...........................................................32

    2.    Contractual Provisions.................................................................33

       2.1 Supply Agreement .................................................................33

       2.2 General Conditions.................................................................34

       2.3 Appendix to Tender................................................................38

       2.4 Revised Appendix to Tender ....................................................38

2.5 2009 Amendment ...................................................................................39

F.    PRELIMINARY ISSUES.........................................................................40

  1.    Identity of Respondent 2 ...............................................................40

  2.    Jurisdictional Objections ...............................................................40

  2.1 Claimant's Position...................................................................41

  2.2 Respondents' Position ............................................................43

  2.3 Tribunal's Determination........................................................44

      2.3.1     French law ...................................................................45

      2.3.2     Other laws ...................................................................46

      2.3.3     Factual elements justifying extending the arbitration clause to KGLPI ....47

          2.3.3.1   Negotiation of the Supply Agreement...........................47

          2.3.3.2   Performance of the Supply Agreement .........................49

          2.3.3.3   Participation in the settlement discussions .....................54

      2.3.4     Conclusion ...................................................................54

G.    On the MERITS: The Parties' Factual Assertions and Legal Arguments.................54

  1.    Claimant's Position .......................................................................54

  2.    Respondents' Position ..................................................................62

  3.    Tribunal's Determination ..............................................................71

H.    KGLPI and DIPCO jointly liable? .......................................................82

  1.1 Claimant's Position...................................................................82

  1.2 Respondents' Position ............................................................83

  1.3 Tribunal's Determination........................................................83

I.    On the Quantum: The Parties' Factual Assertions and Legal Arguments .................87

  1.    Termination Scenario ....................................................................87

  1.1 Claimant's Position...................................................................87

  1.2 Respondents' Position ............................................................87

  1.3 Tribunal's Determination........................................................88

2.      Calculation Method: Price or Costs? ............................................................88

2.1 Claimant..................................................................................................88

2.2 Respondents' Position .............................................................................89

2.3 Tribunal's Determination..........................................................................89

3.      Consideration for 10 Container Cranes ......................................................90

3.1 Claimant's Position..................................................................................90

3.2 Respondents' Position .............................................................................90

3.3 Tribunal's Determination..........................................................................91

4.      Shipping Cancellation Costs .....................................................................92

4.1 Claimant's Position..................................................................................92

4.2 Respondents' Position .............................................................................93

4.3 Tribunal's Determination..........................................................................94

5.      Additional Insurance Costs ......................................................................95

5.1 Claimant's Position..................................................................................95

5.2 Respondents' Position .............................................................................95

5.3 Tribunal's Determination..........................................................................95

6.      Additional Costs for Letters of Guarantee...................................................96

6.1 Claimant's Position..................................................................................96

6.2 Respondents' Position .............................................................................96

6.3 Tribunal's Determination..........................................................................96

7.      Erection Yard Costs.................................................................................97

7.1 Claimant's Position..................................................................................97

7.2 Respondents' Position .............................................................................98

7.3 Tribunal's Determination..........................................................................99

8.      Move-Out Costs ...................................................................................106

8.1 Claimant's Position................................................................................106

8.2 Respondents' Position ...........................................................................106

8.3  Tribunal's Determination........................................................................107

9.    Un-Refunded Import Duty Costs................................................................107

9.1  Claimant's Position............................................................................107

9.2  Respondents' Position ........................................................................107

9.3  Tribunal's Determination......................................................................108

10.   Labor and Maintenance Costs..................................................................108

10.1   Claimant's Position..........................................................................108

10.2   Respondents' Position........................................................................108

10.3   Tribunal's Determination.....................................................................109

11.   Additional Foreign Exchange Costs............................................................114

11.1   Claimant's Position..........................................................................114

11.2   Respondents' Position........................................................................114

11.3   Tribunal's Determination.....................................................................114

12.   Lost Profits on Remaining Work...............................................................115

12.1   Claimant's Position..........................................................................115

12.2   Respondents' Position........................................................................115

12.3   Tribunal's Determination.....................................................................115

13.   First Deduction: Advance Payment ............................................................116

13.1   Claimant's Position..........................................................................116

13.2   Respondents' Position........................................................................116

13.3   Tribunal's Determination.....................................................................117

14.   Second Deduction: Proceeds of Crane Sale ...................................................118

14.1   Claimant's Position..........................................................................118

14.2   Respondents' Position........................................................................118

14.3   Tribunal's Determination.....................................................................119

15.   Interest.....................................................................................120

15.1   Claimant's Position..........................................................................120

15.2    Respondents' Position..............................................................................121

15.3    Tribunal's Determination..........................................................................122

16.    Summary of Quantum.................................................................................123

J.    Costs of Arbitration .......................................................................................124

1.    ICC Costs .................................................................................................125

2.    Party Costs...............................................................................................125

2.1 Costs as claimed by Claimant..................................................................125

2.1.1    ICC Costs.........................................................................................125

2.1.2    Party Costs......................................................................................125

2.2 Costs as claimed by Respondent 1 ..........................................................125

2.2.1    ICC Costs.........................................................................................126

2.2.2    Party Costs......................................................................................126

3.    Arbitral Tribunal's Determination .............................................................126

K.    DISPOSITIVE SECTION ...................................................................................127

## COMMONLY USED TERMS

| Term | Meaning |
| --- | --- |
| 2009 Amendment | Amendment of the Supply Agreement, dated 28 July 2009 (Exhibit C-7) |
| Claimant | DOOSAN HEAVY INDUSTRIES & CONSTRUCTION CO., LTD. (aka "DOOSAN") |
| Container Cranes | Container handling gantry cranes for a ship-to-shore supply |
| DAB | Dispute Adjudication Board pursuant to the standard conditions of the International Federation of Consulting Engineers (FIDIC) |
| FIDIC General Conditions | Part I of the Tender document, incorporated by reference from FIDIC's *Conditions of Contract for Plant and Design-Build* (1999) |
| Hearing | A hearing which took place on 20, 21 and 22 September 2017 at the ICC Hearing Centre in Paris |
| ICC Court | The International Court of Arbitration of the International Chamber of Commerce |
| ICC Rules | The ICC Rules of Arbitration in force as of 1st January 2012 |
| ICC Secretariat | The body of the ICC Court charged with the administration of cases under the direction of the ICC Secretary General |
| Parties | Claimant and Respondents collectively |
| Respondent 1 | DAMIETTA INTERNATIONAL PORT COMPANY S.A.E. (aka "DIPCO") |
| Respondent 2 | KGL International for Ports, Warehousing and Transport K.S.C.C. (aka KUWAIT GULF LINK PORTS INTERNATIONAL or "KGLPI") |
| Respondents | Respondent 1 and Respondent 2 collectively |
| Supply Agreement | Contract dated 13 April 2007 for the supply of Container Cranes, including ten annexes (Exhibit C-1) |
| Tender | A tender which has been specified in the tender document, dated November 2006, and which includes the Conditions of Contract, consisting of Part I – General Conditions (incorporated by reference from FIDIC's *Conditions of Contract, Plant and* |

| | |
|---|---|
| | Design-Build ("General Conditions") (1999)) and Part II – Particular Conditions |
| ToR | Terms of Reference signed by the President and the Co-arbitrators, by Claimant and by Respondent 1 |
| Tribunal | Dr Christian Dorda (President), Philippe Pinsolle (Co-Arbitrator) and Pr Nabil N. Antaki (Co-Arbitrator), collectively |
| Arbitration Agreement | Arbitration agreement pursuant to Clause 20.6 of the General Conditions |

The following chart contains a summary of the substantive submissions filed by the Parties and the abbreviations used for each submission throughout this Final Award.

| Party | Title of Submission | Date | Abbreviation |
|---|---|---|---|
| Claimant | Request for Arbitration | 18 April 2016 | C-RfA |
| Respondents | Answer to the Request for Arbitration and Respondent 1's Counterclaim | 23 August 2016 | R-ANSWER |
| Claimant | Reply to Respondent 1's Counterclaim | 26 September 2016 | C-REPLY |
| Claimant | Request for Interim Measures | 2 February 2017 | C-Request Interim |
| Respondent 1 | Answer to Claimant's Request for Interim Measures | 23 February 2017 | R1-Answer Interim |
| Respondent 1 | Statement of Defense | 10 May 2017 | R1-SoD |
| Claimant | Reply to Respondent 1's Full Statement of Defense | 14 June 2017 | C-SECONDREPLY |
| Respondent 1 | Rejoinder | 26 July 2017 | R1-REJOINDER |
| Claimant | Rebuttal to Respondent 1's Rejoinder | 30 August 2017 | C-REBUTTAL |
| Claimant | Claimant's First Post-Hearing Brief | 13 October 2017 | C-PHB1 |
| Respondent 1 | Respondent 1's First Post-Hearing Briefs | 13 October 2017 | R1-PHB1-CR (by Co-Counsel Crowell & Moring) R1-PHB1-KH (by Co-Counsel Wadih Philippe |

| | | | Khalaf) |
|---|---|---|---|
| Claimant | Claimant's Second Post-Hearing Brief | 6 November 2017 | C-PHB2 |
| Respondent 1 | Respondent 1's Second Post-Hearing Briefs | 6 November 2017 | R1-PHB2-CR (by Co-Counsel Crowell & Moring) |
| | | | R1-PHB2-KH (by Co-Counsel Wadih Philippe Khalaf) |
| Claimant | Claimant's Cost Submission | 17 November 2017 | C-COST |
| Respondent 1 | Respondent 1's Cost Submission | 17 November 2017 | R1-COST |

## A. THE PARTIES

### 1.  Claimant

1.  Claimant in this arbitration is

#### DOOSAN HEAVY INDUSTRIES & CONSTRUCTION Co., LTD.

22 Doosan Volvo-ro, Seongsan-gu,
Changwon-si, Gyeongsangnam-do (51711)
Republic of Korea

2.  Claimant is a Korean limited company, registered under Business Registration Number 609-81-04684.

3.  Claimant is represented by

#### KING & SPALDING International LLP
Attn:    Mr James E. Castello
         Mr Rami Chahine

12 Cours Albert 1er
75008 Paris, France

Tel:     +33 1 73 00 39 00

Email:   jcastello@kslaw.com
         rchahine@kslaw.com

#### KING & SPALDING LLP
Attn:    Mr Jan K. Schäfer
TaunusTurm
Taunustor 1
60310 Frankfurt am Main, Germany

Tel:     +49 69 257 811 000

Email:   jschaefer@kslaw.com

### 2.  Respondents

4.  Respondent 1 in this arbitration is

#### Damietta International Port Company S.A.E.
Damietta Port Road
Kafr El-Battikh
Casablanca Hotel, 2nd Floor
Damietta, The Arab Republic of Egypt

5. Respondent 1 is a company incorporated under the laws of The Arab Republic of Egypt, registered with the Investment Commercial Registry under n° 2139.

6. Respondent 2 in this arbitration is

> **KGL International for Ports, Warehousing and Transport K.S.C.C.**
> P.O. Box 42438
> Shuwaikh 70655, Kuwait

7. Respondent 2 is a company incorporated under the laws of Kuwait. Respondent 2 is also interchangeably referred to as **Kuwait Gulf Link Ports International or KGLPI**.

8. Respondents are represented by

> **CROWELL & MORING LLP**
> Attn:    Mr George D. Ruttinger
>          Mr Ian A. Laird
>          Mr David C. Hammond
>          Ms Ashley R. Rivelra
>          Ms Joanna Coyne
>
> 1001 Pennsylvania Avenue, NW
> Washington, DC 20004-2595, USA
>
> Tel:     +1 202 624-2500
>
> Email:   gruttinger@crowell.com
>          ilaird@crowell.com
>          dhammond@crowell.com
>          arivelra@crowell.com
>          jcoyne@crowell.com

> **CROWELL & MORING LLP**
> Attn:    Ms Rand Adra
> 590 Madison Avenue
> New York, NY 10022-2544, USA
>
> Email:   radra@crowell.com

> **CROWELL & MORING LLP**
> Attn:    Mr John Laird
> Tower 42
> London, UK EC2N 1HQ
>
> Email:   jlaird@crowell.com

> **ALOTHMAN & KHALAF ATTORNEYS & COUNSELLORS-AT-LAW**
> Attn:    Mr Wadih Philippe Khalaf

Kuwait Free Trade Zone, Phase 1
Building No. 3, Office No. 31
Shouwaikh Port
P.O Box 884 Dasman, 15459 Kuwait, The State of Kuwait

Tel:        +965 24845262/24821612

Email:      attorneys@wphklaw.com
            wk@wphklaw.com


## B. THE TRIBUNAL

9.  The Tribunal consists of three arbitrators who are Christian Dorda, Philippe Pinsolle and Pr Nabil N. Antaki.

### 1.        President – Dr Christian Dorda

DORDA Rechtsanwälte GmbH[1]
Universitätsring 10
1010 Vienna, Austria

Telephone:   (+43-1) 5334795-14
Fax:         (+43-1) 5334795-5014,
Email:       christian.dorda@dorda.at

10. Christian Dorda was directly appointed by the ICC pursuant to Art 13(4) of the ICC Rules on 12 January 2017.

### 2.        Co-Arbitrator appointed by Claimant – Philippe Pinsolle

QUINN EMANUEL URQUHART & SULLIVAN LLP
6 rue Lamennais
75008 Paris, France

Telephone:   (+33) 1 73 44 60 00266886
Email:       philippepinsolle@quinnemanuel.com

11. Philippe Pinsolle was nominated by Claimant and confirmed by the Secretary General of the ICC Court on 14 September 2016 pursuant to Article 13(2) of the ICC Rules.

### 3.        Co-Arbitrator appointed by Respondent – Pr Nabil N. Antaki

401-90, Willowdale Avenue
Outremont, Qc.
H3T 1E9, Canada

---

[1]  Formerly DORDA BRUGGER JORDIS Rechtsanwälte GmbH.

Telephone:     (+1) 514 2077371
Email:         nnantaki@videotron.ca

12. Nabil N. Antaki was nominated by Respondent and confirmed by the Secretary General of the ICC Court on 14 September 2016 pursuant to Article 13(2) of the ICC Rules.

## C.  FRAMEWORK OF THE ARBITRATION

### 1.    Arbitration Agreement

13. Clause 20.6 of the General Conditions[2] stipulates as follows:

---

**20.6 Arbitration**

Unless settled amicably, any dispute in respect of which the DAB's decision (if any) has not become final and binding shall be finally settled by international arbitration. Unless otherwise agreed by both Parties:

(a) the dispute shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce,

(b) the dispute shall be settled by three arbitrators appointed in accordance with these Rules, and

(c) the arbitration shall be conducted in the language for communications defined in Sub-Clause 1.4 [Law and Language], as quoted in §15 below.

The arbitrator(s) shall have full power to open up, review and revise any certificate, determination, instruction, opinion or valuation of the Engineer, and any decision of the DAB, relevant to the dispute. Nothing shall disqualify the Engineer from being called as a witness and giving evidence before the arbitrator(s) on any matter whatsoever relevant to the dispute.

Neither Party shall be limited in the proceedings before the arbitrator(s) to the evidence or arguments previously put before the DAB to obtain its decision, or to the reasons for dissatisfaction given in its notice of dissatisfaction. Any decision of the DAB shall be admissible in evidence in the arbitration.

Arbitration may be commenced prior to or after completion of the Works. The obligations of the Parties, the Engineer and the DAB shall

---

[2]  Exhibit C-028, p 63 of the pdf.

13

> not be altered by reason of any arbitration being conducted during the progress of the Works.

14. Article 1.4 of the General Conditions[3] contains the following clause:

> **1.4 Law and Language**
>
> The Contract shall be governed by the law of the country (or other jurisdiction) stated in the Appendix to Tender.
>
> If there are versions of any part of the Contract which are written in more than one language, the version which is in the ruling language stated in the Appendix to Tender shall prevail.
>
> The language for communications shall be that stated in the Appendix to Tender. If no language is stated there, the language for communications shall be the language in which the Contract (or most of it) is written.

15. The Revised Appendix to Tender[4] supplements the following details on the applicable law and on dispute resolution:

| Item: | Governing Law |
|---|---|
| Sub-Clause: | 1.4 |
| Entry: | Delete "Egypt" and insert "The law of the Arab Republic of Egypt" |
| | |
| Item: | Arbitration |
| Sub-Clause: | 20.6 |
| Entry: | Rules: International Chamber of Commerce |
| | Venue: Paris, France |
| | Language: English |

16. Article 20.6 of the FIDIC General Conditions – as supplemented by the Revised Appendix to Tender – constitutes the **Arbitration Agreement**.

### 2.    Place of Arbitration

17. Clause 20.6 of the Revised Appendix to Tender stipulates that the venue of the arbitration shall be Paris, France ("*Venue: Paris, France*").[5]

### 3.    Language of Arbitration

18. Clause 20.6 of the Revised Appendix to Tender stipulates that the language of the arbitration shall be English ("*Language: English*").[6]

---

[3]  Exhibit C-028, p 63 of the pdf.
[4]  Exhibit C-026.
[5]  Exhibit C-026; emphasis added.
[6]  Exhibit C-026; emphasis added.

### 4.    Applicable ICC Rules

10.  Since the Request for Arbitration was made on 18 April 2016, the ICC Rules 2012 apply.

### 5.    Applicable Substantive Law

20.  Clause 1.4 of the General Conditions[7] provides as follows:

> **1.4 Law and Language**
>
> The Contract shall be governed by the law of the country (or other jurisdiction) stated in the Appendix to Tender.
>
> [...]

21.  Clause 1.4 of the Revised Appendix to Tender stipulates that the governing law shall be "[t]*he law of the Arab Republic of Egypt*".[8]

### 6.    Relief Requested by the Parties

### 6.1   Claimant's Requested Relief

22.  Claimant's requested relief has evolved over the course of the arbitration. In its C-RfA dated 18 April 2016, Claimant sought the following relief:[9]

> - Ordering DIPCO and KGLPI to pay to Doosan damages, with the amount to be quantified during the arbitration.
> - Ordering DIPCO and KGLPI to pay interest at an annual rate of 6.5% on amounts due and during times to be specified during the arbitration, until full payment.
> - Declaring that the Supply Agreement has been validly terminated on March 4, 2016.
> - In the alternative, declaring that the Supply Agreement has been validly terminated upon the termination of the Respondent's concession for the Damietta port project.
> - Any other relief that the Arbitral Tribunal considers fair and appropriate.

In its C-REPLY of 26 September 2016, Claimant additionally sought the following relief:[10]

> On the above basis, Doosan respectfully requests that the Tribunal reject the First Respondent's Counterclaim in its entirety. Doosan further maintains in full its claims for relief as set forth in its Request for

---

[7] Exhibit C-028.
[8] Exhibit C-026; emphasis added.
[9] C-RfA §69.
[10] C-REPLY §17.

> Arbitration and reserves its right to seek additional or other relief to which it may be entitled.

23. In its letter of 2 June 2017, Claimant amended its Request for Relief to "*request for an express ruling from the Tribunal declaring that Doosan does not owe to DIPCO any portion of the advance payment that it received*".

24. In its C-SECONDREPLY of 14 June 2017, Claimant sought the following relief:[11]

> a) To find that KGLPI is a proper party to this arbitration and that the Tribunal has jurisdiction over KGLPI;
>
> b) To declare DIPCO and KGLPI in material breach of the Supply Agreement;
>
> c) To declare that DIPCO and KGLPI's breaches of the Supply Agreement are not excused by force majeure;
>
> d) To declare that the Supply Agreement was validly terminated by Doosan for material breach on 4 March 2016 in accordance with Sub-Clause 16.2 of the FIDIC General Conditions;
>
> e) To order DIPCO and KGLPI to pay to Doosan the amounts contemplated by Clause 16.4 of the FIDIC General Condition in case of valid termination for material breach pursuant to Sub-Clause 16.2 of the FIDIC General Conditions, with pre-award and post-award interest;
>
> f) Alternatively, to declare the Supply Agreement terminated on the basis of impossibility pursuant to Sub-Clause 19.7 of the FIDIC General Conditions and Article 159 of the Egyptian Civil Code;
>
> g) In such case, to order DIPCO and KGLPI to pay to Doosan the amounts contemplated by Sub-Clause 19.6 of the FIDIC General Condition in case of termination for impossibility pursuant to Sub-Clause 19.7 of the FIDIC General Conditions, with pre-award and post-award interest;
>
> h) In any event, to declare that DIPCO and KGLPI are not entitled to any re-payment, partially or wholly, of the advance payment provided to Doosan of US$ 18.4 million; and,
>
> i) To order DIPCO and KGLPI to pay all costs and expenses of this arbitration, including the ICC's administrative fees, the fees and expenses of the Arbitral Tribunal, the fees and expenses of Doosan's legal representatives and experts in respect of this arbitration, and any other costs of this arbitration; and finally
>
> j) To grant any other relief that it deems just and proper.

---

[11] C-SECONDREPLY §237.

25. In its C-REBUTTAL of 30 August 2017, Claimant sought the following relief:[12]

a) To change the name of the Second Respondent or KGLPI in the caption for this arbitration to "KGL International for Ports, Warehousing & Transport K.S.C.C."; and to issue any award, order or other directive or communication that extends to KGLPI to "KGL International for Ports, Warehousing & Transport K.S.C.C."

b) To find that KGLPI is a proper party to this arbitration and that the Tribunal has jurisdiction over KGLPI;

c) To declare DIPCO and KGLPI to be jointly and severally liable under the Supply Agreement;

d) To declare that DIPCO and KGLPI have materially breached the Supply Agreement; or, in the alternative, if the Tribunal finds either that it lacks jurisdiction over KGLPI or that KGLPI did not so breach, to declare that DIPCO materially breached the Supply Agreement;

e) To declare that DIPCO and KGLPI's breaches of the Supply Agreement are not excused by force majeure;

f) To declare that the Supply Agreement was validly terminated by Doosan for material breach on 4 March 2016 in accordance with Sub-Clause 16.2 of the FIDIC General Conditions;

g) To order DIPCO and KGLPI – or, in the alternative scenario described in (d) above, to order DIPCO – to pay to Doosan the amounts contemplated by Clause 16.4 of the FIDIC General Conditions in case of valid termination for material breach pursuant to Sub-Clause 16.2 of the FIDIC General Conditions, which amounts have been quantified so far at US$ 79,007,597;

h) To order that DIPCO and KGLPI – or, in the alternative scenario described in (d) above, to order DIPCO – to pay pre-award interest on the amounts ordered to be paid in (g), which interest has been quantified as of 30 August 2017 at US$ 4,856,827, and post-award interest on the amounts ordered to be paid under (g);

i) Alternatively to (d) through (h) above, to declare that the Supply Agreement terminated on the basis of impossibility pursuant to Sub-Clause 19.7 of the FIDIC General Conditions and Article 159 of the Egyptian Civil Code;

j) In such case, to order DIPCO and KGLPI to pay to Doosan the amounts contemplated by Sub-Clause 19.6 of the FIDIC General Conditions, which amounts have been quantified so far at US$ 75,765,593; in the alternative, if the Tribunal finds that it lacks

---

[12] C-REBUTTAL §321.

> jurisdiction over KGLPI, to order DIPCO to pay to Doosan said amounts;
>
> k)  To order that DIPCO and KGLPI – or, in the alternative scenario described in (j) above, to order DIPCO – to pay pre-award interest on the amounts ordered to be paid in (j), which interest has been quantified as of 30 August 2017 at US$ 4,652,781, and post-award interest on the amounts ordered to be paid under (j);
>
> l)  In any event, to declare that DIPCO and KGLPI are not entitled to any re-payment, partially or wholly, of the advance payment provided to Doosan of US$ 18.4 million; and
>
> m)  To order DIPCO and KGLPI to pay all costs and expenses of this arbitration, including the ICC's administrative fees, the fees and expenses of the Arbitral Tribunal, the fees and expenses of Doosan's legal representatives and experts in respect of this arbitration, and any other costs of this arbitration; and finally
>
> n)  To grant any other relief that it deems just and proper.

26.  In its C-PHB1 Brief of 13 October 2017, Claimant sought the following relief:[13]

> a)  To find that KGLPI is a proper party to this arbitration and that the Tribunal has jurisdiction over KGLPI;
>
> b)  To declare DIPCO and KGLPI to be jointly and severally liable under the Supply Agreement;
>
> c)  To declare that DIPCO and KGLPI have materially breached the Supply Agreement; or, in the alternative, if the Tribunal finds either that it lacks jurisdiction over KGLPI or that KGLPI did not so breach, to declare that DIPCO materially breached the Supply Agreement;
>
> d)  To declare that DIPCO and KGLPI's breaches of the Supply Agreement are not excused by force majeure;
>
> e)  To declare that the Supply Agreement was validly terminated by Doosan for material breach on 4 March 2016 in accordance with Sub-Clause 16.2 of the FIDIC General Conditions;
>
> f)  To order DIPCO and KGLPI – or, in the alternative scenario described in (d) above, to order DIPCO – to pay to Doosan the amounts contemplated by Clause 16.4 of the FIDIC General Conditions in case of valid termination for material breach pursuant to Sub-Clause 16.2 of the FIDIC General Conditions, which amounts have been quantified so far at US$ 79,007,597;
>
> g)  To order that DIPCO and KGLPI – or, in the alternative scenario described in (d) above, to order DIPCO – to pay pre-award interest

---

[13]  C-PHB1 §190.

on the amounts ordered to be paid in (g), which interest has been quantified as of 30 August 2017 at US$ 4,856,827, and post-award interest on the amounts ordered to be paid under (g);

h) Alternatively to (d) through (h) above, to declare that the Supply Agreement terminated on the basis of impossibility pursuant to Sub-Clause 19.7 of the FIDIC General Conditions and Article 159 of the Egyptian Civil Code;

i) In such case, to order DIPCO and KGLPI to pay to Doosan the amounts contemplated by Sub-Clause 19.6 of the FIDIC General Conditions, which amounts have been quantified so far at US$ 75,765,593; in the alternative, if the Tribunal finds that it lacks jurisdiction over KGLPI, to order DIPCO to pay to Doosan said amounts;

j) To order that DIPCO and KGLPI – or, in the alternative scenario described in (i) above, to order DIPCO – to pay pre-award interest on the amounts ordered to be paid in (j), which interest has been quantified as of 30 August 2017 at US$ 4,652,781, and post-award interest on the amounts ordered to be paid under (j);

k) In any event, to declare that DIPCO and KGLPI are not entitled to any re-payment, partially or wholly, of the advance payment provided to Doosan of US$ 18.4 million; and

l) To order DIPCO and KGLPI to pay all costs and expenses of this arbitration, including the ICC's administrative fees, the fees and expenses of the Arbitral Tribunal, the fees and expenses of Doosan's legal representatives and experts in respect of this arbitration, and any other costs of this arbitration; and finally

m) To grant any other relief that it deems just and proper.

27. In its C-PHB2 Brief of 6 November 2017, Claimant sought the following relief:[14]

a) To find that KGLPI is a proper party to this arbitration and that the Tribunal has jurisdiction over KGLPI;

b) To declare DIPCO and KGLPI to be jointly and severally liable under the Supply Agreement;

c) To declare that DIPCO and KGLPI have materially breached the Supply Agreement, or, in the alternative, if the Tribunal finds either that it lacks jurisdiction over KGLPI or that KGLPI did not so breach, to declare that DIPCO materially breached the Supply Agreement;

d) To declare that DIPCO's and KGLPI's breaches of the Supply Agreement are not excused by *force majeure*, or, in the alternative,

---

[14] C-PHB2 §249.

if the Tribunal finds either that it lacks jurisdiction over KGLPI or that KGLPI did not materially breach the Supply Agreement, to declare that DIPCO's breaches of the Supply Agreement are not excused by *force majeure*;

e) To declare that the Supply Agreement was validly terminated by Doosan for material breach on 4 March 2016 in accordance with Sub-Clause 16.2 of the FIDIC General Conditions;

f) To order DIPCO and KGLPI – or, in the alternative circumstance described in (c) above, to order DIPCO – to pay to Doosan the amounts contemplated by Clause 16.4 of the FIDIC General Conditions in case of valid termination for material breach pursuant to Sub-Clause 16.2 of the FIDIC General Conditions, which amounts have been quantified at US\$ 79,007,597;

g) To order that DIPCO and KGLPI – or, in the alternative circumstance described in (c) above, to order DIPCO – to pay pre-award interest at the US Federal Reserve Discount Rate + 3% on the amount ordered to be paid in (f) until issuance of the award, which interest has been quantified as of 6 November 2017 at US\$ 5,530,327, and post-award interest at the US Federal Reserve Discount Rate + 3% on the amount ordered to be paid under (f);

h) Alternatively to (c) through (g) above, to declare that the Supply Agreement terminated on the basis of impossibility pursuant to Sub-Clause 19.7 of the FIDIC General Conditions and Article 159 of the Egyptian Civil Code;

i) In such case, to order DIPCO and KGLPI to pay to Doosan the amounts contemplated by Sub-Clause 19.6(a) of the FIDIC General Conditions, which amounts have been quantified as US\$ 78,980,879; in the alternative, if the Tribunal finds that it either lacks jurisdiction over KGLPI or that KGLPI is not liable to Doosan under the Supply Agreement, to order DIPCO to pay to Doosan the said amount;

j) To order that DIPCO and KGLPI – or, in the alternative circumstance described in (i) above, to order DIPCO – to pay pre-award interest at the US Federal Reserve Discount Rate + 3% on the amount ordered to be paid in (i) until issuance of the award, which interest has been quantified as of 6 November 2017 at US\$ 5,528,409, and post-award interest at the US Federal Reserve Discount Rate + 3% on the amount ordered to be paid under (i);

k) Alternatively to (i) through (j) above, to order DIPCO and KGLPI to pay Doosan the amount contemplated by Sub-Clause 19.6(c) of the FIDIC General Conditions, which amount has been quantified at US\$ 75,765,593; in the alternative, if the Tribunal finds that it either lacks jurisdiction over KGLPI or KGLPI is not liable to Doosan under

the Supply Agreement, to order DIPCO to pay to Doosan said amount;

l) To order that DIPCO and KGLPI – or, in the alternative circumstance described in (k) above, to order DIPCO – to pay pre-award interest at the US Federal Reserve Discount Rate + 3% on the amount ordered to be paid in (k) until issuance of the award, which interest has been quantified as of 6 November 2017 at US$ 5,297,591, and post-award interest at the US Federal Reserve Discount Rate + 3% on the amount ordered to be paid under (k);

m) In any event, to declare that DIPCO and/or KGLPI are not entitled to any re-payment, partially or wholly, of the advance payment provided to Doosan of U S$ 18.4 million; and

n) To order DIPCO and KGLPI to pay all costs and expenses of this arbitration, including the ICC's administrative fees, the fees and expenses of the Arbitral Tribunal, the fees and expenses of Doosan's legal representatives and experts in respect of this arbitration; and any other costs of this arbitration; and finally

o) To grant any other relief that it deems just and proper.

## 6.2   Respondents' Requested Relief

31. Respondents' requested relief has evolved over the course of the arbitration. In their R-Answer dated 23 August 2016, Respondents sought the following relief:[15]

(I) This arbitration shall not proceed against KGLPI, the 2nd Respondent, which is not bound to any Arbitration Agreement with the Claimant.

(II) This arbitration cannot proceed due to Claimant's failure to quantify its claim as requested by the Rules.

(III) This arbitration shall not proceed as no Arbitration Agreement existed at the date of the RFA.

26. Alternatively, the Tribunal should issue an award:

(I) Denying any of the relief requested by Claimant in its RFA;

(II) Ordering that Claimant and Counter-Respondent Doosan pay back DIPCO's advance payment of approximately US $18.4 million for the undelivered Container Cranes;

(III) Awarding to Respondents all of their costs and fees associated with this arbitration;

---

[15] R-Answer, §§25 and 26.

> (iv)     Awarding to Respondents pre-award and post-award interest, as appropriate in light of the other items of relief requested, at the highest lawful rate; and
>
> (v)  Awarding to Respondents such other relief as the Tribunal may deem appropriate.

29.  In its R1-SoD of 10 May 2017, Respondent 1 sought the following relief:[16]

> (i)  The Tribunal has no jurisdiction over Respondent 2;
>
> (ii)  Denying all of the relief requested by Claimant in its RFA;
>
> (iii) Awarding to Respondent 1 all of its costs and fees associated with this arbitration;
>
> (iv) Awarding to Respondent 1 pre-award and post-award interest, as appropriate in light of the other items of relief requested, at the highest lawful rate; and
>
> (v)  Awarding to Respondent 1 such other relief as the Tribunal may deem appropriate.

30.  In its R1-REJOINDER of 26 July 2017, Respondent 1 sought the following relief:[17]

> (i)  The Tribunal has no jurisdiction over Respondent 2;
>
> (ii)  Denying all of the relief requested by Claimant in its C-SECONDREPLY;
>
> (iii) Awarding to Respondent 1 all of its costs and fees associated with this arbitration;
>
> (iv) Awarding to Respondent 1 pre-award and post-award interest, as appropriate in light of the other items of relief requested, at the highest lawful rate; and
>
> (v)  Awarding to Respondent 1 such other relief as the Tribunal may deem appropriate.

31.  In the R1-PHB1-CR of 13 October 2017, Co-Counsel Crowell & Moring sought the following relief for Respondent 1:[18]

> (i)  The Tribunal has no jurisdiction over Respondent 2;
>
> (ii)  Denying all of the relief requested by Claimant in its C-REBUTTAL;
>
> (iii) Awarding to Respondent 1 all of its costs and fees associated with this arbitration;

---

[16] R1-SoD, §129.
[17] R1-REJOINDER §202.
[18] R1-PHB1-CR §157.

> (iv) Awarding to Respondent 1 pre-award and post-award interest, as appropriate in light of the other items of relief requested, at the highest lawful rate; and
>
> (v) Awarding to Respondent 1 such other relief as the Tribunal may deem appropriate.

32. In the R1-PHB1-KH of 13 October 2017, Co-Counsel Wadih Philippe Khalaf sought the following relief for Respondent 1:[19]

> Therefore;.
>
> 1) This Arbitration may neither be accepted nor proceed and the Tribunal has no jurisdiction over either Respondent. And even if this Arbitration is to proceed.
>
> 2) KGLPI may not be joined to the Arbitration and, in all cases, may not be liable to Doosan.
>
> 3) The Doosan's relief sought shall be denied as :
>
>     a. No damages are due to be paid to Doosan, by either DIPCO or by KGLPI as neither breached the Supply Agreement or else.
>
>     b. No Interest of any rate or amount is due to Doosan and Doosan should pay back the USD 18.4 Million advance payment to DIPCO with interest.
>
>     c. The Supply Agreement was terminated by Doosan itself on March 4, 2016 without following the Applicable Law termination stipulations, and may not be declared terminated by the Tribunal upon any other reasons or occurrence as it has already been terminated by Doosan itself for its already alleged and declared reasons and such a termination already took effect since March 4, 2016.
>
>     d. No other relief to Doosan is justified or appropriate under this Arbitration.
>
> And thereby the Tribunal is sought to:
>
>     e. Award to DIPCO all of its costs and interest incurred due this Arbitration.

33. In its R1-PHB2-CR of 6 November 2017, Co-Counsel Crowell & Moring did not change the relief sought for Respondent 1 vis-à-vis the relief sought in R1-PHB1-CR.

34. In its R1-PHB2-KH of 6 November 2017, Co-Counsel Wadih Philippe Khalaf sought the following relief for Respondent 1:[20]

---

[19] R1-PHB1-KH §90.
[20] R1-PHB2-KH §94 & §95.

> 95 In view of all the foregoing, DIPCO hereby respectfully request the Tribunal to issue a decision or an award deciding that:
>
> (i) This arbitration shall not proceed against KGLPI, the 2nd Respondent, that refrained from joining this Arbitration since its inception and is not bound to any Arbitration Agreement with the Claimant.
>
> (ii) This arbitration cannot proceed due to Claimant's failure to quantify its claim as requested by the Rules.
>
> (iii) This arbitration shall not proceed as no Arbitration Agreement existed at the date of the RFA.
>
> 96 Alternatively, the Tribunal should issue an award:
>
> (i) Denying any of the relief requested by Claimant;
>
> (ii) Awarding DIPCO all of its costs and fees associated with this arbitration;
>
> (iii) Awarding to DIPCO pre-award and post-award interest, as appropriate in light of the other items of relief requested, at the highest lawful rate; and
>
> (iv) Awarding to DIPCO such other relief as the Tribunal may deem appropriate.

## D. PROCEDURAL HISTORY

35.

| | |
|---|---|
| 18 April 2016 | Claimant submitted its "Request for Arbitration" ("C-RfA"). This is the date the ICC Secretariat received the C-RfA and the date on which the arbitration commenced under Art 4(2) of the ICC Rules. |
| 3 August 2016 | In response to an earlier request for an extension of time for submitting the R-ANSWER, Claimant did not oppose Respondents' request but noted its objection to what Claimant alleged to be delay tactics of Respondents. |
| 23 August 2016 | Respondents submitted their "Answer to the Request for Arbitration and Counterclaims" ("R-ANSWER"). |
| On the same day | Respondents (i) replied to Claimant's objection of 3 August 2016, (ii) objected against including Respondent 2 as a party to the arbitration, requesting the ICC Secretariat to refer the matter to the ICC Court for a decision pursuant to Article 6(4) ICC Rules, and (iii) noted that Claimant had not |

| | |
|---|---|
| | yet complied with the ICC Secretariat's request to estimate the monetary value of its claim. |
| 26 August 2016 | The Secretariat informed the Parties that Respondents' objection to the inclusion of Respondent 2 as Party was not referred to the ICC Court for a decision pursuant to Article 6(4) ICC Rules. |
| 26 September 2016 | Claimant submitted its "Reply to Counterclaim" ("C-REPLY") together with a letter to the Secretariat of the same date. |
| 15 December 2016 | The ICC Court set the advance on costs at EUR 575,000. |
| 13 January 2017 | The ICC Secretariat transmitted the file to the Tribunal. |
| On the same day | The ICC Secretariat informed the Parties of the advance on costs of EUR 575,000, but also clarified that based on the amount in dispute, the ICC Cost Calculator would suggest an advance in excess of EUR 685,000. |
| 17 January 2017 | The Tribunal circulated an introductory letter to the Parties, laying out the intended first steps for the arbitration. Furthermore, the Tribunal nominated Mr Philip Exenberger to be the administrative secretary to the Tribunal. |
| 27 January 2017 | The Tribunal circulated draft Procedural Order No 1 and draft Terms of Reference. |
| 31 January 2017 | Respondents proposed to hold the Case Management Conference in person while Claimant proposed to hold it via telephone. |
| 1 February 2017 | The Tribunal informed the Parties of the availability of the Tribunal for the Case Management Conference. |
| 7 February 2017 | Apart from addressing certain issues with respect to proceedings on an interim measure, Respondents announced that they would "seek a schedule for a hearing of their bifurcation request to determine whether Respondent 2 is a proper party to these proceedings". |
| 12 February 2017 | Claimant addressed issues raised by Respondents on 7 February 2017 and, inter alia, opposed bifurcation of the proceedings and any hearing on whether to order bifurcation, arguing that such bifurcation would not realize any significant efficiencies. |
| 10 February 2017 | Claimant and Respondents submitted their respective comments to the draft Terms of Reference and to the draft Procedural Order No 1. |
| 16 February 2017 | The Tribunal circulated updated versions of the draft Terms of Reference and of the draft Procedural Order No 1 as well as a draft Provisional Timetable. The Tribunal explained that it envisaged an inverse order in that Respondent shall start with a "full Statement of Counterclaim" due to Claimant |

| | |
|---|---|
| | having already gone quite far into the details of its narrative in its C-RfA and in its C-REPLY whereas Respondents had rather confined themselves to global contestations. Given that a Case Management Conference in person could most likely only be held in April 2017, the Tribunal invited Respondents to reconsider their request for a Case Management Conference in person and asked the Parties to keep certain dates clear for a possible telephone conference. |
| 21 February 2017 | The Tribunal informed the Parties that the Case Management Conference would be held on 28 February 2017, 15.30 CET. |
| 22 February 2017 | Counsel for Claimant confirmed their availability for the Case Management Conference. |
| 23 February 2017 | Counsel for Respondent 2 confirmed their availability for the Case Management Conference. |
| 28 February 2017 | Respondent 2 informed that it was unwilling to sign the Terms of Reference due to its view that it should not be included as a party to the arbitration. |
| On the same day | The Case Management Conference took place on the telephone from 15.30 to 17.00 CET. |
| 6 March 2017 | The Tribunal circulated the final Terms of Reference as well as the signed Procedural Order No.1 and asked the Parties to sign the Terms of Reference. Two versions of the Procedural Timetables were also circulated, one in the event a request for document production should be made and admitted, the other without document production. Furthermore, the Tribunal set the deadline for document production requests at 13 March 2017. |
| 7 March 2017 | Respondents requested an extension of three days for making a document production request. |
| 8 March 2017 | Claimant stated that it did not object to Respondents' request for extension of time, presuming that such extension would apply to all Parties. |
| On the same day | The Tribunal extended the deadline for making document production requests for all Parties until 16 March 2017. |
| 16 March 2017 | Respondent 1 submitted its Request for the Production of Documents. |
| On the same day | Claimant stated that while not filing a document production request at this stage of the proceedings, it would reserve its opportunity to request production until such time as Respondents would have provided adequate further detail as to their defences and counterclaims. |
| 19 March 2017 | Claimant informed the Tribunal that the Parties agreed on |

|  |  |
|---|---|
|  | an extension of time until 23 March 2017 for Claimant's submission of its observations concerning Respondent 1's document production request. |
| 21 March 2017 | Respondent 1 submitted clarification requests on Procedural Order No 1 and asked for Mr John Laird to be added to the counsel list for Respondent 1. |
| 22 March 2017 | The Tribunal replied to Respondent 1's clarification requests and invited Claimant to comment by 29 March 2017. |
| 23 March 2017 | The Parties – by email of Respondent 1, confirmed by Claimant – informed the Tribunal of their agreements on a three-day extension to all remaining deadlines with regard to the document production process. |
| On the same day | Claimant submitted its Objections to Respondent 1's Request for the Production of Documents. |
| 24 March 2017 | The Tribunal confirmed the amendment of the Procedural Timetable as agreed between the Parties on 23 March 2017. |
| 29 March 2017 | Claimant submitted its comments to Respondent's clarification requests of 21 March 2017. |
| 30 March 2017 | Respondent 1 submitted its Response to Claimant's Objections to Respondent 1's Request for the Production of Documents. |
| 4 April 2017 | Apart from addressing topics with respect to proceedings on an interim measure, Claimant extended its objections to Respondent 1's document production request no 21. |
| On the same day | The Tribunal confirmed receipt of the Terms of Reference – bearing all signatures with the exception of Respondent 2 – and announced to forward the Terms of Reference to the International Court of Arbitration for approval (Art 23(3) of the ICC Rules). Furthermore, the Tribunal circulated a slightly amended Procedural Order No 1. |
| 10 April 2017 | Apart from addressing topics with respect to proceedings on an interim measure, Respondent 1 confirmed that it would decline to pay the deposit on costs last requested by the ICC Secretariat on 10 March 2017, stating that it assessed the potential consequences of this decision for its counterclaim. In addition, Respondent 2 reiterated its position that it would not be a party to the Arbitration Agreement and that it would not sign the Terms of Reference or participate in the arbitration in general. Respondent 2 also reiterated that the issue of the Tribunal's jurisdiction over Respondent 2 should be addressed first. |
| 12 April 2017 | The Tribunal issued Procedural Order No 2, ruling on Respondent 1's Request for the Production of Documents |

| | |
|---|---|
| | and ordering Claimant to produce the documents by 21 April 2017. |
| 4 May 2017 | Respondent 1 withdrew its Counterclaim, stating that this withdrawal would bear no reflection on its views regarding the legal propriety of its Counterclaim. |
| 8 May 2017 | Respondent 2 informed the ICC that it would be unwilling to sign the Terms of Reference and, hence, would return the original copy of the Terms of Reference to the ICC. |
| 10 May 2017 | Respondent 1 submitted its "Statement of Defense" ("R1-SoD"). |
| 16 May 2017 | The Tribunal confirmed that – given Respondent 1's Request for the Production of Documents – the further arbitration shall be governed by Procedural Timetable B and circulated a slightly amended version of the Procedural Timetable. |
| 26 May 2017 | Apart from addressing topics with respect to proceedings on an interim measure, the Tribunal invited (i) Respondent 1 to clarify whether the Counterclaim was withdrawn with or without prejudice and (ii) Claimant to comment on the withdrawal of the Counterclaim. |
| 1 June 2017 | Respondent 1 stated that the Counterclaim was withdrawn without prejudice. |
| 2 June 2017 | Apart from addressing topics with respect to proceedings on an interim measure, Claimant amended its Request for Relief to "include a request for an express ruling from the Tribunal declaring that Doosan does not owe to BHCO any portion of the advance payment that it received". |
| 8 June 2017 | The Parties – by email of Claimant, confirmed by Respondent 1– informed the Tribunal of their agreements on an extension for submitting the remaining pleadings prior to the Hearing. |
| 12 June 2017 | The Tribunal confirmed the extension of time agreed between the Parties on 8 June 2017. |
| 14 June 2017 | Claimant submitted its Reply to Respondent 1's Statement of Defense ("C-SECONDREPLY"). |
| 15 June 2017 | Claimant provided FTP-login data for access to supporting exhibits and legal authorities to its C-SECONDREPLY and addressed certain errors in their numbering. |
| On the same day | The ICC Court fixed 29 December 2017 as the time limit for the final award. |
| 22 June 2017 | The ICC Court increased the advance on costs to EUR 655,000. |
| 26 June 2017 | Following the Parties' agreement of 8 June 2017, the Tribunal circulated an update Procedural Timetable B |

| | (Version 3). |
|---|---|
| 28 June 2017 | Respondent 1 requested an extension of time for filing its R-REJOINDER from 12 July 2017 to 9 August 2017. In particular, Respondent 1 argued that (i) prior to Claimant's second submission, Respondent 1 had not been able to assess Claimant's full case and to plan its own defence accordingly; that (ii) expert evidence was not discussed at the Case Management Conference and that Claimant had not otherwise previously indicated the form of any expert evidence it intended to produce; that (iii) the range of exhibit evidence presented by Claimant placed a burden on Respondent 1 to assess and consider potential witness testimony in rebuttal; that (iv) Respondent 1's potential witnesses included extensively travelling executives; that (v) given the order of pleadings, Respondent 1 would have been given only one opportunity to respond to Claimant's fully particularised case; that (vi) the conclusion of the month of Ramadan and Eid al-Fitr would have already delayed the ability for counsel to take instructions on the range of issues presented in the C-SECONDREPLY; and that (vii) exhibit C-9 would no longer be the basis of Claimant's damages claims at all. Furthermore, Respondent 1 suggested that Claimant could submit its C-REBUTTAL by 30 August 2017. Finally, Respondent 1 requested that its expert be permitted to submit a short responsive report immediately prior to the Hearing. |
| 30 June 2017 | Claimant opposed Respondent 1's application for an extension of time until 9 August 2017, arguing that an extension would only be acceptable until 21 July 2017 and that even such extension would already shift the bulk of the drafting for its C-REBUTTAL into August 2017, the peak summer vacation season. According to Claimant, all key elements of the claims set forth in C-SECONDREPLY were identified and foreshadowed in its C-RfA and C-ANSWER; exhibit C-9 would be a list of various cost and loss items suffered by Claimant, which would now have to be examined and quantified within the framework of the contract's termination provisions. The Procedural Timetable B would have always foreseen that C-SECONDREPLY would be the first point in the arbitration at which Claimant would submit an expert report. Furthermore, Claimant opposed Respondent 1's request for an additional responsive expert report but stated that if the Tribunal were to grant such responsive expert report, such report would have to be submitted far enough in advance of the Hearing so that the |

| | |
|---|---|
| | Claimant and its expert could review and digest this new report before the Hearing. |
| 4 July 2017 | The Tribunal granted extensions for Respondents' R-REJOINDER until 19 July 2017 and for Claimant's C-REBUTTAL until 23 August 2017 and granted Respondents the opportunity to file a short responsive expert report by 4 September 2017. Against this background, the Tribunal circulated an updated Procedural Timetable B (Version 4). |
| 6 July 2017 | Respondent stated that the extension for its R-REJOINDER granted by the Tribunal until 19 July 2017 would be insufficient for Respondent 1 to prepare its submission due to the conclusion of the month of Ramadan and Eid al-Fitr. Members of Respondent 1's counsel would also be due to prepare for and attend a hearing in another matter on 19 July 2017. Respondent, hence, requested an extension of time of two weeks until 26 July 2017 for filing its R-REJOINDER, arguing that while this would still be an inadequate extension to prepare its case, this would be the base minimum time in which Respondent 1 would even be able to finalize its submission. Finally, Respondent 1 stated that in light of the above and as the Parties would have found it difficult to maintain the original timetable, it would be best to delay the hearing dates for the week commencing 18 September 2017 to one of the weeks commencing 2 October or 9 October 2017. |
| 10 July 2017 | Claimant argued that Respondent 1's alleged justifications for an extension of time would have no merits due to (i) neither the legal claims presented nor the damages sought in C-SECONDREPLY substantially differing from the points set forth by Claimants in its prior pleadings, due to (ii) Respondent 1 having seven named counsel of record and due to (iii) Eid al-Fitr always having been scheduled to occur within the timeframe for the preparation of Respondents' R-REJOINDER. |
| 13 July 2017 | The Tribunal extended the deadlines for Respondents' R-REJOINDER, Claimant's C-REBUTTAL and Respondents' Expert's Short Responsive Report. |
| 21 July 2017 | Co-Arbitrator Philippe Pinsolle informed the Parties that the Hearing could not commence before 20 September 2017. |
| On the same day | Claimant informed the Arbitral Tribunal of certain corrections and amendment to the expert report of Mr Sequeira, submitting additional translations of a number of exhibits. |
| 22 July 2017 | Respondent 1 argued that "adding additional time into the schedule is the fair and proper course to allow Respondent 1 |

| | |
|---|---|
| | an adequate opportunity to respond to Claimant's C-SECONDREPLY and the Navigant expert report' and that, hence, Respondent 1 would prefer to have the Hearing rescheduled to December 2017. Furthermore, Respondent 1 reiterated its request for an extension of the deadline for its R-REJOINDER to 9 August 2017. |
| 26 July 2017 | Respondent 1 submitted its Rejoinder ("R1-REJOINDER). |
| 30 August 2017 | Claimant submitted its Rebuttal to Respondent 1's Rejoinder ("C-REBUTTAL"). |
| 2 September 2017 | Claimant submitted translations of Exhibits C-189 and C-191 to C-200 to C-REBUTTAL. |
| 4 September 2017 | Respondent 1 submitted the names of the witnesses it intended to cross examine during the Hearing. |
| On the same day | The Parties – by email of Respondent 1, confirmed by Claimant – requested the Tribunal to have additional time to confer with respect to a joint hearing schedule and asked for clarifications on other issues related to the Hearing. |
| On the same day | Claimant submitted the names of the two English-Korean interpreters for the Hearing. |
| On the same day | The Tribunal granted an extension of time for submitting a joint hearing schedule and a consolidated list of documents until 7 September 2017. Furthermore, the Tribunal clarified some issues related to the hearing, invited Respondents to comment on the English-Korean interpreters and advised the Parties that the Pre-Hearing Telephone Conference would be held on 11 September 2017. |
| 5 September 2017 | The Tribunal acknowledged receipt of Respondent 1's list of witnesses and noted that no such list had been submitted by other Parties, in particular by Claimant. |
| 6 September 2017 | Claimant submitted the names of the witnesses it intended to cross examine during the Hearing. |
| 7 September 2017 | Respondent 1 stated that it had no comments on the English-Korean interpreters proposed by Claimant. |
| On the same day | The Parties – by email of Claimant – submitted a joint chronological index of factual exhibits for the Hearing. |
| On the same day | The Parties – by email of Respondent 1 – informed the Tribunal that they expected to have the joint hearing schedule ready on the following day. |
| 8 September 2017 | The Parties – by email of Claimant, confirmed by Respondent 1 – submitted the joint hearing schedule. |
| 11 September 2017 | The Pre-Hearing Telephone Conference was held. During the Conference, the Arbitral Tribunal inter alia confirmed the joint hearing schedule submitted by the Parties. |
| 12 September 2017 | Respondent 1 submitted the Second Expert Report of Capt Wolfhard H. Arlt and Hans Otto Bistram. |
| 14 September 2017 | Claimant confirmed that it intended to cross examine (only) Captain Wolfhard H. Arlt as expert witness during the Hearing. |

| 18 September 2017 | The Parties submitted their lists of attendees for the Hearing. |
| 19 September 2017 | After having identified a number of issues requiring clarification, Respondent 1 submitted a new version of its Second Expert Opinion. |
| 20 to 22 September 2017 | The Hearing was held in Paris, France. |
| 13 October 2017 | The Parties submitted their First Post-Hearing Briefs (C-PHB1, R1-PHB1-CR and R1-PHB1-KH). |
| 24 October 2017 | The Tribunal invited Respondent 1 to comment on differing prayers for relief in R1-PHB1-CR and R1-PHB1-KH in Respondent 1's Second Post-Hearing Brief. |
| 2 November 2017 | The Parties – by email of Claimant, confirmed by Respondent 1 – informed the Tribunal of their agreement to extend the deadline for submitting the Second Post-Hearing Briefs to 6 November 2017. |
| On the same day | The Tribunal acknowledged the Parties agreement on extending the deadline for the Parties' Second Post-Hearing Briefs. |
| On the same day | The ICC Secretariat informed the Parties that the ICC Court would examine whether to readjust the advance on costs. |
| 6 November 2017 | The Parties submitted their Second Post-Hearing Briefs (C-PHB2, R1-PHB2-CR and R1-PHB2-KH). |
| 9 November 2017 | The Parties – by email of Claimant, confirmed by Respondent 1 – informed the Tribunal of their agreement to extend the deadline for their Cost Submissions to 17 November 2017. |
| On the same day | The ICC Court increased the advance on costs to EUR 780,000. |
| 17 November 2017 | The Parties filed their Cost Submissions (C-COST and R1-COST). |
| 5 December 2017 | The Tribunal issued Procedural Order No 2, declaring the proceedings closed with respect to the matters to be decided in the award pursuant to Article 27 ICC Rules and informing the Secretariat and the Parties that it expected to submit its draft award to the Court for approval before 31 January 2018. |
| 20 December 2017 | The ICC Court set the deadline for submitting the draft award by 31 January 2018. |

## E. UNDERLYING FACTS

### 1. Brief Narrative of the Case

36. On the basis of a long-term governmental concession the Damietta Port Authority ("**DPA**"), a subsidiary of the Egyptian Ministry of Transport ("**MoT**"), assigned DIPCO,

32

under the involvement of KGLPI who organized the bid tender, to design, build, finance and operate a new container terminal at Damietta, Egypt.

37. In 2007, DIPCO negotiated and signed with Doosan the **Supply Agreement** for 22 Super Post-Panamax ship-to-shore container gantry cranes (the "**Cranes**") to be delivered in two phases, with 14 Cranes to be delivered during Phase 1 and the remaining 8 Cranes to be delivered during Phase 2.

38. The project, however, became abortive for various reasons which, in the essence, were (i) the non-delivery of the entire Project's land free of obstacles; (ii) missing design approvals and costly design changes; (iii) the insufficient financing of DIPCO by its lenders; (iv) further delays in 2011 caused by political hurdles in the context of the "Arab Spring" including the forceful deposition of President Mursi in 2012 and, ultimately, (v) the termination of the governmental concession by Prime-Ministerial Decree in November 2015.

39. As a result, none of the container cranes was ever delivered and installed, and Doosan is seeking in the present arbitration redress from DIPCO and KGLPI, whereas the Respondents oppose Doosan's roughly USD 79mio claim (plus interest) with the arguments of (i) *force majeure* and *impossibility* on their side, (ii) Doosan having assumed the delivery risk regarding the Container Cranes and having waived all its claims by virtue of an amendment of the Supply Agreement entered into with DIPCO (the "**2009 Amendment**") and, at source, (iii) Doosan's missing delivery readiness signified by a missing formal delivery notice that should have been sent to DIPCO.

40. Formally, DIPCO and KGLPI raised jurisdictional objections, and KGLPI, in addition, opposed any liability jointly with DIPCO.

## 2.    Contractual Provisions

### 2.1    Supply Agreement

> The Employer and the Contractor agree as follows:
>
> 1. In this Agreement words and expressions shall have the same meanings as are respectively assigned to them in the Conditions of Contract hereinafter referred to.
>
> 2. The following documents shall be deemed to form and be read and construed as part of this Contract:
>
> (a) the Revised Price Schedule dated 12 April 2007
>
> (b) the Pre-Design Minutes of Meeting (MOM) dated 12 April 2007
>
> (c) the Addenda no 1
>
> (d) the Employer's Requirements dated October 2006
>
> (e) the Revised Appendix to Tender and Particular Conditions dated April 12, 2007

> (f) the Tender Documents (including General and Particular Conditions) dated November 2006
>
> (g) the Letter of Confirmation dated 19 March 2007
>
> (h) the Letter of Acceptance dated 5 March 2007
>
> (i) the Letter of Tender dated 13 December 2006
>
> (j) the Contractor's Proposal (Technical and Commercial) and Schedules [A1-A8 and B1-B7]
>
> 3. In consideration of the payments to be made by the Employer to the Contractor as hereinafter mentioned, the Contractor hereby covenants with the Employer to design, execute and complete the Works and remedy any defects therein , in conformity with the provisions of the Contract.
>
> 4. The Employer hereby covenants to pay the Contractor, in consideration of the execution and completion of the Works and remedying of defects therein, the Contract Price at times and in the manner prescribed in the Contract.

### 2.2    General Conditions

41. The most relevant provisions of the FIDIC's Conditions of Contract, Plant and Design-Build (1999)[21] with regard to the current dispute are:

42. <u>Clause 2.1 of the General Conditions | Right of Access to Site:</u>

> The Employer shall give the Contractor right of access to, and possession of, all parts of the Site within the time (or times) stated in the Appendix to Tender. The right and possession may not be exclusive to the Contractor. If, under the Contract, the Employer is required to give (to the Contractor) possession of any foundation, structure, plant or means of access, the Employer shall do so in the time and manner stated in the Employer's Requirements. However, the Employer may withhold any such right or possession until the Performance Security has been received.
>
> If no such time is stated in the Appendix to Tender, the Employer shall give the Contractor right of access to, and possession of, the Site within such times as may be required to enable the Contractor to proceed in accordance with the programme submitted under Sub-Clause 8.3 [*Programme*].
>
> If the Contractor suffers delay and/or incurs Cost as a result of a failure by the Employer to give any such right or possession within such time, the Contractor shall give notice to the Engineer and shall be entitled subject to Sub-Clause 20.1 [*Contractor's Claims*] to:
>
> (a) an extension of time for any such delay, if completion is or will be delayed, under Sub-Clause 8.4 [*Extension of Time for Completion*], and
>
> (b) payment of any such Cost plus "reasonable profit, which shall be included in the Contract Price.

---

[21] Exhibit C-028.

> After receiving this notice, the Engineer shall proceed in accordance with Sub-Clause 3.5 [*Determinations*] to agree or determine these matters.
>
> However, if and to the extent that the Employer's failure was caused by any error or delay by the Contractor, including an error in, or delay in the submission of, any of the Contractor's Documents, the Contractor shall not be entitled to such extension of time, Cost or profit.

43. **Clause 15.5 of the General Conditions | Employer's Entitlement to Termination:**

> The Employer shall be entitled to terminate the Contract, at any time for the Employer's convenience, by giving notice of such termination to the Contractor. The termination shall take effect 28 days after the later of the dates on which the Contractor receives this notice or the Employer returns the Performance Security. The Employer shall not terminate the Contract under this Sub-Clause in order to execute the Works himself or to arrange for the Works to be executed by another contractor.
>
> After this termination, the Contractor shall proceed in accordance with Sub-Clause 16.3 [*Cessation of Work and Removal of Contractor's Equipment*] and shall be paid in accordance with Sub-Clause 19.6 [*Optional Termination, Payment and Release*].

44. **Clause 16.2 of the General Conditions | Termination by Contractor:**

> The Contractor shall be entitled to terminate the Contract if:
>
> (a) the Contractor does not receive the reasonable evidence within 42 days after giving notice under Sub-Clause 16.1 [*Contractor's Entitlement to Suspend Work*] in respect of a failure to comply with Sub-Clause 2.4 [*Employer's Financial Arrangements*],
>
> (b) the Engineer fails, within 56 days after receiving a Statement and supporting documents, to issue the relevant Payment Certificate,
>
> (c) the Contractor does not receive the amount due under an Interim Payment Certificate within 42 days after the expiry of the time stated in Sub-Clause 14.7 [*Payment*] within which payment is to be made (except for deductions in accordance with Sub-Clause 2.5 [*Employer's Claims*]),
>
> (d) the Employer substantially fails to perform his obligations under the Contract,
>
> (e) the Employer fails to comply with Sub-Clause 1.6 [*Contract Agreement*] or Sub-Clause 1.7 [*Assignment*].
>
> (f) a prolonged suspension affects the whole of the Works as described in Sub-Clause 8.11 [*Prolonged Suspension*], or
>
> (g) the Employer becomes bankrupt or insolvent, goes into liquidation, has a receiving or administration order made against him, compounds with his creditors, or carries on business under a receiver, trustee or manager for the

> benefit of his creditors, or if any act is done or event occurs which (under applicable Laws) has a similar effect to any of these acts or events.
>
> In any of these events or circumstances, the Contractor may, upon giving 14 days' notice to the Employer, terminate the Contract. However, in the case of subparagraph (f) or (g), the Contractor may by notice terminate the Contract immediately.
>
> The Contractor's election to terminate the Contract shall not prejudice any other rights of the Contractor, under the Contract or otherwise.

45. Clause 16.4 of the General Conditions | Payment on Termination:

> After a notice of termination under Sub-Clause 16.2 [*Termination by Contractor*] has taken effect, the Employer shall promptly:
>
> (a) return the Performance Security to the Contractor,
>
> (b) pay the Contractor in accordance with Sub-Clause 19.6 [*Optional Termination, Payment and Release*], and
>
> (c) pay to the Contractor the amount of any loss of profit or other loss or damage sustained by the Contractor as a result of this termination.

46. Clause 17.6 of the General Conditions | Limitation of Liability:

> Neither Party shall be liable to the other Party for loss of use of any Works, loss of profit, loss of any contract or for any indirect or consequential loss or damage which may be suffered by the other Party in connection with the Contract, other than under Sub-Clause 16.4 [*Payment on Termination*] and Sub-Clause 17.1 [*Indemnities*].
>
> The total liability of the Contractor to the Employer, under or in connection with the Contract other than under Sub-Clause 4.19 [*Electricity, Water and Gas*], Sub-Clause 4.20 [*Employer's Equipment and Free-Issue Material*], Sub-Clause 17.1 [*Indemnities*] and Sub-Clause 17.5 [*Intellectual and Industrial Property Rights*], shall not exceed the sum stated in the Particular Conditions or (if a sum is not so stated) the Accepted Contract Amount.
>
> This Sub-Clause shall not limit liability in any case of fraud, deliberate default or reckless misconduct by the defaulting Party.

47. Clause 19.1 of the General Conditions | Definition of Force Majeure:

> In this Clause, "Force Majeure" means an exceptional event or circumstance:
>
> (a) which is beyond a Party's control,
>
> (b) which such Party could not reasonably have provided against before entering into the Contract,
>
> (c) which, having arisen, such Party could not reasonably have avoided or overcome, and
>
> (d) which is not substantially attributable to the other Party.

> Force Majeure may include, but is not limited to, exceptional events or circumstances of the kind listed below, so long as conditions (a) to (d) above are satisfied:
>
> (i) war, hostilities (whether war be declared or not), invasion, act of foreign enemies,
>
> (ii) rebellion, terrorism, revolution, insurrection, military or usurped power, or civil war,
>
> (iii) riot, commotion, disorder, strike or lockout by persons other than the Contractor's Personnel and other employees of the Contractor and Subcontractors,
>
> (iv) munitions of war, explosive materials, ionising radiation or contamination by radio-activity, except as may be attributable to the Contractor's use of such munitions, explosives, radiation or radio-activity, and
>
> (v) natural catastrophes such as earthquake, hurricane, typhoon or volcanic activity.

40. **Clause 19.2 of the General Conditions [ Notice of Force Majeure:**

> If a Party is or will be prevented from performing any of its obligations under the Contract by Force Majeure, then it shall give notice to the other Party of the event or circumstances constituting the Force Majeure and shall specify the obligations, the performance of which is or will be prevented. The notice shall be given within 14 days after the Party became aware, or should have become aware, of the relevant event or circumstance constituting Force Majeure.
>
> The Party shall, having given notice, be excused performance of such obligations for so long as such Force Majeure prevents it from performing them.
>
> Notwithstanding any other provision of this Clause, Force Majeure shall not apply to obligations of either Party to make payments to the other Party under the Contract.

40. **Clause 19.6 of the General Conditions [ Optional Termination, Payment and Release in case of Force Majeure):**

> If the execution of substantially all the Works in progress is prevented for a continuous period of 84 days by reason of Force Majeure of which notice has been given under Sub-Clause 19.2 [Notice of Force Majeure], or for multiple periods which total more than 140 days due to the same notified Force Majeure, then either Party may give to the other Party a notice of termination of the Contract. In this event, the termination shall take effect 7 days after the notice is given, and the Contractor shall proceed in accordance with Sub-Clause 16.3 [Cessation of Work and Removal of Contractor's Equipment].
>
> Upon such termination, the Engineer shall determine the value of the work done and issue a Payment Certificate which shall include:

> (a) the amounts payable for any work carried out for which a price is stated in the Contract;
>
> (b) the Cost of Plant and Materials ordered for the Works which have been delivered to the Contractor, or of which the Contractor is liable to accept delivery: this Plant and Materials shall become the property of (and be at the risk of) the Employer when paid for by the Employer, and the Contractor shall place the same at the Employer's disposal;
>
> (c) any other Cost or liability which in the circumstances was reasonably incurred by the Contractor in the expectation of completing the Works;
>
> (d) the Cost of removal of Temporary Works and Contractor's Equipment from the Site and the return of these items to the Contractor's works in his country (or to any other destination at no greater cost); and
>
> (e) the Cost of repatriation of the Contractor's staff and labour employed wholly in connection with the Works at the date of termination.

50.  Clause 19.7 of the General Conditions | Release from Performance under the Law:

> Notwithstanding any other provision of this Clause, if any event or circumstance outside the control of the Parties (including, but not limited to, Force Majeure) arises which makes it impossible or unlawful for either or both Parties to fulfil its or their contractual obligations or which, under the law governing the Contract, entitles the Parties to be released from further performance of the Contract, then upon notice by either Party to the other Party of such event or circumstance:
>
> (a) the Parties shall be discharged from further performance, without prejudice to the rights of either Party in respect of any previous breach of the Contract, and
>
> (b) the sum payable by the Employer to the Contractor shall be the same as would have been payable under Sub-Clause 19.6 [*Optional Termination, Payment and Release*] if the Contract had been terminated under Sub-Clause 19.6.

## 2.3   Appendix to Tender

51.  The most _relevant_ provision of the Appendix to Tender[22] with regard to the current dispute is Clause 2.1 of the Appendix to Tender:

> | Time for access to the Site | 2.1...... | 455 days after Commencement Date |
> |---|---|---|

## 2.4   Revised Appendix to Tender

52.  In the Revised Appendix to Tender, the Parties have amended the FIDIC General Conditions. The amendments, however, are not of relevance for the present Award.

---

[22] Exhibit C-002.

## 2.5   2009 Amendment

53. The most relevant provisions of the 2009 Amendment Agreement[23] with regard to the current dispute are:

54. Clause 3:

> Subject to the satisfaction of all conditions mentioned under Clause 4 herein below, DIPCO agrees that DOOSAN may sell or supply the Disposal Cranes to a third party of parties and that the delivery date for said Cranes shall be amended by virtue of Clause 4(iv).

55. Clause 4:

> The Parties agree that the exercise of DOOSAN to the option referred to in Clause 3 above is conditional upon the following:
>
> I.   DIPCO shall not bear any additional cost from this transaction sale.
> II.  DOOSAN agrees that the total price for the fourteen (14) cranes shall be 120,000,000 $ (only one hundred and twenty million US dollars) including all costs, fees, any claims such as transportation costs and claims for changes of oil, ropes, etc,.. and also the costs of fixation of any problem that may be discovered after the delivery.
>
> DIPCO shall pay DOOSAN an amount equivalent to 60% of the price of the unsold STS Cranes that has already been constructed for DIPCO by DOOSAN with a minimum of ten (10) cranes (ie 60% of 85,000,000 $ (only eighty five million US dollars)) after the lapse of one week from the financial close (the financial close refers to the date of the acceptance of the new business plan of DIPCO by the shareholders and the lenders of DIPCO).
>
> If DIPCO did not pay the 60% amount until the end of August, 2009, DIPCO shall pay an annual interest rate of 6.5 % on the due amounts to be calculated starting from the 1st of September, 2009.
>
> DIPCO shall pay to DOOSAN an amount of 9,000,000 $ (only nine million US dollars) by the end of December, 2009 provided that the KPA tender mentioned below is not won by the consortium led by DOOSAN.
>
> The remainder of the total price of the cranes shall be paid in accordance with the Original Contract.
>
> III. DOOSAN shall produce and supply DIPCO with new STS Cranes in replacement of the Disposal Cranes (the "Replacement Cranes") and such replacement obligation shall automatically include any other number of STS Cranes which DIPCO might expressly permit DOOSAN to sell to third parties at a future date including the supply of STS cranes to KPA stipulated herein below.

---

[23] Exhibit C-007.

> iv. DOOSAN shall supply STS Cranes and/or the Replacement Cranes to DIPCO upon receipt of a notification to that effect from DIPCO. For the avoidance of doubt, the notification sent from DIPCO to DOOSAN shall include, *inter alia*, the number of the requested cranes for each delivery date and the requested delivery date(s) (which shall not be less than nine months for the first four STS Cranes and twelve months for the remainder of the STS Cranes/Replacement Cranes from the date the notification is sent by DIPCO).
>
> v. DOOSAN shall co-operate with DIPCO and KGLPI in future sales activities and in particular DOOSAN shall co-operate with DIPCO and KGLPI to finalize the tender known as the "Kuwait Port Authority (KPA)" and shall participate as co-leader with KGLPI with regards to said tender for the supply of STS Cranes, related equipment and civil-and electrical works (DOOSAN responsibility is limited to only supplying STS cranes to KPA as they are built under contract with DIPCO).
>
> vi. In case KGLPI and DOOSAN succeed in the tender mentioned under V. above, DIPCO shall have the right to request to DOOSAN and DOOSAN shall be obliged to supply an additional number of STS cranes to KPA under the KPA tender based on the same terms, conditions, Specifications and process stipulated under the Original Contract. Notwithstanding aforesaid, the price and delivery time shall be determined in separate according to mutual agreement between the Parties.

56. Clause 5:

> The Parties agree that all other terms and conditions of the Original Contract remain valid and enforceable without any amendment other than those stipulated under this agreement.

## F. PRELIMINARY ISSUES

### 1.    Identity of Respondent 2

57. The identity and proper name of Respondent 2 was disputed between the Parties and, after unanimous statements of the Parties, was established by the Tribunal with KGL International for Ports, Warehousing and Transport K.S.C.C.[24] The Tribunal also concluded and maintains that the legal entity which had been quoted interchangeably also with Kuwait Gulf Link Ports International in the prior submissions is the same and that only a specification of the proper name of Respondent 2 has occurred.

### 2.    Jurisdictional Objections

58. Respondent 1 and Respondent 2 raised jurisdictional objections. Respondent 2 declined to participate in the proceedings. It remained undisputed that Respondent 2 did not sign

---

[24] Procedural resolution, Hearing Transcript Day 3, p 214 line 25.

an arbitration agreement with Claimant (is a "non-signatory"). The Parties also dealt with the Issue which set of principles and laws the Tribunal should base its findings on.

### 2.1   Claimant's Position

59.   Respondent 2, albeit a non-signatory, shall also be subjected to the present arbitration, for the following reasons:

60.   In the present proceeding the relevant parties hail from South Korea, Egypt and Kuwait, respectively, and the contract at issue is based on a form contract promulgated by FIDIC – which is, as its name confirms, an international federation whose model instruments are used globally.[25]

61.   Therefore, the present case *"presents the archetypical example of a dispute in which transnational principles should apply"*, as shown in the "seminal Dow Chemical case", in which the tribunal explained that the decisions of ICC arbitral tribunals *"create case law which should be taken into account, because it draws conclusions from economic reality and conforms to the needs of international commerce, to which rules specific to international arbitration [...] should respond."*[26]

62.   Alternatively, French law should apply as the law of the seat of the present arbitration.

63.   Both transnational principles[27] and French law hold that a party that has played an active role in the negotiation and performance of a contract containing an arbitration agreement is deemed to have consented to arbitrate any dispute arising out of that agreement.[28]

64.   In Compagnie tunisienne de navigation (Cotunav) v. société Comptoir commercial André, the Paris Court of Appeal upheld an arbitral tribunal's exercise of jurisdiction over a non-signatory that was even not in any way involved in the conclusion of the contract at issue, but that rather had subsequently become involved in the performance of the contract.[29]

65.   In ICC Case No. 6000, the tribunal explained that:[30]

> It is largely admitted that by virtue of a usage of the international trade, where a contract, including an arbitration clause, is signed by a company which is a party to a group of companies, the other company or companies of the group which are involved in the execution, the performance and/or the termination of the contract are bound by the arbitration clause, provided the common will of the parties does not exclude such an extension, and even more so where the common will of the parties was to include a company of the group in the contractual relationship, even if such company did not formally sign the contract.[151]

---

[25] C-REBUTTAL §36.
[26] C-PHB2 §100.
[27] C-REBUTTAL §§30 et seqq.
[28] C-PHB2 §102.
[29] C-PHB2 §103.
[30] C-PHB1 §103.

41

66. And also under <u>Egyptian law</u>, the Egyptian Court of Cassation has recognized that an arbitration agreement may be extended to a non-signatory where *"one can establish that it took part in the execution of the contract or created confusion as to the party actually bound by the arbitration clause."*[31]

67. Proceeding from the foregoing, KGLPI became a party to the arbitration agreement for the following reasons:[32]

68. First, KGLPI was the driving force behind the Damietta Project from the outset and in the Revised Tender Appendix, the term "Concession Agreement" is defined as "the contract for construction and operation of a new container terminal in Damietta Port [...] between the Damietta Port Authority, the Employer, and KGL Ports International Company, as amended from time to time."[33] Moreover, it was KGLPI that was awarded the concession to construct a port at Damietta, created DIPCO specifically for the Damietta Project and remained the single largest shareholder in DIPCO, with roughly a 40% stake.

69. Second, KGLPI appointed its own officers and employees to key positions within DIPCO.

70. Third, most DIPCO employees used KGLPI email addresses and none was shown to use an address with the DIPCO domain.

71. Fourth, KGLPI played an indispensable role in establishing the contractual relationship at issue in this case, as (i) it was KGLPI, and not DIPCO, that prepared the November 2006 Tender Document and reserved the right to cancel DIPCO's acceptance of Doosan's Letter of Tender;[34] (ii) Doosan's Letter of Tender was addressed to KGLPI, and not DIPCO; (iii) KGLPI was the beneficiary of the Tender Security, as specifically requested in the Tender Document and was understood to be the true beneficiary of the Supply Agreement, as can be seen from the LOA conditioning 30% of Doosan's payment upon the *"issue by KGL PI of Taking-Over Certificate."*

72. Fifth, KGLPI played a substantial role in the performance of the Supply Agreement, whereby the considerable overlap in key personnel between DIPCO and KGLPI created confusion as to which individuals were acting on behalf of each entity. For instance, certain meeting minutes between the Parties show DIPCO and KGLPI being treated as a single, interchangeable entity, and at other times KGLPI appeared to be the sole party interacting with Doosan.

73. Sixth and finally, DIPCO's defense that KGLPI's role in the performance of the Supply Agreement was limited to that of an "Employer's Representative" is artificial given that KGLPI was also DIPCO's largest shareholder and had staffed DIPCO with its own officers.

74. Given KGLPI's position as a member of a group of companies and, in particular, its involvement, as outlined above, in the negotiation and performance of the Supply Agreement, it implicitly agreed to be bound by that Agreement's arbitration clause. Moreover, it created confusion as to the party actually bound by the Supply Agreement

---

[31] Exhibit CL-046 (Egyptian Court of Cassation, Cases No. 4729 & 4730 / 72 JY, judgment of June 22, 2004). .
[32] C-PHB1 §§23 et seqq.
[33] Exhibit C-026 (Ship to Shore Supply Agreement, Annex E, Revised Tender Appendix, p 3).
[34] Exhibit C-059 (DIPCO's Letter of Acceptance ["LOA"] dated 5 March 2007).

and, thus, the arbitration clause so that it shall be subjected to the present arbitration also when applying Egyptian law.[35]

## 2.2   Respondents' Position

75. Article 23 of Egyptian Arbitration Code considers an arbitration agreement independent from the contract it is contained in. However, pursuant to Chapter 1 Article 1 of the Egyptian Arbitration Code, this provision of law would apply only to arbitral cases which are either conducted in Egypt or where the parties submitted to Egyptian arbitration law, which they did not in the case at hand.

76. The arbitration clause contained in the Supply Agreement became nonexistent when the Supply Agreement was terminated so that no arbitration agreement existed anymore for either Party when arbitration was initiated.[36]

77. As regards Respondent 2, the fact that Paris is the place of arbitration "could mean the Tribunal may also use French law, as sometimes the law of the seat is seen appropriate for deciding questions of jurisdiction under the arbitration agreement."[37] But even then KGLPI was no more than a "representative, agent and servant of DIPCO"[38], which could be clearly seen from the tender documents. In order to avoid any ambiguity, an exhaustive list of activities limiting KGLPI's responsibilities to "carry out all port development activities" was set out as well as being "responsible for all procurement related to the project construction / development." The role of the "representative" was made clear by using specific words in plain English such as, "no agent or servant of the Employer other than KGLPI or UPTC has any authority to make any representation or explanation to tenderers" [such as Doosan].[39]

78. Also the bank guarantee was made in favour of DIPCO rather than KGLPI, and Doosan's Termination Letter was addressed and sent solely to DIPCO.[40]

79. Doosan's claim that it was "KGLPI that had final say with respect to whether or not DIPCO would enter into the Supply Agreement" is wrong. The letter of acceptance notes, on DIPCO letterhead and on its behalf: "[We] have accepted your offer Dated on December 2006." That KGLPI is stated therein as potentially cancelling the letter is "merely an artefact of its expressly intended function under the tender as the Employer's Representative."[41]

80. As regards the 2009 Amendment, KGLPI's involvement was limited to its cooperation with Doosan to sell cranes to the KPA.

---

[35] C-PHB1 §48.
[36] R1-PHB1-KH §13.
[37] R1-PHB1-KH §33.
[38] R1-PHB2-KH §§10 et seq.
[39] R1-PHB2-CR §11.
[40] R1-PHB1-CR §42.
[41] R1-PHB2-CR §11.

81. Since KGLPI had made its legal position clear no implied consent to adhere to the arbitration clause can be assumed by whatever means, may these be transnational principles or national law.[42]

82. Moreover, even under transnational principles or French law a non-signatory must have been "vital" or "integral" to a contract's existence,[43] which was not the case. KPLIP's involvement was limited to the KPA Tender.

83. Under Egyptian law, "*the default position is that* [it] *will only bind a non-signatory which takes over a contract by express operation of law.*" In the Cassation Case Nos. 4729 and 4730 the Court depicted arbitration as "*an exceptional way to resolve disputes characterized by deviating away from conventional litigation and the guarantees it ensures*", and stated:[44]

> Where one of the parties to a group of companies enters into an arbitration agreement, it does not prove that its mother company will be bound by the arbitration clause, unless one can establish that it took part in the execution of the contract or (emphasis added) created confusion as to the party actually bound by the arbitration clause, in a manner that the will of one company may be mistaken for that of the other, however, the existence of those conditions of intervention needs to be verified or the involvement in the arbitration dispute in accordance with its exceptional nature.

84. In the case at hand, no confusion was generated that would justify, under Egyptian law, KGLPI's submission to the arbitration clause. In case of doubt, DOOSAN should have informed itself about the role of KGLPI's employees it was dealing with.

85. Finally, according to Egyptian and Kuwaiti laws the validity of an arbitration agreement requires a "*special power of attorney to decide an Arbitration, to arbitrate or to sign an arbitration agreement*", which did not exist in the case of either Respondent. Under Kuwaiti case law, to arbitrate is not a management (administrative) act but a disposition that requires a special (internal) authorization to do so.[45]

### 2.3    Tribunal's Determination

86. The Tribunal undertook to examine the procedural arguments under both French and Egyptian law. Yet it finds that French law should be given prevalence.

87. The Arbitration Clause, as contained in Article 20.6 of the FIDIC General Conditions[46] and as supplemented by the Revised Appendix to Tender,[47] was made an integral part of the Supply Agreement. The Supply Agreement was signed by Mohammed Al-Mazeedi,

---

[42] R1-SoD §§46 *et seq.*
[43] R1-PHB1-CR §20.
[44] R1-PHB1-KH §22.
[45] R1-PHB1-KH §10.
[46] Exhibit C-028.
[47] Exhibit C-026.

Chairman and CEO of DIPCO, and by Seong-Eun Hong, Executive Vice President of Doosan.[48]

### 2.3.1 French law

88. In the view of the Tribunal, French law is the law to be applied to resolve the issue of who is bound by the arbitration agreement, given that a wrong decision on the relevant parties to the arbitration agreement (ie, not including the right parties or including the wrong parties) may be reviewed by the Paris Court of appeal.

89. This is an issue of jurisdiction *ratione personae*. The Paris Court of Appeal is entitled to fully review the jurisdictional findings of an award. The principle of full review for jurisdictional issues, both in fact and in law is *jurisprudence constante*.[49] If the Paris Court of Appeal finds that the decision is wrong, it will set aside the award. In this regard, it is important to note that the Court of Appeal does not go through a conflict-of-law analysis. Rather, it applies the so-called "*méthode des règles matérielles*", ie, a set of rules elaborated by French Courts for the purpose of international arbitration and applied to it. Among those rules are the principle of validity of the arbitration agreement in international matters and the rules governing the extension of the arbitration agreement to non-signatories.

90. In essence, French courts take the view that a non-signatory is bound by an arbitration agreement if it has participated *in the negotiation or in the performance* of the contract in question.[50] French courts require an analysis of the facts of the case.

91. The Court of appeal of Paris applied this principle in the *Suba* case:[51]

> Considérant qu'il est donc établi que SUBA&UNICO a participé tant à la négociation qu'à l'exécution du contrat du 17 juillet 2005 liant SUBA France à PUJOL et qu'elle est donc directement impliquée dans cette exécution et dans les litiges qui peuvent en résulter ; qu'elle ne peut dès lors valablement soutenir avoir ignoré la convention d'arbitrage et ce, d'autant moins qu'elle affirme elle-même, dans un courrier qu'elle a adressé le 14 mai 2007 à PUJOL, intervenir depuis plus de 40 ans dans le secteur des semences potagères et qu'elle a été informée par cette dernière de ce qu'elle envisageait de recourir à la procédure d'arbitrage instaurée par la clause litigieuse dès janvier 2007.
>
> English unofficial translation: Considering that it is thus established that SUBA&UNICO participated both in the negotiation and in the performance of the contract of 17 July 2005 between SUBA France and PUJOL and that the company was thus directly involved in this

---

[48] Exhibit C-001.

[49] See also Cass. Civ. 1, 6 October 2010, *Bull. civ. I*, n° 185.

[50] Exhibit CL-23 (*Société Suba France et Suba & Unico v. Société Pujol*, C.A. Paris 7 May 2009, n° 08/02025); Exhibit CL-025 (Judgment of 28 November 1989, 1990 Rev. arb. 675 [Paris Court of Appeal]); Exhibit CL-024 (Paris Court of Appeal, Government of Pakistan, Ministry of Religious Affairs v. Dallah Real Estate and Tourism Holding Company, 17 Feb. 2011, in Yearbook Comm. Arb. 2011 - Vol. XXXVI at 590);  see also *ABS*, Cass. Civ. 1, 27 March 2007, n° 04-20.842 Rev. Arb. 2007.

[51] Exhibit CL-23 (*Société Suba France et Suba & Unico v. Société Pujol*, C.A. Paris 7 May 2009, n° 08/02025).

> performance and in the ensuing disputes ; that the company cannot succeed in arguing a lack of knowledge of the arbitration agreement, especially since it stated, in a letter sent to PUJOL on 14 May 2007, that it had been involved in the vegetable seed industry for more than 40 years and that it had been informed by [PUJOL] of its intention to resort to the arbitration proceedings provided for in the arbitration clause as early as January 2007.

92. This decision followed the leading case of 2007, the so-called ABS case from the Cour de cassation:[52]

> "Mais attendu que l'effet de la clause d'arbitrage s'étend aux parties directement impliquées dans l'exécution du contrat et les litiges qui peuvent en résulter ; que la cour d'appel, qui a relevé que les deux sociétés françaises filiales de la société Amko étaient intervenues pour l'agrément par la société AME, des micro-processeurs électroniques, en a exactement déduit que ces sociétés étaient en droit de se prévaloir, à l'égard de la société ABS et de son assureur subrogé, de la clause d'arbitrage stipulée au contrat liant leur société mère à la société AME".
>
> English unofficial translation: But considering that the effects of the arbitration agreement extend to the parties directly involved in the performance of the contract and to the disputes which can arise out of it; that the Court of appeals, which found that the two French subsidiaries of the Amko company had intervened regarding the approval of the electronic microprocessors by the AME company, has properly concluded that these companies were entitled to rely, with respect to ABS and its subrogated insurer, on the arbitration clause stipulated in the contract binding their parent company to AME.

93. This solution was subsequently confirmed by the Cour de cassation in the 2012 *Amplitude* case:[53]

> The effect of the international arbitration agreement stipulated in the initial contract [extends] to the parties directly involved in the performance of the contract.

94. The crucial question for the Tribunal is therefore whether KGLPI has participated in the negotiation of the contract and in its performance to the point needed to trigger the extension of the clause.

### 2.3.2 Other laws

95. The Parties have argued the position under Egyptian law, but Egyptian law, in the view of the Tribunal, could become relevant in the event of enforcement in Egypt only. Given

---

[52] *ABS*, Cass. Civ. 1, 27 March 2007, n° 04-20.842 Rev. Arb. 2007.
[53] See also *Amplitude*, Cass. Civ. 1, 7 November 2012, n° 11-25.891, JCP G §5; English unofficial translation.

DIPCO's (admitted) financial situation, Doosan would most likely enforce the award against KGLPI in Kuwait or elsewhere where KGLPI has assets or receivables.

96. In any event, the Egyptian Court of Cassation, in a 2004 decision (see §66 above) stated that extending the clause to non-signatories would be justified in cases where a company took part in the execution of a contract **or** created confusion as to the party actually bound by an arbitration clause (*Khatib Petroleum Services International Co. v. Care Construction Co. and Care Services Co.*):[54]

> [...] Where one of the parties to a group of companies enters into an arbitration agreement, it does not prove that its mother company will be bound by the arbitration clause, <u>unless one can establish that it took part in the execution of the contract OR created confusion as to the party actually bound by the arbitration clause, in a manner that the will of one company may be mistaken for that of the other</u> [...].

97. Respondent 1 also argued that according to Kuwaiti laws, the validity of an arbitration agreement would require a "*special power of attorney to decide an Arbitration, to arbitrate or to sign an arbitration agreement*", which allegedly did not exist in the case of either Respondent. However, the Tribunal has held that French law applies to jurisdictional issues. Like Egyptian law, Kuwaiti law could only become relevant when it comes to the enforcement of the Award (in Kuwait).

### 2.3.3 Factual elements justifying extending the arbitration clause to KGLPI

98. The criteria required under both the French and the Egyptian legal system are met in the light of KGLPI's intimate role in the negotiation (§§99 *et seqq*) and the performance of the Supply Agreement (§§109 *et seqq*) and in an attempt to settle the dispute (§§125 *et seq*).

#### 2.3.3.1 Negotiation of the Supply Agreement

99. KGLPI's pivotal role during the negotiation of the Supply Agreement is illustrated by the following elements.

100. <u>First</u>, KGLPI is the originator of the Damietta Port Project and DIPCO's largest shareholder.[55] KGLPI created DIPCO specifically for the Damietta project.[56]

101. As such, KGLPI's Chairman and Chief Commercial Officer communicated about the project and their ambitions for the terminal to the press.[57]

102. Further, KGLPI is a beneficiary of the concession granted by the Damietta Port Authority, before DIPCO's creation. In the Supply Agreement, the Parties have defined the term

---

[54] Exhibit CL-046 (Egyptian Court of Cassation, Cases No. 4729 & 4730 / 72 JY, judgment of June 22, 2004); emphasis added, amended translation.
[55] Exhibit C-005 ("Egypt To Get Megaport At Damietta," CARGONEWS ASIA", 3 December 2007); Exhibit C-170 (Lloyds List Via Thomson Dialog NewsEdge, Major lines join Damietta project, dated 6 December 2007).
[56] Exhibit C-005 ("Egypt To Get Megaport At Damietta," CARGONEWS ASIA", 3 December 2007).
[57] Exhibit C-004 (Excerpt of KGL's Home Webpage, "KGL Ports International K.S.C.C."); Exhibit C-005 ("Egypt To Get Megaport At Damietta," CARGONEWS ASIA, 3 December 2007); Exhibit C-056 (Port Strategy, KGL Awarded Damietta, 1 August 2006).

"Concession" as "the contract for construction and operation of a new container terminal in Damietta Port dated 8 May 2006 between the Damietta Port Authority, the Employer and KGL Ports International Company, as amended from time to time."[58] Although DIPCO contends that KGLPI was replaced by DIPCO as a party to the concession agreement, DIPCO has not exhibited the concession agreement to demonstrate it.[59]

103. Second, as indicated on the first page of the Tender Document, KGLPI, rather than DIPCO, prepared the Tender Document in 2006.[60]

- The Tender Document shows that KGLPI's employees were closely involved in the tender process. For instance, the Tender Document indicates: "*Tenderers will be granted access to the Site during the tender period for the purpose of inspecting the Site, its facilities and the access thereto/therefrom. Tenderers should contact Dr. Ahmed Amin from KGL Ports International at Damietta Port in Egypt contact number +201 01516170 to make arrangements.*"[61]

- The "*Instructions to tenderers*" indicate that queries concerning the Tender Document should be directed to KGLPI.[62]

- KGLPI was initially listed as a party (the Employer) to the Contract Agreement sent to the tender participants[63] and as the beneficiary of the contract's performance security.[64]

104. Third, the letters of Tender, including Doosan's, were addressed to KGLPI, in accordance with the Tender Document.[65]

105. Fourth, KGLPI's representatives conducted the negotiations with Doosan. As explained by Mr Jongsuk Park in his second witness statement:

> [...] when we negotiated the Amendment Agreement in 2009, I recall that Mr. Sam Khatib intervened in the negotiation as a KGL employee to negotiate on behalf of DIPCO. On 21 July 2009, Mr. Khatib wrote to Mr. Choi of Doosan stating that, after their meeting of the same day, he would like to "summarize DIPCO's offer to solve the situation with

---

[58] Exhibit C-001 (Contract for the Supply of Ship to Shore Container Handling Gantry Cranes, 13 April 2007).

[59] Hearing Transcript Day 2, p 98 to p 99.

[60] Exhibit C-027 (Ship to Shore Supply Agreement), Annex F, Tender Document, Particular Conditions of November 2006.

[61] Exhibit C-027 (Ship to Shore Supply Agreement), Annex F, Tender Document, Particular Conditions of November 2006, 13 April 2007, Clause 7, p 5.

[62] Exhibit C-027 (Ship to Shore Supply Agreement), Annex F, Tender Document, Particular Conditions of November 2006, 13 April 2007 Clauses 8 and 9, p 5

[63] Exhibit C-027 (Ship to Shore Supply Agreement), Annex F, Tender Document, Particular Conditions of November 2006, 13 April 2007, Tender Document, p 19.

[64] Exhibit C-027 (Ship to Shore Supply Agreement), Annex F, Tender Document, Particular Conditions of November 2006, 13 April 2007, Tender Document, p 33.

[65] Exhibits C-057 (Doosan's Letter of Tender to KGLPI dated 13 December 2006); Exhibit C-027 (Ship to Shore Supply Agreement, Annex F, Tender Document, Particular Conditions of November 2006, 13 April 2007), Clause 7, p. 5.

Doosan." Mr. Khatib signed his email in the following way "Sam khatib – KGL Holding."[66]

106. **Fifth**, the terms of the letter of acceptance sent by DIPCO (signed by Mr Al-Mazeedi, who was also KGLPI's chairman)[67] to Doosan on 5 March 2007 (which is the Supply Agreement's effective date) shows KGLPI's central role:

- The LOA includes a *caveat* stipulating that KGLPI has the ability to cancel the LOA, thereby in effect overturning DIPCO's acceptance.[68] As indicated by the Claimant,[69] this tends to show that KGLPI was not merely acting on DIPCO's behalf during the negotiation phase, but on its own volition as a separate party involved in the contract.

- The LOA provides that any violation by Doosan of its confidentiality obligation will "*automatically lead to LOA cancellation with no costs impact on KGLPI*".[70] The reference to KGLPI rather than to DIPCO shows its role in the contractual relationship.

107. **Last**, KGLPI was the beneficiary of the Tender Security provided by Doosan, as requested in the Instructions to Tenderers.[71] The Tender Security, provided by the National Bank of Kuwait to KGLPI, indicates:

> We have been informed that Doosan Heavy Industries & Construction Co., Ltd. [...] is submitting an offer for such contract <u>in response to your invitation</u>, and that the conditions of your invitation [...] require [t]his offer to be supported by a tender security.
>
> [We] undertake to pay you [KGLPI] any sum or sums not exceeding in total the amount of USD 1,890,000 dollars".[72]

108. Although DIPCO contends that KGLPI was acting as DIPCO's representative in the negotiation of the Supply Agreement,[73] these elements reveal KGLPI's pivotal role in the contract's conclusion and, already, a certain level of confusion as to the respective roles between KGLPI and DIPCO in the contract's performance.[74]

### 2.3.3.2   Performance of the Supply Agreement

109. The following elements, described by Doosan, show the extent of KGLPI's involvement in the performance of the Supply Agreement.

---

[66] Second Witness Statement of Jongksuk Park Second Witness Statement of Jongkauk Park §§§ *et seq.*
[67] Exhibit C-095 ("Egypt To Get Megaport At Damietta", CARGONEWS ASIA, 3 December 2007).
[68] Exhibit C-059, (Letter of Acceptance from DIPCO to Doosan, 5 March 2007).
[69] C-REBUTTAL §61; Claimant's Opening Presentation, slide 115.
[70] Exhibit C-059 (Letter of Acceptance from DIPCO to Doosan, 5 March 2007).
[71] Exhibit C-157 (Tender Security issued by the National Bank of Kuwait dated 11 December 2006); Exhibit C-027 (Ship to Shore Supply Agreement), Annex F, Tender Document, Particular Conditions of November 2006, 13 April 2007, Instructions to Tenderers, p 12.
[72] Exhibit C-157 (Tender Security issued by the National Bank of Kuwait dated 11 December 2006); emphasis added.
[73] R1-REJOINDER §§103 *et seqq.*
[74] For instance, the guarantee facility sought issued by HSBC bank for Doosan indicates that it was intended to "cover supply and installation of 14 gantry cranes to Egypt *for KGL Port International of Kuwait*." (Exhibit C-055 [Letters of Guarantee issued by HSBC], p. 14).

49

110. First, the scope of KGLPI's role in the project was extensive, as described in the Tender Document:

> [T]he Employer has appointed the Employer's Representative to carry out all port development activities under a separate management agreement. Accordingly, the Employer's Representative is responsible for all procurement related to the project construction / development.[75]

111. Therefore, as "*Employer Representative*" (a role which, according to the Claimant, does not exist in the FIDIC Yellow Book),[76] KGLPI was in charge of effectively all the project's development and could enter contracts with suppliers.[77]

112. Illustrating the fact that KGLPI was considered a party to the Supply Agreement, on 16 April 2007, Doosan obtained a USD 20 million guarantee facility from HSBC. The guarantee facility indicates that it aims to "*cover supply and installation of 14 gantry cranes to Egypt for KGL Port International of Kuwait.*"[78]

113. Second, the contract's payment mechanism was linked to certain actions of KGLPI. The LOA indicates that 30% of the price would be paid to Doosan under the Supply Agreement "*upon issue by KGL PI of Taking Over Certificate*" and a further 15%, constituting an advance payment, "*will be payable with the issuance of a bank grantee* [sic] *by Doosan in favor of KGL PI for the same amount*".[79]

114. Third, as described by Claimant,[80] the lines between KGLPI and DIPCO as distinct entities were blurred during performance of the contract.[81] As a result, KGLPI's intentions could be mistaken for those of DIPCO's.[82]

115. For example, DIPCO's representatives commonly used KGLPI's or its affiliates' letterheads, mail or email addresses to communicate with Doosan:

- A memorandum sent to Doosan in September 2007 describing the Damietta Port quays where the Cranes were to be offloaded was produced on the letterhead of Kuwait United Development ("**KUD**"), an affiliate of KGLPI, and the accompanying drawings listed KUD as project manager.[83] As a result, Doosan corresponded in 2006

---

[75] Exhibit C-027 (Ship to Shore Supply Agreement), Annex F, Tender Document, Particular Conditions of November 2006, 13 April 2007, article 1 [« Definition »].
[76] Claimant's Opening Presentation, slide 123; C-PHB1 §86.
[77] Exhibit C-027 (Ship to Shore Supply Agreement), Annex F, Tender Document, Particular Conditions of November 2006, 13 April 2007, article 1 [« Definition »].
[78] Exhibit C-055 (Letters of Guarantee issued by HSBC, 2007); emphasis added.
[79] Exhibit C-059 (Letter of Acceptance from DIPCO to Doosan, 5 March 2007).
[80] C-PHB1 §29; Claimant's Opening Presentation, slide 126.
[81] Exhibit C-068 (Minutes of Meeting dated 9 – 10 September 2008); Exhibit C-139 (Minutes of Meeting between DIPCO, KGLPI and Doosan dated 11 November 2008); see also Exhibit C-30 (Email from I Choi [Doosan] to F Al-Baghli [DIPCO–KGLPI] and Sam Khatib [KGL Holding – KGLPI]).
[82] First Witness Statement of Jongsuk Park §6.
[83] Exhibit C-158 (Email from J Carroll [DJMJ Harris] to Jongsuk Park [Doosan], 16 September 2007).

and 2007 with both KGLPI and KUD about the Cranes' shipment rather than with DIPCO.[84]

- Mr Jongsuk Park describes in his first witness statement the confusion arising from the fact that DIPCO's managers used KGL email addresses.[85] For instance, Mr Bahbahani, DIPCO's CEO, used email addresses of KGLPI or UITC (a company which is part of the KGL group), and Mr Alsarraf, DIPCO's technical director, used email addresses of KGLPI or IMC (a subsidiary of the KGL group). The same goes for Mr Khatib, Doosan's point of contact after 2012, Mr Al-Baghli, DIPCO's chairman, and a number of senior employees of DIPCO.[86]

116. Further, as indicated by Captain Arit during the hearing, his firm was required to send its reports, correspondence and invoices related to the Damietta Project to KGLPI.[87]

117. DIPCO did not appear to have a dedicated email address or website and used the ones of KGLPI.[88]

118. There was an overlap in personnel, with individuals involved in the project on DIPCO's side acting simultaneously in managerial positions at KGLPI. For instance:

- Mr Albaghly served as chairman of both KGLPI and DIPCO.[89]

- Mr Al-Mazeedi acted as Chairman and CEO of DIPCO and KGLPI.[90]

- Mr Bahbahani acted as CEO of DIPCO, CEO of IMC and as Managing Director of UITC (both belonging to the KGL Group).[91]

- Mr Al Sarraf, acted as DIPCO's technical director and KGLPI's corporate technical director.[92]

- Mr Ali acted as KGLPI's corporate projects director and DIPCO's project director.[93]

- Mr Al Baghli acted as KGLPI's vice-chairman and COO of KGLPI and as chairman of DIPCO.[94]

---

[84] Exhibit C-159 (Letter from R Welshaupt [DJMJ Harris] to Jongsuk Park [Doosan], 27 November 2007); Exhibit C-160 (Email exchange between N Issa [KUD], Jongsuk Park [Doosan], and M Ali [KGLPI-DIPCO], 10 December 2007).
[85] First Witness Statement of Jongsuk Park §87 at seq.
[86] First Witness Statement of Jongsuk Park §87 at seq.
[87] Hearing Transcript Day 3, p 129 line 6 to line 13 (Capt Arit).
[88] Exhibit R-52 (Email from Azza Saleh to Jorn Hinge, Marc Riondel, and Jameel Bahbahani, 21 December 2008).
[89] Exhibit C-162 (Email from F Albaghli [KGLPI-DIPCO] to Jongsuk Park [Doosan], 14 July 2009; Exhibit C-163 (Email from A. Abdel-Khalek [DIPCO] to Jongsuk Park [Doosan], 16 July 2015).
[90] Exhibit C-001 (Contract for the Supply of Ship to Shore Container Handling Gantry Crane, 13 April 2007); Exhibit C-005 ("Egypt To Get Megaport At Damietta," CARGONEWS ASIA, 3 December 2007).
[91] Exhibit R-28 (Letter from DIPCO to DPA, 30 April 2008); Exhibit C-062 (International Motor Company K.S.C.C. Webpage); First Witness Statement of Jongsuk Park §7.
[92] Exhibit C-161 (Email exchange between I Choi [Doosan], C Chae [Doosan], F. Alsarraf [DIPCO-KGLPI-IMC-UITC], 7–8 August 2008); Exhibit C-075 (Email from A. Saleh [KGLPI] to C Chae [Doosan], 24 February 2009); Exhibit C-076 (Minutes of Meeting held between Doosan and DIPCO in Korea, 11 June 2009); Exhibit C-068 (Minutes of Meeting of 9–10 September 2008).
[93] Exhibit C-015 (Letter from DMJM Harris to DIPCO); Exhibit C-073 (Minutes of Meeting, 3 February 2009).

- Mr Khatib was director of business development at the KGL Group, and became, in 2009, a board member for DIPCO, appointed by KGLPI.[95]

119. A level of confusion is likely to have ensued as to the distinction between KGLPI's and DIPCO's respective roles in the project.[96] Mr Park comments in detail on this confusion:

> I could not really tell what tasks KGLPI and DIPCO separately performed under the Supply Agreement. This is because I could not really tell when a person was acting as a KGLPI employee and when he was acting as an employee of DIPCO. As I mentioned in my First Witness Statement, most of the persons who worked on the Damietta Project were employees of both DIPCO and KGLPI and it was almost impossible for me to distinguish between their different capacities. For example, I knew that Mr. Khatib was a KGL employee but he was also significantly involved in the Damietta Port Project and in matters relating to the Supply Agreement. I understand that Mr. Khatib has emphasized in his witness statement that he acted as a board member of DIPCO when he was involved in the Damietta Project. However, his business card does not mention that he is board member of DIPCO and only says that he is a director. Even employees of DIPCO who did not officially hold any capacity in KGLPI used KGLPI email addresses. This is the case for Mr. Abdel-Khalek for example. Usually, when I start working on a project, there is a "kick-off" meeting where everyone is introduced, so that we can understand who is who and who is doing what. However, this did not happen for the Damietta Port Project.[97]

120. Several discussions in relation to the Contract's performance took place between Doosan and KGLPI's representatives without DIPCO being present. For instance:

- In an email dated 19 November 2008, Mr Park (Doosan) wrote to Mr Ali (KGLPI-DIPCO) and Mr Alsarraf (DIPCO-KGLPI- IMC-UITC): *"During the meeting in Kuwait on 12th of November, you confirmed that you would provide us with the final version of port construction schedule by 20th November."*[98]

- In a letter dated 15 December 2008, Mr Chung (Doosan) wrote to Mr Bahbahani (DIPCO-UITC-IMC): *"[W]e, Doosan Heavy Industries & Construction Co., Ltd.,*

---

[94] Exhibit C-005 ("Egypt To Get Megaport At Damietta," CARGONEWS ASIA); Exhibit R-14 (Letter from DIPCO to DPA, 25 June 2009); Exhibit C-162 (Email from F Albaghli [KGLPI-DIPCO] to Jongsuk Park [Doosan], 14 July 2009).
[95] Exhibit C-175 (Business Card of Sam Khatib; First Witness Statement of Sam Khatib §4.
[96] First Witness Statement of Jongsuk Park §7; Second Witness Statement of Jongsuk Park §3: for example, Exhibit C-161 (Email exchange between I Choi [Doosan], C Chae [Doosan], F. Alsarraf [DIPCO-KGLPI-IMC-UITC], 7–8 August 2008).
[97] Second Witness Statement of Jongsuk Park §3; emphasis added.
[98] Exhibit C-165 (Email from Jongsuk Park [Doosan] to M Ali [KGLPI-DIPCO] and F Alsarraf [DIPCO-KGLPI-IMC-UITC], 19 November 2008; emphasis added); Exhibit C-016 (Email from J Bahbahani [DIPCO-UITC] to Y Chung [Doosan], 27 May 2008.

*hereby submit our letter of affidavit according to our previous corresponds [sic] and meeting result between KGLPI and Doosan.*"[99]

- In a teleconference between Doosan and KGLPI on 9 July 2009 discussing Doosan's re-sale of the cranes, the minutes indicate that the only attendees were representatives of Doosan and KGLPI.[100]

- Mr Park also describes the role taken by Mr Khatib in the negotiations of the 2009 amendment "as a KGL employee".[101]

121. KGLPI appeared to take certain strategic decisions alongside DIPCO (minutes of meetings indicate: *"DIPCO/KGLPI and Doosan agreed..."*).[102]

122. At times, KGLPI corresponded with Doosan on key issues of the contract's performance without DIPCO being mentioned.[103] In particular, although the parties decided during a 9 July 2009 teleconference that DIPCO would provide an approval letter for the resale of the Cranes, Mr Jongsuk Park wrote to KGLPI Chairman Mr Albaghli that *"after our conference call on last Thursday, KGLPI and Mr. Choi of our Kuwait branch had another meeting that afternoon. At the meeting, KGLPI confirmed that they will give us the approval letter for selling 4 STS cranes to 3rd party."*[104]

123. DIPCO used KGLPI's offices for meetings with Doosan and KGL's mail address for correspondance. For instance:

- A meeting between Doosan and DIPCO was set up "at KGL's offices in Rotterdam".[105]

- As explained by Mr Park, certain correspondence from Doosan dealing with key issues of contractual performance were sent to DIPCO at an address in Kuwait – for instance, a letter was sent on 15 December 2008 from Doosan to Kuwait, referring to the "previous corresponds and meeting result between Doosan and KGLPI"[106] and a letter was sent on 16 April 2009 to Kuwait dealing with the damages incurred by Doosan to date.[107]

124. The confusion between KGLPI's and Doosan's respective roles is illustrated by the fact that the company Portek issued a pre-shipment report in December 2008 *"for Doosan and KGLPI"*, and, in May 2015, enquired to Mr Khatib whether he was *"acting for DIPCO*

---

[99] Exhibit C-69 (Letter from Y Chung [Doosan] to J Bahbahani [DIPCO-UITC-IMC], 15 December 2008; emphasis added).
[100] Exhibit C-079 (Minutes of Teleconference between Doosan and KGLPI, 9 July 2009).
[101] Second Witness Statement of Jongsuk Park §6.
[102] Exhibit C-068 (Minutes of Meeting of 9-10 September 2008); Exhibit C-139 (Minutes of Meeting between DIPCO, KGLPI and Doosan, 11 November 2008); see also Exhibit C-164 (Minutes of Meetings, 12 April 2007).
[103] For instance, Exhibit C-069 (Letter from Y Chung [Doosan] to J Bahbahani [DIPCO-UITC-IMC], 15 December); Exhibit C-030 (Email from I Choi [Doosan] to F Al-Baghli [DIPCO-KGLPI] and Sam Khatib [KGL Holding - KGLPI], 17 December 2009).
[104] Exhibit C-162 (Email from F Albaghli [KGLPI-DIPCO] to Jongsuk Park [Doosan], 14 July 2009).
[105] Exhibit C-075 (Email from A Salah [KGLPI] to C Choe [Doosan], 24 February 2009).
[106] Exhibit C-069 (Letter from Y Chung [Doosan] to J Bahbahani [DIPCO-UITC-IMC], 15 December 2008).
[107] Exhibit C-029 (Letter from Doosan to DIPCO, 16 April 2009).

*as their representative or as KGLPI?"*[108] During his cross-examination, Mr Khatic refuted any confusion on Portek's part and argued that the confusion was created by Doosan.[109]

### 2.3.3.3    Participation in the settlement discussions

125. In 2015, Mr Khatib (KGLPI's nominee to DIPCO's Board of Directors), negotiated directly with Doosan to find a potential commercial settlement to the dispute. In particular, he sent Doosan an offer to settle the dispute from his KGLPI email address.[110]

126. During his cross-examination, Mr Khatib indicated that his appointment to deal with Doosan resulted from a board resolution, which is not on record. Mr Khatib contended that he had made clear to Doosan that he was acting as DIPCO's board member, rather than a KGLPI representative.[111] The Tribunal does not find this credible at all and the email itself does not indicate any of this. This seems to the Tribunal to be an *ex-post facto* explanation concocted for the purpose of the hearing.

### 2.3.4    Conclusion

127. In light of the above, the criteria set by French law and the Egyptian 2004 Court of Cassation[112] are met. First, KGLPI played a central role in establishing the contractual relationship. Second, KGLPI performed the Supply Agreement including the 2001 Amendment as a party to the contract rather than a mere representative of DIPCO. As a result, KGLPI's and DIPCO's intentions and respective roles were often indistinguishable.

128. The Tribunal does not accept Respondents' argument that the arbitration clause ceased to exist upon termination of the Supply Agreement. It is generally accepted that an arbitration clause survives the contract it is contained in;[113] this is also reflected in Art 6(9) ICC Rules.

129. The Tribunal therefore finds that is has jurisdiction over both DIPCO and KGLPI.

## G. ON THE MERITS: THE PARTIES' FACTUAL ASSERTIONS AND LEGAL ARGUMENTS

### 1.    Claimant's Position

130. **General:** At the time the 2009 Amendment was negotiated, DIPCO had already promised Doosan a sizeable, immediate payment in advance of shipping the Cranes.

---

[108] Exhibit C-167 (Email from Y Meng [Portek] to Jongsuk Park [Doosan] and F Alsarraf [DIPCO-KGLPI-IMC-UITC], 15 December 2008); Exhibit C-168 (Email from N Woo [Portek] to Sam Khatib [KGL Holding – KGLPI] and C Chae [Doosan], 29 May 2015).

[109] Hearing Transcript Day 2, p 96.

[110] Exhibit C-153 (Email exchange between Sam Khatib [KGL Holding – KGLPI] and Jongsuk Park [Doosan], 5 November 2015); Exhibit C-154 (Email from Jongsuk Park [Doosan] to Sam Khatib [KGL Holding – KGLPI], 6 November 2015); Exhibit C-010 (Email from Sam Khatib [KGL Holding] to Doosan, 5 November 2015).

[111] Hearing Transcript Day 2, pp 93 *et seq*.

[112] Exhibit CL-046 (Egyptian Court of Cassation, Cases No. 4729 & 4730 / 72 JY, judgment of June 22, 2004).

[113] *Born*, International Commercial Arbitration, second edition (2014), chapter 3 ("Separability").

DIPCO did this because it had already prevented Doosan from shipping the Cranes for delivery on the contractually agreed dates, the first of which was in July 2008. Those previously scheduled shipments and deliveries of the Cranes would have triggered, according to the Supply Agreement, a payment to Doosan of 70% of the total contract price. Given that DIPCO's own actions had interfered with that payment, DIPCO agreed in February 2009 to release an advance payment by the end of May 2009 in the amount of USD 32mio for the Cranes which should have been shipped by then. This commitment was even renewed in April 2009, after DIPCO had undergone a change in management.

131. The commitment was not conditioned on anything but was timed to coincide with the expected final agreement on compensation for certain unresolved **deviations**, what, however, was then superseded by the Respondents' continuously postponing the dates of expected delivery.

132. On a general note, Respondents' arguments of force majeure and impossibility are misplaced as these should come at play only in the legal relationship between Respondents and the Damietta Port Authority ("DPA"), as Respondents alone have the contractual privity with the DPA that allows them to recover compensation for whatever direct or indirect harm the DPA allegedly caused.[114]

133. **Breach:** Claimant's principal case on the merits is that Respondents materially breached the Supply Agreement in two ways: (i) by failing to provide Doosan timely access to the Site, so that Doosan could ship, deliver and install the Cranes (and receive payment for the work it had already done) in accordance with the Contract; and (ii) by failing to pay the two advance payments it had agreed to make in the 2009 Amendment, which were the advance payment of USD 51mio, and a payment of USD 9mio in the event that the KPA tender – as defined in the 2009 Amendment – was not won by Doosan.[115]

134. As a result of these breaches (or either one of them), the Claimant was entitled to terminate the Supply Agreement for breach, in accordance with Sub-Clause 16.2 of the FIDIC General Conditions. Doosan is therefore entitled to the amounts authorized under Sub-Clauses 16.4 and 19.6 of the FIDIC General Conditions, to which Sub-Clause 16.2 cross-refers.

135. Regarding Respondent 1's *force majeure* argument, a party seeking to invoke force majeure must, under Egyptian law, show that the alleged force majeure events were unforeseeable, and that they rendered performance of that party's obligations impossible. However, events of the type cited by DIPCO are hardly unforeseeable in the context of a construction contract – particularly in Egypt. Moreover, DIPCO's alleged *force majeure* events did not render performance of the Supply Agreement **impossible**.

136. As to the **2009 Amendment Agreement**, its only purpose was to achieve three financial goals: (1) to reduce the contract price of the Cranes for DIPCO; (2) to relieve Doosan's cash flow problems by providing for an interim payment for the Cranes; and (3) to relieve Doosan's cash flow problems by authorizing Doosan to sell certain Cranes to third-party buyers (while replacing them for DIPCO).

---

[114] C-PHB2 §4.
[115] C-PHB1 §49; C-PHB2 §42.

137. Respondents' reading of the 2009 Amendment is untenable, and it is clear that: (i) the 2009 Amendment (see Clause 4(iii)) did not authorize Doosan to sell all the Cranes to third-parties; (ii) by introducing the term of a "financial close" in Clause 4(ii), ie, acceptance of DIPCO's new business plan by its lenders and shareholders, Doosan did not accept to suspend its right to any payments indefinitely; and (iii) Doosan, in relation to Clause 4(iii), never accepted to cancel the existing delivery schedule and leave the possibility of delivering the Cranes to Egypt to Respondents' absolute discretion.

138. Article 5 of the 2009 Amendment Agreement explicitly provides that "all other terms and conditions of the Original Contract remain valid and enforceable without any amendment other than those stipulated under this agreement." Thus, key requirements such as DIPCO's obligation to provide Doosan with Site access were not altered by the Amendment Agreement.

139. The only obligation that the 2009 Amendment links to the Financial Close is DIPCO's advance payment of USD 51mio to Doosan under Clause 4(ii). The Parties expected that the Financial Close would take place within the following month and that Doosan would therefore be required to deliver the remaining 10 Cranes starting April 2010, as anticipated in the Master Schedule that was in effect at the time.[116]

140. The Parties considered the Financial Close not to be a condition but a term (ie, an event which occurrence was certain, although its precise timing was not). The clearest proof is the inclusion of an interest rate of 6.5% p.a. starting on 1 September 2009 until the agreed advance payment of USD 51mio would be made.

141. Conditioning all of DIPCO's obligations under the Supply Agreement upon the Financial Close and DIPCO's providing a subsequent notice thereof would effectively transform all of the Respondents' obligations into "potestative" obligations, which are null under Egyptian law.[117]

142. Doosan requested to be paid the amount of USD 9mio on the basis that the KPA project had turned to the delivery of new cranes, as opposed to Damietta Cranes the Parties had agreed on. Clause 4(v) of the 2009 Amendment provides that Doosan "shall participate as co-leader with KGLPI with regard to [the KPA] tender for the supply of <u>STS Cranes</u>" [emphasis added]. The first item of the recitals ("whereas") defines the term "STS Cranes" as the "14 ship to shore cranes" that Doosan was to supply to DIPCO under the Supply Agreement. Clause 4(v) goes on to state that "DOOSAN responsibility is limited to only supplying STS cranes to KPA as they are built under contract with DIPCO." Thus the amount of USD 9mio became due pursuant to the penultimate sentence of Clause 4(ii).

143. As regards the timing of deliveries, it is a basic feature of FIDIC contracts that the Employer always has the right to suspend the Contract, and only needs to ask the Engineer to issue an official notice of Suspension to do so. However, whenever the Engineer orders the Contractor to suspend its Works, Sub-Clause 8.9 of the FIDIC General Conditions provides that the Contractor shall be entitled to compensation for all the costs incurred because of that Suspension and will be granted an extension of time.

---

[116] C-PHB2 §27.
[117] C-PHB2 §31.

And If such suspension lasts for more than 28 days (and If the Contractor has marked the Plant and/or Materials as the Employer's property in accordance with the Engineer's instructions), then the Contractor is entitled to the payment of the value (as at the date of suspension) of all the Plant and/or Materials that have not been delivered to Site.

144. But Clause 4(iv) of the 2009 Amendment did not cancel the existing delivery schedule. The purpose of Clause 4(iv) of the 2009 Amendment was to protect Doosan against unrealistic delivery dates - not to give Respondents a discretionary right to decide when (or whether) to request delivery of the Cranes. At the time the 2009 Amendment was negotiated, both Parties had a common understanding that Financial Close was going to take place before the end of August 2009.

145. In fact, the Master Schedule communicated to Doosan in May 2009 projected that works on-site would resume on 30 August 2009 (ie, concurrently with the Financial Close) and that Doosan would then deliver a first batch of four Cranes in April 2010. Thus, when the 2009 Amendment was executed at the end of July 2009, Doosan had only eight months left to reserve shipping space on an appropriate cargo ship and otherwise organize the shipment of the Cranes to Damietta, which it felt would be insufficient. This is why Doosan insisted on including in the 2009 Amendment a provision requiring DIPCO to give Doosan at least nine months advance notice for any change in the existing delivery schedule of the first four Cranes. And since it would have to remanufacture at least four of the remaining Cranes to be delivered (the four that it was authorized in Clause 3 of the 2009 Amendment to sell to "a third party"), and since it required at least a year for such remanufacture, Clause 4(iv) required that DIPCO give at least twelve months advance notice for any new delivery dates of remaining Cranes.

146. **Termination:** In its letter of 4 March 2016 Doosan wrote to DIPCO:[118]

> As a result of DIPCO's consistent, serious and egregious breach of the Contract, and in particular of Clause 4(ii) of the Amendments, in light of the cancellation of the Concession Agreement pursuant to Prime Minister's Decree No. 2799 of 2015, published on November 19, 2015, and in light of DIPCO's failure to remedy its breaches, Doosan hereby notifies DIPCO of the termination of the Contract, as pursuant to Article 16 of General Conditions of the Original Contract.

147. This declaration was fully in line with sub-clause 16.2 of the FIDIC General Conditions, as DIPCO, as the Employer, had "substantially failed to perform its obligations" under the Supply Contract, as amended by not having payed the amounts foreseen in Clause 4(ii) of the 2009 Amendment in due time.

148. Doosan had demanded payment already in its letter of 1st December 2009 when it wrote to DIPCO:[119]

> For the subjected agreement, we would like to share our opinion with your esteemed company. We waited the financing close around 3

---

[118] Exhibit C-012.
[119] Exhibit C-082.

57

> months upto now and It is already December of 2009. It means that USD 94,000,000 (USD 85,000.000 + USD 9,000,000) has to be remitted within 30 days beside the interest amount for USD 85.000,000. It Is because KPA project Is turned to new cranes subject to KPA requirement.

149. **Delivery Notice**: Any "readiness notice" would have been superfluous, as it was Respondents who repetitively declared not to be ready for the transfer of the cranes and all over again sought a delay of delivery.

150. Moreover, no such notice applies because the Supply Agreement qualifies as a "works contract," which Is defined by Article 646 of the Egyptian Civil Code ("**ECC**") as a contract where "one of the contracting parties undertakes to do a piece of work or to perform a service in consideration for a remuneration which the other contracting party undertakes to pay." By contrast, a sales contract Is defined by Article 418 of the ECC as "a contract whereby the vendor binds himself to transfer to the purchaser the ownership of a thing or any other property right In consideration of a price in money." In the present case, it Is clear that Doosan did not simply commit to transfer the property of the Cranes to Respondents, Instead, and as clearly stated In the Contract, It committed to "design, manufacture, testing, delivery, installation, commissioning and setting to work" of the Cranes.

151. This distinction Is further confirmed by Article 3(2) of the United Nations Convention on Contracts for the International Sale of Goods ("**CISG**"), to which Egypt is a party and which provides that the convention "does not apply to contracts in which the preponderant part of the obligations of the party who furnishes the goods consists In the supply of labour or other services."

152. Finally, on 7 November 2007, Doosan expressly notified Respondents of Its intention to deliver Its first batch of four Container Cranes on 30 June 2008; Its second batch of two Container Cranes on 31 July 2008; a third batch of four Container Cranes on 27 September 2008 and Its final batch of four Container Cranes on 21 December 2008.

153. **Mitigation:** First and foremost, It would have been DIPCO's burden to show that there were mitigation opportunities that Doosan failed to pursue (*quod non*); DIPCO failed to carry that burden.[120]

154. The main relevant provision of the ECC In relation to mitigation Is Article 216 ECC, which provides that "*[t]he judge may reduce the amount of damages or may even refuse to allow damages if the creditor, by his own fault, has contributed to the cause of, or increased, the loss.*" According to a leading scholar, a "*fault*" is defined as a conscious failure by any person to abide by Its legal obligation to "*behave with carefulness and prudence so as not to harm others.*"

155. However, Article 216 must be read in conjunction with Article 221 ECC, which also bears on the concept of mitigation and provides that, In case of breach of contract, "*[t]he amount of damages includes losses suffered by the creditor and profits of which he has*

---

[120] C-PHB2 §9.

*been deprived, provided that they are the normal result of the failure to perform the obligation or of delay in such performance. These losses shall be considered to be a normal result, if the creditor is not able to avoid them by making a reasonable effort."*

156. Hence, Egyptian law does not refer to an "obligation" or "duty" to mitigate damages but rather adopts the concept of contributory fault.

157. Yet, the vast majority of Doosan's claims are not "damages" flowing from a breach of contract but rather claims for payments for work performed (pursuant to Sub-Clause 19.6(a) of the FIDIC General Conditions) or for manufacturing costs as well as storage and maintenance costs incurred in the performance of the Contract (pursuant to Sub-Clauses 19.6(b) and 19.6(c) of the FIDIC General Conditions). These payments are due to Doosan in all cases, ie, even if the Respondents were found not to have breached the Supply Agreement.[121] These payments would be due to Doosan even in case the Supply Agreement had been terminated by the Respondents themselves (see Sub-Clause 15.5 of the FIDIC General Conditions).

158. Accordingly, the only portion of Claimant's claims that is subject to a statutory requirement of mitigation are the amounts claimed pursuant to Sub-Clause 16.4(c) of the FIDIC General Conditions, which consist of "the amount of any loss of profit or other loss or damage sustained by the Contractor as a result of this termination." However, not even these sums represent damages flowing from Respondents' breaches of the Contract; rather, they represent damages flowing from the termination itself. Hence, and by definition, any requirement of mitigation with respect to these losses cannot have arisen before termination of the Supply Agreement.

159. At no point did the Respondents expressly indicate to the Claimant that the Damietta Project would never resume and that they would never be in a position to take over the Cranes. To the contrary, Respondents repeatedly represented to Doosan that discussions were ongoing with Egyptian authorities, shareholders, or lenders and that they remained committed to resuming the Project and that they would thus need the Cranes. Also, DIPCO repeatedly demanded that Doosan renew the advance payment guarantees and threatened to cash in the guarantees if Doosan failed to make such renewals.

160. Against this background Doosan, as explained by Mr Park during the Hearing, economically faced a limited number of specific options and Doosan's decision not to resell the Cranes earlier than it did was more than reasonable:

– The first option was to wait for the Project to resume, as the Respondents represented would occur, so that Doosan could deliver the Cranes to Damietta and receive the full Contract Price. That was obviously the best option for Doosan, especially once the value of the Cranes had substantially depreciated. In that scenario, Doosan's only "loss" would have been the storage and maintenance costs it had incurred, plus eventually some foreign exchange losses. And even if Doosan did not succeed in obtaining compensation from the Respondents for this "loss", at least part of the loss would have been offset by Doosan's profit margin embedded in the Contract Price.

---

[121] See also C-PHB2 §7.

- The <u>second</u> option was for the Respondents themselves to sell the Cranes and then to pay to Doosan the full contract price. This was the second best case scenario, given DIPCO's precarious solvency, which meant that, initially, Doosan might have received only a portion of the contract price (corresponding to the resale price of the Cranes). But DIPCO would nevertheless have had an uncontested debt to Doosan for the remaining difference between the contract price and whatever amount it initially paid to Doosan, which Doosan could then enforce.

- The <u>third</u> option was for Doosan to sell the Cranes to one or more third parties at its own risk, pursuant to the authorization that the Respondents granted in September 2010, as recorded in the minutes of a meeting between DIPCO and Doosan. Whether this option held any attraction depended primarily on two factors: (i) the net price (ie, "net" of any modification and/or transportation costs) that Doosan could obtain from a third party for the Cranes at any given point in time and (ii) the anticipated schedule of delivery communicated by Respondents. The second factor was relevant, in part, because Respondents' authorization of third party sales was conditioned on Doosan's agreeing to remanufacture Cranes upon DIPCO's request without any additional compensation from the Respondents beyond the Contract Price.

  Hence, once the resale price of the Cranes fell below Doosan's manufacturing costs (which was almost invariably the case from 2010 onwards), reselling the Cranes under this option would have resulted in a definite loss for Doosan (in the amount − at least − of the difference between the net resale price and Doosan's original manufacturing costs), which could have been compounded by an additional loss if the price of raw materials and labor had risen by the time Doosan was required to remanufacture new Cranes. In addition, certain timing issues had to be taken into consideration, as it takes approximately 12 months to build a new Crane. Hence, whenever Doosan received delivery schedules from the Respondents establishing delivery dates less than a year in the future, it could not sell its existing Cranes without taking the risk of defaulting on its commitment toward Respondents.

- Finally, one <u>last</u> option would have been to terminate the Contract at an earlier point and then sell the Cranes to third parties. But, as explained by Mr Park, this option would not be ideal even under the best of circumstances since it entailed significant risks. First, had Doosan terminated the Supply Agreement at any earlier point, it would certainly have faced DIPCO's call for liquidation of its advance payment guarantees. Second, the validity of Doosan's termination prior to Egypt's cancellation of the Damietta Port Concession would almost certainly have been legally challenged by Respondents. Third, Doosan would still have had to commence legal proceedings against Respondent to recover the difference between the resale price of the Cranes and the Contract Price (as it is doing now).

161. DIPCO's argument at the Hearing was that Doosan should have chosen the third or fourth option. But, under each of those two options, Doosan was assured of incurring a loss (even if some of that loss might ultimately be compensated by DIPCO), and for that reason these options cannot be said to constitute mitigation. By contrast, under the first two options, Doosan had the potential of truly minimizing Doosan's losses, which is fully

consistent with the principle of mitigation. In fact, if Doosan had sold the Cranes to one or more third parties from September 2010 onwards (or had terminated the Contract in the same period) and if the Project had subsequently resumed, Respondents might well have blamed Doosan for not waiting until the resumption of the Project. In this context, Doosan's decision to hold on to the Cranes in anticipation of the Project's resumption (a prospect that the Respondents continually entertained) was more than reasonable and cannot give rise to any sanction on the ground that Doosan failed to mitigate its losses.

162. Moreover, the September 2010 Authorization gave Doosan a window of only four months (between October 2010 and February 2011) to sell up to six Cranes that it would then have to begin remanufacturing immediately. Yet, DIPCO fails to identify any attractive sale opportunity that Doosan ignored in that short period of time (although it is DIPCO's burden to demonstrate that Doosan acted unreasonably by failing to sell the Cranes earlier to a third party). And the reason for such failure is simple: There were no such opportunities.

163. In Clause 4(i) of the 2009 Amendment Doosan had agreed not to claim from the Respondents losses resulting from third-party sales. This concession was strictly limited to the "Disposal Cranes" that Doosan was permitted to sell under Clause 3 (ie, the four Cranes that were ultimately sold to a company "HPH"[122]). Doosan accepted this condition on these limited terms because, at the time when the 2009 Amendment Agreement was signed, Doosan had been lucky enough to find a buyer willing to purchase the Cranes at a price of USD 8.5mio per Crane, which essentially matched the original price under the Supply Agreement. Doosan thus had no problem accepting DIPCO's strict terms and proceeding with the sale of four Cranes to HPH in August 2009. Yet, this does not mean that Doosan gave a blanket agreement to sell all Cranes authorized by Respondents irrespective of the prevailing financial conditions at the relevant time.[123]

164. Finally, even if Doosan had been subject to a duty to mitigate, the doctrine does not require that it absorb such losses simply to shield the Respondents from their own liability.[124]

165. **Foreseeability:** To begin with, most of the amounts claimed by Doosan are not strictly speaking "damages" but payments for work performed and/or costs incurred so that the concept of *"foreseeability"* of damages could not apply.[125] Furthermore, it is DIPCO's burden to demonstrate that these "damages" were not foreseeable at the time of contracting. DIPCO does not remotely discharge its burden of proof.[126]

166. In any event, it was more than foreseeable that the Respondents' failure to give Doosan timely access to the Site occurred when the Container Cranes were already fully manufactured and largely erected and that DIPCO's repeated directives to Doosan to postpone the shipment of the Container Cranes would cause Doosan to store the Container Cranes in Korea and thus incur storage and maintenance costs. It was also

---

[122] Exhibit C-079.
[123] C-PHB2 §79.
[124] C-PHB2 §9.
[125] C-PHB2 §244.
[126] C-PHB2 §244.

more than foreseeable that Respondents' failure to give Doosan timely access to the Site would give grounds to Doosan to terminate the Contract for material breach and thus claim for the Cranes' manufacturing costs, as expressly contemplated in Sub-Clauses 16.2 and 19.6 of the FIDIC General Conditions.[127]

167. **Advance Payment Guarantee:** For Claimant, there is no dispute that it must repay the Advance Payment to Respondents following termination of the Supply Agreement (as amended). But such repayment does not result from a retroactive termination of the Contract, but from the text of Sub-Clause 14.2 of the FIDIC General Conditions (as amended by the Parties), which provides that *"in the event of the Contract being terminated under Clause (...) 16 hereof the Employer may deduct the balance of the Advance Payment outstanding from any monies due or which may become due to the Contractor [...]."*[128]

168. On that basis, Doosan has already deducted the amount of the Advance Payment it received from its total claims. However, because the amounts owed by Respondents to Doosan greatly exceed the amount of the Advance Payment, Doosan is still entitled to a substantial net payment from Respondents.[129]

169. Claimant therefore seeks declaratory relief in that Respondent 1 and/or Respondent 2 are not entitled to any repayment, partially or wholly, of the advance payment provided to Claimant of USD 18.4mio.

## 2.    Respondents' Position

### No delivery Notice

170. Egyptian law defines delivery in Article 435(1) ECC as *"Delivery is made when the sold (product) is put under the disposition of the buyer in such a way to be able to possess it and benefit therefrom without impediment, even if he does not acquire it physically as far (provided that) the Seller informed him of that."*[130]

171. Neither before August 2008, when the first delivery of six cranes was due, nor afterwards Doosan proved or even declared or notified DIPCO that any Cranes were at any time duly, fully or even partly, manufactured without manufacturing defects or deviations, and never declared and notified DIPCO that the Cranes are ready for delivery.[131]

172. Admittedly, Doosan undertook to design, execute and complete the works, and such a job description qualifies under Egyptian law as a works contract. Yet this would not exempt Doosan from conveying a formal notice under either the CISG or the ECC.[132]

173. Article 3 of CISG sets out two conditions to exclude its applicability on the supply of goods as sales:

---

[127] C-PHB2 §244.
[128] C-PHB2 §247.
[129] C-PHB2 §248.
[130] R1-PHB1-KH §65.
[131] R1-PHB1-KH §64.
[132] R1-PHB2-KH §32.

> (1) Contracts for the supply of goods to be manufactured or produced are to be considered sales unless the party who orders the goods undertakes to supply a substantial part of the materials necessary for such manufacture or production.
>
> (2) This Convention does not apply to contracts in which the preponderant part of the obligations of the party who furnishes the goods consists in the supply of labour or other services.

174. Neither did DIPCO supply any substantial part of the materials necessary for manufacture or production of the cranes nor did "the preponderant part of the obligations of the party who furnishes the goods consist in the supply of labour or other services" so that the Supply Agreement will be treated under the CISG as a sales contract.

175. In the alternative, when applying the provisions of the ECC, the qualification of the Supply Agreement as a contract for works under Article 646 automatically leads to the application of Articles 655 *seq* of the ECC which states:[133]

> When the contractor accomplishes the work and puts it under the disposition of the Employer, the Employer should initiate to receive it as soon as possible as under the current custom in transactions. If he refrains without a legal reason from the receipt in spite of being requested to do so by an Official Notice, the work would be deemed as delivered to him.

176. The delivery of an official notice requires the service of the notice by the official bailiff, an employee of the Egyptian Ministry of Justice pursuant to Egyptian Civil and Commercial Procedural Law (ECCP). Article 6 ECCP expressly stipulates:[134]

> Every notice or enforcement (execution) will be served by the bailiffs upon the request of an opponent, the courts secretariat or by order of the court. The opponents or their attorneys will guide the procedures and present the papers to the bailiff to be served or enforced, all of the same unless the law stipulates otherwise. The bailiffs will not be responsible but for their mistakes in conducting their jobs.

177. Article 19 ECCP further warns that "Annulment will be the result of not respecting (considering) the dates and procedures stated in, *inter alia*, Article 6."[135]

### Deviations

178. Portek Systems & Equipment Pte Ltd ("**Portek**"), who was retained to review and inspect the Container Cranes, identified 80 technical deviations from the contract specifications.[136] Some of these deviations appear to have been minor – and DIPCO accepted them – but others were of a more serious nature and had to be rectified. The

---

[133] R1-PHB2-KH §35.
[134] R1-PHB2-KH §49.
[135] R1-PHB2-KH §50.
[136] R1-PHB2-CR §5.

parties discussed the technical deviations in late 2008. The meeting minutes reflect that Doosan had purportedly corrected a number of these deviations (which needed to be inspected and confirmed by Portek), had agreed to pay compensation on two of the items, and that DIPCO accepted nine others. These minutes further reflect that there were several dozen outstanding deviations that remained to be rectified and Doosan's commitment to do so at its own expense.

179. The parties continued to discuss Doosan's obligation to fix the deviations in late 2008 and into 2009, with the understanding that the corrections would be paid for by Doosan or would offset Doosan's claims for delay. However, it is undisputed that Doosan never fully rectified this list of deviations, many of which included issues of fabrication.[137]

180. Any payment obligation of DIPCO was only "on condition that the works should be in accordance with the specifications and the conditions agreed upon "irrespective of the nature of the deviations confessed by the Claimant itself, but then Doosan tries to undertone its shortcomings by referring to the deviations as "of minor significance".[138]

181. Egyptian Law imposes strict duty on the Contractor to show that the works are in accordance with the agreed upon specifications before it expects the Employer to accept and thereby receive the work.[139]

**Force majeure[140]**

182. DIPCO's management team worked diligently to achieve the financial close following the 2009 Amendment despite continual frustrations beyond DIPCO's control which were insuperable. These efforts were initially stymied by actions of the Egyptian government (in particular, by requesting exorbitant fees) and were later thwarted by the political upheaval following the revolution in early 2011.[141]

183. DIPCO's shareholders were put in an untenable position as the financial close was delayed and the entire circumstance was driven by the conduct of the DPA and MOT after their differences with DIPCO appeared to have been resolved in May 2009.[142]

**Impossibility**

184. The events described in the context with *force majeure* also qualify as impossibility for Respondents to perform the Supply Agreement and the 2009 Amendment.

185. For this kind of situations, Art 159 of the ECC provides:[143]

> In bilateral agreements, if an obligation lapses due impossibility of performance the opposing obligations would lapse as well and the contract would be terminated by itself."

---

[137] R1-PHB2-CR §6.
[138] R1-PHB2-KH §§66 *et seq.*
[139] R1-PHB2-KH §68.
[140] See R1-SoD, pp 3 to 11 & 20 *et seq.*
[141] R1-PHB2-CR §38.
[142] R1-PHB2-CR §39.
[143] R1-PHB1-KH §83.

186. And Art 165 ECC states:

> If a person proves that the damage was caused by a foreign cause not related to him, as a sudden accident, force majeure , the mistake of the injured or the mistake of another (third party), he will not be responsible to compensate that damage unless a provision or an agreement stipulates otherwise.

187. Art 215 ECC states:

> In case of the debtor's impossibility of performance of an obligation in kind ( in rem) he will be adjudged to compensate due non-performance, save where the debtor establishes that non-performance was due a foreign cause not related to him, and the same will be in case of delay in the performance of his obligation.

188. The ECC and the 2009 Amendment therefore collectively demand that the Supply Agreement had terminated without any existing obligations of payment on DIPCO, and Sub-Clause 19.7 of the FIDIC General Conditions has no relevance in placing any liability on Respondent 1 in the alternative to Sub-Clause 16.4 in such circumstances.

**2009 Amendment Agreement**

189. In essence, by signing the 2009 Amendment, Doosan agreed to share the risk of the delay with Respondents whether and when a delivery of the Cranes would be possible. In return for the Project hopefully moving forward and the ability to sell Container Cranes in the interim and, thus, to generate liquidity, Doosan

(i) offered a 2% discount on the total contract price

(ii) accepted to condition any future payment under the Supply Contract upon the occurrence of the Financial Close;

(iii) accepted to cancel the existing delivery schedule for the Cranes and to leave the schedule to be determined by DIPCO's discretion; and

(iv) took sole responsibility for reselling the 14 ordered Cranes to third-parties so that it could improve its cash-flow situation, while agreeing to timely remanufacture new Cranes, at DIPCO's request and at the original price, and without claiming any compensation from Respondents in case the third-party sales resulted in a loss for Doosan.

190. DIPCO's obligations were suspended until Financial Close. "*The 2009 Amendment is express not that financial close is a prerequisite for the 2009 Amendment itself, but for payment obligations to arise.*"[144] And the exercise of Doosan's wish to sell Container Cranes to a third party was conditioned on Clause 4: "*The Parties agree that the exercise of Doosan to the option referred to in Clause 3 above is conditional upon the following [...]*".[145]

---

[144] R1-PHB1 §52.
[145] R1-PHB1 §§48 et seq.

191. As regards the wording of the third sub-paragraph of Clause 4(ii) of the 2009 Amendment, the principal (the capital) was conditioned on financial close, and the interest was to be calculated on the *"due amounts"*. Until the amounts were due, no interest could be due either.[146] Claimant wants to rely on the minutes of the 1 September 2010 meeting to indicate that interest was due regardless of the occurrence of the financial close.[147] But those minutes also expressly recorded that *"DIPCO and DOOSAN agreed to following payment in case financial close is at 01-nov-2010[,]"*[148] not regardless of it.

192. The "financial close" mentioned in Clause 4(ii) is a (suspensive) condition. The distinction between a condition and an – albeit indefinite - term under articles 265 and 271 of the ECC is between a "future and uncertain event" and a future certain event where the latter is "considered to be certain if it must happen of necessity even if at the time at which it should happen is unknown." Whether something "must happen by necessity" is not a question of the parties' perception.[149]

193. Moreover, the amount of USD 9mio under clause 4(ii) never fell due for two further reasons: First, there is an obligation on DIPCO to pay USD 9mio solely on the occurrence of the KPA tender not being won by Doosan, but Doosan won that tender and supplied cranes under a contract with KPA. Second, in clause 4(v) Doosan agreed to cooperate with DIPCO and KGLPI in future sales activities in general and in the specific KPA tender, what clearly occurred since Doosan supplied those cranes.[150]

194. The lack of Financial Close was not attributable to DIPCO as DIPCO's new management team worked diligently to address the requirements under a USD 480mio Facility Agreement with a lending consortium led by Ahli United Bank (**"AUB consortium"**), developing a two-phased construction plan to reduce the cost overruns[151] while DIPCO's shareholders committed to injecting over USD 140mio in additional funds. However, as DIPCO informed Doosan, the AUB consortium also required the government formally to approve the two-phased construction plan and a further extension to the opening date before Financial Close could be achieved.[152] DIPCO's management team began discussions with DPA to obtain this letter. However, to their surprise, DPA linked this approval with an additional demand that DIPCO pay further penalties.[153]

195. Moreover, the then appointed Minister of Transport interfered in DIPCO's negotiations with DPA and refused to provide an extension *"unless DIPCO agreed to pay incredibly high costs and other harsh conditions."* These new conditions would have made the Project financially infeasible and would have made it impossible to secure financing.

---

[146] R1-PHB1 §§53.
[147] C-PHB1 §66.
[148] Exhibit C-031 (Minutes of the Meeting held between Doosan and DIPCO in Korea on 1 Sept. 2010), §5; emphasis added .
[149] R1-PHB1 §§57 *et seqq.*
[150] R1-PHB1 §§62 *et seqq.*
[151] R1-REJOINDER §20.
[152] R1-REJOINDER §§20 *et seq.*
[153] R1-REJOINDER §35.

196. Then, a few weeks later, the Arab Spring came to Egypt. As it transpired, this effectively ended DIPCO's ability to obtain financial close.[154] And that failure was not a foreseeable outcome.

**No proper termination**

197. Article 221 of the ECC grants only the judge or the arbitrators the sole and exclusive authority and right to terminate agreements and to assess the due compensation, if any. Thus Doosan should have requested a court or an arbitration tribunal to implement or terminate the Supply Agreement and the 2009 Amendment with the argument of DIPCO's fault or default, if any, and in both cases it had to serve a Notice on DIPCO to give DIPCO the chance to abide by and implement the agreement by waving its default, if any, and to avoid the termination with compensation, if due, or to find any other solution, and to allow the arbitrators or the judge to decide termination or not.[155]

198. Moreover, Doosan could only have requested to implement the agreement by requesting its performance in kind under Article 203 or Article 209 of the ECC or against compensation, if justified under Article 215 respecting Articles 216, 218, 219 and in particular Article 221 of the ECC.[156]

199. Should the foregoing not apply, Doosan's termination still failed to comply with the procedure established in the Supply Agreement[157] and Doosan did not follow the steps prescribed by Sub-Clause 16 of the FIDIC General Conditions prior to terminating the Agreement: Doosan neither applied before or in the process of such termination the related required procedures under Sub-Clause 14.6 [Issue of Interim Payment Certificates], Sub-Clause 14.7 [Payment], Sub-Clause 14.8 [Delayed Payment] or else of those required conditions precedent to apply said Article 16, nor served the obligatory Notices there under (Notice of Suspension and Notice of Termination) and thereby none of the events under Sub-Clause 16.2 of the FIDIC General Conditions [Termination by contractor] did occur or was satisfied to enable Doosan to justify its application of this Sub-Clause 16 either to terminate the Supply Agreement or to base upon the quantification of any damages.[158]

200. Sub-Clause 16 of the FIDIC General Conditions provides for:

> If the Engineer fails to certify in accordance with Sub-Clause 14.6 [Issue of Interim Payment Certificates] or the Employer fails to comply with Sub-Clause 2.4 [Employer's Financial Arrangements] or Sub-Clause 14.7 [Payment], the Contractor may, after giving not less than 21 days' notice to the Employer, suspend work (or reduce the rate of work) unless and until the Contractor has received the Payment Certificate, reasonable evidence or payment, as the case may be and as described in the notice.

---

[154] R1-REJOINDER §§549 et seqq.
[155] R1-PHB1-KH §84.
[156] R1-PHB1-KH §4.
[157] Hearing Transcript Day 1, p 198 line 3 to line 11 (counsel for DIPCO).
[158] R1-PHB1-KH §80.

201. Only and only then,

> The Contractor shall be entitled to terminate the Contract if:
>
> (a) the Contractor does not receive the reasonable evidence within 42 days after giving notice under Sub-Clause 16.1 [Contractor's Entitlement to Suspend Work] in respect of a failure to comply with Sub-Clause 2.4 [Employer's Financial Arrangements], [...]

202. Furthermore, Doosan declared termination of the Contract, as pursuant to Article 16 of the FIDIC General Conditions of the Original Contract." Doosan did not specify what Sub-Articles of said Sub-Clause 16 it relies upon for such a termination, as none of the reasons of termination under Sub-Clause 16 of the FIDIC Conditions seemed to apply.

203. None of the events allowing for a Termination by Contractor pursuant to Sub-Clause 16.2(a) FIDIC Conditions had occurred. In particular, Sub-Clause 16.2(d) is not applicable as no substantial or any other failure or breach of the Employer was claimed or a related Claim Notice issued by Doosan to the Engineer in that respect as stipulated for in the Sub-Clause 20.1 [Contractor's Claims] or else of FIDIC Conditions and Doosan never quoted any. Sub-Clause 16.2(f) does not apply as no prolonged suspension under the FIDIC Conditions existed.

204. And, in all cases Doosan neither served the 21-days notice to suspend work under Sub-Clause 16.1 or the 14-days notice under Sub-Clause 16.2 second paragraph before terminating the Contract. The communications Doosan is referring to cannot be construed as notices in accordance with neither the applicable law nor any of the provisions of the FIDIC Conditions.

205. To sum up, Doosan never applied the provisions of the applicable law or the FIDIC General Conditions, either to serve the notices or otherwise, it never issued to the Engineer any Notice for a Taking-Over Certificate as under Sub-Clause 10.1 of the FIDIC General Conditions.[159] No Performance Certificate was issued by the Engineer to Doosan as under Sub-Clause 11.9 of the FIDIC General Conditions, noting that under this Article only such a Performance Certificate shall be deemed to constitute acceptance of the works. No Taking-Over Certificate was issued to Doosan. No Applications by Doosan for Interim Payment Certificates existed or were presented by Doosan for costs of work done as under Sub-Clauses 14.3 and 19.6 of the FIDIC General Conditions. No Statement of Completion was ever submitted by Doosan to the Engineer under Sub-Clause 14.10 of the FIDIC General Conditions, and most importantly, no notice of any claim has been presented by Doosan to the Engineer describing any breach of DIPCO or describing that Doosan issued any Additional Cost Notice or Certificate as a result of any unreasonable delay by DIPCO in permitting access to the works or plant (Site) as under Sub-Clause 12(4) of the FIDIC General Conditions, and no Contractor's notice of a Claim what so ever for any additional payment under any clause of the FIDIC General Conditions or otherwise in connection with the Supply Agreement has been given to the Engineer not later than 28 days after Doosan become aware, or should have become aware, of the

---

[159] R1-PHB2-KH §30.

event or occurrence that caused such an additional payment, noting that without such a claim Doosan (the Contractor) shall not be entitled to any additional payment and without such a notice DIPCO (the Employer) shall be discharged from all liability in connection therewith as all are under first paragraph of Sub-Clause 20.1 of the FIDIC General Conditions.

**No mitigation**

206. Doosan's primary objective in negotiating the 2009 Amendment was to secure the ability to sell the Container Cranes in the interim period before the hoped-for financial close. But Doosan did not act in good faith after the 2009 Amendment as it was at liberty to sell the Container Cranes but did not.

207. Under Article 148(1) of the ECC "[a] *contract must be performed in accordance with its contents and in compliance with the requirements of good faith.*"[160]

208. Doosan's responsibility to sell the Container Cranes is reflected in Clause 4(iii) of the 2009 Amendment, which requires Doosan to produce and supply "*Replacement Cranes*" for any Cranes sold. However, Clause 4(iii) goes on to state that this replacement obligation "*shall automatically include any other number of STS cranes which DIPCO might expressly permit DOOSAN to sell to third parties at a future date ...*" Thus, the parties expressly anticipated the possibility that all the Container Cranes could have been sold by Doosan.

209. Clause 4(iii) does not say anything about the price of any Container Cranes sold, nor does it contemplate that DIPCO dictate the price. DIPCO's primary concern in negotiating the 2009 Amendment only was that replacement cranes would ultimately be made available, if needed, at no additional cost for DIPCO.

210. Even more, in June 2010 DIPCO terminated the facility agreement with the AUB consortium, which meant that DIPCO no longer had to seek approval from its lenders before Doosan could sell the Container Cranes (this approval process had been an impediment in the sale of four Container Cranes that occurred in 2009).[161]

211. By not making reasonable efforts to sell the ten remaining Container Cranes in a timely manner (despite their deviations from the Supply Agreement specifications, there was a market for them, as demonstrated from the sale of four to HPH Panama in 2009), Doosan piled up over six years of alleged costs related to, *inter alia*, storage and maintenance of the cranes. Ultimately Doosan waited until 2016 to sell the cranes at a fire sale price of just USD 16mio. As DIPCO has demonstrated, selling the cranes for the price on two different occasions in 2013 would have netted Doosan USD 46.6mio, thus drastically reducing any damages claim.[162]

---

[160]   Exhibit RL-18 (Article 148 ECC).
[161]   See Exhibit C-018 (Minutes of the meeting held in Korea between DIPCO and Doosan, dated 1 April 2009).
[162]   R1-PHB1-CR §9.

212. Thus, most of the amounts claimed now could have been avoided or reduced if Doosan had sold more of the Cranes to third parties at an earlier time or had terminated the Supply Agreement at an earlier date.[163]

213. **Foreseeability:** Article 221(2) ECC states that *"a debtor who has not been guilty of fraud or gross negligence will not be held liable for damages greater than those which could have normally been foreseen at the time of entering into the contract."*[164] The events which overtook contract performance in this case could not have been foreseen at the time the Supply Agreement was executed between DIPCO and Doosan. Indeed, the events following the summer of 2009 in particular could not have been foreseen. Doosan's costs effectively appear to be for maintenance of the Container Cranes and work stoppage over a period of years in circumstances which were entirely unforeseeable even from the summer of 2009, as Egypt's political situation unravelled in unprecedented ways.[165]

The actions of the Egyptian government following the Amendment, which repeatedly stymied financial close, followed by the political upheaval in Egypt in 2011, eventually resulted in the failure of the Damietta Project. This failure was not a foreseeable outcome.[166]

**Advance Payment Guarantee**

214. DIPCO's request to cash the Advance Payment Bank Guarantees took place only when Doosan, till the last day of validity of these Bank Guarantees, did not renew either's validity on its expiry date and did not repay to DIPCO the amount of the advance payment, when it terminated the Supply Agreement.[167]

215. Even under Sub-Clause 14.2 of the FIDIC General Conditions the advance payment is linked to the opposing Bank Guarantees and thereby Doosan may not refuse both to extend the Bank Guarantees validity and/or not return the advance payment. Even more, the 4th paragraph of Sub-Clause 14.2 of the FIDIC General Conditions states that "the contractor (Doosan) shall ensure that the guarantee is valid and enforceable until the advance payment has been repaid.[168]

216. Once Doosan terminated the Supply Agreement it made it "as never existed" and thereby had to restore DIPCO to its position before such an agreement by returning the advance payment.[169]

217. The Bank Guarantees were issued by the Issuing Bank to guarantee only the repayment of the advance payment upon first request and irrespective of the relationship between Doosan and DIPCO and definitely not to guarantee any obligations of DIPCO towards Doosan. They constitute an independent, personal undertaking of the issuing bank that is not a party to this Arbitration and its undertaking may not be adjudged in this Arbitration

---

[163] R1-PHB1-CR §9.
[164] R1-SoD §112.
[165] R1-SoD §113; R1-REJOINDER §156.
[166] R1-PHB1-CR §74.
[167] R1-PHB2-KH §89.
[168] *Idem.*
[169] R1-PHB2-KH §§23 & 90.

and shall "totally remain out of the scope of this Arbitration and the jurisdiction of the Tribunal," especially as a court case in relation to these Bank Guarantees was filed in Egypt by DIPCO against the issuing Bank before Doosan started this Arbitration and this court case is still proceeding at this moment in Egypt by its natural judge and jurisdiction.[170]

### 3.    Tribunal's Determination

**No delivery notice**

218. As a first step, the Tribunal had to examine whether, as argued by Respondents, it was Doosan who defaulted on a delivery of the Cranes by not serving on DIPCO a formal delivery notice.

219. The evidence clearly shows, and it even remained undisputed by the Parties, that DIPCO was in no position to grant access to the Site where the Cranes were to be delivered and erected and that DIPCO recurrently requested to postpone these deliveries and, ultimately, could no more factually take over the Cranes after the Damietta Port concession of KGLPI had been withdrawn.[171]

220. The Tribunal does not deem it necessary to examine whether the statutory provisions regarding a formal delivery notice under the ECC Respondents have referred to are of a mandatory nature or not because they will not apply to a situation where the recipient of performance has explicitly stated not to accept performance and, even more, where the Parties subsequently and repeatedly agreed on new dates of performance and also entered in an agreement to adapt the underlying contract (the Supply Agreement) to the new circumstances resulting from the non-acceptance by DIPCO of the Cranes, as can be seen from the 2009 Amendment. It is hard to image a more explicit written confirmation of the cause of the non-delivery.

221. Remains the fact that the first set of cranes ready for delivery showed some technical "deviations" that might have qualified as an argument of DIPCO not to accept delivery (or to request repair works or a certain reduction of the price reflecting the value of rectification).

222. The Tribunal is of the view that these "deviations" became irrelevant relative to the non-acceptance by DIPCO of the Cranes. It is the time of takeover by the recipient when goods to be delivered (or installed) shall be free of defects. Thus, if parties agree to postpone a delivery the test whether the goods conform with the contractual terms and conditions will be also delayed until actual takeover.

223. This finding conforms with the intention the Parties had at that time as they agreed to settle the "deviations" in the context with payments which, indeed, would fall due under the original agreement upon delivery only. Moreover, no dispute arose over this issue which the Parties apparently did not raise before the present proceedings started.

---

[170] R1-PHB2-KH §90.
[171] C-SECONDREPLY §§76 et seq; R1-SoD §§41 et seq.

224. Therefore, the Tribunal does not follow Respondents' argument that it was Claimant who defaulted in delivery.

**Termination of the Supply Agreement, as amended**

225. Claimant has based the termination of the agreement on two arguments which were (i) not having been granted access to the Site, and (ii) due payments not having been made. Both events were presented as individual breaches of the agreement so that the Tribunal does not need to examine both of them.

226. For the Tribunal, the non-payment of USD 9mio (see §253 below) is a sufficient reason to decide that there was a breach by Respondent 1 under the Supply Agreement, as amended by way of sub-clause (ii) in conjunction with sub-clause (v) of the 2009 Amendment. This amount fell due when the KPA tender resulted in the delivery of other cranes and the negative (suspensive) condition of not selling "STS Cranes" to the Kuwait Port Authority was met and Doosan requested payment from DIPCO on 1 December 2009.[172]

227. Thus, DIPCO owed Doosan USD 9mio as of 1 January 2010, at the latest, in accordance with sub-clause 4(ii) of the 2009 Amendment.

228. Respondent 1 has argued that Doosan could only have requested to implement the agreement or receive payment from DIPCO with the assistance of the Egyptian competent court. This procedural requirement, however, does not appear to be of a mandatory nature as can be seen from Respondent 1's quote of Article 218 ECC[173] and Article 219 ECC,[174] which read:

> Article 218
>
> The compensation shall not be due unless after notice to the debtor, if not otherwise stipulated for (emphasis added).
>
>
> Article 219
>
> The notice to the debtor shall be by warning him or by what may substitute the warning, service of the warning may be effected by mail as stipulated for by the Procedural law, or according to an agreement thereby the debtor will be considered as noticed by occurrence of a term without the need for any other procedure.

229. The Supply Agreement (as amended) and the FIDIC General Rules are "stipulations" or "agreements", respectively, which do not provide for such kind of a judicial notice.

230. Respondents also argued that Doosan's termination still failed to comply with the procedure established in the Supply Agreement[175] and by Clause 16 of the FIDIC General

---

[172] Exhibit C-082.
[173] R1-PHB1-KH §4, FN6.
[174] R1-PHB1-KH §4, FN7; emphasis added.
[175] Hearing Transcript Day 1, p 198 line 3 to line 11 (counsel for DIPCO).

Conditions prior to terminating the Agreement. The Tribunal is of the view that Doosan was entitled "*to terminate the contract*" under Sub-Clause 16.2 (what it did by way of its letter of 4 March 2016),[176] if the Employer "*substantially fails to perform his obligations under the Contract*" (which was the non-payment of USD 9mio).

231. Contrary to Respondents' belief,[177] the procedures under Sub-Clauses 14.6 [Issue of Interim Payment Certificates], 14.7 [Payment] and 14.8 [Delayed Payment] of the FIDIC General Conditions were not applicable because these procedures would apply to amounts for work performed whereas Claimant's request for payments did relate to amounts owed pursuant to clause 4(ii) of the 2009 Amendment which were not for evaluating work performed and, thus, not linked to the involvement of an Engineer.

232. The consequences of the termination for cause (breach of the 2009 Amendment by DIPCO) under the provisions of ECC *in conj* with the FIDIC General Rules will be addressed in the section on the Quantum (§§327 *et seqq* below).

**Force Majeure; Impossibility**

233. In the view of the Tribunal, neither *force majeure* nor impossibility come at play. The reason is that Claimant, rightfully, based the termination of the Supply Agreement (as amended) on DIPCO's default in payment of the amount of USD 9mio, as provided for in Clause 4(ii) of the 2009 Amendment. This is in conformity with Doosan's termination letter[178] when Doosan made reference to "*DIPCO's consistent, serious and egregious breach of the Contract, and in particular of Clause 4(ii) of the Amendments*" (emphasis added).

234. However, *force majeure* and impossibility never are an excuse for defaulting on payments. Sub-Clause 19.2 of the FIDIC General Conditions expressly states that "Force Majeure shall not apply to obligations of either Party to make payments to the other Party under the Contract."

235. Respondents referred to the general provision of Article 165 ECC which states:[179]

> In bilateral contracts, if an obligation is terminated because of impossibility of its implementation, counter-obligations shall also be terminated, and the contract shall be rescinded by itself.

236. The Tribunal, however, does not believe that such impossibility would also refer to a money debt, following the general legal concept that a debtor may not plead impossibility because of not owning the necessary funds (inapplicability of an *exceptio non habendi pecuniae*).

237. Moreover, the factual situation – albeit not explicitly – underlying the 2009 Amendment was that the Respondents were not able to provide for Doosan's access to the Site and to attain the necessary funds to pay the purchase price of the Cranes. This can be clearly seen from the option granted to Doosan to sell cranes which otherwise should have been

---

[176] Exhibit C-012.
[177] Hearing Transcript Day 1, p 198 line 3 to line 11 (counsel for DIPCO).
[178] Exhibit C-012.
[179] R1-PHB1-KH §83 (translation by counsel for Respondent 1).

delivered to and erected at the Site of DIPCO and, in addition, from DIPCO's continuing right to be delivered with the original number of (possibly re-manufactured) Cranes should DIPCO, later on, be in a factual situation to acquire them (Clause 5 of the 2009 Amendment). In legal terms, the Parties had amended the Supply Agreement in such a way that the events that might have constituted *force majeure* and/or impossibility for Respondents were factored in and dealt with so to admit delay.

238. This is in line with Article 215 ECC as quoted by Respondents:[180]

> If a person proves that the damage was caused by a foreign cause not related to him, as a sudden accident, force majeure, the mistake of the injured or the mistake of another (third party), he will not be responsible to compensate that damage <u>unless a provision or an agreement stipulates otherwise.</u>

239. In the view of the Tribunal, the 2009 Amendment is such an agreement where the Parties, in light of the events occurring in the sphere of Respondents, agreed "otherwise".

240. Moreover, the Parties have agreed in the Supply Agreement to apply the FIDIC General Rules which, by and large, are a different set of stipulations and, thus, have priority over Art 165 ECC (whatever its correct application and interpretation might be).

241. The FIDIC General Rules are clear as regards the consequences of *force majeure* and/or impossibility (for details see the section on the Quantum under §§327 *et seqq* below).

**2009 Amendment Agreement**

242. To start with, the recitals of the 2009 Amendment refer a common intention of the Parties which, in the essence, was for DIPCO not to relinquish "any of its rights arising out of the Original Contract" and for Doosan to sell to a third party six STS Cranes which actually were due under the original contract to be supplied to DIPCO. Although no reference is made in the 2009 Amendment to DIPCO's requests for postponing the delivery of the Phase 1 Cranes, the meaning of the recitals is clear in light of the antecedents of the 2009 Amendment: Doosan had on stock ten cranes ready for delivery which DIPCO had ordered but was not in a position to take into charge, and Doosan was not entitled under the original contract to payments, beyond the original advance of USD 18,4mio, because further payments were tied to the delivery of these Cranes.

243. Thus, an economic solution evidently consisted in selling to third parties these Cranes which were ready for shipment but of no use for an uncertain time, on the one hand, and in manufacturing replacement cranes for DIPCO as soon as DIPCO would be ready for delivery, on the other.

244. The amendment was structured as an option of Doosan (Clause 3: "*may sell*"; Clause 4: "*option*"), what made sense as the economic rationality to sell these so-called "Disposal Cranes" would depend on the terms and conditions offered by third parties, on the one hand, and the later manufacturing costs of the so-called "Replacement Cranes," on the

---

[180] R1-PHB1-KH §83 (translation by counsel for Respondent 1); emphasis added.

other. Therefore, Doosan was free to decide whether to sell Disposal Cranes, but had to bear the extra costs connected with such sales (sub-clause 4(i)).

245. The economic conclusion therefore is that both sides wanted to find a way to avoid financial disadvantages resulting from the Disposal Cranes being an idle asset deteriorating in quality and up-to-dateness and causing costs of maintenance and storage. In addition, the sale of the Disposal Cranes was meant to create an earlier cash-flow for Doosan.

246. From a mere economic perspective, both sides must have found the 2009 Amendment to be in their interest at that time, as the postponement of delivery created financial risks on both sides. Its content, in the words of witness Park, corresponded with the "third solution" of the dilemma (see §160 above). It is against this background that the Tribunal had to interpret Clause 4 of the 2009 Amendment.

247. Clause 4 begins with the words that *"the exercise of DOOSAN to [sic] the option referred to in Clause 3 above is conditional upon the following."* The meaning is clear for the Tribunal: Should Doosan exercise the option to *"sell or supply the Disposal Cranes to a third party"* (last sentence of Clause 3), then the *"terms and conditions"* of Clause 4(i)-(vi) shall apply. To understand the words *"is conditional"* as a suspensive condition for the whole of Clause 4 would not make sense because sub-clauses (i)-(vi) do not contain a uniform condition *per se* but put only specific rights and obligations under a specific suspensive condition (in particular in relation to the "financial close", as argued by Respondents to be a condition, or the winning of the KPA tender, both referred to in sub-clause (ii)).

248. As regards sub-clause 4(ii), and the heavily disputed characterization of the *"financial close"* in relation to the USD 51mio payment, the Tribunal finds that, ultimately, the distinction between an "indefinite term" or a "suspensive condition" is irrelevant: First, it is clear from the structure of Clause 4 that the payments quoted in sub-clause 4(ii) constitute advance payments only. Otherwise the reference in the first sentence to a new "total price" would be contradictory. Now, if the "amount equivalent to 60% of the price of the unsold STS Cranes" is an advance payment falling due under the suspensive condition of a "financial close" and if the financial close never occurs, then this part of the price will fall due in such a way as if the prior, unconditional contractual position were in force, ie, *"in accordance with the Original Contract"*, as also pointed out in the last sentence of sub-clause 4(ii). As a consequence, if "financial close" and, thus, delivery never occurs and the agreement terminates (as it did), all open amounts (the remainder on the "total price") fall due upon termination.

249. As regards interest on such amounts, sub-clause 4(ii) is clear in stating that interest (at an annual rate of 6.5% pa) shall (unconditionally) accrue *"on the due amounts"*, starting from 1 September 2009. This a clear provision to retroactively apply interest as of this date.

250. The amount of USD 9mio was clearly and explicitly put under a suspensive condition (*"provided that the KPA tender mentioned below is not won by the consortium led by DOOSAN"*). "Mentioned below" evidently relates to sub-clause (v) where the tender known as the "Kuwait Port Authority (KPA)" is addressed and where it is stated that

Doosan "*shall participate as co-leader with KGLPI with regards* [sic] *to said tender for the supply of STS Cranes, related equipment and civil- and electrical works.*"

251. The KPA tender was won by DIPCO/Doosan, but it remained disputed among the Parties whether the suspensive condition was fulfilled as the cranes to be delivered under the KPA tender were different from those specified in the Supply Agreement. The Tribunal finds that the condition would have been fulfilled only if KPA tender had related to cranes as defined in the Supply Agreement. In sub-clause 4(ii) the 2009 Agreement refers to "*the KPA tender mentioned below*". It is sub-clause 4(v) which, in the following, addresses the KPA tender. There it was clarified that "*DOOSAN responsibility is limited to only supplying STS cranes to KPA as they are built under contract with DIPCO*" (emphasis added). Moreover, sub-clause 4(vi), which deals with a delivery under the KPA tender of possible additional STS cranes, limits such delivery to STS cranes "*based on the same terms, conditions, Specifications and process stipulated under the Original Contract*", ie, under the Supply Agreement.

252. It is undisputed that the KPA tender, in the end, was not for STS Cranes as specified in the Supply Agreement but other ones. Thus, the negative condition, after DOOSAN's payment request of 1 December 2009,[181] was fulfilled on 1 January 2010, at the latest, and the advance payment of USD 9mio fell due at that time.

**Breach**

253. Doosan declared to terminate the Supply Agreement, as amended, with its letter of 4 March 2016,[182] and made reference to DIPCO's breach of Clause 4(ii) of the 2009 Amendment, which is the clause on advance payments to be made. The non-payment of USD 9mio definitely constituted a breach by DIPCO of its contractual obligations so that the other advance payment in the amount of USD 51mio, which turns on the condition-vs-term issue need not to be examined.

254. Doosan's termination for cause is based on Sub-Clause 16.2 "Termination by Contractor" of the FIDIC General Conditions. It states in its relevant part:[183]

> The Contractor shall be entitled to terminate the Contract if: [...] (d) the Employer substantially fails to perform his obligations under the Contract.

255. Sub-Clause 16.4 [Payment on Termination] of the FIDIC General Conditions addresses the compensation triggered by a termination for cause. Sub-Clause 16.4, in its relevant part, reads as follows:[184]

> After a notice of termination under Sub-Clause 16.2 [Termination by Contractor] has taken effect, the Employer shall promptly: [...] (b) pay the Contractor in accordance with Sub-Clause 19.6 [Optional Termination, Payment and Release], and (c) pay the Contractor the

---

[181] Exhibit C-082.
[182] Exhibit C-012.
[183] Exhibit C-028.
[184] Exhibit C-028.

> amount of any loss of profit or other loss or damage sustained by the Contractor as a result of this termination.

256. This contractual provision would have also applied, in the alternative, to a termination for the *force majeure* / impossibility scenario, which the Tribunal, however, does not follow.

257. Sub-Clause 19.6 of the FIDIC General Conditions defines the amount to be paid. Thus, Doosan is entitled to two relevant compensation amounts, namely: [185]

> (a) the amounts payable for any work carried out for which a price is stated in the Contract; [...] (c) any other Cost or liability which in the circumstances was reasonably incurred by the Contractor in the expectation of completing the Works [...]

258. Therefore, Sub-Clause 16.4 and its referenced other provisions of the FIDIC General Conditions, place Doosan in the position it would have been in had it not terminated the Supply Agreement, as amended, because of the Respondents' material breach of it.

259. The FIDIC General Conditions achieve this purpose by ordering payment to Doosan of three different categories of compensation:
- the price for the works undertaken (16.4(b) in conjunction with 19.6(a));
- the cost or liability it reasonably incurred in the expectation of completing the works (16.4(b) in conjunction with 19.6(c)); and
- the loss of profit or other loss or damage it sustained (16.4 (c)).

260. The Tribunal therefore will apply these criteria when deciding on the Quantum of the claims raised (see §§327 *et seqq* below).

**Mitigation**

261. To mitigate damages is an objection an injuring party may raise against an injured party with the argument that the injured party should have acted or should have omitted certain actions in such a way that the damage would have been lower. This is an accepted obligation in international arbitration.

262. Following the general principle that facts supporting a party's claim (in the case at hand, the negatory claim of mitigation) shall be proven by such party, [186] the burden of proof is with Respondents.

263. Both Parties agree that Article 216 ECC is *sedes materiae* providing that "*the judge may reduce the amount of damages or may even refuse to allow damages if the creditor, by its own fault, has contributed to the cause of, or increased, the loss*". [187] Article 216 ECC must be read in conjunction with Article 221 ECC, which also bears on the concept of mitigation and provides that, in case of breach of contract, [188]

---

[185] Exhibit C-028.
[186] TRANS-LEX.ORG Law Research (University of Cologne), N° XII.1 – Distribution of burden of proof, https://www.trans-lex.org/966000/_/distribution-of-burden-of-proof/ (last visit on 5 January 2018).
[187] Exhibit RL-18, Article 216.
[188] Exhibit RL-18, Article 221; emphasis added.

> [...] the amount of damages includes losses suffered by the creditor and profits of which he has been deprived, provided that they are the normal result of the failure to perform the obligation or of delay in such performance. These losses shall be considered to be a normal result, if the creditor is not able to avoid them by making a reasonable effort.

264. Thus, Egyptian civil law, like other civil-law jurisdictions, follows the concept of contributory fault: If the insured party could have "reasonably" avoided the loss, then this loss – albeit an adequate consequence of the damaging event – cannot be said to flow directly from the breach to the extent the insured party could have "reasonably" avoided such loss. It appears that both, Claimant and Respondents, agree on that concept of law.[189]

265. Respondents have argued that Claimant could have mitigated its losses by terminating the Supply Agreement (as amended) at an earlier point in time and/or selling to third parties Cranes earlier and more of them so that costs of storage and maintenance would have been lower and the price achievable from third parties would have been higher. The Tribunal does not follow this reasoning.

266. Firstly, the Tribunal deems it a basic right of a creditor to stick to a contract and insist on performance by a debtor. Thus, a duty to mitigate damages does not stretch so far that a creditor would be under a legal obligation to rescind a contract.

267. This is even truer when the debtor (DIPCO, in the case at hand) is in a contractual position where it may, as opposed to the creditor, terminate a contract without cause (see Sub-Clause 15.5 of the FIDIC General Conditions) and where the events which are the cause of the losses belong to the debtor's sphere and are therefore under the debtor's control to greater extent than under the control of the creditor.

268. In the view of the Tribunal, the purpose of the 2009 Amendment was to jointly mitigate costs and losses. In other words, the Parties, at that time, set a framework how to address the apparent delay in performing the original Supply Agreement and laid down the elements of an economically "reasonable" behaviour in that situation.

269. The main elements of the 2009 Amendment in order to jointly mitigate the negative economic effects of the delay were the following:

- DIPCO's right to be delivered with the number of Cranes as defined in the Supply Agreement was to "remain valid and enforceable" (Clause 5 of the 2009 Amendment).

- Both Parties expected these deliveries to occur by the end of August 2009, on the basis of the "financial close" (acceptance of the new business plan of DIPCO by its shareholders and lenders; irrespective whether the financial close is to be interpreted as a suspensive condition or a term), and set for these deliveries in Sub-Clause 4(iv) a tight timeframe for delivery requests (of DIPCO) and delivery dates (to be observed by Doosan).

---

[189] C-PHB1 §§88 *et seqq*; R1-PHB2-CR §§67 *et seqq*.

- The main arrangement was that Doosan was granted the "option" to sell a certain number of Cranes which were actually due to be supplied to DIPCO under the original contract (the "Disposal Cranes") to a third party in order to generate cash-flow it financially needed. At the same time, Doosan had to be ready for delivery to DIPCO of identical Replacement Cranes at the original prices and the other terms and conditions and under the time frame mentioned before.

270. This allows the Tribunal to conclude that the Parties have set with the 2009 Amendment a framework of "mitigation" much more specific and narrow as it might flow from a general statutory duty of mitigation under civil law. The arrangement was stricter because Doosan, although being "allowed" to sell the Disposal Cranes, was prevented under the 2009 Agreement from passing on losses from such sales to DIPCO so that the risk of making a bad deal in comparison to supplying the Cranes to DIPCO at a later time was fully with Doosan. Conversely, the possibility to sell the Disposal Cranes was granted to Doosan explicitly as an "option" so that it was free to decide whether it would risk a bad deal and go ahead with the sale of Disposal Cranes, or not.

271. The Tribunal therefore concludes that the 2009 Amendment fully reflects what the Parties agreed on how to "mitigate" the consequences of DIPCO's delay in the takeover of the Cranes and that Doosan was under no obligation to follow up on other measures of mitigation, if any at all.

272. Moreover, the primary person to mitigate the consequences of its default in acceptance of the Cranes would have been DIPCO as it was much better positioned to foresee and control the future timing of the delivery to it of the Cranes. Thus, as correctly pointed out by Claimant, DIPCO itself could have requested delivery of the Cranes and could have either stored them at its cost for later use or sold them on to third parties, under arrangements, if necessary, with Doosan to adapt them to specific needs of such third parties.

273. But even when assuming that Doosan had to apply additional efforts on its side to mitigate damages beyond the setting of the 2009 Amendment, it acted "reasonably" in the view of the Tribunal.

274. When performing such a reasonability test, the Tribunal, first, has to consider what amounts claimed by Doosan qualify as damages of an injured party. Here, the Tribunal concurs with Claimant's view that most of its claims are for payment for work performed (pursuant to sub-clause 19.6(a) of the FIDIC General Conditions) or, in the alternative, for manufacturing cost as well as storage and maintenance cost incurred in the performance of the contract (pursuant to sub-clauses 19.6(b) and 19.6(c) of the FIDIC General Conditions). These amounts are all due to a Contractor in any case, ie, even if the Employer is found not to have breached the supply agreement.

275. But even when assuming that these claims did constitute "damages", Respondent 1 did not demonstrate and prove that Doosan behaved "unreasonable" when performing the Supply Agreement in its 2009 version during the time period before it finally decided to terminate the contract (whereupon the specific rights and obligations of a party, when terminating a contract for breach, under the FIDIC General Conditions are kicking in).

276. Second, the "window of opportunity" for Doosan to sell Cranes to third parties was extremely narrow, as it has demonstrated.[190] The window opened when it received in September 2010 from DIPCO the authorization to sell Cranes to third parties (the "**September 2010 Authorization**"),[191] which was conditioned not only on the requirements previously imposed in the 2009 Amendment (such as the obligation to manufacture Replacement Cranes on demand, at the original price, and the commitment not to claim from the Respondents any losses that could result from selling the Cranes to third parties), but also on compliance with a tight new delivery schedule.

277. In more detail, Claimant's reasoning, which remained un-refuted, was "reasonable", as described in its last submission:[192]

> Specifically, a first batch of four Cranes was to be shipped on 15 September 2011, a second shipment of 6 Cranes on 15 February 2012, and a final shipment of 4 Cranes on 15 September 2012.86 Knowing that it takes between 12 and 18 months to manufacture new Cranes, Doosan could in reality only sell up to six Cranes to a third party in the period beginning September 2010 if it wanted to comply with this schedule. Moreover, if it sold those six Cranes, Doosan would have to begin manufacturing their replacements by February 2011, at the very latest (ie, 12 months in advance of required delivery on 15 February 2012).

278. So, in fact, the September 2010 Authorization gave Doosan a window of only four months (between October 2010 and February 2011) to sell up to six Cranes that it would then have to begin remanufacturing immediately. The evidence gathered during the proceedings does not show any attractive sale opportunity that Doosan ignored in that short period of time. As the witness Jongsuk Park credibly stated, the market price of the Cranes had already fallen at that time well below the manufacturing costs,[193] not to mention technical modifications that would be required to conform with the specifications of any potential buyers.

279. The Tribunal concurs with the choice Doosan was confronted with, submitted in the proceedings as follows:[194]

> In other words, beginning with the September 2010 Authorization, Doosan faced a simple choice: (i) sell the Cranes immediately to a third-party at a significantly (and increasingly) discounted price – thus incurring potentially irrecoverable losses on the Cranes' manufacturing costs but saving additional storage and maintenance costs – or (ii) incur additional storage and maintenance costs but potentially avoid all losses on the Cranes' manufacturing costs by delivering the Cranes to

---

[190] C-PHB2 §§66 et seqq.
[191] Exhibit C-031 (Email from H Meeuwsen [DIPCO] to C Chae [Doosan], attaching Minutes of the Meeting held between Doosan and DIPCO in Korea on 1 September 2010), p 3, Item 4.
[192] C-PHB2 §§67 et seq.
[193] First Witness Statement of Jongsuk Park §43.
[194] C-PHB2 §71.

> Respondents when the Project resumed and receive the full Contract Price. Needless to say, the balance between these two options weighed in favor of the second one, especially when Respondents were themselves optimistic about the Project's chances of resuming.

280. For all these reasons the Tribunal finds that Claimant, even when qualifying all amounts Doosan claims as damages of an injured party, behaved reasonably during the lifetime of the Supply Agreement in the 2009 Amendment version and, thus, its claim shall not be reduced with the argument of a duty of mitigation on its side.

281. **Foreseeability:** Article 221(2) ECC stipulates as follows:

> When, however, the obligation arises from contract, a debtor who has not been guilty of fraud or gross negligence will not be held liable for damages greater than those which could have normally been foreseen at the time of entering into the contract.[195]

282. As held by the Tribunal in the context of Force Majeure / Impossibility, the Parties took account of the circumstances that impeded timely delivery in the 2009 Amendment. This is the perspective one has to consider when examining foreseeability.

283. It is clear from the very wording of the 2009 Amendment that the Parties addressed the circumstances that had already arisen and contemplated additional delays. In other words, they were not only aware of these negative circumstances but, even more, provided contractual stipulations for such situations ~ by authorizing Doosan to sell "Disposal Cranes", on the one hand, and by maintaining Doosan's obligation, in principle, to deliver Container Cranes should the circumstances allow DIPCO to proceed with the Damietta Project and to be supplied with the Container Cranes.

284. The Tribunal therefore finds that the Parties quite well foresaw ensuing obstacles for delivery at the time when they entered into the 2009 Amendment and provided specific contractual consequences for such obstacles. In more detail, it was foreseeable for the Parties that a failure to pay Doosan under Sub-Clause 4(ii) of the 2009 Amendment would result in Doosan incurring additional costs and/or damages for the Container Cranes standing idle at Doosan's premises, awaiting potential future delivery.

**Advance Payment Guarantee**

285. The Advance Payment Guarantee is an accessory instrument securing the repayment of Doosan's advance payment. It results from the very nature of a security (like a bank guarantee, a pledge or a mortgage) that the creditor's right to make use of the security depends on the (continuing) existence of the secured claim.

286. The termination of the Supply Agreement (as amended) entailed its winding up and a settlement of the Parties mutual claims. On Respondents' side, the advance payment they had initially made had to be credited in their favour.

---

[195] Exhibit RL-18, Article 221; translation by counsel for Respondent 1.

287. In the case at hand Claimant has applied Respondent 1's claim for reimbursement of the advance payment against its claims resulting from the breach and the termination of the Supply Agreement so that Respondent 1's counterclaim is satisfied. This, in the view of the Tribunal, is why Respondent 1 has withdrawn the counterclaim it had originally made in the present proceedings.[196]

288. In the light of the proceedings pending before the Egyptian court where Respondent 1 tries to enforce its call on the Advance Payment Guarantees the Tribunal finds that the Claimant has sufficient legal interest to seek a declaratory ruling to the effect that Respondents are not entitled to any restitution of the advance payment to Respondents.

289. It should be added that the declaratory relief this Tribunal is granting has an effect solely for the legal relationship between Claimant and Respondents, as opposed to the legal relationship between Respondent 1 and the bank having issued the guarantees. Thus, it will be up to the Egyptian court whether Respondent 1's estoppel to make use of the bank guarantees will have a direct impact on the claim they have lodged against the bank.

## H. KGLPI AND DIPCO JOINTLY LIABLE?

### 1.1    Claimant's Position

290. KGLPI should be held jointly and severally liable toward Doosan as DIPCO's co-debtor as a matter of Egyptian civil law which, like most other jurisdictions, allows not only for written and oral, but also tacit agreements by way of signs in general use or by such conduct as, in the circumstances of that case, leaves no doubt as to its true meaning.[197]

291. This approach under Egyptian law comports with the general rule typically espoused by international arbitral tribunals. Gary Born notes that "[u]nder most developed legal systems, an entity may become a party to a contract, including an arbitration agreement, impliedly – typically either by conduct or non-explicit declarations..."[198]

292. The evidentiary record clearly shows that KGLPI impliedly consented to be bound by the Supply Agreement and its arbitration provisions according to the tests set forth in arbitral case law, French law, and Egyptian law.[199]

293. Article 47(1) of the Egyptian Commercial Code provides that "[t]*hose who are bound together for a commercial debt shall be jointly responsible for that debt, unless otherwise prescribed by the law or the agreement.*"[200] Similarly, arbitral case law supports a finding of joint liability between entities of the same group of companies that indistinctively participate in a contractual relationship and jointly benefit from it.[201] Therefore, as a consequence of the fact that KGLPI participated in the Supply Agreement alongside DIPCO in an interchangeable manner and benefited from this contract as a joint owner of

---

[196] *Cf* the relief sought in R-ANSWER and in R1-SoD.
[197] C-PHB2 §§119 *et seq.*
[198] *Idem.*
[199] C-PHB2 §117.
[200] C-PHB2 §121.
[201] *Idem.*

the Damietta Concession, to be jointly and severally liable is the manner KGLPI should be held in relation to Doosan.[202]

294. This view is supported by the final award in the ICC Case No. 5103.[203]

### 1.2 Respondents' Position

295. Even if KGLPI were to be joined to this arbitration, it would be neither solely nor jointly bound by DIPCO's agreements nor responsible for any liabilities of DIPCO under the applicable laws, as KGLPI is a completely different legal entity.[204]

296. The Parties are at least in agreement that the formation of any contract between Claimant and Respondent 2 is a matter of Egyptian law.[205]

297. Under Articles 89 and 90 of the ECC contracts are formed by mutual consent. The intention of a party has to be reflected by conduct which, in the circumstances of the case, leaves no doubt as to its true meaning, and no weight shall be given to an intention which is not directed towards producing a legal effect.[206]

298. Third parties cannot be bound to obligations in Egyptian contract law:

> A contract does not create an obligation on third parties, however it can earn the latter a right.

299. Moreover, a joint liability must be expressly established by contract or law. A joint liability between creditors or between debtors is not assumed *per se* and shall only be based upon an agreement or provision of the law.[207]

300. The actual will of KGLPI was to simply act as the Employer's Representative.[208]

### 1.3 Tribunal's Determination

301. The Tribunal has accepted jurisdiction over Respondent 2 with the argument that KGLPI was closely involved in the preparation, negotiation and performance of the Supply Agreement and the 2009 Amendment, and that it acted in its own interest (as the holder of the Port license) and as the parent member of a group of companies to which DIPCO belonged.

302. To decide on jurisdiction, however, is an issue under procedural law, whereas a party's joint and several liability is an issue under substantive law, ie, under Egyptian law in the case at hand.

303. In the view of the Tribunal, the facts surrounding the negotiation and execution of the Supply Agreement and the - albeit parallel and overlapping - functions and interventions of KGLPI in the context of the Project in the years 2006 through 2008 do not sufficiently

---

[202] *Idem.*
[203] Exhibit CL-058.
[204] R1-PHB1-KH §32.
[205] R1-PHB2-CR §17.
[206] R1-PHB2-CR §18.
[207] R1-PHB2-CR §20.
[208] R1-PHB2-CR §20.

demonstrate a uniformly shared contractual intention of the Parties of the Supply Agreement to conclude that KGLPI became another contract party or a guarantor on the Employer's (DIPCO's) side.

304. This, however, changed when Doosan and DIPCO entered into the 2009 Amendment and KGLPI was introduced to it in Sub-Clauses 4(v) and 4(vi) as a legal entity that should acquire certain rights in relation to Doosan and DIPCO.

305. Under Sub-Clause 4(v) Doosan undertook to cooperate with DIPCO and KGLPI in future sales activities and, in particular, to finalize the tender known as the tender of the Kuwait Port Authority (the "KPA") and to participate as co-leader with KGLPI with regard to said tender for the supply of STS Cranes, related equipment and civil- and electrical works.

306. In Sub-Clause 4(vi) Doosan went even a step further by obliging itself "to supply an additional number of STS Cranes to the KPA under the KPA tender based on the same terms, conditions, Specifications and process stipulated under the Original Contract", ie, the Supply Agreement.

307. To begin with from a legal perspective, to ask Doosan in Sub-Clause 4(v) to cooperate and to participate as co-leader are broad legal terms aimed at having the cranes at disposal for KGLPI in the context with the said tender.

308. Sub-Clause 4(vi) is more specific in the sense of contractually obliging Doosan to supply, ie to sell, a certain number of Cranes should the KPA tender be successful.

309. The first conclusion, here, is that Sub-Clauses 4(v) and 4(vi) are meant to grant a third party (KGLPI) certain rights. In that sense, these clauses constitute a contract in favour of a third party. Yet, the Tribunal agrees with Respondent 1 that such kind of a contract does grant rights to but does not impose obligations on the third-party (see §298 above).

310. This, however, may change when the third party accepts the contractual position it has been offered in its favour. And the evidence shows that KGLPI, at least tacitly, accepted the position it was offered in the 2009 Amendment when it followed up on Sub-Clauses 4(v) and 4(vi) of the 2009 Amendment in a teleconference on 9 July 2009 with Doosan by inviting Doosan into the joint venture alongside with KGLPI in order to successfully participate in the KPA tender. It remained undisputed that the joint venture was formed and that KGPLI together with Doosan participated in the KPA tender.

311. To be more precise, under Sub-Clause 4(v) of the 2009 Amendment KGLPI became entitled, as a beneficiary third party, to request Doosan to enter into a partnership (joint-venture) with KGLPI whereby Doosan would contribute to the joint venture its undelivered Cranes which, if successful in the tender, would be sold on to the Kuwait Port Authority.

312. According to the wording of Sub-Clause 4(vi) of the 2009 Amendment, it was DIPCO who could request Doosan to sell additional Cranes to the KPA. But since it was KGLPI who participated in the KPA tender it is evident that it was again KGLPI who would launch such a request, in its own interest as a bidder. In legal terms, Doosan undertook to supply additional Cranes should KGLPI so wish and would either enter into a sales contract directly with the KPA or contribute these Cranes to the tender partnership with KGPLI for further re-sale of these Cranes to the KPA.

313. Whatever the legal structure of the foregoing would be, it remains clear that KGLPI, when accepting the section of the 2009 Amendment offering it a third party beneficiary position would necessarily have also to accept the obligations belonging to that position. In other words, KGLPI would have to pay, or at least warrant the payment, owing from the acquisition of the Disposal Cranes set aside for the KPA tender. Or, to phrase it in economic terms, KGLPI would have to finance the price of the Disposal Cranes against KGPLI's later refinancing out of the subsequent resale of the Disposal Cranes to the Kuwait Port Authority.

314. The Tribunal therefore concludes that KGLPI accepted the third-party beneficiary position when it proceeded under the KPA tender and, thus, undertook to warrant the payment of the Disposal Cranes. Moreover, Sub-Section 4(vi) of the 2009 Amendment broadened KGPLI's position to an (open-ended) "additional number of STS cranes," so that its financial responsibility for warranting the payment of Cranes can be interpreted meant to stretch to any of such Cranes.

315. As a next step, the Tribunal has to evaluate whether the foregoing sufficiently reflects an intention of the parties (including KGLPI as the third party beneficiary) to take on KGLPI as a participant with certain rights and obligations to the Supply Agreement in the 2009 Amendment version. This has to be done against the background of the prior conduct and intentions of all three Doosan, DIPCO and KGLPI.

316. The evidence shows that KGLPI had a double interest. First, it was interested from the very beginning, as the holder of the Port license, to keep the protracted Project afloat by allowing DIPCO and, indirectly, Doosan to further keep the delivery of the Cranes on hold by way of allowing them to sell the Disposal Cranes to third parties and refinancing Doosan's accrued costs of storing and maintaining the manufactured Cranes, but, at the same time, maintaining Doosan's delivery commitment.

317. The 2009 Amendment introduced a second interest of KGLPI which was to successfully participate in the KPA Tender by having appropriate Cranes at its disposal.

318. Here, one must consider all the many elements showing that KGPLI, from the very first moment or even before DIPCO, was the entity strongly interested in implementing the Project including the acquisition of appropriate cranes. Against that background, the acceptance by KGLPI of the position it was offered as a third party in the 2009 Amendment must have stretched much further than the mere acquisition of Cranes under Sub-Clauses 4(v) and 4(vi). KGPLI, as a shareholder of DIPCO, was fully aware of these Cranes being in an extremely problematic situation in both legal and economic terms. It would not have made sense for either party to solely grant KGPLI the right to have a certain number of these Cranes at its disposal for the KPA Tender without warranting the sales relationship underlying these Cranes, ie, the (delayed) supply to DIPCO of the Cranes for the Damietta Port and, as a consequence, the payment of the respective purchase price.

319. In other words, KGLPI had the opportunity to kill two birds with one stone, ie, to participate in the KPA tender and simultaneously to make an economic use of the idle Cranes without relinquishing the right of later delivery should the Damietta Port project continue. Thus, in the protracted situation reflected in the 2009 Amendment it made no

sense for KGLPI to simply purchase Cranes out of the stock designated for the Damietta Port project without warranting the fulfilment of the underlying deliveries, by either becoming a co-debtor or, at least, a guarantor on the side of DIPCO.

320. This, in the view of the Tribunal, must have been the understanding of all three entities when negotiating, concluding and implementing the 2009 Amendment. This conclusion is also supported by the reference in Sub-Clause 4(ii) to a "financial close" as "the date of the acceptance of the new business plan of the call by the shareholders and the lenders of DIPCO, among which KGLPI must have been the most prominent and interested partner.

321. It is true that KGLPI was defined in the Supply Agreement as the "Employer's Representative". Yet this does not change the fact that KGLPI was the main shareholder of DIPCO, the organizer of the Damietta Port Tender and the holder of the Port license. It made sense to grant KGLPI to the outside the position of a representative so that KGLPI could, at any time, monitor, at first hand, all activities of the special purpose vehicle DIPCO.

322. The Tribunal is aware that Egyptian civil law follows internationally accepted standards as to the form contractual undertakings when Articles 89 ECC[209] provides that "[a] contract is created, subject to any special formalities that may be required by law for its conclusion, from the moment that two persons have exchanged two concordant intentions," while Article 90 ECC[210] provides that "[a]n intention may be declared verbally, in writing, by signs in general use, and also by such conduct as, in the circumstances of that case, leaves no doubt as to its true meaning." Article 90 of the ECC goes on to state that "[a] declaration of intention may be implied when neither the law nor the parties require it to be expressed."[211]

323. Thus, also under Egyptian civil law, the Tribunal had to evaluate the involvement and conduct of KGLPI and DIPCO vis-à-vis DOOSAN, as it preceded the 2009 Amendment, and had to conclude that KGLPI, at least tacitly, acceded to the Supply Agreement (in its amended version). Whether KGLPI became a co-debtor (as a main debtor together with DIPCO) or a guarantor (as an accessory debtor with the right of recourse against DIPCO) is irrelevant for the case at hand because only the internal relationship between these two companies would be concerned.

324. When characterizing KGLPI as a co-debtor, one has to determine whether it assumed a joint and several or a partial liability. Since the present matter is a business matter, Article 47(1) of the Egyptian Commercial Code applies which provides that "[t]hose who are bound together for a commercial debt shall be jointly responsible for that debt, unless otherwise prescribed by the law or the agreement."[212] Even when disregarding this statutory provision the result would be the same as the debt at hand is indivisible.

---

[209] Exhibit CL-057.
[210] Idem.
[211] Idem; see also C-PHB2 §§119 et seq.
[212] C-PHB1 §47.

325. Similarly, arbitral case law supports a finding of joint liability between entities of the same group of companies that indistinctively participate in a contractual relationship and jointly benefit from it.

326. The Tribunal therefore concludes that Respondent 2 is jointly and severally liable with Respondent 1 towards Claimant for the claims Claimant has made in the present proceedings.

## I.   ON THE QUANTUM: THE PARTIES' FACTUAL ASSERTIONS AND LEGAL ARGUMENTS

### 1.   Termination Scenario

#### 1.1   Claimant's Position

327. There is an alternative in the quantum part the Arbitral Tribunal has to consider but not necessarily to decide.[213]

328. The first juncture in the analysis depends on the cause of termination Doosan was entitled to invoke, ie, termination for breach (in which case Sub-Clause 16.2 of the FIDIC General Conditions would apply) or termination for impossibility (in which case Sub-Clause 19.7 of the FIDIC General Conditions would apply).[214]

329. The compensation triggered by a termination for cause is stipulated in Sub-Clause 16.4 of the FIDIC General Conditions, which, in its lit (b), refers to Sub-Clause 19.6 of the FIDIC General Conditions.[215] This is the key provision on compensation in the event of a termination by the contractor, but applies also in the alternative of a termination for impossibility.[216]

330. Due to Respondents' substantial breach of the Supply Agreement, Doosan was entitled to terminate the Supply Agreement for breach under Sub-Clause 16.2 of the FIDIC General Conditions.[217] Accordingly, the Tribunal needs only to deal with the primary termination scenario.[218]

#### 1.2   Respondents' Position

331. Respondents did not breach the Supply Agreement[219] and, in any event, Claimant did not notify Respondents of any breach as it should have pursuant to the FIDIC General Conditions.[220]

---

[213] C-PHB1 §107.
[214] C-PHB1 §§109 et seq.
[215] C-PHB2 §129.
[216] C-PHB2 §129.
[217] C-PHB1 §110.
[218] C-PHB1 §110.
[219] See §203 above for details on Respondents' position.
[220] See §205 above for details on Respondents' position.

332. Should the Tribunal find that there was no breach following the 2009 Amendment, then the Supply Agreement terminated without any further obligations of payment on DIPCO.[221]

### 1.3   Tribunal's Determination

333. The Tribunal has found that the Supply Agreement was terminated by Claimant for cause (breach).[222]

334. Therefore, the consequences of the termination are governed by Sub-Clause 16.4 of the FIDIC General Conditions, which, in its lit (b), refers to Sub-Clause 19.6 of the FIDIC General Conditions.[223] This has not been disputed by Respondents.

### 2.   Calculation Method: Price or Costs?

### 2.1   Claimant's position

335. Within each of the termination scenarios there are two alternative calculations possible: One based on Sub-Clause 19.6(a) of the FIDIC General Rules (based on the agreed price) and one based on Sub-Clause 19.6(c) of the FIDIC General Rules (based on the incurred costs).[224]

336. While these alternative methods of calculation would yield different results in the scenario of a termination for impossibility, they lead to the same result in the scenario of a termination for breach - the reason being that Doosan, in the latter scenario, will be also entitled to lost profits in addition to costs, whereas price, at the outset, equals costs plus a profit margin.[225]

337. Therefore, the Tribunal does not need to decide whether to adopt the price or the cost approach when finding that the Supply Agreement was terminated for breach.[226]

338. Sub-Clause 16.4 and the referenced other provisions of the FIDIC General Conditions place Doosan in the position it would have been in but for the valid termination of the Supply Agreement for cause[227] by authorizing payment to Doosan of (i) the price for the works undertaken (Sub-Clause 16.4(b) in conjunction with Sub-Clause 19.6(a)); (ii) the costs and liabilities Doosan reasonably incurred in expectation of completing the works (Sub-Clause 16.4(b) in conjunction with Sub-Clause 19.6(c)); and (iii) the loss of profit or other loss or damage Doosan sustained (Sub-Clause 16.4(c)).[228]

339. Respondent 1's suggestion that the Parties would be in agreement on the application of Sub-Clause 19.6(c) (based on the incurred costs plus lost profit) is misleading and only correct in the event that the Tribunal would decline to calculate Doosan's entitlement

---

[221] R1-PHB2-CR §47.
[222] See §§253 *et seqq* above.
[223] Exhibit C-028; *cf* §45 & §49 above.
[224] C-PHB1 §112.
[225] C-PHB1 §§110 *et seqq.*
[226] C-PHB1 §112.
[227] C-PHB2 §131.
[228] C-PHB2 §132.

under Sub-Clause 19.6(a) of the FIDIC General Conditions (based on the agreed price).[229]

## 2.2 Respondents' Position

340. Sub-Clause 19.6(a) of the FIDIC General Conditions refers to *"the amounts payable for any work carried out for which a price is stated in the Contract"*. However, after the July 2009 Amendment, there was only one price fixed under the contract: for its total completion.[230] Therefore, the correct approach is to (only) apply the cost method, ie to take into account the costs incurred in the expectation of completing the works under Sub-Clause 19.6(c) of the FIDIC General Conditions and lost profits under Sub-Clause 16.4(c) of the FIDIC General Conditions.[231]

## 2.3 Tribunal's Determination

341. The disagreement between the Parties on whether the "price" or the "costs" approach is appropriate only turns on Doosan's claim for consideration for ten Container Cranes. All other payment claims of Doosan have been based on *"costs"* or *"liability"* (in terms of Sub-Clause 19.6(c) of the FIDIC General Conditions) or on *"lost profit"* (in terms of Sub-Clause 16.6(c) of the FIDIC General Conditions).

Schedules A.1 to A.4 of the Supply Agreement contain a detailed breakdown of the price agreed between the Parties.[232] It remained undisputed between the Parties that from these Schedules, a price per Container Crane can be established.

342. In Sub-Clause 4(II) of the 2009 Amendment, the Parties agreed on a reduction of the total price:

> "DOOSAN agrees that the total price for the fourteen (14) cranes shall be 120,000,000 $ (only one hundred and twenty million US dollars) including all costs, fees, any claims such as transportation costs and claims for changes of oil, ropes, etc,.. and also the costs of fixation of any problem that may be discovered after the delivery. [...]"[233]

343. Respondent 1 is correct in pointing out that the 2009 Amendment does not include a breakdown of the reduced total price. However, as shown by Claimant's expert,[234] one can calculate the reduction of the total price in percent and then reduce the price for the individual works as stated in Schedules A.1 to A.4 of the Supply Agreement by such percentage. Respondent 1's experts confirmed that this approach is acceptable.[235]

344. Therefore, the Tribunal applies the *"price approach"* (Sub-Clause 19.6(a) of the FIDIC General Conditions) when it comes to determining Doosan's consideration for the ten Cranes, if any.

[229] C-PHB2 §§154 et seq.
[230] R1-REJOINDER §154.
[231] R1-REJOINDER §154.
[232] Exhibit C-001, pp 3 et seqq.
[233] Exhibit C-007, p 2.
[234] First Expert Opinion of Kiran P Sequeira §49.
[235] Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §37.

### 3.      Consideration for 10 Container Cranes

#### 3.1      Claimant's Position

345.  When the 2009 Amendment was concluded, Doosan had constructed fourteen Container Cranes (four of them unerected), four of which could be sold by Doosan under the 2009 Amendment to third parties and ten of which remained stored with Doosan for DIPCO.[236] When the Supply Agreement, as amended, was terminated by Doosan on 4 March 2016, Doosan still had six erected and four un-erected Container Cranes awaiting shipment to Egypt that it kept stored for DIPCO on its premises in Korea.[237]

346.  The price for fourteen Container Cranes which was initially agreed upon in the Supply Agreement was later reduced by way of the 2009 Amendment.[238] On this basis, Claimant's expert calculated the final price for ten Container Cranes on a *pro rata* basis, making further deductions.[239] These deductions were made to take into account the costs that would need to have been incurred by Doosan for the erection of the four un-erected Container Cranes.[240]

347.  The differences between the Parties' experts with respect to these deductions were narrowed down in the course of the proceedings.[241] The only remaining difference in the calculation of the deduction amounts to USD 1,499,628.[242]

348.  Doosan does not accept such additional deduction. From the accounting records, it was evident that Doosan had sub-contracted erection works for the Container Cranes for a fixed price per Container Crane and Doosan had in fact been charged by its sub-contractor the same amount per Container Crane for the previous erection of them.[243] It is, hence, clear that Doosan would also incur these costs for the erection of the un-erected Container Cranes for which the same sub-contractors had been engaged.[244]

349.  In total, the appropriate consideration for the ten Container Cranes is USD 71,759,532.[245]

#### 3.2      Respondents' Position

350.  The deductions which must be made from the agreed price for ten Container Cranes are higher than assessed by Claimant's experts.[246] More specifically, the experts remain in dispute regarding remaining mechanical and electrical installation costs, with Claimant's expert proposing a total reduction of USD 1,865,780 and Respondent 1's experts positing a reduction of USD 3,365,408.[247] The difference results from Claimant's expert's incorrect

---

[236] C-SECONDREPLY §195.
[237] C-SECONDREPLY §196.
[238] C-SECONDREPLY §197.
[239] C-SECONDREPLY §197.
[240] C-PHB1 §153.
[241] C-REBUTTAL §§212 *et seqq*.
[242] Claimant's Opening Presentation, slide 23.
[243] C-PHB1 §154.
[244] C-PHB1 §154.
[245] C-REBUTTAL §217; Claimant's Opening Presentation, slide 23.
[246] R1-REJOINDER §155.
[247] R1-PHB2-CR §54.

assumption that a comparably low number of manpower would be required to erect the four un-erected Container Cranes.[248]

### 3.3   Tribunal's Determination

351. Given that the Tribunal has held that the price approach is the appropriate one for assessing the consideration for the ten Container Cranes manufactured by Doosan (see §§341 *et seqq* above), the Tribunal need not consider any arguments made by the Parties in the context of a cost-oriented approach.

352. The Parties' experts agree that the price agreed upon by the Parties for ten Container Cranes is USD 74,338,763. The experts – and the Parties, for that matter – further agree that certain deductions must be made to account for (i) the works Doosan would have had to perform for erecting the four un-erected Container Cranes and (ii) future warranty costs that Doosan would save due to the non-performance of the agreement with DIPCO.

353. The experts agree that USD 713,451 must be deducted from the agreed price to account for future warranty costs saved by Doosan.[249] The experts do not, however, agree on the exact amount of work Doosan would have had to perform for the erection of the four un-erected Container Cranes. While the difference was narrowed in the course of the exchanges between the experts, an amount of USD 1,499,628 remains in dispute.[250]

354. Claimant's experts conclude that Doosan would have to incur additional costs of USD 842,035 for assembly, erection and testing.[251] In contrast, Respondent 1's experts conclude that the remaining mechanical and electrical installation would actually amount to a considerably higher amount,[252] arguing that the costs assumed by Claimant's expert would only cover 10.6 workers while at least 40 workers would be required to perform the outstanding work.[253]

355. Claimant's expert's assessment of the remaining completion costs relies on agreements between Doosan and sub-contractors, allegedly covering assembly, erection and testing works. Column E of Appendix C to the Second Expert Opinion of Kiran P Sequeira lists the price of these subcontracted works for a single unit (ie, a single Container Crane). With respect to the four un-erected Cranes, Claimant's expert then assessed which part of the subcontracted works remained unpaid by Doosan vis-à-visits subcontractors.[254] Only the unpaid shares were then added up and – where necessary – converted from KRW to USD, resulting in USD 842,035 for assembly, erection and testing including overhead.[255] In support of these figures, Claimant's expert submitted numerous subcontracts.[256] Respondents did not dispute that Appendix C to the Second Expert Opinion of Kiran P

---

[248] R1-PHB2-CR §54.
[249] Second Expert Report of Kiran P Sequeira 57; Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §§14 *et seq*; Addendum to Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §3.
[250] Opening Statement of Kiran P Sequeira, slide 11; Opening Statement of Capt Wolfhard H Arlt, slide 5.
[251] Appendix C to Second Expert Opinion of Kiran P Sequeira.
[252] Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §612 *et seq*.
[253] Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §12.
[254] Appendix C to the Second Expert Opinion of Kiran P Sequeira, columns G, I, K & M.
[255] Appendix C to the Second Expert Opinion of Kiran P Sequeira, column O.
[256] Exhibit NAV-08.

Sequeira accurately reflects the prices agreed upon between Doosan and third parties in these subcontracts.

356. In fact, Capt Wolfhard H Arlt agreed that, if certain works are subcontracted, solely the subcontractor bears the risk of the price not covering its actual costs:

| | |
|---|---|
| C for Doosan: | But if you subcontract and the subcontractor is doing the work for a fixed price, do you need to worry about how many people from the subcontractor work on it? |
| Capt Arlt: | I don't worry about how many people work on it, no, that's correct.[257] |
| | [...] |
| C for Doosan: | Okay, good. So again if you look at the numbers, it's 1,2,5, where the unit is full and there is 6 and 7, where there is still work to do. Again if you look at the amount from the subcontractor, it's all the same. If the subcontractor managed to do it in that price, do you need to worry about the manpower? |
| Capt Arlt: | If you look at it that way, yes. |
| C for Doosan: | You don't need to look at the manpower? Right? |
| Capt Arlt: | Yes.[258] |

357. The Tribunal finds that the prices established in the subcontracts are the relevant ones. After all, regardless of the actual amount of works to be performed to completion, Doosan's subcontractors were bound by the prices agreed in the subcontracts and, hence, Doosan would not have to invest additional costs.

358. The Tribunal, hence, concludes that the accurate deduction for assembly, erection and testing of the four un-erected cranes amounts to USD 842,035. Considering the agreed) price for the ten cranes and other deduction agreed upon by the Parties' experts, the tribunal finds that Doosan's claim for compensation for ten Container Cranes in the amount of **USD 71,759,532** is justified.

**4.      Shipping Cancellation Costs**

**4.1     Claimant's Position**

359. In order to ensure a timely transportation of the constructed Cranes to Egypt under the contractually agreed delivery schedule, Doosan booked transportation capacity in advance of the dates of required shipment on special vessels that are able to carry the

---

[257] Hearing Transcript Day 3, p 154 line 23 to p 155 line 2.
[258] Hearing Transcript Day 3, p 155 line 14 to p 155 line 22.

heavy Cranes.[259] In doing so for the four shipments of Cranes, Doosan acted prudently.[260]

100. When the Respondents repeatedly postponed the shipment of the Cranes due to its problems at the site in Egypt, Doosan had to cancel the four voyages that it had booked with the shipping company (DongBang).[261] This resulted in a contractual entitlement of the shipping company to 40% of the contracted price for the cancelled voyages, which amounted to USD 6,140,000.[262] This amount constitutes the minimum liability that Doosan incurred for its *prudent* contracting with the shipping company.[263]

161. However, Doosan was able, by negotiation, to reduce this claim for 40% of the contracted price to USD 2,900,000.[264] This constitutes a liability of Doosan under the contract with the shipping company.[265] Said liability would not have been incurred by Doosan but for DIPCO's repeated postponements of the shipment.[266]

162. The suggestion of Respondent 1's experts that Doosan should have insisted on a further reduction of this amount to USD 1,638,000 ignores the contractual obligation to pay USD 6,140,000 at cancellation and depends upon the unproven assumption that the shipping company must have been able to use its vessels booked for three of the four voyages for other customers.[267] Doosan's expert adopted the figure that has been contemporaneously used in settlement negotiations between Doosan and DongBang.[268] In any event, the negotiated figure of USD 2,900,000 is much lower than the compensation to which DongBang is contractually entitled. In other words, the Respondents get the benefit of Doosan's negotiations on this cost item.[269]

## 4.2   Respondents' Position

163. Any shipping cancellation costs allegedly incurred by Claimant may only be claimed if the Supply Agreement has been terminated for cause and if, hence, Article 16.4(c) of the FIDIC General Conditions applies.[270]

164. The transportation contract in question booked vessels for the various planned separate deliveries of the Container Cranes, but the delay in the Project was such that DongBang could be notified well in advance of the required dates.[271] The cancellation could impact DongBang only for the first shipment booked and not for the later shipments. Therefore, the claimed figure should be reduced to USD 1,638,000 in order to represent a reasonable loss to Claimant.[272]

[259] C-SECONDREPLY §201.
[260] C-REJOINDER §234; C-PHB2 §184.
[261] C-REJOINDER §234.
[262] C-REJOINDER §235.
[263] C-REJOINDER §236.
[264] C-REJOINDER §237.
[265] C-SECONDREPLY §202; C-REJOINDER §238; C-PHB2 §183.
[266] C-SECONDREPLY §202.
[267] C-REJOINDER §237.
[268] C-PHB2 §184.
[269] C-PHB2 §184.
[270] R1-REJOINDER §158; R1-PHB1-CR §124.
[271] R1-REJOINDER §159.
[272] R1-REJOINDER §159.

365. Doosan's expert confirmed that Doosan had not yet paid a cancellation fee to DongBang and referred to a series of emails showing that Doosan's final liability would depend on the outcome of the present arbitration and that no final settlement hat been concluded between Doosan and DongBang.[273] During his examination in the Hearing, Doosan's expert conceded that *"the quantum of that liability is not defined with certainty."*[274]

### 4.3   Tribunal's Determination

366. The Tribunal has found that the Supply Agreement was terminated for breach (see §§253 *et seq* above). Thus, Claimant is *inter alia* entitled to both (i) costs or liabilities reasonably incurred in the expectation of completing the works (Sub-Clause 19.6(c) of the FIDIC General Conditions) and (ii) loss of profit or other loss or damage sustained as a result of the termination (Sub-Clause 16.4(c) of the FIDIC General Conditions). As a consequence, whether the "Shipping Cancellation Costs" as claimed by Doosan constitute costs or loss of profit is irrelevant.

367. The Parties' experts are in agreement that Doosan's liability for Shipping Cancellation Costs amounts to at least USD 1,638,000.[275] However, the Parties do not agree on whether or not Doosan is entitled to the surplus of USD 1,262,000.[276]

368. Respondent 1's experts confirmed that under the contract between Doosan and DongBang, Doosan's maximum exposure following the cancellation of all shipments would have been USD 6,140,000.[277] However, they argue that the charge of 40% of the shipping costs as agreed upon in the Doosan-DongBang contract, in case of cancellation of the shipment prior to the ship's arrival at the loading port, would not be appropriate in the case at hand as the shipments were actually cancelled months in advance, allegedly leading to consequences less severe for DongBang than a cancellation at short notice.

369. However, in doing so, Respondent 1's experts rely on a purely hypothetical contractual situation. As a matter of fact, the Doosan-DongBang contract only provides for two cancellation scenarios:

> 3) Cancellation: The Principal must pay to the Subordinate 40% of the contract price per voyage if before the arrival at port of loading, and 80% if after the arrival (based on NR tender).[278]

370. There is no third scenario in case a shipment is cancelled way earlier; this was confirmed by Respondent 1's experts themselves.[279]

371. When turning to the amount of the cancellation fee, the correspondence between Doosan and DongBang – as submitted by Claimant's expert – *inter alia* shows that DongBang offered a range from USD 2,500,000 to USD 2,900,000:

---

[273] R1-PHB1-CR §117.
[274] R1-PHB1-CR §119.
[275] First Expert Report of Kiran P Sequeira §80; Second Expert Report of Kiran P Sequeira §78; First Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §70; Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §21.
[276] USD 2,900,000 – USD 1,638,000 = USD 1,262,000.
[277] First Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §68.
[278] Exhibit NAV-10, p 3 of the pdf.
[279] First Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §70.

> - Payment for the amount of compensation (USD 2.5Mil-USD 2.9Mil) during the idle period.[280]

372. This reflects DongBang's readiness to go to a lower end of USD 2,500,000 in the negotiations. Although Doosan and DongBang did not (yet) finally settle the cancellation fee, the Tribunal is convinced that Doosan will have to pay at least USD 2,500,000 to DongBang for the cancellation of the shipments. Since it was DongBang who proposed both the lower and the higher end of the possible settlement amount, the Tribunal is not convinced that Doosan will end up with an amount higher than USD 2,500,000.

373. Therefore, the Tribunal finds that Doosan's claim for shipping cancellation costs is justified in the amount of **USD 2,500,000**. The surplus of USD 400,000[281] is dismissed.

### 5.    Additional Insurance Costs

#### 5.1    Claimant's Position

374. Doosan insured the Cranes while they were being constructed and later stored on its premises awaiting shipment to Egypt. Due to the Respondents' repeated postponements of the shipping of the Cranes to Egypt, Doosan had to extend the insurance coverage of them in Korea beyond the originally agreed shipping schedule. These costs were incurred in expectation of the eventual delivery of the Cranes to Egypt.

375. The associated costs incurred by Doosan amount to USD 488,113.[282]

#### 5.2    Respondents' Position

376. Respondent 1 accepts that, should Claimant be entitled to damages of the type contemplated in Sub-Clause 19.6(c) of the FIDIC General Conditions, this category would qualify as a cost originally incurred in expectation of completing the works.[283] The figures regarding insurance fees are also agreed.[284]

#### 5.3    Tribunal's Determination

377. The Parties and their experts[285] agree on the figure of USD 488,113 of additional insurance costs incurred by Doosan. Respondent 1 confirmed also that Doosan would be entitled to such additional insurance costs should the Tribunal find that Doosan is entitled to damages pursuant to Sub-Clause 19.6(c) of the FIDIC General Conditions.

378. The Tribunal has found that the delays are attributable to Respondents and that, hence, Doosan is, inter alia, entitled to damages pursuant to Sub-Clause 19.6(c) of the FIDIC General Conditions. Therefore, the Tribunal finds that Doosan's claim for additional insurance costs in the amount of **USD 488,113** is justified.

---

[280] Exhibit NAV-12, p 1 of the pdf.
[281] USD 2,900,000 − USD 2,500,000 = USD 400,000.
[282] C-SECONDREPLY §203; C-REBUTTAL §239; C-PHB2 §186.
[283] R1-REJOINDER §160.
[284] R1-PHB1-CR §108.
[285] First Expert Report of Kiran P Sequeira §§82 et seqq; Second Expert Report of Kiran P Sequeira §79; Opening Statement of Kiran P Sequeira, slide 6; Addendum to Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Biatram §3; Opening Statement of Capt Wolfhard H Arlt & Hans-Otto Biatram, slide 56.

### 6.    Additional Costs for Letters of Guarantee

#### 6.1    Claimant's Position

379. As the Respondents failed to make the Site available in Egypt for Doosan to deliver and erect its Cranes, Doosan was not able to continue its works for completion at the project Site in Egypt, which in turn would have triggered the final payment and the return of the Advance Payment Guarantees.

380. But for the Respondents' failure Doosan would not have incurred the additional costs for repeatedly extending the advance payment guarantees. These costs in the amount of USD 2,397,037 were incurred in expectation of the eventual delivery of the Cranes to Egypt.[286]

#### 6.2    Respondents' Position

381. Respondent 1 accepts that, should Claimant be entitled to damages of the type contemplated in Sub-Clause 19.6(c) of the FIDIC General Conditions, this category would qualify as a "maintained contractual requirement in expectation of completing the works."[287]

382. While Respondent 1 initially rejected the figures calculated by Claimant's expert,[288] it later accepted them after corrections were made in Claimant's Expert's Second Report.[289] The figures regarding bank guarantee costs are, hence, agreed.

#### 6.3    Tribunal's Determination

383. The Parties and their experts[290] agree on the amount of USD 2,397,037 of additional bank guarantee costs incurred by Doosan. Respondent 1 also confirmed that Doosan would be entitled to such additional costs of bank guarantee should the Tribunal find that Doosan is entitled to damages pursuant to Sub-Clause 19.6(c) of the FIDIC General Conditions.

384. The Tribunal has found that the delays are attributable to Respondents and that, hence, Doosan is, *inter alia*, entitled to damages pursuant to Sub-Clause 19.6(c) of the FIDIC General Conditions. Therefore, the Tribunal finds that Doosan's claim for additional bank guarantee costs in the amount of **USD 2,397,037** is justified.

---

[286] C-SECONDREPLY §204 (claiming USD 3,447,603); C-REBUTTAL §§240 *et seqq* (reduced to USD 2,397,037); C-PHB2 §186.
[287] R1-REJOINDER §161.
[288] R1-REJOINDER §161.
[289] R1-PHB1-CR §108.
[290] First Expert Report of Kiran P Sequeira §§82 *et seqq*; Second Expert Report of Kiran P Sequeira §79; Opening Statement of Kiran P Sequeira, slide 6; Addendum to Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §3; Opening Statement of Capt Wolfhard H Arlt & Hans-Otto Bistram, slide 56.

### 7.    Erection Yard Costs

### 7.1   Claimant's Position

385. The repeated postponement of the shipments led to the longer than contractually anticipated occupation of the erection yard by the ten cranes, which in turn cost Doosan USD 6,139,842 as it was unable to rent the space to third parties or to other business units within the Doosan group of companies, as it usually does. These costs were incurred in expectation of the eventual delivery of the Cranes to Egypt.[291]

The evidence presented by Doosan shows that Doosan was able to rent space to third parties and affiliated companies when free space was available to be leased in the erection yard.[292] Just because a space is not "intensively occupied" does not mean that it has not been leased or has not been dedicated to an internal project, just like a rented apartment will not always have renters physically present inside the apartment.[293]

386. Respondent 1's argument that this cost item cannot be considered a "claimable" cost inappropriately narrows Sub-Clause 19.6(a) of the FIDIC General Conditions.[294] In any event, it is not reasonable to expect that Doosan would provide Respondents with large storage space for free over many years.[295]

387. Respondents have been continuously informed in Doosan's updated claims' calculations about the increasing storage costs, so they cannot credibly claim that these came unexpected.[296]

388. While Doosan and its expert agree to a reduction in space by 1,850 sqm to 31,979, they do not agree on the low rental fee applied by Respondent 1's experts.[297] The Rental fee applied by Doosan's expert is an appropriate market rate, reflecting the fees Doosan was actually able to obtain when renting out parts of the pertinent storage space to a third parties.[298]

389. There is no justification to apply a long-term lease scenario in a situation in which Respondents requested the prolongation of the advance payment guarantees every six months, which suggested that they wanted to go ahead with the Project. A six-month lease period is not a long-term period.[299] The discount of 50% for long-term lease contracts as applied by Capt Arlt is arbitrary.[300]

390. Against this background, Capt Arlt's low figure for erection yard costs should be disregarded.[301]

[291] C-SECONDREPLY §205; C-REBUTTAL §250.
[292] C-PHB2 §181.
[293] C-PHB2 §182.
[294] C-REBUTTAL §245.
[295] C-REBUTTAL §246.
[296] C-REBUTTAL §246.
[297] C-REBUTTAL §248.
[298] C-REBUTTAL §249.
[299] C-PHB1 §175 & §177.
[300] C-PHB1 §176.
[301] C-PHB1 §177.

## 7.2   Respondent's Position

391. The "erection yard costs" claimed by Doosan are actually not costs incurred or liability accrued – as Doosan did not expend any monies under this head of claim – but rather a loss of profit.[302] Loss of profit may only be claimed under Sub-Clause 16.4(c) of the FIDIC General Conditions and, hence, is irrecoverable should the Tribunal find that the Supply Agreement has been terminated for impossibility and Sub-Clause 19.7 of the FIDIC General Conditions apply.[303]

392. In its R1-PHB2-KH, Respondent 1 raised an additional argument, ie that "storage and maintenance costs" as purported by Claimant had never been agreed upon in the Supply Agreement. As these claims are not the result of a breach of contract and in absence of any explicit contractual undertaking and/or breach by DIPCO, Doosan is not entitled to any "storage and maintenance costs".[304]

393. Furthermore, it is neither foreseeable nor reasonable in terms of Art 221(2) and Art 224 ECC to expect Respondent 1 to pay for Doosan's allegedly lost opportunity to make a profit renting out its yard space owing to its own decision to store the Container Cranes on its property and restrict its own economic profit.[305]

394. Furthermore, the area claimed by Doosan is overlarge.[306] Despite Doosan's expert discussing the changes in size of space used in the erection yard, he still calculates a rent for a consistent area throughout the entire period of storage, which is unsustainable.[307]

395. The move-out costs claimed by Doosan show that Doosan could and did find alternative storage space at a cheaper price than it now claims it could have rented its space if it had removed the cranes from its own work site.[308] Therefore, Doosan has not applied a reasonable market rate for storage rental foregone by Doosan.[309]

396. Furthermore, Mr Sequeira failed to verify that Doosan was indeed prevented from either using the storage space for ongoing projects undertaken by Doosan or from renting this space to third parties.[310] As shown by Google Earth photos displayed by Capt Arlt, the storage areas were not intensively occupied at several times between 2009 and 2015. Doosan could not have missed any opportunities to lease land in the erection yard if swaths of the yard were unoccupied.[311] This fact and the long term nature of the storage lead to a 50% discount applied by Respondent 1's experts.[312]

302 R1-REJOINDER §163; R1-PHB1-CR §120.
303 R1-REJOINDER §163.
304 R1-PHB2-KH §75.
305 R1-REJOINDER §164.
306 R1-REJOINDER §166.
307 R1-REJOINDER §166.
308 R1-REJOINDER §165.
309 R1-REJOINDER §166.
310 R1-PHB1-CR §121; R1-PHB2-CR §61.
311 R1-PHB1-CR §122; R1-PHB2-CR §60.
312 R1-PHB2-CR §60.

### 7.3   Tribunal's Determination

397.  The Parties are in disagreement as to whether any "erection yard costs" as claimed by Doosan would have to be qualified as (i) actual costs or rather as (ii) lost profit. The Tribunal agrees with Respondent 1 in that Doosan's claim actually reflects a claim for opportunity costs. It is a generally accepted principle that at least in cases where no specific contracts have been entered into by the damaged party, opportunity costs constitute lost profit rather than costs incurred.

398.  However, in the case at hand, the differentiation between these two categories does not entail any difference in the outcome: As correctly pointed out by Respondent 1, loss of profit may only be claimed under Sub-Clause 16.4(c) of the FIDIC General Conditions. While Sub-Clause 16.4(c) of the FIDIC General Conditions may not apply if the Supply Agreement has been terminated for impossibility, the Tribunal has found that the Supply Agreement was terminated by Doosan for cause due to Respondents' breach of contract. Doosan is, hence, in principle entitled to compensation for lost profit.

399.  For the same reason, Respondent 1's argument that storage and maintenance costs are not recoverable due to them not being the result of a breach of contract is to no avail: The Tribunal has held that Respondents were indeed in breach of contract (see §§353 *et seq* above); if Respondents would have accepted delivery of the Container Cranes in time, Claimant would not have incurred any additional storage costs.

400.  The Tribunal has no doubt that a reasonably prudent person could foresee that a delay in the delivery of the Container Cranes could lead to (i) Doosan having to store the Container Cranes for an extended period of time and (ii) Doosan being unable to rent its property to third parties during such period. This "restriction" of Doosan's own profit – as described by Respondent 1 – is in fact not owed to a decision of Doosan, but a mere consequence of Respondents' breach of contract: Doosan was not able to use the erection yard otherwise during the extended time of storage of the Container Cranes.

401.  During the Hearing, Doosan's expert witness Mr Sequeira confirmed that he did not conduct a thorough investigation of whether and to what extent Doosan did receive specific offers for rental of its erection yard:

| C for Respondent 1: | Do you know of any opportunities to rent the space that -- specific opportunities that Doosan had to forego because the ten cranes were sitting in the yard? |
|---|---|
| Mr Sequeira: | A. Well, I don't know how you could find that out because if you have cranes that are sitting in your yard, you just cannot rent the space, right? So how do you go about assessing that. |
| C for Respondent 1: | Well, hypothetically, you could have a situation where somebody comes and says, "I would like to rent 11,000 square metres in your yard", and Doosan says, "Sorry, can't do it because our yard |

|                | is occupied." Do you know of any instances where that happened? |
|----------------|-----------------------------------------------------------------|
| Mr Sequeira:   | I don't and I have not enquired along those lines.[313] |

402. As a matter of fact, Doosan did not submit evidence of such offers in this arbitration. However, the lease agreements[314] submitted by Doosan show that there was indeed a certain demand for storage space from third parties: Exhibit NAV-17 covers a time period of one year in 2016/2017, Exhibit NAV-18 covers a time period of one year in 2014/2015 and Exhibit NAV-33 covers a time period of one year in 2008.

403. With respect to the computation of the erection yard storage costs, Respondent 1 – following some discussions between the Parties' experts – does not dispute an amount of USD 1,987,837. With respect to the balance to USD 6,139,842, Respondent 1 disputes Doosan's calculation, citing the expert opinions of Capt Arlt and Mr Bistram.

404. The Parties' experts have reached agreement that the total storage area occupied by the Container Cranes is 31,439 sqm.[315] The experts do not agree, however, on the allocation of the overall area between surfaced and unsurfaced areas: While Respondent 1's experts state that the surface area amounts to 14,299 sqm,[316] Claimant's expert states that the correct figure is 19,153 sqm.[317] In his Opening Statement, Mr Sequeira credibly showed that areas at dockside yard (1,836 sqm) and a paved portion of the storage area for the six erected Container Cranes (2,604 sqm) must be allocated to the surfaced area.[318] However, after adding these areas to the surfaced area, the total surfaced area still only amounts to 18,739 sqm instead of the 19,153 sqm claimed by Doosan. Neither Claimant itself nor Mr Sequeira presented a credible explanation for the remaining difference of 414 sqm. The Tribunal, hence, finds that of the 31,439 sqm occupied, 18,739 sqm constitute surfaced area and 12,700 sqm constitute unsurfaced area.

405. As stated by Mr Sequeira himself, he assumed a rent of KRW 2,790 of per sqm.[319] This is the rent agreed in the lease agreement between Doosan and GE Power Systems.[320] Mr Sequeira argues that this is the most suitable rent as it was charged to a third party (ie, GE Power Systems) and would, hence, appropriately reflect the market rate for Doosan's erection yard.[321] Capt Arlt and Mr Bistram criticized this approach, arguing that Doosan could – as a maximum – claim the lowest internal rent rate, for example the rate charged to Doosan Mecatec (KRW 2,315 per sqm).[322]

406. The Tribunal agrees with Respondent 1's experts in that a rent of KRW 2,790 – as claimed by Doosan – is excessive. The mere fact that the lease agreement with GE Power

---

[313] Hearing Transcript Day 3, p 68 line 15 to p 69 line 2.
[314] Exhibit NAV-17, Exhibit NAV-18 and Exhibit NAV-33.
[315] Second Expert Opinion of Kiran P Sequeira, §97; Opening Statement of Capt Wolfhard H Arlt & Hans-Otto Bistram, p 33.
[316] Opening Statement of Capt Wolfhard H Arlt & Hans-Otto Bistram, p 21.
[317] Opening Statement of Kiran P Sequeira, p 26.
[318] Opening Statement of Kiran P Sequeira, p 26.
[319] First Expert Report of Kiran P Sequeira, §91; Second Expert Report of Kiran P Sequeira, §99.
[320] Exhibit NAV-17.
[321] Second Expert Report of Kiran P Sequeira, §99.
[322] Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §§27 et seq; cf Exhibit NAV-33.

Systems describes the agreed rent as "*calculated based on the market price*"[323] may well have been included only as a general statement for accounting/auditing purposes of both companies. Claimant has not presented any specific rental offers for the extended storage period of the Container Cranes. The Tribunal is, hence, not convinced that Doosan could have indeed achieved a continuous rental rate of KRW 2,790, but finds that the lowest rental rate of KRW 2,315 per sqm – as agreed between Claimant and Doosan Mecatec before[324] – must be applied for surfaced areas.

407. With respect to unsurfaced areas, Respondent 1's experts argue that such areas are inferior to erection yard space and must, hence, be charged at a considerably lower rate.[325] Respondent 1's experts recommend calculating such areas on the basis of the rate of the move-out area in the port of KRW 714 per sqm.[326] During his opening statement, Mr Sequeira argued that third party storage area would be inferior to the unsurfaced area in the erection yard as it could not withstand the load of erected Container Cranes.[327] However, Respondent 1's experts' argument that unsurfaced areas must reasonably be charged at a lower rent then surfaced areas is reasonable. Given that Claimant has not presented any alternative rates for unsurfaced areas and that Mr Sequeira has conducted an alternative calculation based on a rental rate of KRW 714 per sqm for the unsurfaced areas,[328] the Tribunal finds that the appropriate rental rate for unsurfaced areas is KRW 714.

408. Given that the advance payment guarantees were extended every six months and also considering Respondents' repeated correspondence that they were working on achieving Financial Close, it is prudent to assume that Doosan would not have been able to conclude long-term lease contracts. In any event, Capt Arlt confirmed that the discount factor he applied was more or less arbitrary:

| Capt Arlt: | And we came to the conclusion that maybe 50 per cent would be acceptable or would be appropriate. We could have taken 30, we could have taken 40, yes, but then you would have asked the same question.[329] |
|---|---|
| | [...] |
| C for Doosan: | But wasn't the bank guarantees extended every six months? |
| Capt Arlt: | Yes. |
| C for Doosan: | So every six months you knew this was going to proceed. So that's a short-term period, isn't it, six |

[323] Exhibit NAV-17, Article 3.
[324] Exhibit NAV-33.
[325] Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §33.
[326] Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §33.
[327] Opening Statement of Kiran P Sequeira, p 28.
[328] Opening Statement of Kiran P Sequeira, p 28.
[329] Hearing Transcript Day 3, p 181 line 11 to p 181 line 14.

| | months? So what is your experience with long-term rents or rents at all? |
|---|---|
| **Capt Arlt:** | I have never rented an industrial site. [330] |

409. Screenshots from Google Earth – as presented during Capt Arlt's Opening Statement[331] – may constitute tangible evidence in certain cases. However, they only provide snapshots for certain points in time which the end-user cannot define at will. Therefore, the snapshots presented by Capt Arlt do not prove that the erection yard was not intensively occupied for extended periods of time. It is reasonable to assume that there are – or have been, for that matter – indeed projects within Doosan's erection yard that are in different project stages, sometimes requiring a higher level of occupation of the erection yard, sometimes requiring a lower level.

410. The Tribunal has translated the above findings into the below calculation chart. The calculation method is taken from Appendix E.3 to the Second Expert Opinion of Kiran P Sequeira. Neither Respondents nor Respondent 1's experts have raised concerns with respect to this calculation method and, in particular, the KRW/USD exchange rates applied therein. The variables which were changed vis-à-vis Appendix E.3 are the rate in KRW per sqm per month, on the one hand, and the areas, on the other.

| Period | Surfaced Area | | | | | |
|---|---|---|---|---|---|---|
| | Rate (KRW) | KRW/USD | Rate (USD) | | Area (sqm) | Rent (USD) |
| Sep.09 | KRW 2,790.00 | 1,241 | $ | 2.25 | 18,739 | $ 42,128.78 |
| Okt.09 | KRW 2,790.00 | 1,178 | $ | 2.37 | 18,739 | $ 44,381.84 |
| Nov.09 | KRW 2,790.00 | 1,182 | $ | 2.36 | 18,739 | $ 44,231.65 |
| Dez.09 | KRW 2,790.00 | 1,161 | $ | 2.40 | 18,739 | $ 45,031.71 |
| Jän.10 | KRW 2,315.00 | 1,164 | $ | 1.99 | 18,739 | $ 37,268.72 |
| Feb.10 | KRW 2,315.00 | 1,169 | $ | 1.98 | 18,739 | $ 37,109.31 |
| Mär.10 | KRW 2,315.00 | 1,154 | $ | 2.01 | 18,739 | $ 37,591.67 |
| Apr.10 | KRW 2,315.00 | 1,126 | $ | 2.06 | 18,739 | $ 38,526.45 |
| Mai.10 | KRW 2,315.00 | 1,108 | $ | 2.09 | 18,739 | $ 39,152.33 |
| Jun.10 | KRW 2,315.00 | 1,216 | $ | 1.90 | 18,739 | $ 35,674.99 |
| Jul.10 | KRW 2,315.00 | 1,229 | $ | 1.88 | 18,739 | $ 35,297.63 |
| Aug.10 | KRW 2,315.00 | 1,183 | $ | 1.96 | 18,739 | $ 36,670.15 |
| Sep.10 | KRW 2,315.00 | 1,185 | $ | 1.95 | 18,739 | $ 36,608.26 |
| Okt.10 | KRW 2,315.00 | 1,130 | $ | 2.05 | 18,739 | $ 38,390.08 |
| Nov.10 | KRW 2,315.00 | 1,117 | $ | 2.07 | 18,739 | $ 38,836.87 |
| Dez.10 | KRW 2,315.00 | 1,151 | $ | 2.01 | 18,739 | $ 37,689.65 |
| Jän.11 | KRW 2,315.00 | 1,126 | $ | 2.06 | 18,739 | $ 38,526.45 |
| Feb.11 | KRW 2,315.00 | 1,117 | $ | 2.07 | 18,739 | $ 38,836.87 |
| Mär.11 | KRW 2,315.00 | 1,124 | $ | 2.06 | 18,739 | $ 38,595.00 |

---

[330] Hearing Transcript Day 3, p 182 line 23 to p 183 line 5.
[331] Opening Statement of Capt Arlt, p 31.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Apr.11 | KRW | 2,315.00 | 1,091 | $ | 2.12 | 18,739 | $ | 39,762.41 |
| Mai.11 | KRW | 2,315.00 | 1,072 | $ | 2.16 | 18,739 | $ | 40,467.15 |
| Jun.11 | KRW | 2,315.00 | 1,078 | $ | 2.15 | 18,739 | $ | 40,354.22 |
| Jul.11 | KRW | 2,315.00 | 1,067 | $ | 2.17 | 18,739 | $ | 40,656.78 |
| Aug.11 | KRW | 2,315.00 | 1,051 | $ | 2.20 | 18,739 | $ | 41,275.72 |
| Sep.11 | KRW | 2,315.00 | 1,061 | $ | 2.18 | 18,739 | $ | 40,886.70 |
| Okt.11 | KRW | 2,315.00 | 1,178 | $ | 1.97 | 18,739 | $ | 36,825.79 |
| Nov.11 | KRW | 2,315.00 | 1,114 | $ | 2.08 | 18,739 | $ | 38,941.46 |
| Dez.11 | KRW | 2,315.00 | 1,126 | $ | 2.06 | 18,739 | $ | 38,526.45 |
| Jan.12 | KRW | 2,315.00 | 1,152 | $ | 2.01 | 18,739 | $ | 37,656.93 |
| Feb.12 | KRW | 2,315.00 | 1,126 | $ | 2.06 | 18,739 | $ | 38,526.45 |
| Mär.12 | KRW | 2,315.00 | 1,117 | $ | 2.07 | 18,739 | $ | 38,836.87 |
| Apr.12 | KRW | 2,315.00 | 1,133 | $ | 2.04 | 18,739 | $ | 38,288.42 |
| Mai.12 | KRW | 2,315.00 | 1,132 | $ | 2.05 | 18,739 | $ | 38,322.25 |
| Jun.12 | KRW | 2,315.00 | 1,178 | $ | 1.97 | 18,739 | $ | 36,825.79 |
| Jul.12 | KRW | 2,315.00 | 1,145 | $ | 2.02 | 18,739 | $ | 37,887.15 |
| Aug.12 | KRW | 2,315.00 | 1,127 | $ | 2.05 | 18,739 | $ | 38,492.27 |
| Sep.12 | KRW | 2,315.00 | 1,135 | $ | 2.04 | 18,739 | $ | 38,220.96 |
| Okt.12 | KRW | 2,315.00 | 1,115 | $ | 2.08 | 18,739 | $ | 38,906.53 |
| Nov.12 | KRW | 2,315.00 | 1,092 | $ | 2.12 | 18,739 | $ | 39,725.99 |
| Dez.12 | KRW | 2,315.00 | 1,083 | $ | 2.14 | 18,739 | $ | 40,056.13 |
| Jan.13 | KRW | 2,315.00 | 1,064 | $ | 2.18 | 18,739 | $ | 40,771.41 |
| Feb.13 | KRW | 2,315.00 | 1,097 | $ | 2.11 | 18,739 | $ | 39,544.93 |
| Mär.13 | KRW | 2,315.00 | 1,085 | $ | 2.13 | 18,739 | $ | 39,982.29 |
| Apr.13 | KRW | 2,315.00 | 1,115 | $ | 2.08 | 18,739 | $ | 38,906.53 |
| Mai.13 | KRW | 2,315.00 | 1,101 | $ | 2.10 | 18,739 | $ | 39,401.26 |
| Jun.13 | KRW | 2,315.00 | 1,130 | $ | 2.05 | 18,739 | $ | 38,390.08 |
| Jul.13 | KRW | 2,315.00 | 1,132 | $ | 2.05 | 18,739 | $ | 38,322.25 |
| Aug.13 | KRW | 2,315.00 | 1,124 | $ | 2.06 | 18,739 | $ | 38,595.00 |
| Sep.13 | KRW | 2,315.00 | 1,110 | $ | 2.09 | 18,739 | $ | 39,081.79 |
| Okt.13 | KRW | 2,315.00 | 1,074 | $ | 2.16 | 18,739 | $ | 40,391.79 |
| Nov.13 | KRW | 2,315.00 | 1,061 | $ | 2.18 | 18,739 | $ | 40,886.70 |
| Dez.13 | KRW | 2,315.00 | 1,058 | $ | 2.19 | 18,739 | $ | 41,002.63 |
| Jan.14 | KRW | 2,315.00 | 1,056 | $ | 2.19 | 18,739 | $ | 41,080.29 |
| Feb.14 | KRW | 2,315.00 | 1,081 | $ | 2.14 | 18,739 | $ | 40,130.24 |
| Mär.14 | KRW | 2,315.00 | 1,068 | $ | 2.17 | 18,739 | $ | 40,618.71 |
| Apr.14 | KRW | 2,315.00 | 1,059 | $ | 2.19 | 18,739 | $ | 40,963.91 |
| Mai.14 | KRW | 2,315.00 | 1,033 | $ | 2.24 | 18,739 | $ | 41,994.95 |
| Jun.14 | KRW | 2,315.00 | 1,020 | $ | 2.27 | 18,739 | $ | 42,530.18 |
| Jul.14 | KRW | 2,315.00 | 1,012 | $ | 2.29 | 18,739 | $ | 42,866.39 |
| Aug.14 | KRW | 2,315.00 | 1,037 | $ | 2.23 | 18,739 | $ | 41,832.97 |
| Sep.14 | KRW | 2,315.00 | 1,013 | $ | 2.29 | 18,739 | $ | 42,824.07 |

| Okt.14 | KRW | 2,315.00 | 1,062 | $ | 2.18 | 18,739 | $ | 40,848.20 |
|---|---|---|---|---|---|---|---|---|
| Nov.14 | KRW | 2,315.00 | 1,069 | $ | 2.17 | 18,739 | $ | 40,580.72 |
| Dez.14 | KRW | 2,315.00 | 1,114 | $ | 2.08 | 18,739 | $ | 38,941.46 |
| Jän.15 | KRW | 2,315.00 | 1,094 | $ | 2.12 | 18,739 | $ | 39,653.37 |
| Feb.15 | KRW | 2,315.00 | 1,094 | $ | 2.12 | 18,739 | $ | 39,653.37 |
| Mär.15 | KRW | 2,315.00 | 1,098 | $ | 2.11 | 18,739 | $ | 39,508.91 |
| Apr.15 | KRW | 2,315.00 | 1,102 | $ | 2.10 | 18,739 | $ | 39,365.50 |
| Mai.15 | KRW | 2,315.00 | 1,077 | $ | 2.15 | 18,739 | $ | 40,279.28 |
| Jun.15 | KRW | 2,315.00 | 1,110 | $ | 2.09 | 18,739 | $ | 39,081.79 |
| Jul.15 | KRW | 2,315.00 | 1,118 | $ | 2.07 | 18,739 | $ | 38,802.13 |
| Aug.15 | KRW | 2,315.00 | 1,170 | $ | 1.98 | 18,739 | $ | 37,077.59 |
| Sep.15 | KRW | 2,315.00 | 1,172 | $ | 1.98 | 18,739 | $ | 37,014.32 |
| Okt.15 | KRW | 2,315.00 | 1,176 | $ | 1.97 | 18,739 | $ | 36,888.42 |
| Nov.15 | KRW | 2,315.00 | 1,141 | $ | 2.03 | 18,739 | $ | 38,019.97 |
| Dez.15 | KRW | 2,315.00 | 1,158 | $ | 2.00 | 18,739 | $ | 37,461.82 |
| Jän.16 | KRW | 2,315.00 | 1,173 | $ | 1.97 | 18,739 | $ | 36,982.77 |
| Feb.16 | KRW | 2,315.00 | 1,200 | $ | 1.93 | 18,739 | $ | 36,150.65 |
| | | | | | | **Subtotal surfaced area:** | **$** | **3,066,419.46** |

| Period | Unsurfaced Area | | | | |
|---|---|---|---|---|---|
| | Rate (KRW) | KRW/USD | Rate (USD) | Area (sqm) | Rent (USD) |
| Sep.09 | KRW 714.00 | 1,241 | $ 0.58 | 12,700 | $ 7,306.85 |
| Okt.09 | KRW 714.00 | 1,178 | $ 0.61 | 12,700 | $ 7,697.62 |
| Nov.09 | KRW 714.00 | 1,182 | $ 0.60 | 12,700 | $ 7,671.57 |
| Dez.09 | KRW 714.00 | 1,161 | $ 0.61 | 12,700 | $ 7,810.34 |
| Jän.10 | KRW 714.00 | 1,164 | $ 0.61 | 12,700 | $ 7,790.21 |
| Feb.10 | KRW 714.00 | 1,169 | $ 0.61 | 12,700 | $ 7,756.89 |
| Mär.10 | KRW 714.00 | 1,154 | $ 0.62 | 12,700 | $ 7,857.71 |
| Apr.10 | KRW 714.00 | 1,126 | $ 0.63 | 12,700 | $ 8,053.11 |
| Mai.10 | KRW 714.00 | 1,108 | $ 0.64 | 12,700 | $ 8,183.94 |
| Jun.10 | KRW 714.00 | 1,216 | $ 0.59 | 12,700 | $ 7,457.07 |
| Jul.10 | KRW 714.00 | 1,229 | $ 0.58 | 12,700 | $ 7,378.19 |
| Aug.10 | KRW 714.00 | 1,183 | $ 0.60 | 12,700 | $ 7,665.09 |
| Sep.10 | KRW 714.00 | 1,185 | $ 0.60 | 12,700 | $ 7,652.15 |
| Okt.10 | KRW 714.00 | 1,130 | $ 0.63 | 12,700 | $ 8,024.60 |
| Nov.10 | KRW 714.00 | 1,117 | $ 0.64 | 12,700 | $ 8,117.99 |
| Dez.10 | KRW 714.00 | 1,151 | $ 0.62 | 12,700 | $ 7,878.19 |
| Jän.11 | KRW 714.00 | 1,126 | $ 0.63 | 12,700 | $ 8,053.11 |
| Feb.11 | KRW 714.00 | 1,117 | $ 0.64 | 12,700 | $ 8,117.99 |

| Mär.11 | KRW 714.00 | 1,124 | $ | 0.64 | 12,700 | $ | 8,067.44 |
|---|---|---|---|---|---|---|---|
| Apr.11 | KRW 714.00 | 1,091 | $ | 0.65 | 12,700 | $ | 8,311.46 |
| Mai.11 | KRW 714.00 | 1,072 | $ | 0.67 | 12,700 | $ | 8,458.77 |
| Jun.11 | KRW 714.00 | 1,075 | $ | 0.66 | 12,700 | $ | 8,435.16 |
| Jul.11 | KRW 714.00 | 1,067 | $ | 0.67 | 12,700 | $ | 8,498.41 |
| Aug.11 | KRW 714.00 | 1,051 | $ | 0.68 | 12,700 | $ | 8,627.78 |
| Sep.11 | KRW 714.00 | 1,061 | $ | 0.67 | 12,700 | $ | 8,546.47 |
| Okt.11 | KRW 714.00 | 1,178 | $ | 0.61 | 12,700 | $ | 7,697.62 |
| Nov.11 | KRW 714.00 | 1,114 | $ | 0.64 | 12,700 | $ | 8,139.86 |
| Dez.11 | KRW 714.00 | 1,126 | $ | 0.63 | 12,700 | $ | 8,053.11 |
| Jän.12 | KRW 714.00 | 1,152 | $ | 0.62 | 12,700 | $ | 7,871.39 |
| Feb.12 | KRW 714.00 | 1,126 | $ | 0.63 | 12,700 | $ | 8,053.11 |
| Mär.12 | KRW 714.00 | 1,117 | $ | 0.64 | 12,700 | $ | 8,117.99 |
| Apr.12 | KRW 714.00 | 1,133 | $ | 0.63 | 12,700 | $ | 8,003.35 |
| Mai.12 | KRW 714.00 | 1,132 | $ | 0.63 | 12,700 | $ | 8,010.42 |
| Jun.12 | KRW 714.00 | 1,178 | $ | 0.61 | 12,700 | $ | 7,697.62 |
| Jul.12 | KRW 714.00 | 1,145 | $ | 0.62 | 12,700 | $ | 7,919.48 |
| Aug.12 | KRW 714.00 | 1,127 | $ | 0.63 | 12,700 | $ | 8,045.96 |
| Sep.12 | KRW 714.00 | 1,135 | $ | 0.63 | 12,700 | $ | 7,989.25 |
| Okt.12 | KRW 714.00 | 1,115 | $ | 0.64 | 12,700 | $ | 8,132.56 |
| Nov.12 | KRW 714.00 | 1,092 | $ | 0.65 | 12,700 | $ | 8,303.85 |
| Dez.12 | KRW 714.00 | 1,083 | $ | 0.66 | 12,700 | $ | 8,372.85 |
| Jän.13 | KRW 714.00 | 1,064 | $ | 0.67 | 12,700 | $ | 8,522.37 |
| Feb.13 | KRW 714.00 | 1,097 | $ | 0.65 | 12,700 | $ | 8,266.00 |
| Mär.13 | KRW 714.00 | 1,085 | $ | 0.66 | 12,700 | $ | 8,357.42 |
| Apr.13 | KRW 714.00 | 1,115 | $ | 0.64 | 12,700 | $ | 8,132.56 |
| Mai.13 | KRW 714.00 | 1,101 | $ | 0.65 | 12,700 | $ | 8,235.97 |
| Jun.13 | KRW 714.00 | 1,130 | $ | 0.63 | 12,700 | $ | 8,024.60 |
| Jul.13 | KRW 714.00 | 1,132 | $ | 0.63 | 12,700 | $ | 8,010.42 |
| Aug.13 | KRW 714.00 | 1,124 | $ | 0.64 | 12,700 | $ | 8,067.44 |
| Sep.13 | KRW 714.00 | 1,110 | $ | 0.64 | 12,700 | $ | 8,169.19 |
| Okt.13 | KRW 714.00 | 1,074 | $ | 0.66 | 12,700 | $ | 8,443.02 |
| Nov.13 | KRW 714.00 | 1,061 | $ | 0.67 | 12,700 | $ | 8,546.47 |
| Dez.13 | KRW 714.00 | 1,058 | $ | 0.67 | 12,700 | $ | 8,570.70 |
| Jän.14 | KRW 714.00 | 1,056 | $ | 0.68 | 12,700 | $ | 8,586.93 |
| Feb.14 | KRW 714.00 | 1,081 | $ | 0.66 | 12,700 | $ | 8,388.34 |
| Mär.14 | KRW 714.00 | 1,068 | $ | 0.67 | 12,700 | $ | 8,490.45 |
| Apr.14 | KRW 714.00 | 1,059 | $ | 0.67 | 12,700 | $ | 8,562.61 |
| Mai.14 | KRW 714.00 | 1,033 | $ | 0.69 | 12,700 | $ | 8,778.12 |
| Jun.14 | KRW 714.00 | 1,020 | $ | 0.70 | 12,700 | $ | 8,890.00 |
| Jul.14 | KRW 714.00 | 1,012 | $ | 0.71 | 12,700 | $ | 8,960.28 |
| Aug.14 | KRW 714.00 | 1,037 | $ | 0.69 | 12,700 | $ | 8,744.26 |

| Sep.14 | KRW 714.00 | 1,013 | $ 0.70 | 12,700 | $ 8,951.43 |
|--------|------------|-------|--------|--------|-------------|
| Okt.14 | KRW 714.00 | 1,062 | $ 0.67 | 12,700 | $ 8,538.42 |
| Nov.14 | KRW 714.00 | 1,069 | $ 0.67 | 12,700 | $ 8,482.51 |
| Dez.14 | KRW 714.00 | 1,114 | $ 0.64 | 12,700 | $ 8,139.86 |
| Jän.15 | KRW 714.00 | 1,094 | $ 0.65 | 12,700 | $ 8,288.67 |
| Feb.15 | KRW 714.00 | 1,094 | $ 0.65 | 12,700 | $ 8,288.67 |
| Mär.15 | KRW 714.00 | 1,098 | $ 0.65 | 12,700 | $ 8,258.47 |
| Apr.15 | KRW 714.00 | 1,102 | $ 0.65 | 12,700 | $ 8,228.49 |
| Mai.15 | KRW 714.00 | 1,077 | $ 0.66 | 12,700 | $ 8,419.50 |
| Jun.15 | KRW 714.00 | 1,110 | $ 0.64 | 12,700 | $ 8,169.19 |
| Jul.15 | KRW 714.00 | 1,118 | $ 0.64 | 12,700 | $ 8,110.73 |
| Aug.15 | KRW 714.00 | 1,170 | $ 0.61 | 12,700 | $ 7,750.26 |
| Sep.15 | KRW 714.00 | 1,172 | $ 0.61 | 12,700 | $ 7,737.03 |
| Okt.15 | KRW 714.00 | 1,176 | $ 0.61 | 12,700 | $ 7,710.71 |
| Nov.15 | KRW 714.00 | 1,141 | $ 0.63 | 12,700 | $ 7,947.24 |
| ·Dez.15 | KRW 714.00 | 1,158 | $ 0.62 | 12,700 | $ 7,830.57 |
| Jän.16 | KRW 714.00 | 1,173 | $ 0.61 | 12,700 | $ 7,730.43 |
| Feb.16 | KRW 714.00 | 1,200 | $ 0.60 | 12,700 | $ 7,556.50 |
| | | | | Subtotal unsurfaced area: | $ 634,712.31 |

411. The Tribunal, hence, finds that Doosan's claim for erection yard costs is justified in the amount of **USD 3,701,131.78**;[332] the remaining claim of USD 2,438,710.22[333] is not justified and dismissed.

## 8.    Move-Out Costs

### 8.1    Claimant's Position

412. The ten Cranes remained at Doosan's premises longer than contractually anticipated, and during that period Doosan needed the erection yard for another project and, therefore, moved the parts of the four non-erected Cranes to an external storage facility.

413. Doosan incurred costs for the moving of the parts to this facility as well as associated storage fees. These costs – amounting to USD 292,034 – were incurred in expectation of the eventual delivery of the Cranes to Egypt.[334]

### 8.2    Respondents' Position

414. Respondent 1 accepts that, should Claimant be entitled to damages of the type contemplated in Sub-Clause 19.6(c) of the FIDIC General Conditions, the move-out costs claimed would qualify as a "maintained contractual requirement in expectation of completing the works."[335] The figures regarding move-out costs are agreed.[336]

---

[332] USD 3,066,419.46 + USD 634,712.31 = USD 3,701,131.78.
[333] USD 6,139,842 – USD 3,701,131.78 = USD 2,438,710.22.
[334] C-SECONDREPLY §206; C-REBUTTAL §251; C-PHB2 §186.
[335] R1-REJOINDER §165.

### 8.3   Tribunal's Determination

415. The Parties and their experts[337] agree on the figure of USD 292,034 of move-out costs incurred by Doosan. Respondent 1 also confirmed that Doosan would be entitled to such move-out costs should the Tribunal find that Doosan is entitled to damages pursuant to Sub-Clause 19.6(c) of the FIDIC General Conditions.

416. The Tribunal has found that the delays are attributable to Respondents and that, hence, Doosan is *inter alia* entitled to damages pursuant to Sub-Clause 19.6(c) of the FIDIC General Conditions. Therefore, the Tribunal finds that Doosan's claim for move-out costs in the amount of **USD 292,034** is justified.

### 9.   Un-Refunded Import Duty Costs

### 9.1   Claimant's Position

417. Due to the repeated postponements in the shipment of the Cranes from Korea to Egypt, Doosan incurred import duties that it would not have had to pay had the Respondents adhered to the terms of the Contract.

418. Korea levied import duties on Crane parts procured by Doosan abroad that would have been refundable had the Cranes been exported to Egypt within the time foreseen in the Contract. Doosan therefore would not have had to foot these costs but for the Respondents' repeated postponements of the shipping. These costs were incurred in expectation of the eventual delivery of the Cranes to Egypt.[338]

419. While initially claiming that the un-refunded import duty costs would amount to USD 1,060,887,[339] Claimant later reduced its claim to USD 946,226,[340] following Respondent 1's remarks that four of the Cranes were sold and shipped out and that, hence, there should have been a full refund of their related import fees.[341]

### 9.2   Respondents' Position

420. Respondent 1 accepts that, should Claimant be entitled to damages of the type contemplated in Sub-Clause 19.6(c) of the FIDIC General Conditions, this category would qualify as a cost originally incurred in expectation of completing the works.[342]

421. The figures regarding import refund duties are agreed.[343]

---

[336] R1-PHB1-CR §108.
[337] First Expert Report of Kiran P Sequeira §§92 *et seqq*; Second Expert Report of Kiran P Sequeira §§108 *et seq*; Opening Statement of Kiran P Sequeira, slide 6; Addendum to Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §3; Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §8 (Table 1).
[338] C-SECONDREPLY §207.
[339] C-SECONDREPLY §207.
[340] C-REBUTTAL §252.
[341] R1-REJOINDER §167.
[342] R1-REJOINDER §167.
[343] R1-PHB1-CR §108.

### 9.3 Tribunal's Determination

422. The Parties and their experts[344] agree on the figure of USD 946,226 of un-refunded import duty costs incurred by Doosan. Respondent 1 also confirmed that Doosan would be entitled to such costs should the Tribunal find that Doosan is entitled to damages pursuant to Sub-Clause 19.6(c) of the FIDIC General Conditions.

423. The Tribunal has found that the delays are attributable to Respondents and that, hence, Doosan is, *inter alia*, entitled to damages pursuant to Sub-Clause 19.6(c) of the FIDIC General Conditions.

424. Therefore, the Tribunal finds that Doosan's claim for un-refunded import duty costs in the amount of **USD 946,226** is justified.

### 10.   Labor and Maintenance Costs

### 10.1  Claimant's Position

425. During the time that the six erected and four not-yet-erected Container Cranes were stored in Korea due to the Respondents' postponing of their shipment to Egypt, Doosan incurred costs for labor and maintenance in the amount of USD 1,419,446 from 2010 to 2015.[345]

426. Contrary to Respondent 1's allegation, Claimant's expert did not simply rely on accounting data but conducted a thorough and comprehensive review.[346] Doosan largely suspended maintenance after 2014; therefore, it is not necessarily surprising that the Container Cranes had some physical issues (e.g., rust chipped paint) by mid-2016.[347]

427. In any event, Respondents' expert's accepted costs of USD 25,000 for this period of five years are too low.[348]

### 10.2  Respondents' Position

428. Claimant's expert is not an expert in port operations. He simply relied on Claimant's accounting data.[349] However, the figures provided in the accounting records are not reflected in the other evidence:[350] The Container Cranes and components were in disrepair in the later years of their storage, such that the alleged maintenance regime could not have been properly executed.[351] Doosan itself admitted that over the period of 2009 to 2016, there are no records for the labor and maintenance work for almost five of the seven years in which bi-yearly work is claimed by Doosan.[352]

---

[344] Second Expert Report of Kiran P Sequeira §§110 *et seq*; Opening Statement of Kiran P Sequeira, slide 6; Addendum to Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §3; Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §8 (Table 1) & §41.
[345] C-PHB1 §178.
[346] C-PHB2 §176.
[347] C-PHB2 §179.
[348] C-PHB1 §180; C-PHB2 §177.
[349] R1-PHB1-CR §128.
[350] R1-PHB1-CR §129.
[351] R1-PHB1-CR §130.
[352] R1-PHB1-CR §131.

429. Furthermore, under the tests required by Sub-Clause 19.6(c) of the FIDIC General Conditions and Egyptian law, the issue is not whether the costs which Respondent 1's experts have allowed are a reasonable reflection of the costs of good maintenance over period; the question is whether the costs Claimant claims as damages are a reasonable reflection of costs expended *"in the expectation of completing the Works"*.[353] The evidence is that labor and maintenance costs were not reasonably incurred and Claimant has not reached its burden.[354]

430. The analysis of Respondent 1's experts – concluding that costs of only USD 25,870 are be justified – is not that the costs they agreed were reasonably incurred were the full range of costs that reasonable maintenance of the Container Cranes would entail; rather, the evidence of accounting records presented was not supported by other evidence that the costs claimed were incurred reasonably to maintain the Cranes.[355]

431. In any event, "storage and maintenance costs" as purported by Claimant had never been agreed upon in the Supply Agreement. As these claims are not the result from a breach of contract and in absence of any explicit contractual undertaking and/or breach by DIPCO, Doosan is not entitled to any "storage and maintenance costs".[356]

### 10.3   Tribunal's Determination

432. Respondent 1's expert has accepted additional labor and maintenance costs in the amount of USD 25,870.[357] The remainder of Doosan's claim in the amount of USD 1,393,576 remains disputed between the Parties.

433. Claimant and their experts are primarily relying on Doosan's accounting records when determining Claimant's alleged additional labor and maintenance costs. Respondent 1's experts conclude that the labor and maintenance costs as claimed by Doosan are not reflected in other evidence.

434. The Tribunal has no reason to doubt the accuracy of Claimant's accounting records as such. Doosan's annual financial statements were audited yearly and, at least in 2007, 2008 and 2009, received unqualified audit opinions by PWC.[358] Respondents did not raise doubts that such clearance would not apply to the consecutive years and, in fact, there is no reason for the Tribunal to doubt that such unqualified clearance was given. Therefore, the Tribunal applies the amounts as indicated in Table 11 of the Second Expert Opinion of Kiran P Sequeira.[359]

439. However, Respondent 1 and its experts have questioned specific categories of costs claimed by Claimant and whether they were indeed reasonably incurred in the expectation of completing the Works.

---

[353] R1-PHB1-CR §132.
[354] R1-PHB1-CR §132.
[355] R1-PHB2-CR §62; Respondent 1's Opening Presentation, slide 66.
[356] R1-PHB2-KM §75.
[357] Addendum to Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §3; Opening Statement of Capt Wolfhart H Arlt, slide 56.
[358] Exhibit NAV-11 (eg on page 3 for 2007).
[359] Second Expert Opinion of Kiran P Sequeira §120.

436. Having thoroughly reviewed the various cost categories and the related sections of the expert's opinions, the Tribunal finds the following:

437. **Machinery:** Respondent 1's experts criticized that these costs were booked in an unusual way as concerns the time periods in which they were recorded.[360] Claimant's witness Jongsuk Park explained the approach underlying this way of booking as follows:

> These costs in fact correspond to work performed by our design and production management teams earlier in 2010 to the beginning of 2011. However, because of the Damietta Project's delay at the time (which in turn prevented us from being paid), our management had decided to suspend all internal work billings on this project, until we receive the advance payment promised by DIPCO and resume the project. This was to avoid further deterioration of the financial performance metrics of this project. However, as DIPCO continuously failed to pay Doosan, and as certain departments within Doosan (such as the manufacturing department) objected to this decision, our management reversed its policy and allowed us to record all of these entries in our accounting system in April and May 2011. After May 2011, it was decided not to record any internal labor costs for the maintenance of the Cranes, although some work was performed during that subsequent period.361

438. The Tribunal deems the explanation given by Jongsuk Park convincing. It is not to the detriment of Respondents that works were recorded periodically rather than continuously. The Tribunal finds that Doosan's claim for Machinery costs of **USD 238,383** is justified.

439. **Electrical:** Respondent 1's experts criticized the amount of work Doosan invested for this category. This, however, remained an unsubstantiated view of Respondent 1 so that the Tribunal sees no reason why not to follow the evidence submitted by Claimant, including the credible statements of Jongsuk Park and the several purchase orders for electrical and mechanical maintenance work.[362]

440. Therefore, the Tribunal finds that Doosan's claim for Electrical costs of **USD 48,252** is justified.

441. **Raw Material:** The Tribunal deems it credible that the raw materials purchased by Doosan (such as lubrication and anti-freezing oil) are necessary components for Doosan when performing the maintenance works.[363] Respondent 1's experts only (initially) questioned why Doosan apparently incurred substantially higher raw material costs in 2010 while later recording negative raw material costs in 2011 to 2014.[364] However, following Claimant's expert's explanation that additional raw material was purchased in

---

[360] Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §§43, 44 & 46.
[361] Second Witness Statement of Jongsuk Park §37.
[362] Second Witness Statement of Jongsuk Park §43; Exhibits C-195, C-196 & C-197, *inter alia* listing items such as "*Machine maintenance*" and "*Damietta machine maintenance work*".
[363] Second Expert Opinion of Kiran P Sequeira §125.
[364] First Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §111.

expectation of completing the four unfinished Container Cranes,[365] Respondent 1's experts seem to have abandoned their objection.[366]

442. Therefore, the Tribunal finds that Doosan's claim for Raw Material of **USD 10,018** is justified.

443. **Business Expenses:** Respondent 1's experts criticized the fact that shop testing was performed on Container Cranes that were stored since 2009.[367] The Tribunal cannot follow the logics Respondent 1's experts have introduced in their Second Expert Opinion.[368] Even if one could deduct from Claimant's own reporting on shop testing that by end of 2008 shop testing had been completed for seven of the ten Container Cranes, this would not exclude that additional shop testing became necessary to determine the status of the Container Cranes during extended storage.

444. Therefore, the Tribunal finds that Doosan's claim for Business Expenses of **USD 19,573** is justified.

445. **Other Production Costs:** Respondent 1's experts raised two arguments against this category: (i) costs of forklifts for moving components within Doosan's erection yard shall not be charged, and (ii) painting of all Container Cranes had been virtually finished at the end of 2008 so that additional paint costs could only be related to touch-up and repair of damages that were caused by Doosan's own staff.[369]

446. Neither Respondent 1 nor its experts have provided a conclusive argument why Doosan should be entitled to costs forklifts necessary for relocating equipment.

447. With respect to painting costs, the Tribunal, more generally finds that these are not justified for a different reason: As correctly pointed out by Respondent 1's experts in the context with the category of Logistics and Transport Costs,[370] the Container Cranes were sold with a five-year paint guarantee. Sub-Clause 10.6.2(4) of the *"Employer's Requirements for 65t STS"* – which, according to Clause 2(d) of the Supply Agreement, form part of the contract between the Parties – stipulates:

| Warranty |
| --- |
| All paintwork shall be guaranteed for 5 years, minimum, from the date of acceptance of the cranes.[371] |

448. Given that according to Appendix K.5 to the Second Expert Opinion of Kiran P Sequeira,[372] all painting costs claimed as Other Production Costs were incurred in 2012, they would fall under the pending guarantee under all deliver dates envisaged by the

---

[365] Second Expert Opinion of Kiran P Sequeira §126.
[366] No further comment by Respondent 1's experts in the Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram.
[367] Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §§57 et seqq.
[368] Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §§57 et seqq.
[369] Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §§63 et seq.
[370] Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §68.
[371] Exhibit C-001, p 260 of the pdf.
[372] Appendix K.5 to the Second Expert Opinion of Kiran P Sequeira, column G.

Parties. As one can also derive from Appendix K.5, these painting costs amount to USD 6,305.10.[373]

449. Therefore, the Tribunal deducts USD 6,305.10 from Doosan's claim for Other Production Costs and finds that an amount of **USD 42,049.90** is justified.[374]

450. **Other Material and Equipment:** Respondent 1's experts initially criticized that the costs claimed by Doosan under this category would apparently relate to a different project, given that they allegedly referred to costs for *"Handling Equipment – Quay"*.[375] The Tribunal concurs with Kiran P Sequeira's assumption[376] that Respondent 1's experts mistook the item *"Handling Equipment – Quality Inspection"* in Appendix K.6 to the Second Expert Opinion of Kiran P Sequeira for *"Handling Equipment – Quay"*. In any event, said Appendix K.6 clearly refers to "Quality Inspection" and not to any "Quay"-related costs.[377] Notably, Respondent 1's experts did not revert on this argument in their Second Expert Opinion.

451. Therefore, the Tribunal finds that Doosan's claim for Other Material and Equipment of **USD 13,896** is justified.

452. **Logistics and Transport:** It is undisputed between the Parties' experts that these costs relate to coating/painting.[378] As discussed in the context of Doosan's claim for Other Production Costs (see §§445 *et seqq* above) and as correctly argued by Respondent 1's experts,[379] the Container Cranes were sold to DIPCO with a five-year guarantee on paintwork.[380]

453. Given that according to Appendix K.7 to the Second Expert Opinion of Kiran P Sequeira,[381] all costs claimed as Logistics and Transport costs were incurred by 10 January 2013, at the latest. Thus they would fall under the pending guarantee under all deliver dates envisaged by the Parties.

454. Therefore, the Tribunal finds that Doosan's claim for Logistics and Transport in the amount of USD 114,208 is **not justified**.

455. **Production Management / Design Costs:** Respondent 1's experts, in the essence, opposed these claims with the arguments that (i) these categories are "summary accounts", ie, accounts where costs that cannot be allocated otherwise are booked and (ii) the design process had been completed in November 2007.[382]

456. With respect to the design costs, Claimant's Monthly Progress Report of December 31 2008 indeed shows that the design work was already finished in November 2007:[383]

---

[373] Appendix K.5 to the Second Expert Opinion of Kiran P Sequeira, sum of cells J22:J27.
[374] USD 48,355 – USD 6,305.10 = USD 42,049.90.
[375] First Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §117.
[376] Second Expert Opinion of Kiran P Sequeira §131 FN102.
[377] Appendix K.6 to the Second Expert Opinion of Kiran P Sequeira, column K.
[378] Second Expert Opinion of Kiran P Sequeira §132; Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §§66 *et seqq*.
[379] Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §68.
[380] Exhibit C-001, p 260 of the pdf.
[381] Appendix K.7 to the Second Expert Opinion of Kiran P Sequeira, column G.
[382] Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §§71 *et seqq*
[383] Exhibit C-25, p 24 of the pdf.

| Description | Weighted Ratio | Percentage | Nov | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Design / Engineering | 13.9 | Plan % | 8.60% | 1.95% | 4.17% | 1.65% | 4.17% | 8.73% | 8.07% | | | |
| | | Actual % | 8.60% | 1.95% | 1.61% | 1.67% | 1.65% | 8.73% | 8.77% | 8.77% | 8.07% | 8.07% |

457. In any event, the Tribunal does not see any reason to believe that the extended storage period could have entailed additional design costs.

458. For this reason alone, the Tribunal finds that Doosan's claim for Design costs in the amount of USD 261,646 is **not justified**.

459. With respect to Doosan's claim for Production Management costs, the Tribunal finds that Claimant has not submitted evidence as to the actual tasks performed by the personnel shown in Appendix K.8 to the Second Expert Opinion of Kiran P Sequeira. In particular, Claimant has not discharged its burden of proof that these tasks actually relate to keep the Container Cranes in good condition during the extended storage period. Respondent 1's experts' criticism in this respect[384] is founded.

460. For this reason, the Tribunal finds that Doosan's claim for Production Management costs in the amount of USD 556,357 is **not justified**.

461. **Summary:** From the above and from the below chart can be seen that the Tribunal found a total of USD 372,144.90 as direct Labor and Maintenance costs to be justified. When adding the undisputed 8.3% Overhead, the Tribunal finds that Doosan's claim for Labor and Maintenance costs is justified in the amount of **USD 403,032.93**.

| | claimed | awarded | rejected |
|---|---|---|---|
| Machinery | USD   238,383.00 | USD   238,383.00 | USD   - |
| Electrical | USD   48,252.00 | USD   48,252.00 | USD   - |
| Raw Material | USD   10,018.00 | USD   10,018.00 | USD   - |
| Business Expenses | USD   19,573.00 | USD   19,573.00 | USD   - |
| Other Production Costs | USD   48,355.00 | USD   42,049.90 | USD   6,305.10 |
| Other Material and Equipment | USD   13,869.00 | USD   13,869.00 | USD   - |
| Logistics and Transport | USD   114,208.00 | USD   - | USD   114,208.00 |
| Production Management | USD   556,357.00 | USD   - | USD   556,357.00 |
| Design | USD   261,646.00 | USD   - | USD   261,646.00 |
| Direct Labor and Maintenance | USD 1,310,661.00 | USD   372,144.90 | USD   938,516.10 |
| Overhead @ 8.3% | USD   108,784.86 | USD   30,888.03 | USD   77,896.84 |
| Total Labor and Maintenance | USD 1,419,445.86 | USD 403,032.93 | USD 1,016,412.94 |

---

[384] Second Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §73.

### 11.    Additional Foreign Exchange Costs

#### 11.1   Claimant's Position

462. Doosan incurred additional costs of USD 700,965 relating to foreign exchange fluctuations between the USD and the KRW due to the non-payment by DIPCO.[385]

463. DIPCO's argument that currency fluctuations would be Doosan's risk under the Supply Agreement ignore the fact that postponing the shipment of the Cranes over many years made it impossible for Doosan to hedge its risk. Doosan incurred these costs in the expectation of completing the works pursuant to Sub-Clause 19.6(c) of the FIDIC General Conditions.[386]

#### 11.2   Respondents' Position

464. Currency fluctuations were Doosan's risk to bear: Under Sub-Clause 13.8 of the FIDIC General Conditions, the Parties had the option to set a formula for cost adjustments with regard to, *inter alia*, exchange rate fluctuations, but that option was not taken up by the Parties.[387]

465. Doosan has not engaged with this aspect of the contract; it merely relied on Mr Sequeira's suggestion that Doosan could not hedge such risk. This argument is irrelevant in circumstances where a party has contractually agreed to the risk.[388]

466. In the alternative, there is no suggestion that foreign exchange fluctuations can represent a cost incurred in expectation of completing the works, as they are merely a passive result of relative currency movements. This affects both Doosan's claims for Container Cranes costs and alleged delay damages.[389]

#### 11.3   Tribunal's Determination

467. Respondent 1 has not disputed Claimant's figure of USD 700,965 to correspond to foreign exchange fluctuations between the USD and the KRW resulting from the non-payment by DIPCO. Notably, while Claimant's expert calculated a figure of USD 700,965,[390] Respondent 1's experts calculated even higher foreign exchange costs of USD 725,085.[391]

468. The Parties, however, do not agree on whether Doosan is entitled to any compensation for currency fluctuations at all.

469. DIPCO's argument that the Supply Agreement does not provide a cost adjustment based on currency fluctuation might exclude any such adjustments in the normal course of a

---

[385] C-PHB2 §134; C-REBUTTAL §233 & §§258 *et seq.*
[386] C-REBUTTAL §268.
[387] R1-REJOINDER §140; R1-PHB1-CR §106.
[388] R1-PHB1-CR §106.
[389] R1-PHB1-CR §106.
[390] First Expert Report of Kiran P Sequeira §§100 *et seqq*; Second Expert Report of Kiran P Sequeira §79; Opening Statement of Kiran P Sequeira, slide 6.
[391] First Expert Report of Capt Wolfhard H Arlt & Hans-Otto Bistram §156; Addendum to Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §3; Opening Statement of Capt Wolfhard H Arlt & Hans-Otto Bistram, slide 56;

contract's performance. However, in the case at hand, Doosan has calculated its claim for foreign exchange costs only from the dates when the payments should have been received.[392] This has not been disputed by Respondents. Doosan, hence, does not claim for foreign exchange costs during the intended term of the Supply Agreement, but only for costs accrued during the delays attributable to Respondents.

470. Were it not for Respondents breaching the contract, Doosan would not have incurred such additional foreign exchange costs. Despite DIPCO's experts' conclusion that Doosan's additional foreign exchange costs amounted to USD 725,085, Doosan has continued to claim only USD 700,965.

471. The Tribunal may not rule on any potential damages or costs which are not included in Claimant's prayer for relief. Doosan's claim for foreign exchange costs is, hence, justified in the amount of **USD 700,965.**

## 12. Lost Profits on Remaining Work

### 12.1 Claimant's Position

472. Upon termination of the Supply Agreement on 4 March 2016, Doosan lost the opportunity to make a profit on the remaining works that should have been completed under the Supply Agreement and paid by DIPCO, as specified and priced in Schedules A.2, A.3 and A.4.[393] Such lost profits may be claimed under Sub-Clause 16.4(c) of the DIFIC General Conditions, as Doosan was entitled to terminate the Supply Agreement for Respondents' material breach.[394]

473. Claimant initially claimed lost profit in the amount of USD 729,514,[395] later reducing this figure to USD 26,718[396] following criticism by Respondent 1 and its experts.[397]

### 12.2 Respondents' Position

474. Respondent 1 accepted that lost profit would fall under Sub-Clause 16.4(c) of the FIDIC General Conditions.[398] Furthermore, Respondent 1 conceded that lost profits are recoverable should the Tribunal agree that the Supply Agreement was terminated for cause pursuant to Sub-Clause 16.2 of the FIDIC General Conditions.[399]

### 12.3 Tribunal's Determination

475. The Parties and their experts[400] agree on the figure of USD 26,718 of lost profit of Doosan Doosan. Respondent 1 also confirmed that Doosan would be entitled to such

---

[392] *Cf* First Expert Opinion of Kiran P Sequeira, §101.
[393] C-SECONDREPLY §210.
[394] C-REBUTTAL §262.
[395] C-SECONDREPLY §210.
[396] C-REBUTTAL §261; C-PHB2 §186.
[397] R1-REJOINDER §174.
[398] R1-REJOINDER §173.
[399] R1-REJOINDER §173.
[400] Second Expert Report of Kiran P Sequeira §§141 *et seqq*; Opening Statement of Kiran P Sequeira, slide 6; Addendum to Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §3; Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §8 (Table 1).

costs should the Tribunal find that Doosan is entitled to damages pursuant to Sub-Clause 16.4(c) of the FIDIC General Conditions following a termination for cause by Claimant pursuant to Sub-Clause 16.2 of the FIDIC General Conditions.

476. The Tribunal has found that the Supply Agreement was terminated for cause by Doosan and that, hence, Doosan is, *inter alia*, entitled to lost profit pursuant to Sub-Clause 16.4(c) of the FIDIC General Conditions.

477. Therefore, the Tribunal finds that Doosan's claim for lost profit in the amount of **USD 26,718** is justified.

## 13.    First Deduction: Advance Payment

### 13.1   Claimant's Position

478. Claimant does not dispute that it must repay the Advance Payments to Respondents following the termination of the Supply Agreement.[401]

479. However, Sub-Clause 14.2 of the FIDIC General Conditions (as amended by the Parties) stipulates that in the event of the Contract is being terminated under Clause 16 of the FIDIC General Conditions, the employer may deduct the balance of the Advance Payment outstanding from any monies due or which may become due to the contractor.[402]

480. On this basis, Doosan already deducted the Advance Payment from its total claims (which considerably exceed the Advance Payment).[403]   However, Doosan incurred legal fees of USD 393,832 for resisting DIPCO's illegal calling of the advance payment guarantee and reduced the deduction accordingly.[404] Therefore, USD 18,029,093 is to be deducted for advance payment guarantees.[405]

481. As to Respondent 1's argument that the ToR do not include such legal fees for resisting the call of the advance payment guarantee, the ToR restate the Claimant's request for relief at paragraph 41. It included, in its most general form, the request to order the Respondents *"to pay to Claimant damages, with the amount to be quantified during the arbitration"*. In addition, the *"Issues to be Determined"* at paragraph 45 of the Terms of Reference list the issue *"Whether Respondent 1's advance payment of approximately USD 18.4mio shall be applied against the Claimant's damage, if any."*[406]

### 13.2   Respondents' Position

482. Once Doosan terminated the Supply Agreement, it had to repay the Advance Payment; it may not terminate and at the same time keep the Advance Payment. This is also set out in Art 160 of the ECC.[407]

---

[401] C-PHB2 §247.
[402] C-PHB2 §247.
[403] C-PHB2 §248.
[404] C-SECONDREPLY §113.
[405] C-REBUTTAL §275.
[406] C-REBUTTAL §275.
[407] R1-PHB1-KH §87.

403. Therefore, Doosan has to repay the Advance Payment. In fact, it had to make the repayment immediately after the termination of the Supply Agreement and irrespective of whether or not it intended to raise any compensation claims.[408] The Bank Guarantees were issued to ensure repayment of the Advance Payment upon first request.[409]

404. The advance payment guarantee action in Cairo is between DIPCO and the guarantor bank as the parties to those instruments. It was Claimant's own decision to have sought to intervene in that litigation, and such legal costs are not a cost incurred by Doosan under the Supply Agreement. Although Respondent 1 did not object to the inclusion of relief in the form of a declaration as a corollary of Claimant's position on liability, such legal costs represent a separate claim outside the ToR, for which Claimant has not sought the permission of the Tribunal to pursue under Article 23(4) of the ICC Rules.[410]

405. It is noteworthy that Respondents' dropped their earlier payment claim for repayment of the Advance Payment in the course of the proceedings.[411]

### 13.3   Tribunal's Determination

406. The Parties' agree that Doosan must repay the Advance Payment following the termination of the Supply Agreement. This does not mean, however, that the Advance Payment must be repayed in cash: Not only is it a generally accepted principle that (justified) (counter-)claims may be set off against payment claims of the damaging party, but this principle is expressly reflected in Sub-Clause 14.2 of the FIDIC General Conditions (as amended by the Parties):

> In the event of the Contract being terminated under Clause 15 or 16 hereof the Employer may deduct the balance of the Advance Payment outstanding from any monies due or which may become due to the Contractor or the Contractor shall upon demand pay to the Employer the amount of such balance and it shall be deemed a debt due from the Contractor to the Employer and shall be recoverable accordingly from the Contractor or from the Guarantor.[412]

407. The Tribunal has held that most parts of Doosan's payment claim – by far exceeding the Advance Payment of USD 18,422,925 – are justified. Clearly, the Advance Payment must be deducted from Doosan's payment claim. This has already been factored in in Doosan's claim calculation.[413]

408. With respect to Doosan's reduction of the deduction by USD 393,832 for alleged legal costs for resisting the calling of the advance payment guarantees, §41 of the ToR *inter alia* states:

[408] R1-PHB2-KH §90.
[409] R1-PHB2-KH §90.
[410] R1-REJOINDER §176.
[411] Letter from counsel for Respondent 1 to the President of the Tribunal dated 4 May 2017.
[412] Exhibit C-001, p 331 of the pdf.
[413] C-PHB2 §186.

> The Tribunal shall consider, inter alia, the following issues: [...] Whether Respondent 1's advance payment of approximately USD 18.4 million shall be applied Claimant's damage, if any; [...] ".

489. Moreover, in §42 of the ToR, the Tribunal explicitly reserved the right to consider other issues, new or modified, which may arise during the course of the proceedings. In the view of the Tribunal, the legal fees accompanying the issue of the advance payment guarantees constitute such an issue as they closely relate to the issue of whether or not Respondent 1 may call the advance payment guarantee.

490. Claimant's intervention at the proceedings before the Egyptian court were an accessory effort of Claimant to bar Respondent 1 from enforcing the advance payment guarantees and, thus, to support the declaratory relief sought by Claimant in the present arbitration.

491. Claimant and its expert submitted evidence for the legal fees invoiced by several law firms acting on behalf of Claimant with respect to the litigation in Egypt.[414] Respondents did not dispute the accuracy of these invoices. In fact, Respondent 1's experts confirmed that the total amount to be deducted with respect to the Advance Payment amounts to USD 18,029,093 (as asserted by Claimant).[415]

492. Thus, the Tribunal finds that the **deduction** for the Advance Payment amounts to **USD 18,029,093**.

## 14.    Second Deduction: Proceeds of Crane Sale

### 14.1   Claimant's Position

493. The proceeds from the sale of the ten Containe Cranes in 2016 of USD 16,380,000 are deducted from Claimant's payment claim, save for the transaction costs of USD 1,154,914[416] that Doosan incurred in the context of the sale because Doosan personnel had to perform various functions to facilitate shipment of the cranes to PT Parvi, including supervision and oversight of all work performed by PT Parvi personnel within Doosan's premises.[417]

494. Therefore, the deduction for the 2016 sales proceeds is to be made in the amount of USD 15,225,086.[418]

### 14.2   Respondents' Position

495. The 2016 sale of ten Container Cranes by Doosan to PT Parvi was on an "as-is" basis.[419] Owing to this and other factors, there was no commercial reason for Doosan to incur such expenses.[420]

---

[414] Exhibit NAV-30; Appendix F to First Expert Report of Kiran P Sequeira.
[415] Addendum to Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §3.
[416] C-REBUTTAL §276.
[417] C-SECONDREPLY §214; C-REBUTTAL §276 & §277.
[418] C-REBUTTAL §278.
[419] R1-REJOINDER §460.
[420] R1-REJOINDER §460.

496. Clause 6 of the contract between Doosan and PT Parvi stipulates: *"Purchaser, at its own expense, shall carry out all related works required for the taking delivery of, and the taking out of the Supply Works out from the Site (including sorting, dismantling, loading, transportation, hiring lifting equipment & transportation equipment)."* Moreover, at clause 10 of said contract, PT Parvi accepted the Container Cranes on an "as-is" basis, with no warranty as to fitness or merchantability.[421]

497. Therefore, the full price of USD 16,380,000 from the sale to PT Parvi must be deducted from Doosan's claims.[422]

**14.3  Tribunal's Determination**

498. The Parties agree that the proceeds of the sale of Container Cranes by Doosan to PT Parvi in 2006 must be deducted from Claimant's payment claim.

499. However, the Parties disagree on whether this deduction must be reduced by certain "transaction costs" allegedly incurred by Doosan in preparation and in the course of the implementation of the PT Parvi sale and the collection of the Container Cranes by PT Parvi.

500. Respondent 1's argument that the Container Cranes were sold to PT Parvi "as-is" is not convincing. It is very well possible that Doosan had to incur certain costs in order to pave the way for entering into a sales contract with PT Parvi. The witness Jongsuk Park was credible in describing the tasks Doosan had to perform in order to implement the transfer to PT Parvi of the Container Cranes.[423] The Tribunal has no doubts that Doosan incurred certain costs in this context.

501. However, the Tribunal is not convinced that the amount claimed corresponds to the actual costs incurred with respect to the transfer to PT Parvi.

502. First, Claimant claims transaction costs of USD 1,154,914, all of which would have to be incurred between the termination of the Supply Agreement on 4 March 2016 and the date of the last shipment to PT Parvi on 31 January 2017,[424] ie, within a period of about eleven months. In contrast, Doosan's total claim for Labor and Maintenance costs for six years (2010 to 2015) amounted only to USD 1,419,446.[425] The Tribunal does not find credible such a huge disparity.

503. Second, Claimant did not submit credible evidence that Management Costs and Design Costs were actually related to the sale of the Container Cranes to PT Parvi. With respect to USD 27,392 Doosan claims for "Design",[426] Claimant's Monthly Progress Report of December 31, 2008 shows that the design work was already finished in November 2007,[427] leaving no room for additional design costs in the process of transferring the

[421] R1-PHB2-CR §64.
[422] R1-REJOINDER §460; R2-PHB2-CR §66.
[423] Second Witness Statement of Jongsuk Park §44.
[424] First Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §147; cf also Appendix D.1 to Second Expert Opinion of Kiran P Sequeira, column Z.
[425] C-PHB1 §178.
[426] Appendix D.1 to Second Expert Opinion of Kiran P Sequeira, cell Z42; see also §§456 et seq above.
[427] Exhibit C-025, p 24 of the pdf.

Container Cranes – "*as-is*" – to PT Parvi. This is equally true with respect to USD 17,350 Doosan claims for "*Electrical Design*".[428]

504. With respect to USD 1,110,172 Doosan claims for "*Management and Planning*",[429] Claimant's expert merely stated:

> [...] <u>We understand</u> that Doosan incurred costs of USD 1,171,988 in labor and maintenance expenses in 2016 which includes the expenses incurred to prepare the cranes for delivery to the purchaser and perform other tasks including safety control and administration work. [...] 430

505. He continued in saying that the fact that all "*transaction costs*" were recorded in 2016 "<u>*is*</u> <u>*consistent with*</u> *the explanation that Doosan's employees were spending time preparing for the sale, overseeing PT Parvi personnel, and performing safety and administrative functions.*"[431]

506. These statements merely refer to a possibility, ie, that the costs recorded by Doosan in 2016 might ("*we understand*"; "*consistent with*") properly relate to the so-called transaction costs. This, however, does not reflect a proper discharge by Claimant of its burden of proof, a different allocation of these costs appears equally possible.

507. As a consequence, the Tribunal concludes that Doosan's payment claim must be reduced by the full proceeds of USD 16,380,000 resulting from the sale to PT Parvi, without any deductions.

## 15.   Interest

### 15.1   Claimant's Position

508. Claimant distinguishes between Pre-Termination Interest, Pre-Award Interest and Post-Award Interest.

509. With respect to **Pre-Termination Interest**, the 2009 Amendment stipulates that Doosan is entitled to interest at a rate of 6.5% on an amount of USD 51mio as of 1 September 2009 and on an amount of USD 9mio as of 1 January 2010.[432] Since Article 4(ii) of the 2009 Amendment contemplates that interest will start accruing from 1 September 2009 onward and simultaneously says that such interest is to be calculated "*on the due amounts*", this means that, starting 1 September 2009, the sum of USD 51mio must be considered as "due." The minutes of a September 2010 meeting, during which the Parties recorded their agreement that the payment of USD 51mio had been "[d]*ue at*" 1 September 2009, confirm this.[433] This understanding was also confirmed by both Doosan's and DIPCO's witnesses during the Hearing.[434]

---

[428] Appendix D.1 to Second Expert Opinion of Kiran P Sequeira, cell Z11.
[429] Appendix D.1 to Second Expert Opinion of Kiran P Sequeira, cell AB34.
[430] First Expert Opinion of Kiran P Sequeira §109; emphasis added.
[431] Second Expert Opinion of Kiran P Sequeira §151; emphasis added.
[432] C-SECONDREPLY §211.
[433] C-PHB2 §49.
[434] C-PHB2 §49.

510. These interest claims constitute independent contractual claims under the 2009 Amendment. Accordingly, it does not matter to these claims whether Doosan validly terminated the Supply Agreement for material breach or impossibility.[435] There is no dispute between the experts on the calculation of the Pre-Termination Interest.[436]

511. Doosan claims USD 21,579,288 Pre-Termination Interest on USD 51mio plus USD 3,612,575 Pre-Termination Interest on USD 9mio.[437]

512. Furthermore, since Doosan has not been paid any of the compensation owed to it since termination of the Supply Agreement on 4 March 2016, Doosan is entitled to **Pre-Award Interest** at the rate stipulated in the Supply Agreement.[438]

513. The calculation of the Pre-Award Interest as per 30 August 2017 remained undisputed between the Parties.[439] In its C-PHB2, Doosan updated its calculation of Pre-Award Interest, now including interest up to and including 6 November 2017 and leading to a total amount of USD 5,530,327.[440] Since the FIDIC Conditions establish the interest rate as the sum of the relevant US discount rate + 3% [sic!, should read: percentage points], this equals 4.75% at the time of C-PHB2.[441] Thus, any further day until issuance of the arbitration award will roughly add USD 10,281.81 as Pre-Award Interest per day (on the assumption that the interest rate remains unchanged).[442]

514. Claimant requested **Post-Award Interest** which would correspond with the Pre-Award Interest Rate.

### 15.2   Respondents' Position

515. With respect to **Pre-Termination Interest**, awarding the entirety of Pre-Termination Interest on USD 51mio as claimed by Doosan would be excessive, in particular given the context of the case and Claimant's admitted duty to mitigate.[443] Claimant should have terminated the Supply Agreement years earlier.[444] Therefore, a cut off would necessarily be established according to the reasonable mitigation efforts Claimant should have undertaken, according to the obligations under Articles 221(1) and 216 ECC.[445]

516. With respect to Pre-Termination Interest on USD 9mio, the KPA Tender was won and, hence, the trigger for the USD 9mio was not realized regardless of any other factors and was not payable.[446]

517. However, even if the Tribunal were to find that payment of USD 9mio was triggered, Article 226 ECC declares that interest may only run from the date of filing a claim unless

[435] C-REBUTTAL §263.
[436] C-REBUTTAL §264.
[437] C-PHB2 §186.
[438] C-SECONDREPLY §217; C-REBUTTAL §281.
[439] C-PHB1 §100, §105 & §189.
[440] C-PHB2 §139.
[441] C-PHB2 §140.
[442] C-PHB2 §140.
[443] R1-REJOINDER §178; R1-PHB1-CR §134.
[444] R1-REJOINDER §178.
[445] R1-REJOINDER §178.
[446] R1-REJOINDER §179.

otherwise previously set.[447] Egyptian law may allow for interest against the grain of sha'ria principles, but nevertheless requires express stipulations in order to derogate from the standard rule under Article 226 ECC.[448] The 2009 Amendment did not stipulate interest with regard to the KPA tender payment.[449] Interest at 5% on USD 9mio would thereby run from 18 April 2016 (the date of the C-REQUEST) if Respondent 1 is liable for this sum at all.[450]

518. However, Respondent 1 does not dispute the calculation of Pre-Termination Interest by Claimant.[451]

519. Respondent 1 does not object in principle that **Pre-Award Interest** that the level of the US Federal Reserve discount rate plus 3 percentage points is reasonable.[452]

520. Respondents, in essence, did not comment on Claimant's request for **Post-Award Interest.**

### 15.3   Tribunal's Determination

521. With respect to **Pre-Termination Interest**, both the interest rate and the time periods to be covered remained undisputed between the Parties from a calculation perspective. This is also reflected in all Parties' experts' opinions.[453]

522. The Tribunal has held that Claimant complied with its mitigation duty, if any (see §§261 et seqq above). Therefore, there is no room for a reduction of Pre-Termination Interest with this argument. Furthermore, the KPA Tender (in the meaning of Article 4(ii) in conj with (v) of the 2009 Amendment) was not won because it ultimately related to cranes different from those agreed in the Supply Agreement and, hence, the USD 9mio obligation was triggered (see §§250 et seqq above).

523. Article 226 ECC stipulates:

> When the object of an obligation is the payment of the sum of money of which the amount is known at the time when the claim is made, the debtors shall be bound, in case of delay in payment, to pay to the creditor, as damages for the delay, interest at the rate of 4% in civil matters and 5% in commercial matters. Such interest shall run from the date of the claim in Court, unless the contract or commercial usage fixes another date. This article shall apply, unless otherwise provided by law.[454]

---

[447] R1-REJOINDER §180.
[448] R1-PHB1-CR §133.
[449] R1-REJOINDER §180; R1-PHB1-CR §133.
[450] R1-REJOINDER §180.
[451] R1-PHB1-CR §133.
[452] R1-REJOINDER §181.
[453] Second Expert Report of Kiran P Sequeira §146 (USD 25,191,863); Addendum to Second Expert Opinion of Capt Wolfhard H Arlt & Hans-Otto Bistram §3 (USD 21,579,288 + USD 3,612,575 = USD 25,191,863).
[454] Exhibit RL-25; translation by counsel for Respondent 1.

524. The last sentence of this statutory provision provides for alternative stipulations by the Parties, which the Parties made use of in Article 4(ii) of the 2009 Amendment.[455] Pursuant to this provision, DIPCO had to pay to Doosan the amount of USD 9mio *"by the end of December, 2009"*, because, as held above (see §§250 et seqq), the KPA tender was not won in such a way that it would qualify under the 2009 Amendment. Therefore, Doosan may claim interest on USD 9mio from 1 January 2010.

525. The Tribunal has independently verified that this calculation is correct. Thus, Doosan's claim for Pre-Termination Interest in the amount of **USD 25,191,863** is justified.

526. With respect to **Pre-Award Interest**, there is no dispute between the Parties that the level of the US Federal Reserve discount rate plus three percentage points would be reasonable.[456] Claimant has put this into the words *"at the US Federal Reserve Discount Rate + 3%"* in its Relief sought.[457]

527. Therefore, the Tribunal deems Doosan's claim for Pre-Award Interest justified.

528. What has been said with respect to Pre-Award Interest is equally true with respect to **Post-Award Interest**; therefore, Doosan's claim for Post-Award Interest is equally justified.

529. The Tribunal notes that even Claimant's expert calculated interest on a simple basis, ie, without adding compound interest.[458] Doosan requests Pre-Award and Post-Award Interest on its entire payment claim, including its capitalized claim for Pre-Termination Interest. This, however, would effectively result in compound interest, ie, on Pre-/Post-Award-Interest on (capitalized) Pre-Termination Interest.

530. In the view of the Tribunal, to apply compound interest would require either a contractual agreement or a statutory provision. Neither did the Parties assert such agreement or provision nor became the Tribunal aware of any such legal basis in the course of the arbitration.

531. Therefore, Doosan is entitled to Pre-Award and Post-Award Interest on the adjudicated payment claim excluding, however, the claim for Pre-Termination Interest **(USD 25,191,863)**, thus, on the amount of USD 48,805,696.71[459] starting from 4 March 2016 (ie, termination of the Supply Agreement).

## 16.   Summary of Quantum

532. As a result of the above findings and the results from the itemization below, the Tribunal holds that Doosan's payment claim is justified in the amount of USD 73,997,559.71:

---

[455] Exhibit C-007.
[456] R1-REJOINDER §181; cf Sub-Clause 14.8 of the FIDIC General Conditions (Exhibit C-028).
[457] C-PHB2 §249.
[458] First Expert Report of Kiran P Sequeira §104, §105 FN84 & §113.
[459] USD 73,997,559.71 - USD 25,191,863 = USD 48,805,696.71.

| Item | Claimed (C-PHB2) | | Awarded | | Dismissed | |
|---|---|---|---|---|---|---|
| **Compensation for 10 Container Cranes** | | | | | | |
| Stated Price (19.6(a)) | USD | 74,338,763.00 | USD | 74,338,763.00 | USD | - |
| Less: Remaining Costs | -USD | 1,865,780.00 | -USD | 1,865,780.00 | USD | - |
| Less: Future Warranty Costs | -USD | 713,451.00 | -USD | 713,451.00 | USD | - |
| = Net Received Price (19.6(a)) | USD | 71,759,532.00 | USD | 71,759,532.00 | USD | - |
| | | | | | | |
| **Costs from Postponement** | | | | | | |
| Shipping Cancellation Costs | USD | 2,900,000.00 | USD | 2,500,000.00 | USD | 400,000.00 |
| Insurance Fees | USD | 488,113.00 | USD | 488,113.00 | USD | - |
| Fees for Letters of Guarantee | USD | 2,397,037.00 | USD | 2,397,037.00 | USD | - |
| Erection Yard Costs | USD | 6,139,842.00 | USD | 3,701,131.78 | USD | 2,438,710.22 |
| Move-Out costs | USD | 292,034.00 | USD | 292,034.00 | USD | - |
| Unrefunded Import Duties | USD | 946,226.00 | USD | 946,226.00 | USD | - |
| Labor and Maintenance Costs | USD | 1,419,446.00 | USD | 403,032.93 | USD | 1,016,413.07 |
| Foreign Exchange Losses | USD | 700,965.00 | USD | 700,965.00 | USD | - |
| | | | | | | |
| **Lost Profits on Remaining Work** | USD | 26,718.00 | USD | 26,718.00 | USD | - |
| | | | | | | |
| **Deductibles** | | | | | | |
| Recovered - Advance Payment | -USD | 18,422,925.00 | -USD | 18,422,925.00 | USD | - |
| plus: Legal Fees re guarantee litigation | USD | 393,832.00 | USD | 393,832.00 | USD | - |
| Recovered - Sale of 10 Cranes | -USD | 16,380,000.00 | -USD | 16,380,000.00 | USD | - |
| plus: Transaction Costs | USD | 1,154,914.00 | USD | - | USD | 1,154,914.00 |
| | | | | | | |
| **Interest** | | | | | | |
| Interest on USD 51mio | USD | 21,579,288.00 | USD | 21,579,288.00 | USD | - |
| Interest on USD 9mio | USD | 3,612,575.00 | USD | 3,612,575.00 | USD | - |
| **Total:** | USD | 79,007,597.00 | USD | 73,997,559.71 | USD | 5,010,037.29 |

533.

## J. COSTS OF ARBITRATION

534. Pursuant to Article 37(4) of the ICC Rules, the final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.

535. The costs of arbitration are specified in Article 37(1) of the ICC Rules and include:

i. the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the ICC Court, in accordance with the scale in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the arbitral tribunal ("**ICC Costs**"); and

ii. the reasonable legal and other costs incurred by the parties for the arbitration ("**Party Costs**").

## 1.   ICC Costs

626. At its session of 8 January 2018, the ICC Court fixed determined the Arbitral Tribunal's fees and expenses and the ICC administrative expenses at a total of EUR 780,000.

## 2.   Party Costs

### 2.1   Costs as claimed by Claimant

637. Throughout the arbitration – and ultimately in its C-PHB2 – Claimant requested the Tribunal to order DIPCO and KGLPI to pay all costs and expenses of this arbitration, including the ICC's administrative fees, the fees and expenses of the Arbitral Tribunal, the fees and expenses of Doosan's legal representatives and experts in respect of this arbitration, and any other costs of this arbitration.[460]

#### 2.1.1   ICC Costs

638. In its C-COST, Claimant states that it has paid the entirety of the ICC's administrative fees and the fees and expenses of the Tribunal in the total amount of EUR 655,000.[461] However, Claimant already anticipated that it would likely also have to bear Respondents' share of the increase, ie, the finally determined total advance on costs of EUR 780,000.[462]

#### 2.1.2   Party Costs

639. Claimant states that the fees and expenses it incurred amount to EUR 1,598,603.85 plus USD 581,299.88,[463] consisting of

- expenses of Doosan amounting to USD 38,224.34 (including Doosan's travel expenses and USD 9,528.69 paid to the real-time interpreters for their services during the Hearing);
- counsel fees of King & Spalding and Shahid Law Firm amounting to EUR 1,555,587.50 and USD 53,175.51;
- counsel expenses of King & Spalding amounting to EUR 43,016.35 (including EUR 9,896.22 paid to Opus 2 for court reporting services as well as EUR 10,486.08 paid to the ICC for renting hearing rooms);
- expert fees of Navigant/Versant amounting to USD 469,237.50; and
- expert expenses of Navigant/Versant in the amount of USD 58,886.88.

### 2.2   Costs as claimed by Respondent 1

640. In both its C-PHB1-CR and its C-PHB2-KH, Respondent 1 requested the Tribunal to award to Respondent 1 all of its costs and fees associated with this arbitration.[464]

---

[460] C-PHB2 §249, lit n).
[461] C-COST §4.
[462] C-COST §4, FN6.
[463] C-COST §3.
[464] R1-PHB1-CR §157, item (iii); R1-PHB2-KH §96, item (ii).

### 2.2.1 ICC Costs

541. Respondent does not request reimbursement of any of the ICC's administrative fees or fees and expenses of the Tribunal.

### 2.2.2 Party Costs

542. Respondent 1 states that the costs and fees it incurred amount to USD 1,422,852.57,[465] consisting of

- expenses of DIPCO amounting to USD 31,941 (including DIPCO's travel expenses);
- counsel fees of Crowell & Moring amounting to USD 1,050,000 and of Alothman & Khalaf amounting to USD 150,000;
- counsel expenses of Crowell & Moring amounting to USD 133,064.02 (including internal and third party costs); and
- expert fees and costs of Capt Wolfhard Arlt and Mr Hans Otto Bistram amounting to 57,847.55.

## 3.    Arbitral Tribunal's Determination

543. Both Claimant and Respondent 1 (initially also Respondent 2) have, throughout the entire arbitration, requested compensation by their opponent for all costs related to the present arbitral proceedings.

544. In making decisions as to costs, Article 37(5) ICC Rules stipulates that the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner.

545. The Tribunal finds that both sides have similarly tried to be heard with their factual and legal positions so that no reason exists to provide for any deductions from their cost requests under this perspective. Thus, the Tribunal awards the costs according to the principle that "costs follow the event". According to this principle, the unsuccessful party shall pay the costs of the other side incurred in connection with the proceedings.

546. As a basis to measure the Parties' respective success, the Tribunal compares the monetary claims as initially established in the Court's Financial Table of 29 December 2016, which were USD 89,056,061 on Claimant's side and USD 18,400,000 on Respondents' side with the financial outcome on the basis of the present award. These were

- on Claimant's side being awarded USD 73,997,559.71 and not having to, separately, pay to Respondents the initially claimed amount of USD 18,400,000, ie, being successful with an aggregate amount of USD 92,397,559.71 and
- on Respondents' side having successfully defended a share of USD 15,058,501.29 of Claimant's initial claim.

---

[465] R1-COST §3.

847. The Parties' success rates result from a comparison of the above individual amounts with the initial aggregated amount under dispute of USD 107,456,061.[466] The success rates therefore are (i) 85.99% for Claimant and (ii) 14.01% for Respondents.

948. The Tribunal therefore finds that (i) Claimant shall be reimbursed with 85.99% of all of its costs and (ii) Respondents shall be reimbursed with 14.01% of all of their costs.

949. As regards the quantum of the fees, the Tribunal, based on its members' long-standing experience as to legal costs, finds the legal fees requested by the Parties to be reasonable in light of the total amount in dispute. With respect to the other costs of the arbitration, both Parties have applied a similar level of detail in their submissions on costs and the Tribunal has no reason to doubt the accuracy of any of the figures presented therein.

850. The result of the above approach can be seen as follows:

| | Claimant | | Respondents |
|---|---|---|---|
| | **EUR** | **USD** | **USD** |
| **Fees & Expenses** | EUR  1 598 603.85 | USD   581 299.88 | USD  1 422 852.57 |
| **ICC Costs (Art 37)** | EUR   780 000.00 | USD         - | USD         - |
| **Success Rate** | 85.99% | | 14.01% |
| Costs awarded | EUR  2 045 361.45 | USD   499 859.77 | USD   199 341.65 |

## K. DISPOSITIVE SECTION

951. For the reasons set out above, the Tribunal herewith

- declares that Respondent 1 and Respondent 2 are proper parties to this arbitration and that the Tribunal has jurisdiction over Respondent 1 and Respondent 2;
- orders Respondent 1 and Respondent 2 to pay, as joint and several debtors, to Claimant the amount of USD 73,997,559.71 plus interest on the amount of USD 48,805,696.71 from 4 March 2016 until payment at the US Federal Reserve Discount Rate plus 3%;
- declares that Respondents have materially breached the Supply Agreement;
- declares that Respondents' material breach of the Supply Agreement is not excused by *force majeure*;
- declares that the Supply Agreement was validly terminated by Claimant for material breach on 4 March 2016 in accordance with Sub-Clause 16.2 of the FIDIC General Conditions;
- declares that Respondent 1 and/or Respondent 2 are not entitled to any repayment, partially or wholly, of the advance payment provided to Claimant of USD 18.4 million;
- orders Respondents to jointly and severally reimburse the Claimant for the costs of the arbitration in the amount of EUR 2,045,361.45 plus USD 499,859.77;

---

[466] Cf Financial Table of 29 December 2016: USD 89,056,061 + USD 18,400,000 = USD 107,456,061.

- orders Claimant to reimburse Respondent 1 for the costs of the arbitration in the amount of USD 199,341.65;
- rejects all other claims and requests of Claimant; and
- rejects all claims and requests of Respondents.

Place of arbitration: Paris, France

Date: _15  January_ 2018

_____

Dr Christian Dorda (President of the Tribunal)

_____

Philippe Pinsolle (Co-Arbitrator)

_____

Pr Nabil N. Antaki (Co-Arbitrator)

DeARCY HALL, J.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 2 5 2019 ★

BROOKLYN OFFICE

MISC 19 - 1638

# Exhibit B



TRANSPORTATION



STEVEDORING





ANNUAL REPORT 2018





w w w . k g l . c o m

His Highness
**Sheikh Sabah Al-Ahmad Al-Jaber Al-Sabah**
Amir of The State of Kuwait



His Highness
**Sheikh Nawaf Al-Ahmad Al-Jaber Al-Sabah**
Crown Prince of The State of Kuwait



His Highness
**Sheikh Jaber Al-Mubarak Al-Hamad Al-Sabah**
The Prime Minister of The State of Kuwait



# CONTENTS

| | |
|---|---|
| **Board of Directors' Report** | 4 |
| **Board Members** | 5 |
| **Corporate Governance Report 2018** | 6 |
| **Consolidated Financial Statements** | 26 |

## Board of Directors' Report

**Dear shareholders,**
**Peace Be Upon You,**

It is our pleasure to welcome you today on the occasion of holding Kuwait & Gulf Link Transport Company's (K.P.S.C) annual General Assembly, and to present to you the Board of Directors' Annual Report, Consolidated Financial Statements and clarifications of the company, in addition to the Auditor's report of the company's business for the fiscal year ended on 31/12/2018.

**<u>Financial Indicators:</u>**
The operating revenues for the year 2018 amounted K.D 65,384,161 comparing to the amount of K.D 64,814,644 for the fiscal year 2017 with an increase of K.D 565,517 representing the percentage of 0.88%.
The total expenses for the year 2018 amounted to K.D 51,763,715 comparing to the amount of K.D 52,102,335 for the fiscal year 2017, with a decrease of K.D 338,620 representing a percentage of 0.65%.
The company's net profit for the year 2018 reached the amount of K.D 2,718,343 comparing to the amount of K.D 10,054,120 for the fiscal year 2017 with a decrease of K.D 7,335,777 representing percentage of 72.96%.

**<u>The BOD Recommendations:</u>**
The BOD recommends the esteemed General Assembly to do the following:

- Distribute free bonus shares for the financial year ended on 31/12/2018 at the rate of 5% of the company's issued and paid capital by 5 shares for each 100 shares with an amount of KD 1,387,433.300 for the shareholders registered in the company's records by end of maturity date determined within 15 days from date General Assembly meeting. It shall be distributed to the shareholders after 5 days from maturity date, and authorizing Board of Directors to dispose fractions of shares and amending the aforementioned time schedule, in the event of inability to announce the confirmation of the time schedule at least 8 days prior to maturity date because the delay of registration procedures.
- Grant the BOD members remunerations for the fiscal year ended on 31/12/2018 with total amount of KD 75,000 (Seventy-Five  thousands Kuwaiti Dinars only).
- Reappointing Mr. Abdul Hussain AL Rasheed of (Rödl Middle East Burgan International Accountants, Ali Al Hassawi & Partners), and Mr. Faisal Saqer Abdul Kareem Al Saqer of (BDO Al Nisf & Partners) as auditor for the company's financials for the fiscal year to be ended on 31/12/2019 based on the recommendation of the Audit Committee.
- Deduct 10% of the net profit for the statutory reserve account.
- Deduct 10% of the net profit for the voluntary reserve account.

The Financial Benefits Granted to the Board Members:
There have been no financial benefits granted to the BOD members during the fiscal year 2018.

**<u>The Financial Benefits Granted to the Members of Executive Management:</u>**
The Executive Management members were granted salaries and allowances with total amount of K.D 199,945 during the fiscal year 2018.

**<u>The Future Plan:</u>**
The company looks forward in 2019 to expand its activities locally and regionally, and to enter new fields to achieve its growth in the future. In addition to the continuation of following up the policy of development and diversity of the services which Kuwait & Gulf Link Transport Co. and its subsidiaries are providing for their customers in order to achieve more profits and desired revenues in favor of its shareholders. Furthermore, the company's management is seeking to win more of new contracts and projects beside the ones it and its subsidiaries are currently executing with the governmental bodies and the private sector; hoping that the company to acquire more development, progress, and prosperity.
Finally, I express, in my name and in the name of the BOD members, my sincere thanks and gratitude to all the company's shareholders for their priceless confidence and continued support to the BOD in achieving the company's goals.
I also appreciate all the employees' professional performance and sincere efforts and faithful work.
I beseech Allah Almighty to bless us with progress and prosperity under the leadership of his Highness the Amir of Kuwait, His Highness the Crown Prince, His Highness the Prime Minister and his distinguished government.
I also extend gratitude on your behalf and in the name of the BOD, to all the employees at the Ministries and Institutions of the state for their lasting support and help to facilitate all our business.

<div align="right">

**Maher Abdullah Marafi**
**The Chairman**

</div>

## Board Members

**Maher Abdullah Marafi**
Chairman

**Ali Esmail Dashti**
Vice Chairman

**Emad Jumaah Ali Al Salem**
Board Member

**Mohamad Ahmad Alkandari**
Board Member

**Yousef Saeed Dashti**
Board Member

KUWAIT AND GULF LINK TRANSPORT COMPANY K.P.S.C



CORPORATE GOVERNANCE REPORT
FOR THE FISCAL YEAR ENDED 31/12/2018

## BOD Undertaking of
## Soundness and Integrity of the Financial Statements

**Dear Messrs. /**
**Shareholders of Kuwait & Gulf Link Transport Co.,**

The BOD of Kuwait & Gulf Link Transport Co. (K.P.S.C) undertaking the integrity and accuracy of the financial statements that were provided to the external auditors in order to act therewith to carry out the entrusted tasks thereof to the fullest; and the financial statements of the company show fairly and clearly the company's financial position, its business profits and cash flow as of 31/12/2018; as per the financial data and reports we received from the executive management, and performance of the due diligence to verify the integrity and accuracy of the said data and reports.
Sincerely Yours,

**Maher Abdullah Marafi,**
**Chairman**

## Introduction

Corporate governance is defined as the set of internal rules, controls and procedures of the companies governing the relationship between the main parties of the Company (Members of the Board Of Directors ("BOD"), Executive Management, shareholders, other stakeholders ...) which aims to balance the interests of different parties, and to promote the values of responsibility, disclosure, transparency and fairness to ensure the protection of shareholders' rights and other interests and to ensure that the company is managed in manner that serves its stakeholders.

Based on the belief of Kuwait Gulf Link Transport Company in the importance of the principles established by Corporate Governance Rules and its pivotal role in helping the company to achieve its objectives to implement its plans and strategy to reach sustainable development in order to achieve the interests of the related parties, the company's BOD has  created a set of policies, regulations and systems to act therewith along with the company's applied policies, regulations and statutes to enhance the company's wise governance culture in line with the corporate governance rules established by the Capital Markets Authority of Kuwait, and what is globally recognized.

Based on this principal, Kuwait and Gulf Link Transport Company is always keen to ensure that it is fully committed to all relevant regulations and laws, especially with regards to rules of the Corporate governance and applications thereof.

### Rule I: Construct a Balanced Board Composition

- **Brief on BOD' formation**

  The current BOD, consists of five members, was elected by the Ordinary General Assembly which was held on 26/4/2018 for a period of three years. The BOD was formed in accordance with the provisions of the Companies Law, its Executive Regulations and the Company's Articles of Association. In addition, the diversity of scientific and practical experiences was observed in the formation of the BOD in commensurate with the size and nature of the company's activities. Moreover, It is considered that the majority of the members of the BOD shall be from the nonexecutive members and that among its members shall be members who enjoy independence as stated in Article (3-2) of Chapter Two of Book 15 "Corporate Governance".

| S. No. | The name | Member classification | Academic qualification and practical experience | Date of election / appointment |
|---|---|---|---|---|
| 1 | Mr. Maher Abdullah Marafi (Chairman) | Non-Executive Member | - Holds Bachelor of Business Administration and Marketing - Higher Technical Institute - Ain Shams University Egypt.<br>- Member of the BOD of KGL Logistics.<br>- Former Chairman of National Cleaning Company.<br>- Former Member of the BOD of Al Khaleej Shipping & Unloading Co. Ltd. - Saudi Arabia.<br>- Former BOD member and former vice chairman of the Association of Shipping Agents.<br>- Former BOD member of Kuwait Shipbuilding and Repair Company.<br>- Former BOD member and former chairman of the Gulf Company for the Deepening of Waterways.<br>- Former member of the Higher Committee of the Ministry of Social Affairs and Labor.<br>- Former member of the Central Committee for the Treatment of Illegal Residents.<br>- Former member of the Executive Committee of the Economic Community.<br>- Former Chairman of Gulf Maritime Services Company.<br>- Member of private committees and charities. | 26/4/2018 |

CORPORATE GOVERNANCE REPORT 2018

| 2 | Dr. Ali Esmail Dashti (Vice-Chairman) | Non-Executive | - Holds a PhD degree of Computer Science from South California University, USA.<br>- Holds a Master degree of Computer Engineering from South California University, USA.<br>- Holds a Bachelor degree of Science, Computer Engineering from Pacific University, USA.<br>- Holds a Master degree of Business Management from Chicago University, USA.<br>- A Professor Member of Kuwait University, Computer Engineering Section since 1999.<br>- The Chairman of Kuwait and Gulf Link Holding<br>- A former member of BOD of E-Learning Co.<br>- Founder and Chairman of Axis Solutions for computer Systems Co.<br>- A member of Kuwait Engineering Society.<br>- A former member of Youth Presidents Organization-Kuwait. | 26/4/2018 |
|---|---|---|---|---|
| 3 | Mr. Emad Jumaah Al Salem (BOD Member) | Independent Member | - Holds Bachelor of Science/Business Administration from the University of Minnesota State in Mankato, USA<br>- Worked as computer programmer at KOC during the period 1985-1992.<br>- Worked as Director of Information Technology Security in Kuwait Company for Trade, Contracting and Foreign Investments during the period 1992 - 1994.<br>- Worked as Director of Information Technology at Kuwait Clearing Company (1994 - 2014). | 26/4/2018 |
| 4 | Mr. Mohamed Ahmad Al-Kandari (BOD Member) | Independent Member | - A holder of a bachelor's degree in Science/ Industrial Engineering from USA.<br>- Worked as system analyst in Kuwait Oil Company during 1979-1985.<br>- Worked as technical support coordinator in Kuwait Company for Petroleum Derivatives during 1985-1991.<br>- Worked as manager of the internal audit in Petrochemicals Industry Company during 1991-1996.<br>- Worked as manager of the internal audit in Kuwait Oil Company during 1996-2005.<br>- Worked as manager of the internal audit in Kuwait Oil Company during 2008-2014. | 26/4/2018 |
| 5 | Mr. Yousef Saeed Dashti (BOD Member) | Non-Executive Member | - Holds a bachelor's degree of science/ Business Administration from the South California University, USA.<br>- General Manager of Kuwait Motoring Company.<br>- Had the position of Assistant Manager of the Business Development – KGL Holding (2007-2009).<br>- Had the position of Fleet Manager and the Manager of Qatar office – KGL Transportation Company (2009 - 2016) | |
| 6 | Mr. Yaqoub Abdullah Al Wazzan (BOD Member) | Non-Executive Member | - Holds bachelor's degree in insurance from Kuwait University.<br>- Served as Insurance Controller at the KOC (1999-2004).<br>- Has extensive experience in commercial and government business.<br>- Attended several workshops and specialized courses in business administration.<br>- Current and former member of several BODs of directors of Kuwaiti shareholding companies. | 26/7/2017 |
| 7 | Mr. Ahmed Afifi Mahmoud | Secretary | - Holds Bachelor of Law Cairo University.<br>- Has over 30 years of experience in the field of legal work, and has extensive experience in the field of corporate law, laws and regulations governing securities activity.<br>- Current and former member of several BODs of directors of Kuwaiti shareholding companies. | 2/5/2018 |

- **Brief on Company's BOD meetings through the below statement:**

  The BOD of Kuwait & Gulf Link Transport Co. had held (9) meetings during 2018, in which it discussed subjects, strategies, phasing financial statements of the company as well as the annual financial statements. The BOD had formed 3three specialized committees (Audit Committee, Risk Management Committee, and nominations and Remunerations Committee).

**Below, the BOD' meetings statement during 2018:**

| S. No. | Number and date / Name and position | Meeting (1) 12/3/2018 | Meeting (2) 2/5/2018 | Meeting (3) 3/5/2018 | Meeting (4) 6/5/2018 | Meeting (5) 14/5/2018 | Meeting (6) 5/6/2018 | Meeting (7) 1/8/2018 | Meeting (8) 17/9/2018 | Meeting (9) 13/11/2018 | Number Of Meetings |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Mr. Maher Abdullah Marafi Chairman of the BOD | √ | √ | √ | √ | √ | √ | √ | √ | √ | 9 |
| 2 | Dr. Ali Ismaeil Dashti Vice-Chairman | Not Member of BOD | √ | √ | √ | √ | √ | √ | √ | √ | 8 |
| 3 | Mr. Yousef Saeed Dashti Vice-Chairman | √ | | | | | | | | | 5 |
| | Mr. Yousef Saeed Dashti Member of the BOD | | × | × | × | √ | √ | × | √ | √ | |
| 4 | Mr. Emad Jumaah Al Salem Member of the BOD | √ | √ | √ | √ | √ | √ | √ | √ | √ | 9 |
| 5 | Mr. Mohamed Ahmad Al Kandari Member of the BOD | √ | √ | √ | √ | √ | √ | √ | √ | √ | 9 |
| 6 | Mr. Yaqoub Abdullah Al Wazzan Member of the BOD | × | Membership Expired | | | | | | | | - |
| 7 | Mr. Ahmed Afifi Mahmoud Secretary of the BOD | √ | √ | √ | √ | √ | √ | √ | √ | √ | 9 |

√: Attended   x: Apologized from Attendance

Note: the membership of Mr. Yaqoub Abdullah Al Wazzan expired, and he was replaced by Dr. Ali Esmail Dashti through election of a new BOD by the Ordinary Assembly Meeting held on 26/4/2018.

- **Brief on application of registration, coordination, and archiving the minutes of BOD Meetings:**

  The secretary of the company's BOD has been appointed from the company's staff who enjoys university qualifications and related practical experience. The terms of reference and powers of the BOD shall govern the functions and responsibilities of the Secretary of the BOD, including but not limited to the following:

1. Preparing the meetings of the BOD, ensuring that all legal requirements are met, and working to ensure their success.
2. Coordinating and preparing all reports, presentations, proposals and other materials submitted to the BOD and providing the members of the BOD with such information for their consideration.
3. Drafting the agenda of the meetings of the BOD and the resolutions of the BOD and obtaining the approval of the Chairman of the BOD before presenting them to the BOD.
4. Recording and maintaining all minutes of meetings, records and books and reports of the BOD that are submitted by the BOD and provided that the minutes of meetings should be signed by him and all the members present.

5. Ensuring that the members follow the procedures approved by the BOD, and ensuring that the meetings of the BOD are notified three working days before, taking into account the emergency meetings.

6. Assisting members of the BOD in full and rapid access to all minutes of meetings of the BOD and information and documents and records relating to the company.

7. Ensuring the proper delivery and distribution of information and coordination among the members of the BOD and among the other stakeholders in the company, including the shareholders and the various departments of the company and employees under the supervision of the President.

8. Maintaining the confidentiality of the information and all the documents of the BOD and other relevant documents.

**Rule II: Establish Appropriate Roles and Responsibilities**

• **Brief on Company's performance of determining tasks, responsibilities and duties of the BOD Members and Executive Management, as well as the authorities and powers conferred to the Executive Management.**

**- The role and responsibilities of the BOD**

The main role of the BOD is to represent the majority of shareholders in the management of the Company, and to implement their decisions that are issued through the General Assembly in its ordinary and extraordinary capacity,   to take responsibility for achieving the Company's strategic objectives, maximizing its assets, empower its competitive ability locally and regionally, and to maintain the company's leadership firmly and wisely.

The BOD is responsible for identifying and approving the Company's main and strategic objectives, applying and ensuring the effectiveness of the rules of governance, supervising capital expenditures, ensuring that the approved policies and regulations of the Company are transparent and clear as to premises process of taking decisions and achievement of the wise governance principals, forming specialized committees that assist the BOD to act its works and set out its policies, determining its tasks, forming methodology, and tenure; and ensuring the clarity of the powers and authorities between the BOD and the Executive Management, and the extent of the company's compliance with the policies and procedures that ensure the company's respect for the internal rules and regulations in force, as well as the laws and regulations in force in the country. Furthermore, verify the adequacy of the organizational, administrative and accounting structures of the company and its group, as well as the supervision and control on the company's management team, and confirm that it is very efficient and effective, and is performing the tasks assigned thereto in compliance with the authorities conferred thereupon... etc.

The BOD is responsible for approving the interim and annual financial statements, ensuring the soundness of the Company's financial and accounting systems, including relevant financial reporting systems, and presenting a report on the Company's activity and financial position on an annual basis to the General Assembly. In addition to submit recommendations to the General Assembly on the distribution of profits and to approve the appointment, reappointment or removal of the auditor appointed by shareholders upon their approval at the annual general assembly meeting of the Company, in accordance with the recommendation of the Audit Committee.

**- Role and responsibilities of the Chairman**

The Chairman of the BOD shall be the legal representative of the Company to third parties in accordance with the Articles of Association of the Company. He shall supervise the proper functioning of the BOD, encourage members of the BOD to participate collectively and effectively in the conduct of the affairs of the BOD to ensure that the BOD's responsibilities for the interest of the company, and coordination with the executives, heads of committees, and the Secretary of the BOD to determine the schedule of meetings of the BOD and its committees and other important meetings. Also, to ensure that the BOD discusses all key issues in an effective and timely manner. He is also responsible for overseeing the BOD members to receive accurate and clear information in a timely manner and ensure communication between the Company and its shareholders. Moreover, the Chairman also conducts detailed discussions on Company's strategies and financial statements (quarterly and annually), reviewing operational plans, and the chairman of the BOD plays a leading and effective role in close cooperation with the Company's CEOs.

**- Role of Executive Management.**

The company has a team of highly qualified executives from Executive Management members. The corporate governance framework reflects the provisions of Article (10-3) of the 15th book "Corporate Governance" of the Executive Regulations of the Capital Market Authority Law, tasks and responsibilities of Executive Management to which it is committed in the light of the powers and authorities vested and approved by the BOD. Whereas, the Executive Management works on managing the day-to-day work of the company and managing company's activities and resources in an optimal manner to maximize profits and reduce expenses in accordance with the company's objectives and its strategies set by the BOD, and carry out the tasks vested thereto by the BOD. Moreover, submit financial and non-financial reports to the BOD on the Company's activities and operations results, and the close cooperation with the BOD and the departments of the committees emanating from the BOD.

**- The following are achievements of the BOD during 2018**
- Approving annual estimated budget and approving quarterly and annual financial statements.
- The formation of the committees of audit, risk, nominations and remuneration and the naming of its members in accordance with a charter that sets the duration of each committee, its powers and responsibilities, the manner of monitoring of BOD thereon and determining their duties and responsibilities and the follow-up by the BOD of the reports issued by those committees.
- Supervising and monitoring the performance of Executive Management members and ensuring that the Executive Management operates according to the policies and regulations approved by the BOD.
- Following up the progress of the work of the company and its group through periodic meetings with the Executive Management and discuss the results of the company and its subsidiaries during a series of periodic reports.
- Approving to submit recommendation to the General Assembly to appoint the company's auditor(s) for the year 2018 and determining their fees.
- Approving the Governance Report of 2017.
- Approving the distribution of the profits on the shareholders, and remunerations of BOD, and submit recommendation to the general Assembly on such regard.
- Revising the organizational chart of the company and its group and approve the same.

- **Committees emanating from the BOD**

In light of applying the correct governance rules in the company, in its meetings held on 6/8/2017 and 2/5/2018, the BOD of Kuwait and Gulf Link Transport Company has formed three specialized committees to assist the BOD in carrying out its supervisory and regulatory responsibilities effectively in each committee's scope of responsibility approved by the BOD. The duration of the work of each committee begins from the date of its formation and for a period of three years, and ends with expiry of the membership of the BOD for any reason, and may be reformed, whenever deemed necessary, under a resolution by the BOD. Those committees are Audit Committee, Remunerations Committee, and Risk Management Committee.

**1- Audit Committee.**
The Audit Committee is composed of three members with financial expertise in the field of auditing, and the Audit Committee reviews the financial statements before submitting them to the BOD and making recommendations on them to ensure the fairness and transparency of the financial reports, studying the financial and accounting policies adopted by the Company, and assessing the adequacy of internal financial and control systems and controls on a regular basis and the technical supervision of the company's internal audit unit; where the internal audit unit submits its reports directly to the audit committee to ensure the independence of these internal controls. The Committee also submits its recommendations to the BOD on appointing or reappointing or removal of external auditors and their fees after confirming that they are only perform works for the company, which are necessary for auditing, in order to enable the BOD to approve such recommendations at the Annual General Assembly Meeting. The Audit Committee held (9) meetings during 2018.

- **Formation of Audit Committee:**
1. Mr. Mohamed Ahmad Alkandari (Chairman)
2. Mr. Emad Jumaah Al Salem (Member)
3. Mr. Yousef Saeed Dashti (Member)

The tasks and achievements of the Committee are represented in the following:
1. Review the annual and quarterly financial statements before presenting them to the BOD, and submit their recommendations to the BOD.
2. Providing recommendation in regard with reappointing the Auditors and determining their fees.
3. Discuss the auditors' reports and listen to their views on the audit.
4. Follow up the work of the auditors of the company, and ensure that they do not provide any services outside the scope of the audit.
5. Read and review the accounting policies used, , and recommend thereon to the BOD.
6. Supervise the Internal Audit Department of the company to ascertain its effectiveness regarding the implementation of the tasks assigned thereto.
7. Read and review the Internal Audit Reports of the company and its subsidiaries to ascertain the extent to which the company complies with applicable laws, policies and regulations.
8. Review and approve the annual audit plan.
9. Evaluate the efficiency of Internal Control Systems (ICR) followed by the company, and submit recommendations on such regard to the BOD.
10. Review the Independent Auditor Report on reviewing and evaluating (ICR), and provide recommendations for the Internal Audit Department to take the necessary actions thereon.

## Report of the Audit Committee for 2018

**Dear Shareholders,**
**Peace, mercy and blessings of Allah be up on you**
On behalf of the members of the Audit Committee of Kuwait and Gulf Link Transport Co. (K.P.S.C), I am pleased to present to you today the report of the 2018 Annual Audit Committee on the occasion of the Annual General Meeting of the Company including the Tasks and achievements of the Audit Committee for 2018.

### First: Audit Committee Objectives.
The main objective of the Audit Committee of the BOD is to assist the BOD to perform its functions and supervisory responsibilities to ensure the integrity and soundness of the Company's financial reports and to ensure the adequacy and effectiveness of the Company's internal control systems through the Committee's direct contact with the parties involved in the preparation and review of financial reports, whereby they are (financial management, internal audit, external auditor, and Executive Management) to monitor the effectiveness of the audit of the financial statements of the company, whether internal audit or external audit and ensure the independence and neutrality of the observer the external auditor.

### Second: Audit Committee Formation.
The Audit Committee shall consist of three members (one non-executive member and two independent members) fully familiar with the accounting and financial fields, the Secretary of the Committee, who shall perform the functions of recording and signing meetings of the members and coordinating with the Chairman of the Committee to prepare the agendas and reports of the Committee.

### Third: Committee's Membership Duration.
According to the Charter of the work of the Audit Committee, the membership shall be for three-year term beginning the date of formation thereof and ends with its BOD term expiry for any reason.

### Fourth: Committee Meetings.
The Committee shall hold its meetings at the Company's headquarters on a regular basis and whenever necessary, at least once every three months. The Committee shall hold periodic meetings with the External Auditor and at least four times with the Internal Auditor. Where the Committee during 2018 held nine (9) meetings during which it discussed several issues related to the interim and annual financial statements, the auditor's report, the appointment of an independent auditor to review the internal control systems… etc. Moreover, these meetings were attended by the internal Auditor and the Account Auditor to discuss and listen to their opinions in their respective fields. The committee has submitted its recommendations to the BOD to take the necessary action.

### Fifth: Results of the work of the Committee.
During its work in 2018, the Committee has achieved many of its goals and responsibilities assigned thereto as follow:

1. Review the annual and quarterly financial statements before presenting them to the BOD, and submit their recommendations to the BOD.
2. Providing recommendation in regard with reappointing the Auditors and determining their fees.
3. Discuss the auditors' reports and listen to their views on the audit.
4. Follow up the work of the auditors of the company, and ensure that they do not provide any services outside the scope of the audit.
5. Read and review the adopted accounting policies, and recommend thereon to the BOD.

6. Supervise the Internal Audit Department of the company to ascertain its effectiveness regarding the implementation of the tasks assigned thereto.
7. Read and review the Internal Audit Reports of the company and its subsidiaries to ascertain the extent to which the company complies with applicable laws, policies and regulations.
8. Review and approve the annual audit plan.
9. Evaluate the efficiency of Internal Control Systems (ICR) followed by the company, and submit recommendations on such regard to the BOD.
10. Review the Independent Auditor Report on reviewing and evaluating (ICR), and provide recommendations for the Internal Audit Department to take the necessary actions thereon.

### Sixth: Committee's Work plan during the fiscal year 2019.

To complement the functions and responsibilities assigned to the Committee by the BOD, the Committee shall endeavor during 2019 to do as follow:

1. Recommending the BOD to appoint, reappoint or change of the external auditors and the determination of their fees.
2. Following up the work of the external auditors and the internal auditor and ascertaining the extent of their independence.
3. Ensuring the adequacy and efficacy of the disclosure in the quarterly and annual financial statements by following up the company's disclosure of all aspects and financial policies followed in the preparation of the financial statements and discussing the disclosure of important events in the financial statements, as well as discussing the financial decisions affecting the financial statements and how to disclose them in the complementary clarifications.
4. Ensuring that the company's Internal Control System provides accurate accounting and administrative data and information that the management can rely on upon decision-making.
5. Ensuring that there are no violations of the company's Articles of Association as well as the laws, provisions and regulations relating to the company's activities.
6. Confirming company's compliance with the provisions and laws regulating the company's work progress.
7. Following up of the internal audit unit of the company to review all the work of payments and receipts, whether checks or cash.
8. Studying all reports prepared by the independent auditor and internal audit unit of the company, and the position of observations and recommendations contained therein, which were discovered during the review, and reflections and impacts of those comments, and the comments of the management regarding these observations.
9. Discussing the items of the financial statements with the Financial Manager of the company and requesting clarifications and analyses that the committee may consider necessary to approve the results of the work.

Finally, on behalf of the members of the Audit Committee, I would like to thank the members of the BOD and the Executive Management for their efforts with the Committee during 2018 and their keenness to the optimum implementation of the laws and regulations issued by the regulatory bodies in the interest of the Company. Also, I would like to thank Mr. Abdul Hussain Al Rasheed of (Rödl Middle East - Burgan International Accountants, Ali Al Hassawi & Partners), and Mr. Faisal Saqer Abdul Kareem Al Saqer of (BDO Al Nisf & Partners) as auditor for the company's financials and all their employees for their cooperation and fruitful views of the Committee. Peace, mercy and blessings of God be upon you.

**Head of Audit Committee**

### 2. Nominations and Remuneration Committee

The Nomination and Remuneration Committee is composed of three members, chaired by a nonexecutive BOD member. The Nomination and Remuneration Committee held one meeting during 2018.

**-   Formation of Nominations and remuneration Committee.**
1.   Mr. Maher Abdullah Marafi (Chairman).
2.   Dr. Ali Esmail Dashti (Member).
3.   Mr. Emad Jumaah Al Salem (Member).

Note: the Committee formation was including both of Mr. Yousef  Saeed Dashti (Chairman) and Mr. Mohamed Ahmed Alkandari (Member) till date of holding the Ordinary General Assembly on 26/4/2018.

•   **Brief on tasks and responsibilities of the Committee**

•   Supervise the procedures for nomination to the BOD and Executive Management, and submit its recommendations in this regard.
•   Determine the remuneration of the Chairman and members of the BOD, as well as the remuneration of the Senior Executive Management.
•   Review the remuneration policy adopted by the company to attract qualified and keep its qualified staff to achieve the company's strategic goals.
•   Develop functional descriptions for executive, non-executive and independent members.

### 3. Risk Management Committee

The Risk Management committee comprises of three members headed by a nonexecutive BOD member. The Risk Management Committee held four (4) during the year 2018.

**-   Formation of Risk Management Committee.**
1.   Mr. Emad Jumaah Al Salem (Chairman)
2.   Mr. Mohamed Ahmed Alkandari (Member)
3.   Mr. Yousef Saeed Dashti (Member)

•   **Brief on tasks and responsibilities of the Committee**

•   Assisting the BOD in determining and assessing the acceptable risk level for the Company ,and ensuring that the Company does not exceed this level of risk after its approval by the BOD.
•   The Risk Management Committee is responsible for preparing and reviewing risk management strategies and policies before they are approved by the BOD.

- Ensure that risk management strategies and policies are implemented and that they are commensurate with the nature and size of the company's activities.
- Ensure the independence of risk management personnel from activities that may result in Company's exposure to risks.
- Ensure that risk management personnel have a full understanding of the risks surrounding the company and work to increase their awareness and recognize of risk culture.
- Approve Company's risk management record.
- Discuss the periodic risk management unit reports and submit recommendation thereon to the BOD.
- Review the periodic reports on the nature of the risks to which the company is exposed, and submit its recommendations thereon to the BOD.
- Review the organizational structure of risk management and make, recommendations before it is approved by the BOD.

- **Brief on how to apply requirements that allow BOD members to obtain accurate and timely information and data**

  The Secretary of the BOD handle the proper delivery and circulation of information and coordination among the members of the BOD and the Executive Management using the latest technological means provided by the Company to ensure the quick and easy and accurate access to information and data by BOD members.

### Rule III: Recruit Highly Qualified Candidates for the Members of a BOD and the Executive Management

The BOD, following its selection from the General Assembly, formed the Nomination and Remuneration Committee in accordance with the requirements of the Capital Market Authority, as shown above.

The Company has a policy approved by the BOD to determine the remuneration of the Chairman and BOD Members and the various categories of remuneration awarded to the Executive Management in accordance with the applicable legal and regulatory requirements.

### Report of the remuneration granted to
### BOD Members and Executive Management.

Kuwait Gulf Link Transport Company is always striving to provide a competitive level of remuneration to attract and retain qualified and efficient employees to achieve the Company's strategic objectives, in accordance with the Company's applied salaries and remuneration policy as follows:

- **Executive Management Remunerations.**
1. Fixed remunerations (Basic Salaries): This type of remunerations is determined in the light of the skills of the staff and the tasks and responsibilities assigned to them as per job description.
2. Performance-based variable remuneration: This type of remunerations is linked to assessing the individual performance of each employee and his contribution in the achievement of the company's strategic objectives represented in: annual performance remuneration, incentives and shares options.
3. End of Service Benefits: This type of remuneration is determined according to the provisions of the Labor Law and is payable at the end of service.

- **BOD' Remunerations**

The remunerations of the members of the BOD shall be determined in accordance with the provisions of Article (198) of the Companies Law No. 1 of 2016, where the total remunerations granted to the Chairman and Members of the BOD shall not exceed more than 10% of the net profit after deduction of consumption and reserves and distribution of profit not less than 5% of the capital to the shareholders, and the remuneration of directors is subject to the approval of shareholders in the Ordinary General Assembly.

- **Details of financial benefits granted to the BOD Members**
- No financial benefits (In cash or in kind) were granted to the members of the BOD during the fiscal year 2018.

- **Details of financial benefits granted to members of Executive Management.**

Directors of the Executive Management were granted salaries, end of service benefits and short-term benefits during the fiscal year 2018 with a total amount of KD 199,945 as detailed below.
Basic Salaries:      KD 155,200/-
Allowances:         KD 44,745/-

## Rule IV: Safeguard the Integrity of Financial Reporting

- **Written commitments by the BOD and Executive Management to the safety and integrity of the prepared financial reports**

  The company is always keen on the integrity and integrity of financial statements to shareholders, therefore, Company's BOD Executive Management undertakes in writing by the correctness and integrity of all financial statements, and that the Company's financial statements present fairly and clearly the financial position, results of operations and cash flows of the Company and are prepared in accordance with International Accounting Standards. The BOD of the Company also undertakes to the shareholders by the correctness and integrity of the financial statements as referred to in the Company's annual report.

- **Brief on applying the requirements of forming Audit Committee**

  The BOD had formed the audit committee in accordance with requirements of Capital Market Authority and referred to above.

- **In the event of a conflict between the recommendations of the Audit Committee and the decisions of the BOD, a statement shall be included detailing and clarifying the recommendations and the reasons behind the decision of the BOD not to comply therewith**

  There was no conflict between the recommendations of the Audit Committee and the BOD' decisions during 2018.

- **Emphasis on the independence and neutrality of the external auditor**

  The external auditors of the Company shall be nominated on the recommendation of the Audit Committee to the BOD, after assuring that he is independent from the Company and its BOD, and assuring that he does not perform any additional works for the Company, which are not included in the revision and auditing works, and which may affect impartiality or independence; provided that the auditor shall be registered at the Capital Markets Authority. The annual ordinary general assembly appoints or reappoints the external auditors based on the recommendation of the BOD.
  The external auditor attends the meetings of the ordinary general assembly and reads its own prepared report to the shareholders.

**Rule V: Apply Sound Systems of Risk Management and Internal Audit**

- **A brief statement on the application of requirements for the formation of an independent Risk Management Unit**

  The company has an independent Risk Management Unit subsidiary of Risk Management Committee. This unit is responsible for identifying, measuring, monitoring and limiting all types of risks that the Company may encounters in accordance with the policies approved by the BOD, and for preparing the necessary periodic reports and presenting them to the Risk Management Committee.

- **A brief on applying requirements of the Risk Management Committee**

  The BOD has formed a Risk Management Committee in accordance with the requirements of the Capital Market Authority and as referred to above.

- **A brief shows Internal Control & Supervision Systems**

  The BOD is completely responsible for the   system of internal control in the company, and the purpose of this system is to set up standards and trustworthy systems contain internal controls and it is scheduled that these means must ensure the accuracy and credibility of the Company accounts & records and protecting its assets.
  The BOD, continuously, reviews the effectiveness of internal control systems through its Internal Audit Management Committee and its Risk Management Committee, as well as the Internal Audit Unit which monitors financial and accounting policies, financial controls and controls and reports on the proposed corrective actions for all problems identified during the audit process, as well as the risk management unit under its control issues related to regulatory risks and ensure that the company undertakes its activities in the safe and sound manner consistent with the prescribed rules and regulations.
  The Company assigns the audit work of internal control systems on an annual basis to an independent audit office. The audit includes the examination of accounting, financial records and other records and the evaluation of internal control systems, including but not limited to, financial management, legal management, operations management, information technology, Risk management, human resources management and management affairs, and internal audit management.
  The BOD shall review the results of the evaluation of the internal control systems prepared by the Independent Audit Office and issue its guidance to the concerned managements to address the observations contained in the report.

- **A brief statement on the application of the requirements for the formation of an Independent Internal Audit Department**

  The Company has an Internal Audit Department emerged from Audit Committee. The internal audit department has qualified human resources to ac their works. Internal Audit Department works in reviewing and evaluating the internal control systems applied by the company in accordance with the policies approved by the BOD and in accordance with the audit plans approved by the Audit Committee, as well as preparation of periodic reports necessary in this regard and submitted the same to the Audit Committee.

**Rule VI: Promote Code of Conduct and Ethical Standards**

- **A brief on work code, which includes criteria and limitations of professional Code of Conduct professional Behavior and Ethical Values**

  The BOD has adopted the Code of Professional Conduct and Ethical Values of the Company to establish the principles of transparency, integrity, objectivity, competence and loyalty within the company, which enhance the integrity of the company and maintain its financial integrity. Thus, the Code of Professional Conduct and Ethical Values is one of the pillars of the governance system of the company where the BOD and Executive Management are keen to ensure the quality of compliance with this code in the course of daily business, to achieve the interests of all stakeholders and parties concerned in the company and shareholders without conflict of interest and with a high degree of transparency. In addition, the Charter is subject to periodic review to ensure that it complies with all updates and developments in the areas of governance and controlling the Professional Conduct.

- **A brief on policies and mechanisms of limiting Conflict of Interest**

  The Company firmly believes that its management and decision-making must be based on purely economic principles, so that the Company avoids any conflict of interest of any kind that could affect the economic fundamentals in business management or decision-making. Thus, the BOD has established a policy to prevent conflicts of interest and cover matters related to conflicts of interest in accordance with the Companies Law No. (1) of 2016 and the rules of governance including but not limited to:
  - The person who has a representative on the BOD or a Chairman or a member of the BOD or a member of the Executive Management or their spouses or second-level relatives, may not be entitled to have direct or indirect interest in the contracts and transactions concluded with the Company or for its account unless they are issued by the Ordinary General Assembly; the works made by public competition shall be excepted.
  - The chairman or member of the BOD, even if he is a representative of a natural or legal person, may not use the information obtained by virtue of his position to obtain interest for himself or for others.
  - The Chairman of the BOD or any of the members of the BOD may not combine the membership of the BOD of two competing companies or participate in any business that would compete with the Company or trade for his account or for third parties in one of the branches of the company's activity. Otherwise, the company may claim him for the compensation or to consider the transactions that he has undertaken for his account as if they were performed for the Company's account, unless this was made under the approval of the Ordinary General Assembly.

**Rule VII: Ensure Timely and High Quality Disclosure and Transparency**

- **A brief on application of mechanisms of accurate and transparent presentation and disclosure that determine aspects, fields, and features of disclosure**

  As a commitment of the BOD to establish a transparent corporate environment in accordance with the best governance rules in this regard, the BOD has adopted a detailed policy of disclosure and transparency mechanisms that specifies the material information to be disclosed and the manner and quality of the disclosure in order to achieve the principle of justice in the provision of appropriate information in a timely manner to help investors to make investment decisions based on correct and adequate information and being accessed by all the beneficiaries equally, and to ensure that information is not leaked to some investors rather than others.

- **A brief on application of requirements of record of members of BOD and Executive Management**

  The Company has established a special record that includes the disclosures of the members of the BOD and the Executive Management, containing the information and data required to be disclosed in accordance with the requirements of the laws, regulations and the Company's policies in this regard, and being updated periodically.

- **A brief statement on application of requirements of Investors' Affairs organization**

  The Company had established the Investor Affairs Unit, which provides the necessary data, information and reports to potential investors in a timely fashion and accurate manner, through the usual known means of disclosure. The Company also created a dedicated portal for corporate governance on its website.

- **A brief on how to develop IT infrastructure, and rely heavily on disclosures process**

  The company is keen to rely on information technology to communicate with shareholders, potential investors and other stakeholders through the creation of a special section/tab on the company's website for governance, through which it presents information and data that help them to evaluate the company's performance.

## Rule VIII: Respect the Rights of Shareholders

- **A brief on the application of requirements for the identification and protection of public rights, to ensure equity and justice amongst shareholders**

  The Company's Articles of Association, internal policies and procedures guarantee the practice of all shareholders for their rights in a manner that achieves justice and equality and in a manner that does not contradict with the laws, regulations, resolutions and instructions in force. The company is also keen to treat all shareholders equally and without any discrimination. The following are of the most prominent public rights of shareholders:

**1- Shareholders' General Rights**
- The Ordinary General Meeting shall be valid only if it is attended by shareholders representing more than (50%) at least of the issued capital. If this quorum is not available at the first meeting, the Ordinary General Assembly shall be held within a period not less than seven days and not exceeding thirty days as from the date of the first meeting, a second meeting to discuss the same agenda. Thus, the second meeting shall be considered valid regardless of the number of shares represented therein. Thus, the decisions shall be issued by an overwhelming majority of the shares present at the meeting.
- The Extraordinary General Meeting of the General Assembly shall not be valid unless attended by shareholders representing at least 75% of the issued capital. If such quorum is not available at the first meeting, the Extraordinary General Assembly shall be convened within a period not less than seven days and not exceeding thirty days from the date of the first meeting, a second meeting to discuss the same agenda. Its second meeting shall be considered valid if attended by a number of shareholders representing more than 50% of the issued capital. Decisions shall be issued by a majority of more than 50% issued capital.
- Each shareholder has the right to vote on General Assembly resolutions, to discuss the topics on the agenda of the Assembly meeting and to ask questions thereon to the President of the assembly or the Company's Comptroller, and to answer the shareholders' questions to the extent that does not

jeopardize the Company's interest.
- The topics before the General Assembly shall be accompanied by sufficient information to enable shareholders to make their decisions.
- Enabling the shareholders to access the minutes of the assembly meeting. The Company shall provide the Capital Markets Authority, the Kuwait Stock Exchange and Ministry of Commerce and Industry with a copy of the minutes of the meeting within fifteen days from the date of the meeting.
- The company announces the results of the General Assembly immediately upon its completion on the Kuwait Stock Exchange website.

**2- Shareholders' Rights related to the General Assembly.**
- Each shareholder, owns shares of the Company's, shall have the right to attend the General Assembly, and may appoint another person to attend on his behalf, provided that the assignment is made under the power of attorney or authorization prepared by the Kuwait Clearing Company.
- The shareholders have the right to call the Assembly to convene within fifteen days, in the event of the request of the auditor or a number of shareholders holding not less than 10% of the capital.

- **A brief on the establishment of a special record to be kept with the Clearing Agency as a part of the requirements for continuous monitoring of shareholder data**

    The record of shareholders of Kuwait Clearing Company shall be kept in accordance with the agreement signed there with, in which the information and data of the shareholders shall be registered. The Company shall keep a copy of this record, and the information and data contained therein shall be treated with the maximum protection and confidentiality.

- **A brief on how to encourage shareholders to participate and vote in the meetings of the Company's General Assembly**

    The company is keen to encourage shareholders to attend and participate in the General Assembly meeting. Whereas the company invites the shareholders are invited to attend the General Assembly meeting including the agenda, time and place of the meeting, by announcing them in accordance with the mechanism specified in the Company's Articles of Association and as stipulated in the executive regulations of Corporate Law, on the website of the Kuwait Stock Exchange, and in two daily newspapers published inside the State of Kuwait. An original copy of the agenda to be sent to the Department of Joint Stock Companies at the Ministry of Commerce & Industry.
    The company, also, provides full opportunity for shareholders to participate effectively in the meetings of the General Assembly by choosing the appropriate place and time, while the company does not impose any fees on the shareholders in return for attending the General Assembly.
    Voting is a fundamental right of every shareholder and cannot be canceled in any way. The Company shall be committed to avoid any action that may impede the use of the right to vote.

**Rule IX: Recognize the Roles of Stakeholders**

- **A brief on systems and policies that guarantee protection and acknowledgment of Stakeholders**

    In pursuit by the BOD for maintaining the rights of stakeholders and related parties including employees, creditors, customers, suppliers and investors, the BOD has adopted a clear policy that regulates the relationship with stakeholders and ensures protection and recognition of their rights, in accordance with the provisions of the laws issued in this regard.

Taking into consideration that any of the stakeholders shall not obtain any preferential advantage through dealing in contracts and transactions that fall within the normal activities of the company.

- **A brief on encouraging Stakeholder to participate in following up company's activities**

  The company is keen to benefit from the contributions of stakeholders and encourage them to participate in following up activities in conformity with the realization of its interests, where the company provides the information, data and reports necessary to stakeholders in a timely manner and through the applicable methods and means of disclosure, through Investors' Affairs Unite as mentioned above. As well as the company allows stakeholders to report to the BOD any improper practices to which they are exposed by the Company, further to providing appropriate confidentiality and protection to parties reporting in good faith on such practices.

**Rule X: Encourage and Enhance Performance**

- **A brief on the application of the requirements of development of mechanisms that continuously allow BOD members and Executive Management to obtain training programs and courses**

  The BOD and Executive Management are provided with an introduction program on the nature of the company's activity and organizational structure, including providing them with the company's Articles of Association, strategy, annual report, financial statements, and codes of BOD practices, committees and adopted policies, as well as any information, data, reports or other documents. In addition, a plan of appropriate training programs is prepared and approved for the members of BOD and the Executive Management on developments in fields relevant to the Company's business, as the company believes that the continuous training and qualification of BOD members and Executive Management is one of the fundamental pillars of good governance. Thus, it contributes significantly to enhancing the performance of the company through the full exercise of the tasks and responsibilities entrusted to them by the BOD and the Executive Management.

- **A brief on how to assess the performance of the BOD as a whole, and the performance of each member of BOD and Executive Management**

  The Company has a set of objective performance indicators approved by BOD for periodic self-evaluation of BOD as a whole and Executive Management, to demonstrate the contribution of each Member of BOD and its emerged committees to achieve Company's strategic goals, through promoting BOD and its members' abilities in all fields related to company's business.

- **A brief on efforts of the BOD to create value creations of company's employees, through achieving the strategic goal and improve performance rates**

  The BOD also works to create institutional values within the company by developing mechanisms and procedures that work to achieve the company's strategic objectives and improve performance rates, which effectively contributes to creating the institutional values of employees and motivating them to work continuously to maintain the financial integrity of the company.

**Rule XI: Focus on the Importance of Corporate Social Responsibility**

- **A brief on development of a policy to ensure a balance between company's goals and society goals**

  The company's BOD adopted a social responsibility policy that aims at linking the company's goals with the goals that the society seeks to achieve, taking into account the social and economic aspects of the society, in terms of job opportunities, project support, awareness programs, charitable initiatives, healthcare and environmental protection.

- **A brief on the programs and mechanisms used to help highlighting the company's exerted efforts in the field of social work**

  Kuwait Gulf Link Transport Company (KSPC) and its subsidiaries seek to direct all their businesses and activities towards society service, and the Group is always keen on the quality of services it provides to all segments of society in order to meet the needs of society so as to participate in the sustainable development of the society as a whole, as well as the initiatives adopted by the group in many social activities, such as support for social, sports, environmental, cultural and health activities in the context of social responsibility. The company suing all technology means to bring out its exerted efforts in social activities, including but not limited to social media, and the activities and programs that the company is keen to contribute in are the following:

  - **In the field of sustainable development, the company's programs aim to provide a livelihood in an appropriate manner locally and sustainable manner environmentally**
  - Providing vocational training for national manpower to raise their competitiveness.
  - Providing employment without distinction based on gender or age group.
  - Supporting development projects in the country.
  - Applying all security, health and safety standards to the services provided by the Group.
  - Holding workshops and distribution of awareness leaflets aimed at raising the awareness of the community of the environment and health and security and safety requirements.

  - **In the field of Traffic**
  - Participating in awareness campaigns that aim to spreading traffic awareness among the different sectors of society at the local and regional levels.
  - Honoring the winners of individuals, leaders and groups for their outstanding performance and distinctive performance in the development of traffic safety concepts and conscious leadership.
  - Holding workshops and distributing awareness leaflets that aim to raise the awareness of society about the negative effects of road accidents and security and safety requirements.

  - **In the Field of Health**
  - Supporting blood donation campaigns.
  - Supporting awareness campaigns that discuss the public health, disease treatment and prevention thereof.

  - **In the Field of Environment**
  - Supporting campaigns by governmental and nongovernmental organizations to preserve the environment.
  - Disseminating the culture of separation of waste from the source and provide the necessary support to urge members of society to do so.
  - Holding workshops and distributing awareness leaflets aimed at raising the awareness of society about the need to preserve the environment.
  - Developing the services provided by the Group in this area in order to reduce pollutants that may be harmful to both human health and the environment.

- Participating in campaigns that encourage the reduction of energy consumption and natural resources.

The company's initiatives and contributions are based on its firm belief in the importance of the modern social role of companies. Its mission is not limited to achieving the profitability and financial returns of its shareholders or to provide direct services to the beneficiaries of its activities and business, but it also triggers the increase of the social awareness of all its managers and employees, and urging all stakeholders to support these efforts for the advancement of society and its wellbeing, hence this mission becomes one of the duties of the company and one of its primary responsibilities that it seeks to achieve either directly or through supporting government efforts or institutionalizing civil society or public benefit associations to ensure the success of future state plans towards progress and prosperity for both individuals and society alike .

**KUWAIT AND GULF LINK TRANSPORT COMPANY K.P.S.C.
AND ITS SUBSIDIARIES
STATE OF KUWAIT**



**CONSOLIDATED FINANCIAL STATEMENTS AND INDEPENDENT
AUDITORS' REPORT
FOR THE YEAR ENDED 31 DECEMBER 2018**

# CONTENTS

**Independent auditors' report** 28

**Consolidated statement of financial position** 32

**Consolidated statement of profit or loss** 33

**Consolidated statement of comprehensive income** 34

**Consolidated statement of changes in equity** 35

**Consolidated statement of cash flows** 36

**Notes to the consolidated financial statements** 37 - 86



**Rödl**
Middle East
برون معاسبون عالميون
علي الحساوي وشركاه

Al Johara Tower, 6th Floor
Khaled Ben Al Waleed Street, Sharq
P.O. Box 25578, Safat 13116
Kuwait
Tel: +965 2242 6999
Fax: +965 2240 1666
www.bdo.com.kw

Ali Al Hassawi & Partners
P.O. Box: 22351 Safat 13084 Kuwait
Sharq – Dasman Complex – Block 2 – 9 Floor
Tel: 22464574-6 /22426862-3 Fax:  22414956
Email: info-kuwait@rodlme.com
www.rodlme.com

# INDEPENDENT AUDITORS' REPORT

## TO THE SHAREHOLDERS OF
## KUWAIT AND GULF LINK TRANSPORT COMPANY K.P.S.C.
## STATE OF KUWAIT

## Report on the Audit of Consolidated Financial Statements

### Opinion
We have audited the consolidated financial statements of Kuwait and Gulf Link Transport Company K.P.S.C. (the "Parent Company") and its subsidiaries (together referred to as "the Group"), which comprise the consolidated statement of financial position as at 31 December 2018, and the consolidated statement of profit or loss, the consolidated statement of comprehensive income, consolidated statement of changes in equity and consolidated statement of cash flows for the year then ended, and notes to the consolidated financial statements, including a summary of significant accounting policies.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the consolidated financial position of the Group as at 31 December 2018, and its consolidated financial performance and its consolidated cash flows for the financial year then ended in accordance with International Financial Reporting Standards ("IFRSs").

### Basis for Opinion
We conducted our audit in accordance with International Standards on Auditing ("ISAs"). Our responsibilities under those standards are further described in the Auditors' Responsibilities for the Audit of the Consolidated Financial Statements section of our report. We are independent of the Group in accordance with the International Ethics Standards Board for Accountants' Code of Ethics for Professional Accountants ("IESBA Code") together with ethical requirements that are relevant to our audit of the consolidated financial statements in the State of Kuwait, and we have fulfilled our other ethical responsibilities in accordance with these requirements and the IESBA code. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

### Key Audit Matters
Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements of the current year. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters. We identified the following key audit matters:





## Report on the Audit of the Consolidated Financial Statements (Continued)

*Key Audit Matters (continued)*

### First-time adoption of IFRS 9: Financial Instruments

The Group adopted IFRS 9: Financial Instruments from 1 January 2018, which resulted in changes in accounting policies and adjustments to amounts previously recognised in the consolidated financial statements. As permitted by transitional provisions of IFRS 9, the Group elected not to restate the comparative figures and recorded an adjustment of KD 1,011,169 to the opening retained earnings as at 1 January 2018 and KD 334,589 to the fair value reserve of financial assets at FVOCI. The Group also recorded an adjustment of KD 3,116,942 on account of Group's share on adoption of IFRS 9 on associates.

The changes required to processes, system and controls to comply with IFRS 9 were complex and significant, as the standard requires a fundamental change to the way, when Expected Credit Losses (ECL) are recognised, and how these are measured and the fair value requirements for the unquoted FVOCI financial instruments.

There was a risk that:
- Judgements, assumptions and estimates, which includes adopting a 'default' definition is inadequate;

- Inadequate data, as well as lack of uniformity in the data are used which makes it difficult to develop models, which are sufficient for IFRS 9 impairment requirements.

Refer to the following notes of the consolidated financial statements:

- (Note 4-c-A) - Application of IFRS 9
- (Note 5.9) - Summary of significant accountingpolicies on financial instruments
- (Note 30.2) - Financial risk and capital management
- (Note 11) - Fair value reserve of financial assets at FVOCI

### How our audit addressed the matter

We updated our understanding of the Group's adoption of IFRS 9 and evaluated the reasonableness of management's key judgment and estimates made in preparing the transition adjustments.

In addition, our work performed include the below procedures:

- We evaluated, with the assistance of our specialists, the reasonableness of management's key judgments and estimates made in the ECL calculation, which include but not limited to, the selection of methods, models assumptions and data sources and fair value techniques.

- We evaluated the appropriateness and test the mathematical accuracy of the ECL model applied.

- We evaluated post model adjustments and management overlays in order to assess the reasonableness of these adjustments.

- We evaluated the appropriateness of the financial statements disclosures for IFRS 9 first-time adoption.





*Other Information*

Management is responsible for the other information. The other information comprises the information included in the Annual Report of the Group for the year ended 31 December 2018, but does not include the consolidated financial statements and our auditors' report thereon. The Annual Report of the Group for the year ended 31 December 2018 is expected to be made available to us after the date of our auditors' report. Our opinion on the consolidated financial statements does not cover the other information, and we do not express any form of assurance conclusion thereon.

In connection with our audit of the consolidated financial statements, our responsibility is to read the other information identified above when it becomes available and, in doing so, consider whether the other information is materially inconsistent with the consolidated financial statements or our knowledge obtained during the audit, or otherwise appears to be materially misstated.

## *Responsibilities of Management and Those Charged with Governance for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with IFRSs, and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is responsible for assessing the Group's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless management either intends to liquidate the Group or to cease operations, or has no realistic alternative but to do so.

Those charged with governance are responsible for overseeing the Group's financial reporting process.

## *Auditors' Responsibilities for the Audit of the Consolidated Financial Statements*

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditors' report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional scepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control.
- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by management.





- Conclude on the appropriateness of management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Group's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditors' report to the related disclosures in the consolidated financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditors' report. However, future events or conditions may cause the Group to cease to continue as a going concern.
- Evaluate the overall presentation, structure and content of the consolidated financial statements, including the disclosures, and whether the consolidated financial statements represent the underlying transactions and events in a manner that achieves fair presentation.
- Obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Group to express an opinion on the consolidated financial statements. We are responsible for the direction, supervision and performance of the group audit. We remain solely responsible for our audit opinion.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.
We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, related safeguards.
From the matters communicated with those charged with governance, we determine those matters that were of most significance in the audit of the consolidated financial statements of the current year and are therefore the key audit matters. We describe these matters in our auditors' report unless law or regulation precludes public disclosure about the matter or when, in extremely rare circumstances, we determine that a matter should not be communicated in our report because the adverse consequences of doing so would reasonably be expected to outweigh the public interest benefits of such communication.

## Report on Other Legal and Regulatory Requirements

In our opinion, proper books of account have been kept by the Parent Company and the consolidated financial statements, together with the contents of the report of the Parent Company's Board of Directors relating to these consolidated financial statements, are in accordance therewith. We further report that we obtained all the information and explanations that we required for the purpose of our audit and that the consolidated financial statements incorporate all information that is required by the Companies' Law No. 1 of 2016, its Executive Regulations, as amended and by the Parent Company's Memorandum of Incorporation and Articles of Association, as amended, that an inventory was duly carried out and that, to the best of our knowledge and belief, no violations of the Companies' Law No. 1 of 2016 and its Executive Regulations, as amended nor of the Parent Company's Memorandum of Incorporation and Articles of Association, as amended, have occurred during the financial year ended 31 December 2018 that might have had a material effect on the business or financial position of the Parent Company.

Faisal Saqer Al Saqer
Licence No. 172 "A"
BDO Al Nisf & Partners

Abdulhussain M. Al- Rasheed
Licence No. 67-A
Rödl Middle East
Burgan - International Accountants

Kuwait: 31 March 2019

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Consolidated statement of financial position
As at 31 December 2018

| | Notes | 2018 KD | 2017 KD |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Property, plant and equipment | 7 | 62,320,068 | 61,923,732 |
| Intangible assets | | | 201,017 |
| Investment in associates | 8 | 61,897,465 | 61,254,604 |
| Investment properties | 10 | 12,030,000 | 11,705,750 |
| Financial assets at fair value through other comprehensive income ("FVOCI") | 11 | 84,113 | |
| Financial assets available for sale | 12 | | 1,448,780 |
| | | 136,331,646 | 136,533,883 |
| **Current assets** | | | |
| Inventories | 13 | 7,430,207 | 8,386,552 |
| Due from related parties | 14 | 1,101,025 | 5,188,947 |
| Trade and other receivables | 15 | 22,613,352 | 28,507,503 |
| Financial assets at fair value through profit or loss ("FVPL") | 16 | 17,824,656 | 18,058,978 |
| Bank balances and cash | 17 | 3,550,389 | 1,297,763 |
| | | 52,519,629 | 61,439,743 |
| Total assets | | 188,851,275 | 197,973,626 |
| | | | |
| **EQUITY AND LIABILITIES** | | | |
| **EQUITY** | | | |
| Share capital | 18 | 27,748,666 | 27,748,666 |
| Share premium | 19 | 25,954,132 | 25,954,132 |
| Statutory reserve | 20 | 2,103,079 | 1,720,599 |
| Voluntary reserve | 21 | 2,103,079 | 1,720,599 |
| Treasury shares | 22 | (181,083) | (14,928) |
| Treasury shares reserve | | 53,166 | 53,166 |
| Foreign currency translation reserve | | 228,970 | (493,670) |
| Fair value reserve of financial assets at FVOCI | | (864,667) | - |
| Retained earnings | | 7,614,524 | 10,620,983 |
| Equity attributable to equity holders of the Parent Company | | 64,759,866 | 67,309,547 |
| Non-controlling interests | | 1,025,187 | 1,642,745 |
| Total equity | | 65,785,053 | 68,952,292 |
| | | | |
| **LIABILITIES** | | | |
| **Non-current liabilities** | | | |
| Provision for staff indemnity | | 6,235,616 | 3,826,884 |
| Term loans | 23 | 62,304,741 | 61,108,604 |
| Trade and other payables | 24 | 7,791,384 | 5,425,749 |
| | | 74,331,741 | 70,361,237 |
| **Current liabilities** | | | |
| Term loans | 23 | 11,330,943 | 14,537,009 |
| Due to related parties | 14 | 16,083,208 | 18,887,189 |
| Trade and other payables | 24 | 19,097,923 | 25,235,899 |
| Contract liabilities | 25 | 2,222,407 | - |
| | | 48,734,481 | 58,660,097 |
| Total liabilities | | 123,066,222 | 129,021,334 |
| Total equity and liabilities | | 188,851,275 | 197,973,626 |

Maher Abdullah Marafie                               Dr. Ali Esmail Dashti
**Chairman**                                                **Vice Chairman**

The accompanying notes on pages 37 to 86 form an integral part of these consolidated financial statements.

# Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Consolidated statement of profit or loss
For the year ended 31 December 2018

| | Notes | 2018 KD | 2017 KD |
|---|---|---|---|
| Revenues | 25 | 65,384,161 | 64,814,644 |
| Cost of revenues | | (51,763,715) | (52,102,335) |
| Gross profit | | 13,620,446 | 12,712,309 |
| Other income | | 552,379 | 18,784,657 |
| Impairment of property, plant and equipment | 7 | (595,526) | (5,709,455) |
| Loss on sale of property, plant and equipment | | (494,060) | (1,934,363) |
| Impairment of intangible assets | | (201,017) | (607,605) |
| Share of results of associates | 8 | 3,456,784 | 3,879,207 |
| Change in fair value of investment properties | 10 | 324,250 | (1,011,700) |
| Impairment loss on financial assets available for sale | | | (200,450) |
| Impairment of inventories | 13 | (103,676) | (418,240) |
| Provision for expected credit losses | 14,15 | (158,476) | (95,868) |
| Unrealized loss on financial assets at FVPL | 16 | (234,322) | (2,003,426) |
| General and administrative expenses | 26 | (9,646,513) | (9,535,904) |
| Finance costs | | (3,429,473) | (3,104,083) |
| Profit before Kuwait Foundation for Advancement of Sciences ("KFAS"), Zakat, National Labour Support Tax ("NLST") and Board of Directors' remuneration | | 3,090,796 | 10,755,079 |
| KFAS | 27 | (102,213) | (189,546) |
| Zakat | 27 | (113,626) | (210,614) |
| NLST | 27 | (52,614) | (217,799) |
| Board of Directors' remuneration | 27 | (104,000) | (83,000) |
| Profit for the year | | 2,718,343 | 10,054,120 |
| | | | |
| Attributable to: | | | |
| Equity holders of the Parent Company | | 3,452,349 | 10,786,448 |
| Non-controlling interests | | (734,006) | (732,328) |
| | | 2,718,343 | 10,054,120 |
| Earnings per share attributable to equity holders of the Parent Company (basic and diluted) (fils) | 28 | 12.46 | 38.90 |

The accompanying notes on pages 37 to 86 form an integral part of these consolidated financial statements.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Consolidated statement of comprehensive income
For the year ended 31 December 2018

| | Notes | 2018 | 2017 |
|---|---|---|---|
| | | KD | KD |
| Profit for the year | | 2,718,343 | 10,054,120 |
| | | | |
| **Other comprehensive (loss)/income items:** | | | |
| Items that will not be reclassified subsequently to the consolidated statement of profit or loss: | | | |
| Changes in fair value of financial assets at FVOCI | 11 | (1,030,078) | - |
| | | | |
| Items that may be reclassified subsequently to the consolidated statement of profit or loss: | | | |
| Foreign exchange difference on translation of foreign operations | | 1,159,615 | 2,602,441 |
| Other comprehensive income for the year | | 129,537 | 2,602,441 |
| Total comprehensive income for the year | | 2,847,880 | 12,656,561 |
| | | | |
| **Attributable to:** | | | |
| Equity holders of the Parent Company | | 3,144,911 | 13,478,293 |
| Non-controlling interests | | (297,031) | (821,732) |
| | | 2,847,880 | 12,656,561 |

The accompanying notes on pages 37 to 86 form an integral part of these consolidated financial statements.



ANNUAL REPORT 2018

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Consolidated statement of changes in equity
For the year ended 31 December 2018

| | Share capital | Share premium | Statutory reserve | Voluntary reserve | Treasury shares | Treasury shares reserve | Foreign currency translation reserve | Fair value reserve of financial assets at FVOCI | Retained earnings | Equity attributable to equity holders of the Parent Company | Non-controlling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | KD | KD | KD | KD | KD | KD | KD | KD | KD | | KD | KD |
| At 1 January 2017 | 26,427,300 | 25,954,132 | 571,858 | 571,858 | (153) | 53,166 | (3,185,515) | - | 3,453,383 | 53,846,029 | 2,464,477 | 56,310,506 |
| Profit for the year | | | | | | | | | 10,786,448 | 10,786,448 | (732,328) | 10,054,120 |
| Other comprehensive income/(loss) for the year | - | - | - | - | - | - | 2,691,845 | - | | 2,691,845 | (89,404) | 2,602,441 |
| Total comprehensive income/(loss) for the year | - | - | - | - | - | - | 2,691,845 | - | 10,786,448 | 13,478,293 | (821,732) | 12,656,561 |
| Issue of bonus shares (Note 18) | 1,321,366 | | | | | | | | (1,321,366) | | | |
| Purchase of treasury shares | | | | | (14,775) | | | | | (14,775) | | (14,775) |
| Transfer to reserves | - | - | 1,148,741 | 1,148,741 | | | | | (2,297,482) | - | - | - |
| At 31 December 2017 | 27,748,666 | 25,954,132 | 1,720,599 | 1,720,599 | (14,928) | 53,166 | (493,670) | - | 10,620,983 | 67,309,547 | 1,642,745 | 68,952,292 |
| At 1 January 2018 ("As previously stated") | 27,748,666 | 25,954,132 | 1,720,599 | 1,720,599 | (14,928) | 53,166 | (493,670) | - | 10,620,983 | 67,309,547 | 1,642,745 | 68,952,292 |
| Impact on adoption of IFRS 9 at 1 January 2018 (Note 4) | | | | | | | | (334,589) | (1,011,169) | (1,345,758) | | (1,345,758) |
| Group's share of impact on adoption of IFRS 9 in associates (Note 4-c-A & 8) | | | | | | | | | (3,116,942) | (3,116,942) | | (3,116,942) |
| At 1 January 2018 ("restated") | 27,748,666 | 25,954,132 | 1,720,599 | 1,720,599 | (14,928) | 53,166 | (493,670) | (334,589) | 6,492,872 | 62,846,847 | 1,642,745 | 64,489,592 |
| Profit for the year | | | | | | | | | 3,452,349 | 3,452,349 | (734,006) | 2,718,343 |
| Other comprehensive income/(loss) for the year | - | - | - | - | - | - | 722,640 | (1,030,078) | | (307,438) | 436,975 | 129,537 |
| Total comprehensive income/(loss) for the year | - | - | - | - | - | - | 722,640 | (1,030,078) | 3,452,349 | 3,144,911 | (297,031) | 2,847,880 |
| Reclassification of fair value changes of financial assets at FVOCI upon derecognition | | | | | | | | 500,000 | (500,000) | | | |
| Acquisition of non-controlling interest (Note 9) | | | | | | | | | 320,527 | 320,527 | (320,527) | |
| Purchase of treasury shares | | | | | (166,155) | | | | | (166,155) | | (166,155) |
| Cash dividends (Note 32) | | | | | | | | | (1,386,264) | (1,386,264) | | (1,386,264) |
| Transfer to reserves | - | - | 382,480 | 382,480 | | | | | (764,960) | | | |
| At 31 December 2018 | 27,748,666 | 25,954,132 | 2,103,079 | 2,103,079 | (181,083) | 53,166 | 228,970 | (864,667) | 7,614,524 | 64,759,866 | 1,025,187 | 65,785,053 |

The accompanying notes on pages 37 to 86 form an integral part of these consolidated financial statements.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Consolidated statement of cash flows
for the year ended 31 December 2018

| | Notes | 2018 | 2017 |
|---|---|---|---|
| | | KD | KD |
| **OPERATING ACTIVITIES** | | | |
| Net profit for the year | | 2,718,343 | 10,054,120 |
| Adjustments for: | | | |
| *Depreciation* | 7 | 6,246,221 | 5,645,327 |
| Other income | | | (16,229,458) |
| Impairment of property, plant and equipment | 7 | 595,526 | 5,709,455 |
| Loss on sale of property, plant and equipment | | 494,060 | 1,934,363 |
| Impairment of intangible assets | | 201,017 | 607,605 |
| Share of results of associates | 8 | (3,456,784) | (3,879,207) |
| Change in fair value of investment properties | 10 | (924,250) | 1,011,700 |
| Impairment loss on financial assets available for sale | | | 200,450 |
| Impairment of inventories | | 103,676 | 418,240 |
| Provision for expected credit losses | 13 | 168,476 | 95,868 |
| Unrealized loss on financial assets at fair value through profit or loss ("FVPL") | 14,15 | 234,322 | 2,003,426 |
| Finance costs | | 3,429,473 | 3,104,083 |
| Provision for staff indemnity | | 715,829 | 1,151,456 |
| **Operating profit before working capital changes** | | (1,115,909) | 11,827,428 |
| Inventories | | 3,941,344 | (493,435) |
| Trade and other receivables | | 4,728,980 | 2,159,147 |
| Related parties-net | | 1,104,581 | 11,731,849 |
| Trade and other payables | | (3,772,341) | 5,234,203 |
| Contract liabilities | | 2,222,407 | - |
| **Cash flows generated from operations** | | 19,340,880 | 30,459,192 |
| Staff indemnity paid | | (302,225) | (472,875) |
| **Net cash flows generated from operating activities** | | 19,038,655 | 29,986,317 |
| | | | |
| **INVESTING ACTIVITIES** | | | |
| Purchase of investment properties | 10 | | (43,450) |
| Dividend received from associates | 8 | 31,875 | - |
| Purchase of property, plant and equipment | 7 | (13,948,482) | (28,513,960) |
| Proceeds from sale of property, plant and equipment | 7 | 1,834,292 | 5,237,589 |
| **Net cash used in investing activities** | | (12,082,315) | (23,319,821) |
| | | | |
| **FINANCING ACTIVITIES** | | | |
| Purchase of treasury shares | | (166,155) | (14,775) |
| Dividends paid | 32 | (1,386,264) | - |
| Net movement in term loans | | (2,009,929) | (3,226,801) |
| Finance costs paid | | (3,429,473) | (3,104,083) |
| **Net cash used in financing activities** | | (6,991,821) | (6,345,659) |
| Foreign currency translation adjustment | | 2,288,107 | (294,444) |
| Net increase in bank balances and cash | | 2,252,626 | 26,393 |
| Bank balances and cash at beginning of the year | | 1,297,763 | 1,271,370 |
| **Bank balances and cash at end of the year** | 17 | 3,550,389 | 1,297,763 |

The Group has the following non-cash activities during the year, which is not reflected in the consolidated statement of cash flows.

| | 2018 | 2017 |
|---|---|---|
| | KD | KD |
| **Non-cash transactions:** | | |
| Effect of transfer of property, plant and equipment to related parties | 161,057 | - |
| Effect of transfer of property, plant and equipment to inventories | 3,088,675 | 6,584,756 |
| Elimination of associates' inter-company transactions | 834,894 | (1,438,527) |

The accompanying notes on pages 37 to 86 form an integral part of these consolidated financial statements.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 1. General Information

Kuwait and Gulf Link Transport Company K.P.S.C. (the "Parent Company") was incorporated in the State of Kuwait on 1 May 1982. The Parent Company is listed on Boursa Kuwait.

The Group comprises the Parent Company and its subsidiaries. Details of the subsidiaries (together referred to as "the Group") are set out in Note 9.

The principal activities as defined in the Parent Company's Articles of Association are:
- General cargo & stevedoring service at sea ports
- Container terminal operator
- General cargo transport & handling services
- Container transport & handling services
- Heavy equipment lease services
- Heavy lift transport services
- Light vehicle lease services
- International overland passenger services
- Shipping lines – agency services
- Customs clearance services
- Fuel haulage services
- Municipal services
- Cleaning services
- Garbage collection and transportation services
- Skilled and semi skilled manpower services
- Investment through portfolio managers

The Parent Company's registered office is P.O. Box 24565 - Safat 13106 - State of Kuwait.

These consolidated financial statements of the Group for the year ended 31 December 2018 were authorized for issue in accordance with a resolution of the Parent Company's Board of Directors on 31 March 2019. The shareholders' General Assembly has the power to amend these consolidated financial statements after issuance.

## 2. Basis of Preparation

These consolidated financial statements have been prepared under the historical cost convention except for investment properties, financial assets at FVOCI, and FVPL that are measured at fair value. The consolidated financial statements have been presented in Kuwaiti Dinars ("KD"), which is also the functional currency of the Parent Company.

## 3. Statement of Compliance

The consolidated financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRSs") and the IFRS interpretations Committee applicable to companies reporting under IFRS as issued by the International Accounting Standards Board ("IASB"), and applicable requirements of the Companies' Law and its Executive Regulations, as amended.

The preparation of consolidated financial statements in compliance with adopted IFRS requires the use of certain critical accounting estimates. It also requires the Group's management to exercise judgement in applying the Group's accounting policies. The areas of significant judgements and estimates made in preparing the consolidated financial statements and their effect are disclosed in Note 6.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 4.   Application of new and revised International Financial Reporting Standards (IFRSs)

### a)   New standards, interpretations and amendments effective 1 January 2018

The accounting policies applied by the Group are consistent with those used in the previous year except for the changes due to implementation of the following new and amended International Financial Reporting Standards as of 1 January 2018:

*Amendments to IFRS 2 - Classification and Measurement of Share-based Payment Transactions*
The amendments are effective for annual periods beginning on or after 1 January 2018, the amendments address three main areas:
* The effects of vesting conditions on the measurement of a cash-settled share-based payment transaction.
* The classification of a share-based payment transaction with net settlement features for withholding tax obligations.
* The accounting where a modification to the terms and conditions of a share-based payment transaction changes its classification from cash-settled to equity-settled.
* The adoption of these amendments did not have any impact on the Group.

*Amendments to IFRS 4 – Insurance contracts (Applying IFRS 9 financial instruments)*
The amendments is effective for annual periods beginning on or after 1 January 2018, the amendments address concerns arising from implementing the new standard IFRS 9 (Financial instruments), before implementing IFRS 17, which replaces IFRS 4. The amendments introduce two options for entities issuing insurance contracts: a temporary exemption from applying IFRS 9 and an overlay approach.

The adoption of these amendments did not have any impact on the Group.

*IFRS 9 - Financial Instruments*
The standard is effective for annual periods beginning on or after 1 January 2018, replaces the existing guidance in IAS 39: Financial Instruments: Recognition and Measurement. IFRS 9 specifies how an entity should classify and measure its financial instruments and includes a new expected credit loss model for calculating impairment of financial assets and the new general hedge accounting requirements. It also carries forward the guidance on recognition and derecognition of financial instruments from IAS 39.

For the initial application of IFRS 9 and its effects, kindly refer to Note (4-c-A) below.

*IFRS 15 - Revenue from contracts with customers*
The standard is effective for annual periods beginning on or after 1 January 2018, establishes a comprehensive framework for determining whether, how much and when revenue is recognized. It replaces the following existing standards and interpretations upon its effective date:
* IAS 18 – Revenue,
* IAS 11 – Construction Contracts,
* IFRIC 13 – Customer Loyalty Programs,
* IFRIC 15 – Agreements for the Construction of Real Estate,
* IFRIC 18 – Transfers of Assets from Customers, and,
* SIC 31 – Revenue-Barter Transactions Involving Advertising Services.
For the initial application of IFRS 15 and its effects, kindly refer to Note (4-c-B) below.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

4.  Application of new and revised International Financial Reporting Standards (IFRSs) (Continued)

**a)   New standards, interpretations and amendments effective 1 January 2018 (Continued)**

*IFRIC 22 - Foreign Currency Transactions and Advance Consideration*
The interpretation is effective for annual periods beginning on or after 1 January 2018 and clarifies that in determining the spot exchange rate to use on initial recognition of the related asset, expense or income (or part of it) on the derecognition of a nonmonetary asset or non-monetary liability relating to advance consideration, the date of the transaction is the date on which an entity initially recognizes the non-monetary asset or nonmonetary liability arising from the advance consideration. If there are multiple payments or receipts in advance, then the entity must determine a date of the transactions for each payment or receipt of advance consideration.

This interpretation did not have any impact on the Group.

*Amendments to IAS 40 Investment Property – Transfers of Investment Property*
The amendments are effective for annual periods beginning on or after 1 January 2018 and clarify when an entity should transfer property, including property under construction or development, into or out of investment property. The amendments state that a change in use occurs when the property meets, or ceases to meet, the definition of investment property and there is evidence of the change in use. A mere change in management's intentions for the use of a property does not provide evidence of a change in use.

The adoption of these amendments did not have any impact on the Group.

*Annual Improvements to IFRSs 2014 – 2016 Cycle*

*Amendments to IAS 28 – Investment in Associates and Joint Ventures*
The amendments should be applied retrospectively and are effective from 1 January 2018, with earlier application permitted.

The amendments clarify that:
a)   An entity that is a venture capital organisation, or other qualifying entity, may elect, at   initial recognition on an investment-by-investment basis, to measure its investments in associates and joint ventures at fair value through profit or loss.

b)   If an entity that is not itself an investment entity has an interest in an associate or joint venture that is an investment entity, the entity may, when applying the equity method, elect to retain the fair value measurement applied by that investment entity associate or joint venture to the investment entity associate's or joint venture's interests in subsidiaries. This election is made separately for each investment entity associate or joint venture, at the later of the date on which (i) the investment entity associate or joint venture is initially recognised; (ii) the associate or joint venture becomes an investment entity; and (iii) the investment entity associate or joint venture first becomes a parent.

The adoption of these amendments did not have any impact on the Group.

**b)   Standards and interpretations issued but not effective**

The following new and amended IASB Standards have been issued but are not yet effective, and have not been adopted by the Group:

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 4. Application of new and revised International Financial Reporting Standards (IFRSs) (Continued)

**b)  Standards and interpretations issued but not effective (Continued)**

*IFRS 16 - Leases*
This standard will be effective for annual periods beginning on or after 1 January 2019. This standard will be replacing IAS 17 "Leases" and will require lessees to account for all leases under a single on-balance sheet model in a similar way to finance leases under IAS 17 with limited exceptions for low-value assets and short term leases. At the commencement date of a lease, a lessee will recognize a liability to make lease payments and an asset representing the right to use the underlying asset during the lease term. The new standard does not significantly change the accounting for leases for lessors. Early application is permitted provided that IFRS 15 is applied on the same date.

The Group is currently assessing the impact of IFRS 16 and plans to adopt the new standard on the required effective date.

*IFRS 17 – Insurance Contracts*
This standard will be effective for annual periods beginning on or after 1 January 2022 and replaces IFRS 4 - Insurance Contracts. The new standard applies to all types of insurance contracts, regardless of the type of entities that issue them, as well as to certain guarantees and financial instruments with discretionary participation features. The core of IFRS 17 is the general model, supplemented by:
• A specific adaptation for contracts with direct participation features (Variable fee approach).
• A simplified approach (premium allocation approach) mainly for short duration contracts.
This standard is not expected to have any impact to the Group.

*Amendments to IFRS 9: Prepayment features with negative compensation*
The amendments should be applied retrospectively and are effective from 1 January 2019, with earlier application permitted. Under IFRS 9, a debt instrument can be measured at amortized cost or at fair value through other comprehensive income, provided that the contractual cash flows are 'solely payments of principal and interest on the principal amount outstanding' (the SPPI criterion) and the instrument is held within the appropriate business model for that classification. The amendments to IFRS 9 clarify that a financial asset passes the SPPI criterion regardless of the event or circumstance that causes the early termination of the contract and irrespective of which party pays or receives reasonable compensation for the early termination of the contract.

These amendments are not expected to have any impact to the Group.

*Amendments to IAS 28: Long-term interests in associates and joint ventures*
The amendments should be applied retrospectively and are effective from 1 January 2019, with early application permitted. The amendments clarify that an entity applies IFRS 9 to long-term interests in an associate or joint venture to which the equity method is not applied but that, in substance, form part of the net investment in the associate or joint venture (long-term interests). This clarification is relevant because it implies that the expected credit loss model in IFRS 9 applies to such long-term interests.

The amendments also clarified that, in applying IFRS 9, an entity does not take account of any losses of the associate or joint venture, or any impairment losses on the net investment, recognized as adjustments to the net investment in the associate or joint venture that arise from applying IAS 28: Investments in Associates and Joint Ventures.

These amendments are not expected to have any impact to the Group.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 4. Application of new and revised International Financial Reporting Standards (IFRSs) (Continued)

**b) Standards and interpretations issued but not effective (Continued)**

_Annual Improvements to IFRSs 2015 – 2017 Cycle (issued in December 2017)_

_IFRS 3 – Business Combinations_
The amendments apply to business combinations for which the acquisition date is on or after the first annual reporting period beginning on or after 1 January 2019, with early application permitted. The amendments clarify that, obtaining control of a business that is a joint operation is a business combination achieved in stages, including remeasuring previously held interests in the assets and liabilities of the joint operation at fair value. In doing so, the acquirer remeasures its entire previously held interest in the joint operation.

_IFRS 11 – Joint Arrangements_
The amendments apply to transactions in which it obtains joint control on or after the first annual reporting period beginning on or after 1 January 2019, with early application permitted. A party that participates in, but does not have joint control of, a joint operation might obtain joint control of the joint operation in which the activity of the joint operation constitutes a business as defined in IFRS 3. The amendments clarify that the previously held interests in that joint operation are not remeasured.

_IAS 23 – Borrowing Costs_
The amendments will be effective for annual periods beginning on or after 1 January 2019 with early application permitted. The amendments clarify that an entity treats as part of general borrowings any borrowing originally made to develop a qualifying asset when substantially all of the activities necessary to prepare that asset for its intended use or sale are complete. An entity applies those amendments to borrowing costs incurred on or after the beginning of the annual reporting period in which the entity first applies those amendments.
These amendments are not expected to have any impact to the Group.

**c) Application of new standards effective from 1 January 2018**

The Group has initially adopted IFRS 9 "Financial Instruments" (see (A) below) and IFRS 15 "Revenue from Contracts with Customers" (see (B) below) from 1 January 2018 as follow:

_A. IFRS 9: Financial Instruments_
IFRS 9 sets out the requirements for recognizing and measuring financial assets, financial liabilities and some contracts to buy or sell non- financial items. This Standard replaces IAS 39 Financial Instruments: Recognition and Measurement.
The following table summarises the impact of transition to IFRS 9 on the opening balance of equity (for a description of the transition method, see note below).

| 1 January 2018 | Note | Impact of adopting IFRS 9 on opening balance (KD) |
|---|---|---|
| Fair value reserve of financial assets at FVOCI | 11 | (334,589) |
| Retained earnings | 15 | (1,011,169) |
| **Total** | | **(1,345,758)** |

Other transition's adjustments include share of impact on adoption of IFRS 9 in associates amounting to KD 3,116,942 recognized in the opening retained earnings (Note 8).

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

4.  Application of new and revised International Financial Reporting Standards (IFRSs) (Continued)

**c)  Application of new standards effective from 1 January 2018 (Continued)**

*A.    IFRS 9: Financial Instruments (continued)*

**i.  Classification and measurement of the financial assets and liabilities**

The adoption of IFRS 9 has not had a significant effect on the Group's accounting policies related to financial liabilities. The impact of IFRS 9 on the classification and measurement of financial assets is set out below:

Under IFRS 9, on initial adoption, the financial asset is classified as measured at amortised cost, fair value through other comprehensive income – debt investments, fair value through other comprehensive income, equity investments or fair value through profit or loss. The classification of financial assets under IFRS 9 is generally based on the business model in which a financial asset is managed and its contractual cash flow characteristics.

*Financial asset is measured at amortised cost*
A financial asset is measured at amortised cost if it meets both of the following conditions and is not designated as at fair value through profit or loss:
- It is held within a business model whose objective is to hold assets to collect contractual cash flows; and
- Its contractual terms give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

*Debt investment at fair value through other comprehensive income*
A debt investment is measured at fair value through other comprehensive income if it meets both of the following conditions and is not designated as at fair value through profit or loss:
- It is held within a business model whose objective is achieved by both collecting contractual cash flows and selling financial assets, and
- Its contractual terms give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

*Equity securities at fair value through other comprehensive income*
On initial recognition of an equity investment that is not held for trading, the Group may irrevocably elect to present subsequent changes in the investment's fair value in OCI. This election is made on an investment-by-investment basis.

*Equity securities at fair value through profit or loss*
All financial assets, other than those classified as financial assets measured at amortised cost or fair value through other comprehensive income as described above, are measured at fair value through profit or loss. On initial recognition, the Group may irrevocably designate a financial asset that otherwise meets the requirements to be measured at amortised cost or at fair value through other comprehensive income as financial asset recognized at fair value through profit or loss if doing so eliminates or significantly reduces an accounting mismatch that would otherwise arise.

A financial asset (unless it is a trade receivable without a significant financing component that is initially measured at the transaction price) is initially measured at fair value plus, for an item not recognized at fair value through profit or loss, transaction costs that are directly attributable to its acquisition.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

4.  Application of new and revised International Financial Reporting Standards (IFRSs) (Continued)

**c)   Application of new standards effective from 1 January 2018 (Continued)**

*A.    IFRS 9: Financial Instruments (continued)*

**i.   Classification and measurement of the financial assets and liabilities (continued)**
The following accounting policies apply to the subsequent measurement of financial assets.

**Financial assets at fair value through profit or loss**
These assets are subsequently measured at fair value. Net gains and losses, including any interests or dividends income, are recognised in profit or loss.
**Financial assets carried at amortised cost**
These assets are subsequently measured at amortised cost using the effective interest method. The amortised cost is reduced by impairment losses. Interest income, foreign exchange profits and losses and impairment are recognised in profit or loss. Any gain or loss on derecognition is recognized in profit or loss.
**Debt investments at fair value through other comprehensive income**
These assets are subsequently measured at fair value. Interest income calculated using the effective interest method, foreign exchange gains and losses and impairment are recognised in profit or loss. Other net profits and losses are recognised in other comprehensive income. On derecognition, gains and losses accumulated in other comprehensive income are reclassified to profit or loss.
**Equity investments at fair value through other comprehensive income**
These assets are subsequently measured at fair value. Dividends are recognised as income in profit or loss unless the dividend clearly represents a recovery of part of the cost of the investment. Other net gains and losses are recognised in other comprehensive income and are never reclassified to profit or loss.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

4.  Application of new and revised International Financial Reporting Standards
(IFRSs) (Continued)

c)  **Application of new standards effective from 1 January 2018 (Continued)**

*A.   IFRS 9: Financial Instruments (continued)*

i.  **Classification and measurement of the financial assets and liabilities (continued)**

**Classification of financial assets and financial liabilities**
The following table and accompanying notes show reconciliation of original measurement categories
in accordance with IAS 39 and the new measurement categories under IFRS 9 for each category of
financial assets and financial liabilities of the Group as at 1 January 2018:

| Financial assets | Notes | Original Classification Under IAS 39 | New classification Under IFRS 9 | Original carrying amount under IAS 39 | New carrying value under IFRS 9 | Impact of adoption of IFRS 9 |
|---|---|---|---|---|---|---|
| | | | | KD | KD | KD |
| Financial assets available for sale – equity instrument | a) | Available for sale | FVOCI – equity instrument Amortised cost | 1,448,780 | 1,114,191 | (334,589) |
| Due from related parties | b) | Loans and receivables | Amortised cost | 5,188,947 | 5,188,947 | - |
| **Trade and other receivables (excluding prepayments and advances)** | c) | Loans and receivables | Amortised cost | 22,686,885 | 21,675,716 | (1,011,169) |
| Financial assets at fair value through profit or loss – equity instrument | d) | Fair value through profit or loss | Fair value through profit or loss | 18,058,978 | 18,058,978 | - |
| Bank balances and cash | | Loans and receivables | Amortised cost | 1,297,763 | 1,297,763 | - |
| **Total** | | | | **48,681,353** | **47,335,595** | **(1,345,758)** |
| **Financial liabilities** | | | | | | |
| **Term loans** | e) | Amortised cost | Amortised cost | 75,645,613 | 75,645,613 | - |
| Due to related parties | e) | Amortised cost | Amortised cost | 18,887,189 | 18,887,189 | - |
| Trade and other payables | e) | Amortised cost | Amortised cost | 30,304,417 | 30,304,417 | - |
| **Total** | | | | **124,837,219** | **124,837,219** | **-** |

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

4.  Application of new and revised International Financial Reporting Standards (IFRSs) (Continued)

c)  **Application of new standards effective from 1 January 2018 (Continued)**

A.  *IFRS 9: Financial Instruments (continued)*

i.  **Classification and measurement of the financial assets and liabilities (continued)**

a)  These equity securities represent investments that the Group intends to hold for the long term for strategic purposes. As permitted by IFRS 9, the Group has designated these investments at the date of initial application as measured at FVOCI. Unlike IAS 39, the accumulated fair value reserve related to these investments will never be reclassified to profit or loss.
b)  Due from related parties that were classified as loans and receivables under IAS 39 are now classified at amortised cost. There is no allowance for impairment over these receivables to be was recognised at 1 January 2018 on transition to IFRS 9.
c)  Trade and other receivables that were classified as loans and receivables under IAS 39 are now classified at amortised cost. An increase of KD 1,011,169 in the provision for expected credit loss over these receivables was recognised in opening retained earnings at 1 January 2018 on transition to IFRS 9. There are no trade and other receivables recognised at 1 January 2018 on the adoption of IFRS 15.
d)  These equity securities represent investments that the Group intend to hold for the short term for trading purposes. As permitted by IFRS 9, the Group has designated these investments at the date of initial application as measured at fair value through profit or loss. The relative profit or loss will be recognized in profit or loss.
e)  The accounting for the Group's financial liabilities remains the same as it was under IAS 39.

ii.  **Impairment of financial assets**
IFRS 9 replaces the 'incurred loss' model in IAS 39 with an "expected credit loss" (ECL) model. The new impairment model applies to financial assets measured at amortised cost, contract assets and debt investments at fair value through other comprehensive income, but not to investments in equity instruments. Under IFRS 9, credit losses are recognised earlier than under IAS 39.
The financial assets at amortised cost consist of due from related parties, trade and other receivables (excluding prepayments and advances) and bank balances and cash.

Under IFRS 9, loss allowances are measured on either of the following bases:
-  12-month ECLs: these are ECLs that result from possible default events within the 12 months after the reporting date; and
-  Lifetime ECLs: these are ECLs that result from all possible default events over the expected life of a financial instrument.
The Group measures loss allowances at an amount equal to lifetime ECLs, except for the following, which are measured as 12-month ECLs:
-  Debt securities that are determined to have low credit risk at the reporting date; and
-  Other debt securities, bank balances, and term deposits (i.e. the risk of default occurring over the expected life of the financial instrument) has not increased significantly since initial recognition.
The Group has elected to measure; using the simplified approach, loss allowances for trade and other receivables (excluding prepayments and advances) at an amount equal to lifetime ECLs.

When determining whether the credit risk of a financial asset has increased significantly since initial recognition and when estimating ECLs, the Group considers reasonable and supportable information that is relevant and available without undue cost or effort. This includes both quantitative and qualitative information and analysis, based on the Group's historical experience and informed credit assessment and including forward-looking information.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

4.  Application of new and revised International Financial Reporting Standards
(IFRSs) (Continued)

**c)  Application of new standards effective from 1 January 2018 (Continued)**

*A.   IFRS 9: Financial Instruments (continued)*

**ii.  Impairment of financial assets (continued)**

The Group assumes that the credit risk on a financial asset has increased significantly if it is more
than 30 days past due.

The Group considers a financial asset to be in default when:
- The borrower is unlikely to pay its credit obligations to the Group in full, without recourse by the
Group to actions such as realising security (if any is held); or
- The financial asset is more than 90 days past due.

The maximum period considered when estimating ECLs is the maximum contractual period over
which the Group is exposed to credit risk.

**Measurement of ECLs**
ECLs are a probability-weighted estimate of credit losses. Credit losses are measured as the present
value of all cash shortfalls (i.e. the difference between the cash flows due to the entity in accordance
with the contract and the cash flows that the Group expects to receive). ECLs are discounted at the
effective interest rate of the financial asset.

**Credit-impaired financial assets**
At each reporting date, the Group assesses whether financial assets carried at amortised cost are
credit-impaired. A financial asset is 'credit-impaired' when one or more events that have a detrimental
impact on the estimated future cash flows of the financial asset have occurred.

**Presentation of impairment**
Loss allowances for financial assets measured at amortised cost are deducted from the gross carrying
amount of the assets.

Impairment losses related to trade and other receivables, including contract assets, are presented
separately in consolidated statement of profit or loss.

**Impact of the new impairment model**
For assets in the scope of the IFRS 9 impairment model, impairment losses are generally expected
to increase and become more volatile. The Group has determined that the application of IFRS 9's
impairment requirements at 1 January 2018 results in an additional impairment allowance as follows:

| Loss allowance as at 1 January 2018 | Amount (KD) |
|---|---|
| Additional impairment recognised at 1 January 2018: | |
| Retained earnings | **(1,011,169)** |

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

4.   Application of new and revised International Financial Reporting Standards
     (IFRSs) (Continued)

**c)   Application of new standards effective from 1 January 2018 (Continued)**

*A.    IFRS 9: Financial Instruments (continued)*

**ii.   Impairment of financial assets (continued)**

**Receivables**
The following analysis provides further detail about the calculation of ECLs related to trade and other receivables on the adoption of IFRS 9. The Group considers the model and some of the assumptions used in calculating these ECLs as key sources of estimation uncertainty.

The ECLs were calculated based on actual credit loss experience over the past 3-5 years. The Group performed the calculation of ECL rates for its customers.

Exposures within each Group were segmented based on common credit risk characteristics such as credit risk grade, geographic region and industry, delinquency status, age of relationship and type of service where applicable.

Actual credit loss experience was adjusted by scalar factors to reflect differences between economic conditions during the period over which the historical data was collected, current conditions and the Group's view of economic conditions over the expected lives of the trade and other receivables.

At 1 January 2018, as a result of adoption of IFRS 9, the Group recognized an additional provision for expected credit losses of KD 1,011,169 (Note 15).

**iii.   Transition**
The Group has taken an exemption not to restate comparative information for prior periods with respect to classification and measurement (including impairment) requirements. Differences in the carrying amounts of financial assets and financial liabilities resulting from the adoption of IFRS 9 are recognised in retained earnings and fair value OCI reserve as at 1 January 2018. Accordingly, the information presented for 2017 does not generally reflect the requirements of IFRS 9 but rather those of IAS 39.

The following assessments have been made on the basis of the facts and circumstances that existed at the date of initial application.
- The determination of the business model within which a financial asset is held.
- The designation and revocation of previous designations of certain financial assets and financial liabilities as measured at fair value through profit or loss.
- The designation of certain investments in equity instruments not held for trading as at fair value through other comprehensive income.

*B.    IFRS 15: Revenue from Contracts with Customers*

IFRS 15 establishes a comprehensive framework for determining whether, how much and when revenue is recognised. It replaced IAS 18 "Revenue", IAS 11 "Construction Contracts" and related interpretations, IFRIC 13, IFRIC 15, IFRIC 18 and SIC 31.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 4. Application of new and revised International Financial Reporting Standards (IFRSs) (Continued)

**c)   Application of new standards effective from 1 January 2018 (Continued)**

_B.      IFRS 15: Revenue from Contracts with Customers (continued)_

Adoption of IFRS 15 by the Group on 1 January 2018 had no impact on the Group's consolidated financial statements as at 31 December 2017 and the consolidated financial statements for the year ended 31 December 2018 as majority of the Group's revenues that fall within the scope of IFRS 15 are represented by the following:

_Transportation revenue:_
Performance obligation related to the Group's transportation revenue is satisfied at a point in time typically on completion of movement of passengers and heavy transportation between two or more specified points, which is in line with the recognition criteria required by IFRS 15.

_Sale of used vehicles:_
Performance obligations related to the Group's sale of used vehicles are satisfied at a point in time typically on delivery of the vehicles, legal transfer of title and issuing of the invoice to customers.

_Leasing revenue:_
Performance obligations related to the Group's leasing of property and equipment is outside the scope of IFRS 15.

Other revenue:
The other revenue types of the Group are mainly represented by gain on settlement of debt and reversal of excess accruals which are outside the scope of IFRS 15.

## 5. Summary of Significant Accounting Policies

**5.1   Basis of consolidation**

The consolidated financial statements comprise the Parent Company and its subsidiaries drawn up to 31 December 2018 (Note 9). All subsidiaries have a reporting date at 31st of December.

Subsidiaries are those enterprises controlled by the Parent Company. Control exists when the Parent Company has the power, directly or indirectly, to govern the financial and operating policies of an enterprise so as to obtain benefits from its activities. The Parent Company controls an investee if all of three of the following elements are present:
- Power over the investee;
- Exposure to variable returns or obtains rights from involvement with the investee; and
- Ability of the investor to use its power to affect the investee returns.

When the Parent Company does not has majority voting rights in the investee, the Parent Company takes into consideration facts and other factors in assessing the control, which include:
- Contractual arrangement between the Parent Company and other vote holders of the investee;
- Rights arising from other contractual arrangements;
- The Parent Company's voting rights;
- Other potential voting rights.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5.  Summary of Significant Accounting Policies (Continued)

### 5.1  Basis of consolidation (Continued)

The financial statements of subsidiaries acquired or disposed are included in the consolidated financial statements from the date the control effectively commences until the date that control effectively ceases.

The financial statements of the subsidiaries are consolidated on a line-by-line basis by adding together alike items of assets, liabilities, revenues and expenses. All inter-company balances and transactions, including unrealized profits or losses arising from inter-company transactions, are fully eliminated. Consolidated financial statements are prepared using uniform accounting policies for similar transactions and other events which accrue in similar conditions.

The financial statements of the subsidiaries are prepared for the same date or within three months of the reporting period of the Parent Company, using consistent accounting policies.

Adjustments are made to bring into line any dissimilar accounting policies that may exist between the subsidiaries' financial year date and the Parent Company's financial year date.

Non-controlling interests in the net assets of consolidated subsidiaries are identified separately from the Group's equity therein. Non-controlling interests consist of amount of those interests at the date of original business combination and the non-controlling entity's share of changes in equity since the date of the combination. Losses within a subsidiary are attributed to the non-controlling interest even if that results in a deficit balance.

Changes in the Group's ownership interests in subsidiaries that do not result in the Group losing control over the subsidiaries are accounted for as equity transactions. For purchases from non-controlling interests, the difference between any consideration paid and the relevant share acquired of the carrying value of net assets of the subsidiary is recorded in equity. Gains or losses on disposals to non-controlling interests are also recorded in equity.

When the Group ceases to have control or significant influence, any retained interest in the entity is remeasured to its fair value, with the change in carrying amount recognised in profit or loss. The fair value is the initial carrying amount for the purposes of subsequently accounting for the retained interest as an associate, joint venture or financial asset. In addition, any amounts previously recognised in other comprehensive income in respect of that entity are accounted for as if the Group had directly disposed of the related assets or liabilities (i.e. reclassified to profit or loss or transferred directly to retained earnings as specified by applicable IFRSs).

### 5.2  Business combinations and goodwill

Acquisitions of subsidiaries and businesses are accounted for using the acquisition method. The consideration transferred in a business combination is measured at fair value, which is calculated as the sum of the acquisition date fair values of assets transferred by the Group, liabilities incurred or assumed by the Group to the former owners of the acquiree and equity instruments issued by the Group in exchange for control of the acquiree, plus any costs directly attributable to the business combination. Acquisition-related costs are generally recognised in profit or loss as incurred. At the acquisition date, the identifiable assets acquired and liabilities and contingent liabilities that meet the conditions for recognition under IFRS 3 Business Combinations are recognised at their fair values at the acquisition date.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5.  Summary of Significant Accounting Policies (Continued)

### 5.2   Business combinations and goodwill (Continued)

When the consideration transferred by the Group in a business combination includes assets or liabilities resulting from a contingent consideration arrangement, the contingent consideration is measured at its acquisition-date fair value and included as part of the consideration transferred in a business combination. Changes in the fair value of the contingent consideration that qualify as measurement period adjustments are adjusted retrospectively, with corresponding adjustments against goodwill. Measurement period adjustments are adjustments that arise from additional information obtained during the 'measurement period' (which cannot exceed one year from the acquisition date) about facts and circumstances that existed at the acquisition date.

The subsequent accounting for changes in the fair value of the contingent consideration that do not qualify as measurement period adjustments depends on how the contingent consideration is classified. Contingent consideration that is classified as equity is not measured at subsequent reporting dates and its subsequent settlement is accounted for within equity. Contingent consideration that is classified as an asset or a liability is remeasured at subsequent reporting dates in accordance with IAS 39, or IAS 37 Provisions, Contingent Liabilities and Contingent Assets, as appropriate, with the corresponding gain or loss being recognised in profit or loss.

Goodwill is measured as the excess of the sum of the consideration transferred, the amount of any non-controlling interests in the acquiree, and the fair value of the acquirer's previously held equity interest in the acquiree (if any) over the net of the acquisition date amounts of the identifiable assets acquired and the liabilities assumed. If, after reassessment, the net of the acquisition date amounts of the identifiable assets acquired and liabilities assumed exceeds the sum of the consideration transferred, the amount of any non-controlling interests in the acquiree and the fair value of the acquirer's previously held interest in the acquiree (if any), the excess is recognized immediately in profit or loss as a bargain purchase gain.

Non-controlling interests that are present ownership interests and entitle their holders to a proportionate share of the entity's net assets in the event of liquidation may be initially measured either at fair value or at the non-controlling interests' proportionate share of the recognize amounts of the acquiree's identifiable net assets. The choice of measurement basis is made on a transaction-by-transaction basis.

If the initial accounting for business combination is incomplete by the end of the reporting period in which the combination occurs, the Group reports provisional amounts for items for which the accounting is incomplete. Those provisional amounts are adjusted during the measurement period (see above), or additional assets or liabilities are recognised, to reflect new information obtained about facts and circumstances that existed at the acquisition date that, if known, would have affected the amounts recognised at that date.

When a business combination is achieved in stages, the Group's previously held equity interest in the acquiree is remeasured to fair value at the acquisition date (i.e. the date when the Group obtains control) and the resulting gain or loss, if any, is recognised in profit or loss. Amounts arising from interests in the acquiree prior to the acquisition date that have previously been recognised in other comprehensive income are reclassified to profit or loss where such treatment would be appropriate if that interest were disposed of.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5.  Summary of Significant Accounting Policies (Continued)

### 5.3  Property, plant and equipment

Property, plant and equipment except free hold land are stated in the consolidated statement of financial position at cost less accumulated depreciation and any accumulated impairment losses. Properties in the course of construction for production, supply or administrative purposes, or for purposes not yet determined, are carried at cost, less any recognised impairment loss. Cost includes professional fees and, for qualifying assets, borrowing costs capitalised in accordance with the Group's accounting policy (see borrowing costs policy). Depreciation is calculated based on the estimated useful lives of the applicable assets using the straight-line method, except for heavy vehicles which uses the double declining method, commencing when the assets are ready for their intended use. The estimated useful lives, residual values and depreciation methods are reviewed at each year end, with the effect of any changes in estimate accounted for on prospective basis.
Assets held under finance leases are depreciated over their expected useful lives on the same basis as owned assets or, where shorter, the term of the relevant lease.
Maintenance and repairs, replacements and improvements of minor importance are expensed as incurred. Significant improvements and replacements of assets are capitalised.

Work in progress for purposes of production works or administrative usage are stated at cost less any recognised impairment loss. Cost includes professional fees and borrowing costs capitalized on assets that meet the conditions of capitalizing the borrowing costs in accordance with the Group's accounting policy. These properties are classified within the appropriate categories of items of property, plant and equipment when finished and being considered ready for use. Depreciation of such assets commences when they are ready for use for their intended purpose in the same way as other items of property, plant and equipment.
The gain or loss arising on the disposal or retirement of an item of property, plant and equipment is determined as the difference between the sale proceeds and the carrying amount of the asset and is recognised in consolidated statement of profit or loss in the period in which they occur.

### 5.4  Intangible assets

Intangible assets are measured on initial recognition at cost.  Following initial recognition, intangible assets are carried at cost less any accumulated amortisation and any accumulated impairment losses. The useful lives of the intangible assets are assessed to be either finite or indefinite. Intangible assets with finite lives are amortised over the useful economic life and tested for impairment whenever there is an indication that the intangible asset may be impaired. Intangible assets with indefinite useful lives are not amortised but tested for impairment annually and whenever there is an indication that the intangible asset may be impaired.
If the carrying value of the intangible asset is more than the recoverable amount, the intangible asset is considered impaired and is written down to its recoverable amount. The excess of carrying value over recoverable amount is recognised in the consolidated statement of profit or loss.

### 5.5  Impairment of tangible and intangible assets

At each reporting date, the Group reviews the carrying amounts of its tangible and intangible assets to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, the Group estimates the recoverable amount of the cash-generating unit to which the asset belongs. Where a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated to individual cash-generating units, or otherwise they are allocated to the smallest Group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5. Summary of Significant Accounting Policies (Continued)

### 5.5 Impairment of tangible and intangible assets (Continued)

Intangible assets with indefinite useful lives and intangible assets not yet available for use are tested for impairment annually, and whenever there is an indication that the asset may be impaired. Recoverable amount is the higher of fair value less costs to sell and value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.
If the recoverable amount of an asset (or cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (cash-generating unit) is reduced to its recoverable amount. An impairment loss is recognised immediately in the consolidated statement of profit or loss.

Where an impairment loss subsequently reverses, the carrying amount of the asset (cash-generating unit) is increased to the revised estimate of its recoverable amount, but so that the increased carrying amount does not exceed the carrying amount that would have been determined had no impairment loss been recognised for the asset (cash-generating unit) in prior years. A reversal of an impairment loss is recognised immediately in the consolidated statement of profit or loss.

### 5.6 Investments in associates

An associate is an entity over which the Group has significant influence and that is neither a subsidiary nor an interest in a joint venture. Significant influence is the power to participate in the financial and operating policy decisions of the investee but is not control or joint control over those policies.

The Group's investment in associate is accounted for under the equity method of accounting, i.e. on the financial position at cost plus post-acquisition changes in the Group's share of the net assets of the associate, less any impairment in value and the consolidated statement of profit or loss reflects the Group's share of the results of operations of the associate.
Any excess of the cost of acquisition over the Group's share of the net fair value of the identifiable assets, liabilities and contingent liabilities of the associate recognised at the date of acquisition is recognised as goodwill. The goodwill is included within the carrying amount of the investment and is assessed for impairment as part of that investment. Any excess of the Group's share of the net fair value of the identifiable assets, liabilities and contingent liabilities over the cost of acquisition, after reassessment, is recognised immediately in the consolidated statement of profit or loss.

Distributions received from the associate reduce the carrying amount of the investment. Adjustments to the carrying amount may also be necessary for changes in the Group's share in the associate arising from changes in the associate's equity. The Group's share of those changes is recognised directly in equity; fair value reserve or foreign currency translation reserve as appropriate.
When the Group's share of losses in an associate equals or exceeds its interest in the associate, including any other unsecured receivables, the Group does not recognise further losses, unless it has incurred obligations or made payments on behalf of the associate.

Unrealised gains on transactions with associate are eliminated to the extent of the Group's share in the associate. Unrealised losses are also eliminated unless the transactions provide evidence of impairment in the asset transferred. An assessment for impairment of investments in associates is performed when there is an indication that the asset has been impaired, or that impairment losses recognised in prior years no longer exist.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5. Summary of Significant Accounting Policies (Continued)

### 5.6  Investments in associates (Continued)

The associate's financial statements are prepared either to the Parent Company's reporting date or to a date not earlier than three months of the Parent Company's reporting date using consistent accounting policies. Where practicable, adjustments are made for the effect of significant transactions or other events that occurred between the reporting date of the associates and the Parent Company's reporting date.

### 5.7  Investment properties

Investment properties are initially recorded at cost, including transaction costs. After initial recognition, investment properties are re-measured and carried at fair value on an individual basis based on an annual external valuation by an independent real estate assessor. Any gain or loss arising either from a re-measurement at fair value or sale is included in the consolidated statement of profit or loss.

### 5.8  Current versus non-current classification

The Group presents assets and liabilities in the statement of financial position based on current/non-current classification. An asset is current when it is:
• Expected to be realised or intended to be sold or consumed in the normal operating cycle;
• Held primarily for the purpose of trading;
• Expected to be realised within twelve months after the reporting period or;
• Cash and cash equivalents unless restricted from being exchanged or used to settle a liability for at least twelve months after the reporting period.

All other assets are classified as non-current.

A liability is current when:
• It is expected to be settled in the normal operating cycle;
• It is held primarily for the purpose of trading;
• It is due to be settled within twelve months after the reporting period or;
• There is no unconditional right to defer the settlement of the liability for at least twelve months after the reporting period.
• The Group classifies all other liabilities as non-current.

### 5.9  Financial instruments

The Group classifies its financial instruments as financial assets and financial liabilities. Financial assets and financial liabilities are recognized when the Group becomes a party of the contractual provisions of such instruments.
Financial assets and financial liabilities carried on the consolidated statement of financial position include financial assets at fair value through other comprehensive income, due from related parties, trade and other receivables (excluding prepayments and advances), financial assets at fair value through profit or loss, bank balances and cash, term loans, due to related parties, trade and other payables and contract liabilities.

### 5.9.1 Financial assets

**Recognition, initial measurement and derecognition**
To determine their classification and measurement category, IFRS 9 requires all financial assets, except equity instruments and derivatives, to be assessed based on a combination of the entity's business model for managing the assets and the instruments' contractual cash flow characteristics.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5.  Summary of Significant Accounting Policies (Continued)

### 5.9  Financial instruments (Continued)

### 5.9.1 Financial assets (Continued)

**Recognition, initial measurement and derecognition (continued)**
The Group determines its business model at the level that best reflects how it manages groups of financial assets to achieve its business objectives and in order to generate contractual cash flows. That is, whether the Group's objective is solely to collect the contractual cash flows from the assets or is to collect both the contractual cash flows and cash flows arising from the sale of assets. If neither of these is applicable (e.g. financial assets are held for trading purposes), then the financial assets are classified as part of 'Sell' business model and measured at FVPL. The Group's business model is not assessed on an instrument-by-instrument basis, but at a higher level of aggregated portfolios.

Purchases and sales of those financial assets are recognized on trade-date – the date on which the Group commits to purchase or sell the asset. Financial assets are initially recognized at fair value plus transaction costs for all financial assets not carried at FVPL.
A financial asset is derecognized either when: the contractual rights to receive the cash flows from the financial asset have expired; or the Group has transferred its rights to receive cash flows from the financial asset and either (a) has transferred substantially all the risks and rewards of ownership of the financial asset, or (b) has neither transferred nor retained substantially all the risks and rewards of the financial asset, but has transferred control of the financial asset. Where the Group has retained control, it shall continue to recognize the financial asset to the extent of its continuing involvement in the financial asset.

**Classification of financial assets**
Financial assets are classified in the consolidated financial statements into the following categories upon initial recognition:

- Financial assets at amortised cost; and
- Equity instruments at fair value through profit or loss.
- Equity instruments at fair value through other comprehensive income.

*Financial assets at amortised cost*
A financial asset is measured at amortised cost if it meets both of the following conditions and is not designated as at fair value through profit or loss:
- It is held within a business model whose objective is to hold assets to collect contractual     cash flows; and
- Its contractual terms give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.
Financial assets measured at amortized cost are subsequently measured at amortized cost using the effective yield method adjusted for impairment losses if any. Gains and losses are recognized in consolidated statement of profit or loss when the asset is derecognized, modified or impaired.

Financial assets carried at amortised cost consist of due from related parties, trade and other receivables and bank balances and cash.

*Trade receivables*
Trade receivables are amounts due from customers for services performed in the ordinary course of business and recognized initially at fair value and subsequently measured at amortised cost using the effective interest method, less provision for impairment.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5.  Summary of Significant Accounting Policies (Continued)

**5.9   Financial instruments (Continued)**

**5.9.1 Financial assets (Continued)**

_Financial assets at amortised cost (Continued)_
_Cash and cash equivalents_
Cash and cash equivalents comprise cash on hand and at banks and are subject to an insignificant risk of changes in value.

_Financial assets at FVPL_
The Group classifies financial assets as held for trading when they have been purchased or issued primarily for short-term profit making through trading activities or form part of a portfolio of financial instruments that are managed together, for which there evidence of a recent pattern of short-term profit is taking. Held-for-trading assets are recorded and measured in the consolidated statement of financial position at fair value. In addition, on initial recognition, the Group may irrevocably designate a financial asset that otherwise meets the requirements to be measured at amortized cost or at FVOCI as at FVPL if doing so eliminates or significantly reduces an accounting mismatch that would otherwise arise.

Changes in fair value, gain or loss on disposal, interest income and dividends are recorded in consolidated statement of profit or loss according to the terms of the contract, or when the right to payment has been established.

The financial assets at FVPL are represented in unquoted equity investments.

_Equity instruments at fair value through other comprehensive income (FVOCI)_
Upon initial recognition, the Group may elect to classify irrevocably some of its equity instruments at FVOCI when they meet the definition of Equity under IAS 32 Financial Instruments: Presentation and are not held for trading. Such classification is determined on an instrument-by- instrument basis.

Gains and losses on these equity instruments are never recycled to statement of profit or loss. Dividends are recognized in consolidated statement of profit or loss when the right of the payment has been established, except when the Group benefits from such proceeds as a recovery of part of the cost of the instrument, in which case, such gains are recorded in OCI. Equity instruments at FVOCI are not subject to an impairment assessment. Upon disposal, cumulative gains or losses are reclassified from cumulative changes in fair value to retained earnings in the consolidated statement of changes in equity.

The financial assets at FVOCI represent unquoted equity investments.

**Impairment of financial assets**
IFRS 9 replaces the "incurred loss" model in IAS 39 with an expected credit loss (ECL) model. The new impairment model applies to financial assets measured at amortised cost, contract assets and debt investments at fair value through other comprehensive income, but not to investments in equity instruments. Under IFRS 9, credit losses are recognised earlier than under IAS 39.

ECLs are based on the difference between the contractual cash flows due in accordance with the contract and all the cash flows that the Group expects to receive. The shortfall is then discounted at an approximation to the asset's original effective interest rate.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5. Summary of Significant Accounting Policies (Continued)

### 5.9  Financial instruments (Continued)

### 5.9.1 Financial assets (Continued)

For trade and other receivables, the Group has applied the standard's simplified approach and has calculated ECLs based on lifetime expected credit losses. Accordingly, the Group does not track changes in credit risk and assesses impairment on a collective basis. The Group has established a provision matrix that is based on the Group's historical credit loss experience, adjusted for forward-looking factors specific to the customers and the economic environment. Exposures were segmented based on common credit characteristics such as credit risk grade, geographic region and industry, delinquency status and age of relationship where applicable.

In applying this forward-looking approach, the Group applies a three stage assessment to measuring ECL as follows:
- Stage 1 - financial instruments that have not deteriorated significantly in credit quality since initial recognition or that have low credit risk; and
- Stage 2 (not credit impaired) - financial instruments that have deteriorated significantly in credit quality since initial recognition and whose credit risk is not low.
- Stage 3• (credit impaired) - financial assets that have objective evidence of impairment at the reporting date and assessed as credit impaired when one or more events have a detrimental impact on the estimated future cash flows have occurred.

•12-month expected credit losses' are recognized for Stage 1 while 'lifetime expected credit losses' are recognized for Stage 2.

Measurement of the expected credit losses is determined by a probability-weighted estimate of credit losses over the expected life of the financial instrument. ECLs for financial assets measured at amortized cost are deducted from the gross carrying amount of the assets and charged to consolidated statement of profit or loss.

### 5.9.2. Financial liabilities

The accounting for financial liabilities remains largely the same as it was under IAS 39, except for the treatment of gains or losses arising from an entity's own credit risk relating to liabilities designated at FVPL. Such movements are presented in OCI with no subsequent reclassification to consolidated statement of profit or loss.

*Borrowings*
Borrowings are recognized initially at fair value, net of transaction costs incurred. Borrowings are subsequently stated at amortized cost; any difference between the proceeds (net of transaction costs) and the redemption value is recognized in consolidated statement of profit or loss over the period of the borrowings using the effective interest method.

Fees paid on the establishment of loan facilities are recognized as transaction costs of the loan to the extent that it is probable that some or all of the facility will be drawn down. In this case, the fee is deferred until the draw-down occurs. To the extent there is no evidence that it is probable that some or all of the facility will be drawn down, the fee is capitalized as a pre-payment for liquidity services and amortized over the period of the facility to which it relates

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5. Summary of Significant Accounting Policies (Continued)

**5.9  Financial instruments (Continued)**

**5.9.2. Financial liabilities (Continued)**

*Accounts payable*
Accounts payable include trade and other payables. Trade payables are obligations to pay for goods or services that have been acquired in the ordinary course of business from suppliers. Trade payables are recognized initially at fair value and subsequently measured at amortized cost using the effective interest method. Accounts payable are classified as current liabilities if payment is due within one year or less (or in the normal operating cycle of the business if longer). If not, they are presented as non - current liabilities.

**Derecognition of financial liabilities**
A financial liability is derecognized when the obligation under the liability is discharged or cancelled or expires. When an existing financial liability is replaced by another from the same lender on substantially different terms, or the terms of an existing liability are substantially modified, such an exchange or modification is treated as a derecognition of the original liability and the recognition of a new liability, and the difference in the respective carrying amounts is recognized in consolidated statement of profit or loss.

**5.10  Offsetting of financial assets and liabilities**

Financial assets and financial liabilities are offset and the net amount reported in the consolidated statement of financial position if, and only if, there is a currently enforceable legal right to offset the recognized amounts and there is an intention to settle on a net basis, or to realise the assets and settle the liabilities simultaneously.

**5.11  Equity, reserves and dividend payments**

Share capital represents the nominal value of shares that have been issued.
Share premium includes any premiums received on issue of share capital. Any transaction costs associated with the issuing of shares are deducted from share premium.

Foreign currency translation differences arising on the translation of the Group's foreign entities are included in the foreign currency translation reserve. Gains and losses on certain financial instruments are included in fair value reserve for available for sale investments.
Retained earnings include all current and prior period retained profits.

Dividends are recognised as a liability in the Group's consolidated financial statements in the period in which the dividends are approved by the shareholders.

**5.12  Treasury shares**

Treasury shares consist of the Group's own shares that have been issued, subsequently reacquired by the Group and not yet reissued, sold or cancelled. No gain or loss is recognized in the consolidated statement of profit or loss on the purchase, sale, issue or cancellation of the treasury shares. Consideration paid or received is directly recognized in equity. When the treasury shares are sold, gains are credited to a separate account in shareholders' equity (treasury shares reserve) which is not distributable. Any realized losses are charged to the same account to the extent of the credit balance on that account. Any excess losses are charged to retained earnings and then to reserves.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5. Summary of Significant Accounting Policies (Continued)

### 5.12 Treasury shares (Continued)

Gains realized subsequently on the sale of treasury shares are first used to offset any previously recorded losses in the order of reserves, retained earnings and treasury shares reserve account. No cash dividends are paid on these shares. The issue of bonus shares increases the number of treasury shares proportionately and reduces the average cost per share without affecting the total cost of treasury shares.

### 5.13 Provision for staff indemnity

The Group provides end of service benefits to its employees. The entitlement to these benefits is based upon the employees' final salary and length of service, subject to the completion of a minimum service period in accordance with relevant labour law and the employees' contracts. The expected costs of these benefits are accrued over the period of employment. This liability, which is unfunded, represents the amount payable to each employee as a result of termination on the financial position date.

With respect to its Kuwaiti national employees, the Group makes contributions to the Public Institution for Social Security calculated as a percentage of the employees' salaries. The Group's obligations are limited to these contributions, which are expensed when due.

### 5.14 Provisions

A provision is recognized in the consolidated statement of financial position when the Group has a legal or constructive obligation as a result of a past event, it is probable that an outflow of economic benefits will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation. If the effect is material, provisions are determined by discounting the expected future cash flows at a rate that reflects current market assessments of the time value of money and, where appropriate, the risks specific to the liability.

### 5.15 Dividends

The dividends attributable to shareholders of the Parent Company are recognised as liabilities in the consolidated financial statements in the period in which the dividends are approved by the Parent Company's shareholders.

### 5.16 Contingencies

Contingent assets are not recognised in the consolidated financial statements, but are disclosed when an inflow of economic benefits is probable.

Contingent liabilities are not recognised in the consolidated statement of financial position, but are disclosed unless the possibility of an outflow of resources embodying economic benefits is remote.

### 5.17 Revenue recognition

Revenue is measured based on the consideration to which the Group expects to be entitled in a contract with a customer and excludes amounts collected on behalf of third parties. The Group recognises revenue when it transfers control of a product or service to a customer. The Group follows a 5-step process:
- Identifying the contract with a customer

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5.  Summary of Significant Accounting Policies (Continued)

### 5.17   Revenue recognition (Continued)

- Identifying the performance obligations
- Determining the transaction price
- Allocating the transaction price to the performance obligations
- Recognising revenue when/as performance obligation(s) are satisfied.

The total transaction price for a contract is allocated amongst the various performance obligations based on their relative stand-alone selling prices. The transaction price for a contract excludes any amounts collected on behalf of third parties.

IFRS 15 requires entities to exercise judgement, taking into consideration all of the relevant facts and circumstances when applying each step of the model to contracts with their customers. The standard also specifies the accounting for the incremental costs of obtaining a contract and the costs directly related to fulfilling a contract. In addition, the standard requires extensive disclosures.

Revenue is recognised at a point in time when the Group satisfies performance obligations by transferring the control of promised goods or services to its customers.

The Group considers the following factors in determining whether control of an asset has been transferred:
- The Group has a present right to payment for the goods.
- The customer has legal title to the goods.
- The Group has transferred physical possession of the goods.
- The customer has the significant risks and rewards of ownership of the goods.
- The customer has accepted the goods.

Revenue for the Group arises from:

*Transportation revenue:*
Performance obligation related to the Group's transportation revenue is satisfied at a point in time typically on completion of movement of passengers and heavy transportation between two or more specified points, which is in line with the recognition criteria required by IFRS 15.

*Sale of used vehicles:*
Performance obligations related to the Group's sale of vehicles are satisfied at a point in time typically on delivery of the vehicles, legal transfer of title and issuing of the invoice to customers.

*Leasing revenue:*
Performance obligations related to the Group's leasing of property and equipment is outside the scope of IFRS 15. Revenue from property and equipment leasing is recognised on a straight line basis over the contract duration.

*Other revenue:*
The other revenue types of the Group are mainly represented by gain on settlement of debt and reversal of excess accruals which are outside the scope of IFRS 15.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5. Summary of Significant Accounting Policies (Continued)

### 5.18 Foreign currency translation

The consolidated financial statements are presented in currency ("KD"), which is also the functional currency of the Parent Company.

*Transactions and balances*
Transactions in currencies other than the Group's functional currency (foreign currencies) are recorded at the rates of exchange prevailing on the dates of transactions. At each reporting date, monetary items denominated in foreign currencies are retranslated at the rates prevailing on the statement of financial position date. Non-monetary items carried at fair value that are denominated in foreign currencies are retranslated at the rates prevailing on the date when the fair value was determined. Non-monetary items that are measured in terms of historical cost in a foreign currency are not retranslated.
Exchange differences arising on the settlement of monetary items, and on the retranslation of monetary items, are included in the consolidated statement of profit or loss for the year. Exchange differences arising on the retranslation of non-monetary items carried at fair value are included in the consolidated statement of profit or loss for the year except for differences arising on the retranslation of non-monetary items in respect of which gains and losses are recognised directly in other comprehensive income. For such non-monetary items, any exchange component of that gain or loss is also recognised directly in other comprehensive income.

### 5.18 Foreign currency translation (Continued)

Group companies
The assets and liabilities of the Group's foreign operations are expressed in KD using exchange rates prevailing at the reporting date. Income and expense items are translated into the Group's presentation currency at the average rate over the reporting period. Exchange differences are charged / credited to other comprehensive income and recognised in the currency translation reserve in equity. On disposal of a foreign operation the cumulative translation differences recognised in equity are reclassified to profit or loss and recognised as part of the gain or loss on disposal. Goodwill and fair value adjustments arising on the acquisition of a foreign entity have been treated as assets and liabilities of the foreign entity and translated into KD at the closing rate.

### 5.19 Finance costs

Finance costs primarily comprise interest on the Group's financing. Finance costs directly attributable to the acquisition, construction or production of qualifying assets are capitalised during the period of time that is necessary to complete and prepare the asset for its intended use or sale. Other finance costs are expensed in the period in which they are incurred and are recognised in the consolidated statement of profit or loss in the period in which they are incurred.

### 5.20 Taxation

*Contribution to Kuwait Foundation for the Advancement of Sciences*
The Group is legally required to contribute to the Kuwait Foundation for the Advancement of Sciences ("KFAS"). The Group's contributions to KFAS are recognised as an expense in the period during which the Group's contribution is legally required. KFAS is imposed at 1% of net profit attributable to the equity holders of the Parent Company, less permitted deductions.

*National Labour Support tax*
The Group calculates National Labour Support Tax ("NLST") in accordance with the Ministry of Finance resolution No.19 of 2000. NLST is imposed at 2.5% of net profit attributable to the equity holders of the Parent Company, less permitted deductions.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 5. Summary of Significant Accounting Policies (Continued)

**5.20   Taxation (Continued)**

*Zakat*
The Group has provided for Zakat in accordance with the requirements of Law No. 46 of 2006. Zakat is imposed at 1% of net profit attributable to the equity holders of the Parent Company, less permitted deductions.

**5.21   Segment information**

A segment is a distinguishable component of the Group that engages in business activities from which it earns revenue and incurs cost. The operating segments used by the management of the Group to allocate resources and assess performance are consistent with the internal report provided to the chief operating decision maker. Operating segment exhibiting similar economic characteristic, product and services, class of customers where appropriate are aggregated and reported as reportable segments.

## 6. Significant Accounting Judgements and Estimation Uncertainty

The preparation of consolidated financial position in conformity with International Financial Reporting Standards requires the use of estimates and assumptions that affect the reported balances of assets and liabilities and disclosures of contingent assets and liabilities at the date of the consolidated financial position and the recorded amounts of revenues and expenses during the year. Although these estimates are based on management's best knowledge of current events, actual results may differ for those easements.

The estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognised in the period in which the estimate is revised if the revision affects only that period, or in the period of the revision and future periods if the revision affects both current and future periods.

**Significant management judgements**
In the process of applying the Group's accounting policies, management has made the following significant judgements, which have the most significant effect on the amounts recognised in the consolidated financial statements:

*Useful life of tangible and intangible assets*
As stated in the significant accounting policies Note 5, the Group reviews the estimated useful life by which it depreciates its tangible assets and amortizes its intangible assets. The Group's management is convinced that the estimates of useful life for these assets are appropriate.

*Classification of properties*
Upon acquisition of a property, the management classifies the properties into either property, plant and equipment or investment property, based on the intention of the management for the use of the property.

The property is classified as investment properties when the intention to earn rentals from property or hold the property for capital appreciation or if the intention is not determined by Group.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 6. Significant Accounting Judgements and Estimation Uncertainty (Continued)

**Significant management judgements (Continued)**

*Classification of financial instruments*
On acquisition of a financial asset, the Group decides whether it should be classified as "at fair value through profit or loss", "at fair value through other comprehensive income" or "at amortised cost". IFRS 9 requires all financial assets, except equity instruments and derivatives, to be assessed based on a combination of the Group's business model for managing the assets of the instrument's contractual cash flow characteristics. The Group follows the guidance of IFRS 9 on classifying its financial assets and is explained in (Note 5).

*Principal versus agent considerations*
The Group enters into contracts to sell goods and render services to its customers at an amount that reflects the consideration to which the Group expects to be entitled in exchange for those goods or services. The Group determined that it is a principal in all its contracts with its customers.
- The Group controls the promised goods or services before the Group transfers the goods or services to the customer.
- The Group satisfies the performance obligations by itself and does not engage another party in satisfying its performance obtligations in its contracts with customers.

**Estimation uncertainty**

The key assumptions concerning the future and other key sources of estimation uncertainty at the consolidated statement of financial position date, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

*Impairment of non-financial assets*
The Group reviews tangible assets on a continuous basis to determine whether a provision for impairment should be recorded in the consolidated statement of profit or loss. In particular, considerable judgment by management is required in the estimation of the amount and timing of future cash flows when determining the level of provisions required.

*Impairment of investment in associates*
After application of the equity method, the Group determines whether it is necessary to recognise any impairment loss on the Group's investment in its associated companies, at each reporting date based on existence of any objective evidence that the investment in the associate is impaired. If this is the case the Group calculates the amount of impairment as the difference between the recoverable amount of the associate and its carrying value and recognises the amount in "share of gain in associate" in the consolidated statement of profit or loss.

*Fair value measurement and valuation techniques*
Some of the Group's assets are measured at fair value for financial reporting purposes. The Group's management determines the appropriate valuation techniques and input for fair value measurement. In estimating the fair value of an asset, the management uses market observable data to the extent it is available. In case no market observable data are available, the Group shall assign an external qualified valuer to carry out the valuation process. Information about valuation techniques and input used in determining the fair value of various assets are disclosed in (Note 31).

*Impairment of inventories*
Inventories are held at cost or net realisable value whichever is lower. When inventories become old or obsolete, an estimate is made of the required impairment. For individually significant amounts, this estimation is performed on an individual basis. Amount which are not individually significant,

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 6. Significant Accounting Judgements and Estimation Uncertainty (Continued)

**Estimation uncertainty (Continued)**

*Impairment of inventories (Continued)*
but which are old or obsolete, are assessed collectively and a provision applied according to the inventory type and the degree of ageing or obsolescence, based on historical selling prices.

*Provision for expected credit losses of trade receivables*
The Group uses a provision matrix to calculate ECLs for trade receivables. The provision rates are based on days past due for groupings of various customer segments that have similar loss patterns (i.e., by geographical region, services type, customer and type). The provision matrix is initially based on the Group's historical observed default rates.

The Group will calibrate the matrix to adjust the historical credit loss experience with forward-looking information.

For instance, if forecast economic conditions (i.e., gross domestic product) are expected to deteriorate over the next year which can lead to an increased number of defaults in the transportation sector, the historical default rates are adjusted. At every reporting date, the historical observed default rates are updated and changes in the forward-looking estimates are analysed.

The assessment of the correlation between historical observed default rates, forecast economic conditions and ECLs is a significant estimate. The amount of ECLs is sensitive to changes in circumstances and of forecast economic conditions. The Group's historical credit loss experience and forecast of economic conditions may also not be representative of customer's actual default in the future. The information about the ECL on the Group's trade receivables is disclosed in (Note 30.2).

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 7.  Property, plant and equipment

| | Buildings | Vehicles | Machinery | Furniture, computers and cleaning equipment | Capital work in progress | Total |
|---|---|---|---|---|---|---|
| | KD | KD | KD | KD | KD | KD |
| **Cost** | | | | | | |
| At 1 January 2017 | 8,437,484 | 107,549,665 | 5,203,767 | 5,123,501 | 241,282 | 126,555,699 |
| Additions | 184,167 | 27,825,156 | 332,591 | 163,936 | 8,110 | 28,513,960 |
| Disposals | - | (11,906,902) | (220) | - | - | (11,907,122) |
| Foreign exchange differences | (4,698) | 359,684 | (177,492) | (22,152) | - | 155,342 |
| Transfers to inventories | - | (6,583,854) | (902) | - | - | (6,584,756) |
| At 31 December 2017 | 8,616,953 | 117,243,749 | 5,357,744 | 5,265,285 | 249,392 | 136,733,123 |
| Additions | 66,607 | 11,429,060 | 159,536 | 460,343 | 1,832,886 | 13,948,432 |
| Disposals | - | (4,341,366) | (2,400) | (55) | (1,742) | (4,345,563) |
| Foreign exchange differences | (35,079) | 29,932 | (1,606,513) | (14,210) | - | (1,625,870) |
| Transfers to inventories | - | (9,688,056) | (9,506) | - | - | (9,697,562) |
| At 31 December 2018 | **8,648,481** | **114,673,319** | **3,898,861** | **5,711,363** | **2,080,536** | **135,012,560** |
| | | | | | | |
| Accumulated depreciation and impairment | | | | | | |
| At 1 January 2017 | 3,519,442 | 57,484,350 | 2,296,628 | 4,899,101 | - | 68,199,521 |
| Charge for the year | 429,835 | 4,794,141 | 296,390 | 124,961 | - | 5,645,327 |
| Impairment loss | - | 5,709,455 | - | - | - | 5,709,455 |
| Related to disposals | - | (4,735,170) | - | - | - | (4,735,170) |
| Foreign exchange differences | (2,526) | 66,419 | (51,533) | (22,102) | - | (9,742) |
| At 31 December 2017 | 3,946,751 | 63,319,195 | 2,541,485 | 5,001,960 | - | 74,809,391 |
| Charge for the year | 469,105 | 5,357,383 | 250,417 | 169,316 | - | 6,246,221 |
| Impairment loss | - | 595,412 | 114 | - | - | 595,526 |
| Related to disposals | - | (1,855,931) | (263) | - | - | (1,856,194) |
| Foreign exchange differences | (19,122) | 18,592 | (478,801) | (14,234) | - | (493,565) |
| Related to transfers to inventories | - | (6,603,053) | (5,834) | - | - | (6,608,887) |
| At 31 December 2018 | **4,396,734** | **60,831,598** | **2,307,118** | **5,157,042** | **-** | **72,692,492** |
| **Carrying amount** | | | | | | |
| At 31 December 2018 | **4,251,747** | **53,841,721** | **1,591,743** | **554,321** | **2,080,536** | **62,320,068** |
| At 31 December 2017 | 4,670,202 | 53,924,554 | 2,816,259 | 263,325 | 249,392 | 61,923,732 |
| **Annual depreciation rates** | **5%** | **5-20%** | **15-25%** | **25%** | **–** | **–** |

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 7. Property, plant and equipment (Continued)

*Capital work in progress represents leasehold improvements, engineering and design work in a warehouse facility's expansion for a new project in a Group's subsidiary ("KGL Food Services W.L.L.), which are expected to be completed during 2019.

Buildings are erected on leased land from the Government of Kuwait for a period of one year and renewable for similar periods.

Heavy and light vehicles with carrying amount of KD 25,055,634 (2017: KD 29,929,621) are mortgaged against term loans granted to the Group (Note 23).

During the year, the Group performed an internal impairment test on its operational assets, specially the vehicles, through performing a review of its recoverable amount, which resulted in recognizing an impairment loss of KD 595,526 in the consolidated statement of profit or loss (2017: KD 5,709,455).

The depreciation charge has been allocated as follows:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Cost of sales | 6,077,741 | 5,469,334 |
| General and administrative expenses (Note 26) | 168,480 | 175,993 |
|  | 6,246,221 | 5,645,327 |

## 8. Investment in associates

| Name of associate | Country of incorporation | Ownership interest | | Carrying value | |
|---|---|---|---|---|---|
|  |  | 2018 | 2017 | 2018 | 2017 |
|  |  | % | % | KD | KD |
| KGL Logistics K.P.S.C. | Kuwait | 47.24 | 47.24 | 42,061,447 | 41,156,289 |
| National Cleaning Company K.P.S.C.* | Kuwait | 35.87 | 34.16 | 13,085,710 | 13,480,510 |
| KGL International for Ports, Warehousing and Transport Company K.S.C. (Closed) | Kuwait | 38.92 | 38.92 | 4,870,114 | 5,083,560 |
| Axis Solutions for Computer Systems K.S.C. (Closed) | Kuwait | 44 | 44 | 1,421,189 | 1,090,049 |
| Amin International for Valuables Transportation and Facilities Security W.L.L | Kuwait | 34 | 34 | 324,189 | 226,960 |
| Kuwait United Development Company K.S.C. (Closed) | Kuwait | 43.64 | 43.64 | 134,816 | 217,236 |
|  |  |  |  | 61,897,465 | 61,254,604 |

Associates are accounted for using the equity method.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 8. Investment in associates (Continued)

*During the year, the associate National Cleaning Company K.P.S.C. distributed bonus shares to its shareholders out of its treasury shares, which increased the Parent Company's stake to reach 35.87%.

Summary of principal activities of the associates:

| Name of associate | Principal activities |
|---|---|
| KGL Logistics K.P.S.C. | Warehouses management |
| National Cleaning Company K.P.S.C. | Environmental protection |
| KGL International for Ports, Warehousing and Transport Company K.S.C. (Closed) | Management of marine and river ports |
| Axis Solutions for Computer Systems K.S.C. (Closed) | IT related activities |
| Amin International for Valuables Transportation and Facilities Security W.L.L. | Security system installation, maintenance and management |
| Kuwait United Development Company K.S.C. (Closed) | Construction project management |

On 1 January 2018, the Group recognized its share of impact on adoption of IFRS 9 in the associates amounting to KD 3,116,942 in the opening balance of retained earnings.

As at 31 December 2018, the fair value of Group's interest in KGL Logistics K.P.S.C., which is listed on Boursa Kuwait was KD 14,029,837 (2017: KD 14,660,832). The management believes that there are no indications for the existence of impairment in carrying value for the associate.

As at 31 December 2018, the fair value of Group's interest in National Cleaning Company K.P.S.C., which is listed on the Boursa Kuwait was KD 4,837,171 (2017: KD 4,564,174). The management believes that there are no indications for the existence of impairment in carrying value for the associate.

The Group's investment in associates with carrying value of KD 40,550,600 (2017: KD 39,639,244) are mortgaged against term loans (Note 23).

The carrying value of KGL International for Ports, Warehousing and Transport Company K.S.C. (Closed) and KGL Logistics K.P.S.C. includes goodwill amount to KD 4,002,726 (2017: KD 4,002,726).

The following table summarises the information relating to the Group's significant associates:

**a)   KGL Logistics K.P.S.C.**

Associate's financial position:

| | 2018 | 2017 |
|---|---|---|
| | KD | KD |
| Total assets | 133,100,316 | 137,272,452 |
| Total liabilities | 34,551,384 | 40,457,107 |
| Net assets | 98,548,932 | 96,815,345 |
| Group's share of net assets of associate | 46,554,516 | 45,790,269 |
| Goodwill | 2,694,366 | 2,694,366 |
| Elimination of inter-company transactions | (7,187,435) | (7,328,346) |
| Total investment balance of associate | 42,061,447 | 41,156,289 |

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 6. Investment in associates (Continued)

### a) KGL Logistics K.P.S.C. "continued"

Associate's revenues and results:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Revenues | 41,239,425 | 40,401,692 |
| Net profit | 6,178,662 | 6,338,189 |
| Group's share of results of associate | 2,918,800 | 2,994,161 |

The associate has certain litigations as follows:

- The associate has an ultimate subsidiary (KGL Stevedoring W.L.L.) which has won a litigation against the Kuwait Ports Authority ("KPA") in the Court of First Instance, which has been advocated before courts of appeal and cassation, relates to registration and renewal as being stevedoring contractor at Shuaiba port. Further, the Court of First Instance has issued another judgement in favor of the ultimate subsidiary, obliging the KPA to pay KD 24.5 million as compensation to the ultimate subsidiary, which is currently deliberated before the court of appeal based on the appeal filed by KPA.
- The associate has investment properties amounting to KD 33,500,000 (2017: KD 34,021,000) representing assets held in virtue of an appropriation right granted to the ultimate subsidiary in its capacity as a stevedoring contractor for unspecified period in Mina Abdulla area. However, this appropriation right is subject to litigation filed by the ultimate subsidiary, to cancel the administrative resolution concerning withdrawal of land of Mina Abdulla area, which is currently pending before the Court of Appeal.

### b) National Cleaning Company K.P.S.C.

Associate's financial position:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Total assets | 79,075,470 | 87,411,800 |
| Total liabilities | 42,594,538 | 47,948,948 |
| Net assets | 36,480,932 | 39,462,852 |
| Group's share of net assets of associate | 13,085,710 | 13,480,510 |

Associate's revenues and results:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Revenues | 34,213,592 | 40,263,549 |
| Net profit | 1,330,916 | 1,345,867 |
| Group's share of results of associate | 477,400 | 459,748 |

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 6. Investment in associates (Continued)

### b) KGL International for Ports, Warehousing and Transport Company K.S.C. (Closed)

Associate's financial position:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Total assets | 30,359,609 | 29,552,461 |
| Total liabilities | 17,784,361 | 16,156,451 |
| Net assets | 12,575,248 | 13,396,010 |
| Group's share of net assets of associate | 4,894,287 | 5,213,727 |
| Goodwill | 1,308,360 | 1,308,360 |
| Elimination of inter-company transactions | (1,332,533) | (1,438,527) |
| Total investment balance of associate | 4,870,114 | 5,083,560 |

Associate's revenues and results:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Revenues | 2,291,332 | 2,449,563 |
| Net (loss)/profit | (921,203) | 460,914 |
| Group's share of results of associate | (358,532) | 179,388 |

KGL Ports International for ports, Warehousing and Transport Company K.S.C (Closed) has an ultimate associate ("Damietta International Ports Company SAE –Egypt" or "DIPCO") with a carrying amount of KD 14,604,332. DIPCO did not start its operations due to Damietta Port Authority's ("DPA") failure to meet their contractual obligations, political conflicts and economic uncertainty during the time of establishment. Consequently, DIPCO has filed arbitration at the International Court of Arbitration of the International Chamber of Commerce (ICC) against DPA claiming for a compensation of USD 1.2 billion for which the legal counsel of DIPCO, believes that DIPCO has good chances in securing a positive outcome. Final judgement is expected to be issued during 2019 unless the Tribunal or ICC decides otherwise.  Also related to the DIPCO project, Doosan (the crane supplier for DIPCO) have received an award against DIPCO and KGLPI for USD 76 Million. This award is currently being challenged before the competent courts.

In addition, there are legal cases filed by the associate against KPA in regard to the stevedoring license and other contracts whereby judgements were awarded in favor of the associate at the Court of First Instance and is currently pending before the Courts of Appeal and Cassation.

The following table summarises the information relating to the other associates of the Group:
Associates' financial position:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Total assets | 10,143,681 | 9,727,417 |
| Total liabilities | 5,578,839 | 6,084,714 |
| Net assets | 4,564,842 | 3,642,703 |
| Total investment balance of associates | 1,880,194 | 1,534,245 |

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 6. Investment in associates (Continued)

Associates' revenues and results:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Revenues | 9,163,069 | 9,059,798 |
| Net profit | 1,015,818 | 593,870 |
| Group's share of results of associates | 419,116 | 245,910 |

The aggregate dividends received from associates during the year ended 31 December 2018 amount to KD 31,875 (2017: KD Nil).

## 9. Subsidiaries

| Name of subsidiary | Country of incorporation | Ownership Interest (%) 2018 | Ownership Interest (%) 2017 | Principle activity |
|---|---|---|---|---|
| Kuwait and Gulf Link Holding Company K.S.C. (Closed) | Kuwait | 99.34 | 99.34 | Investment activities |
| KGL Car Rental Company W.L.L. | Kuwait | 99 | 99 | Car rental |
| Majestic Travel and Tourism Company W.L.L. | Kuwait | 99 | 99 | Travel and Tourism |
| KGL Passenger Transport  Services K.S.C. (Closed) | Kuwait | 98.90 | 98.90 | Passenger Transport |
| KGL Private Passenger Transport Services J.S.C. | UAE | 100 | 100 | Passenger Transport |
| Ras Al Khaimah Shipping Company L.L.C. | UAE | 84.75 | 84.75 | Cargo transport |
| Global united for Insurance services Co K.S.C. (Closed) | Kuwait | 90 | 90 | Insurance services |
| KGL Technical Services Company W.L.L. | Kuwait | 99 | 99 | Garage and maintenance |
| KGL Transportation Company K.S.C.(Closed)* | Kuwait | 98.5 | 97 | Transportation |
| KGL Transportation Company W.L.L. | Qatar | 100 | 100 | Transportation |
| Darb Al Tabana Transport L.L.C. | UAE | 100 | 100 | Transportation |
| KGL Food Services Company W.L.L. | Kuwait | 99 | 99 | Food supply |
| KGL Real Estate Company K.S.C. (Closed) | Kuwait | 99.93 | 99.93 | Real estate |
| Zoud International Real Estate Co. K.S.C. (Closed) | Kuwait | 99 | 99 | Real estate |
| Kuwait and Gulf Link Real Estate Co. W.L.L. | Kuwait | 99 | 99 | Real estate |
| International Motors Company K.S.C. (Closed) | Kuwait | 80 | 80 | Sale of spare parts and vehicle maintenance |
| Sudan River Transport  Company | Sudan | 50.6 | 50.6 | Cargo transport |
| North Star Shipping Company K.S.C. (Closed) | Kuwait | 99 | 99 | Passenger and Cargo transport |
| Gulf Aviation for Airplane Services K.S.C. (Closed) | Kuwait | 99 | 99 | Transportation |
| United Metal Cutting Company K.S.C.(Closed) | Kuwait | 98.50 | 98.50 | Sale of scraps |
| Virgola Event Management and Communication Company W.L.L. | Kuwait | 99 | 99 | Advertising |

*During the year, the Group acquired an additional interest of 1.5% in its subsidiary KGL Transportation Company K.S.C.C.
The Group does not have subsidiaries with material non-controlling interests as at 31 December 2018 and 2017.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 10. Investment properties

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Balance at the beginning of year | 11,705,750 | 12,674,000 |
| Additions |  | 43,450 |
| Change in fair value | 324,250 | (1,011,700) |
|  | 12,030,000 | 11,705,750 |

The fair value of the Group's investment properties have been determined on the basis of a valuation carried out by independent evaluators.
The fair values were determined based on the market comparable approach that reflects recent transaction priced for similar properties. In estimating the fair values of the properties, the highest and best use of the properties is their current use. The management has valued all its investment properties on an individual basis at the lowest of the evaluations received from independent valuers at 31 December.
Investment properties of KD 6,663,000 (2017: KD 6,384,750) are pledged against a term loan granted to the Group (Note 23).

## 11. Financial Assets at Fair Value Through other Comprehensive Income ("Fvoci")

Financial assets at fair value through other comprehensive income ("FVOCI") comprise equity securities which are not held for trading, and for which the Group has made an irrevocable election at initial recognition to recognise changes in fair value through other comprehensive rather than profit or loss as these are strategic investments and the Group considered this to be more relevant. At 1 January 2018, as a result of adoption of IFRS 9, the Group elected to reclassify investments amounting to KD 1,448,780 from financial assets available for sale (Note 4-c-A, Note 12).

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Unquoted equity securities | 84,113 | - |

- Financial assets at fair value through other comprehensive income ("FVOCI") with a carrying value of KD 84,113 represent investments in related parties (Note 14).

- Valuation techniques of financial assets at fair value through other comprehensive income ("FVOCI") are disclosed in Note 31.

Movement in the fair value reserve for financial assets at FVOCI during the year is as follows:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Impact on adoption of IFRS 9 (Note -4c-A) | (334,589) | - |
| Change in fair value for the year | (1,030,078) | - |
| Reclassification of fair value changes of financial assets at FVOCI upon derecognition | 500,000 | - |
|  | (864,667) | - |

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 12. Financial Assets Available for Sale

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Unquoted equity securities | - | 1,448,780 |

At 1 January 2018, as a result of adoption of IFRS 9, the Group elected to reclassify financial assets available for sale with a carrying value of KD 1,448,780 to financial assets at fair value through other comprehensive income ("FVOCI") (Note 11).

## 13. Inventories

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Spare parts | 2,443,120 | 1,801,796 |
| Used vehicles* | 5,090,763 | 6,584,756 |
|  | 7,533,883 | 8,386,552 |
| Provision for old and obsolete inventories | (103,676) | - |
|  | 7,430,207 | 8,386,552 |

*The Group has transferred used vehicles amounting to KD 2,993,149 from property, plant and equipment.

Movement in the provision for old and obsolete inventories is as follows:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Balance at beginning of the year | - | 250,000 |
| Charge for the year | 103,676 | 418,240 |
| Written off inventory | - | (668,240) |
|  | 103,676 | - |

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 14. Related Party Balances and Transactions

Related parties consist of major shareholders, directors and executive officers of the Group, their families and companies of which they are the principal owners or over which they are able to exercise significant influence. All related party transactions approximate arm's length terms and are approved by the Group's management. Balances due from/to related parties are interest free and without maturity dates.

Related party balances and transactions included in the consolidated financial statements are as follows:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Consolidated statement of financial position: |  |  |
| a) Financial assets at FVOCI (Note 11) | 84,113 | - |
| b) Financial assets available for sale (Note 12) |  | 1,448,780 |
| c) Change in fair value of financial assets at FVOCI (Note 11) | (1,030,078) | - |
| d) Investment in associates (Note 8) | 61,897,465 | 61,254,604 |
| e) Due from related parties | 1,106,558 | 5,188,947 |
| Less: allowance for expected credit losses* | (5,533) | - |
|  | 1,101,025 | 5,188,947 |
| f) Due to related parties | 16,083,208 | 18,887,189 |

* During the year ended 31 December 2018, as a result of the adoption of IFRS 9, the Group recorded the provision for expected credit losses against due from related parties amounting to KD 5,533.

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Consolidated statement of profit or loss: |  |  |
| • Share of results of associates (Note 8) | 3,456,784 | 3,879,207 |
| • Rental income – revenues | 1,027,500 | 1,327,500 |
| • Rental expenses – cost of revenues | 1,380,150 | 1,380,150 |
| • Key management compensation | 199,945 | 292,089 |
| • BOD remuneration (Note 27) | 104,000 | 83,000 |

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 15. Trade and other receivables

Movement in the provision for doubtful debts

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Trade receivables | 20,133,976 | 25,948,196 |
| Allowance for expected credit losses | (9,577,967) | (8,565,530) |
|  | 10,556,009 | 17,382,666 |
| Prepayments and advances to suppliers | 6,318,118 | 5,820,618 |
| Refundable deposits | 2,646,099 | 1,908,770 |
| Staff receivables | 981,861 | 1,371,067 |
| Other receivables | 2,111,265 | 2,024,382 |
|  | 22,613,352 | 28,507,503 |

Trade receivables are non-interest bearing generally due within 90 days. Unimpaired receivables are expected on the basis of past experience to be fully recoverable. It is not the practice of the Group to obtain collateral over receivables.

Movement in the allowance for expected credit losses is as follows:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Balance at beginning of the year | 8,565,530 | 8,474,460 |
| Impact on adoption of IFRS 9 (Note -4c-A) | 1,011,169 | - |
| Provision for expected credit losses charged during the year | 152,943 | 95,868 |
| Foreign currency translation differences | 1,059 | (4,798) |
| Written off during the year | (152,734) | - |
|  | 9,577,967 | 8,565,530 |

Disclosures relating to the credit risk exposures and analysis relating to the allowance for expected credit losses are set forth in Note 30.2.

## 16. Financial assets at fair value through profit or loss

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Unquoted equity securities | 17,824,656 | 18,058,978 |

Unquoted foreign equity security represents an investment stake of 19% in Gulf Stevedoring Contracting Company W.L.L., Saudi Arabia ("GSCC") in which the Group has no significant influence. The fair value was determined by an independent evaluator at 31 December 2018, using the fair value measurements derived from valuation techniques which include inputs for the asset that are not based on observable market date (unobservable inputs) classified in level 3 fair value hierarchy (Note 31).

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 17. Bank Balances and Cash

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Bank balances | 1,690,825 | 883,338 |
| Cash in hand | 1,859,564 | 414,425 |
|  | 3,550,389 | 1,297,763 |

## 18. Share capital

The authorized, issued and fully paid-up share capital amount to KD 27,748,666 divided into 277,486,663 shares of fils 100 (2017: KD 27,748,666 divided into 277,486,663 shares of fils 100). All shares are of cash nature.
On 22 August 2017, the Extraordinary General Assembly meeting was held, which approved the increase of share capital from KD 26,427,300 to be KD 27,748,666 by an amount of KD 1,321,366 through issuance of bonus shares at 5% of share capital. This increase has been authenticated by the Capital Market Authority and Ministerial memo no. 2/9 dated 6 September 2017.

## 19. Share Premium

The share premium account is not available for distribution.

## 20. Statutory Reserve

As required by the Companies' Law, as amended, and the Parent Company's Articles of Association, as amended, at least 10% of the profit for the year attributable to shareholders of the Parent Company before contribution to Kuwait Foundation for the Advancement of Sciences, National Labour Support Tax, Zakat and Board of Directors' remuneration is transferred per annum to statutory reserve as per a resolution issued by the Parent Company's Ordinary General Assembly. Such Transfer may be discontinued as per a resolution issued by the Company's ordinary General Assembly when the reserve exceeds 50% of the share capital. This reserve is not available for distribution except in cases stipulated by Law and the Parent Company's Articles of Association.

## 21. Voluntary Reserve

As required by the Companies' Law, as amended, and the Parent Company's Articles of Association, as amended, no more than 10% of the profit for the year attributable to shareholders of the Parent Company before contribution to Kuwait Foundation for the Advancement of Sciences, National Labour Support Tax, Zakat and Board of Directors' remuneration may be deducted per annum, as per a resolution issued by the Parent Company's Ordinary General Assembly, in order to form voluntary reserve, which is allocated for the purposes specified by the assembly.

## 22. Treasury Shares

|  | 2018 | 2017 |
|---|---|---|
| Number of shares | 1,985,489 | 231,207 |
| Percentage of issued shares | 0.72% | 0.08% |
| Cost (KD) | 181,083 | 14,928 |
| Market value (KD) | 190,011 | 15,094 |

Reserves of the Parent Company equivalent to the cost of treasury shares have been earmarked as non-distributable.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 23. Term Loans

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Non-current portion | 62,304,741 | 61,108,604 |
| Current portion | 11,330,943 | 14,537,009 |
|  | 73,635,684 | 75,645,613 |

The effective interest rate on term loans ranges from 1.5 % to 3.5% (2017: 1.5% to 3.5%) per annum over bank discount rate. These term loans are granted by local and foreign financial institutions and are secured by certain property, plant and equipment, certain investment in associates and investment properties (see Note 7, 8 and 10).

## 24. Trade and Other Payables

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Trade payables | 12,329,322 | 17,000,892 |
| Accrued expenses | 3,576,197 | 3,714,654 |
| Provision for staff leave | 908,904 | 923,836 |
| NLST payable | 56,465 | 290,219 |
| Zakat Payable | 257,639 | 247,267 |
| KFAS payable | 410,353 | 308,140 |
| Due to employees | 1,121,925 | 1,269,278 |
| Others | 437,118 | 1,481,613 |
|  | 19,097,923 | 25,235,899 |
| Non-current trade payables | 7,791,384 | 5,425,749 |
|  | 26,889,307 | 30,661,648 |

Liabilities classification between current and non-current is based on the estimated settlement of trade payables taking into consideration contractual agreement and understandings with payable parties.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 25. Revenues

| December 31,2017 | For the year ended 31 December 2018 | | | | |
|---|---|---|---|---|---|
| | Transportation | Others | Sub-total | Lease | Total revenue |
| | | KD | KD | KD | KD |
| Passengers and heavy transportation | 47,388,345 | - | 47,388,345 | - | 47,388,345 |
| Sale of used vehicles and others | - | 8,253,870 | 8,253,870 | - | 8,253,870 |
| Total revenue from contracts with customers | **47,388,345** | **8,253,870** | **55,642,215** | **-** | **55,642,215** |
| | | | | | |
| Lease revenue | | | | | |
| Leasing of property and equipment | - | - | - | 9,741,946 | 9,741,946 |
| Total revenue | **47,388,345** | **8,253,870** | **55,642,215** | **9,741,946** | **55,642,215** |
| | | | | | |
| Geographical markets | | | | | |
| Kuwait | 44,084,914 | 8,253,870 | 52,338,784 | - | 52,338,784 |
| UAE | 3,303,431 | - | 3,303,431 | - | 3,303,431 |
| Total revenue from contracts with customers | **47,388,345** | **8,253,870** | **55,642,215** | **-** | **55,642,215** |
| | | | | | |
| Timing of revenue recognition | | | | | |
| Services transferred at a point in time | 47,388,345 | - | 47,388,345 | - | 47,388,345 |
| Goods transferred at a point in time | - | 8,253,870 | 8,253,870 | - | 8,253,870 |
| Total revenue from contracts with customers | **47,388,345** | **8,253,870** | **55,642,215** | **-** | **55,642,215** |

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 25. Revenues (Continued)

| December 31,2017 | For the year ended 31 December 2017 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Transportation | Others | Sub-total | Lease | Total revenue |
| | | KD | KD | KD | KD |
| Passengers and heavy transportation | 52,358,978 | - | 52,358,978 | - | 52,358,978 |
| Sale of used vehicles and others | - | 4,553,600 | 4,553,600 | - | 4,553,600 |
| Total revenue from contracts with customers | **52,358,978** | **4,553,600** | **56,912,578** | **-** | **56,912,578** |
| Lease revenue | | | | | |
| Leasing of property and equipment | - | - | - | 7,902,066 | 7,902,066 |
| Total revenue | **52,358,978** | **4,553,600** | **56,912,578** | **7,902,066** | **64,814,644** |
| Geographical markets | | | | | |
| Kuwait | 49,088,012 | 4,553,600 | 53,641,612 | - | 53,641,612 |
| UAE | 3,270,966 | - | 3,270,966 | - | 3,270,966 |
| Total revenue from contracts with customers | **52,358,978** | **4,553,600** | **56,912,578** | **-** | **56,912,578** |
| Timing of revenue recognition | | | | | |
| Services transferred at a point in time | 52,358,978 | - | 52,358,978 | - | 52,358,978 |
| Goods transferred at a point in time | - | 4,553,600 | 4,553,600 | - | 4,553,600 |
| Total revenue from contracts with customers | **52,358,978** | **4,553,600** | **56,912,578** | **-** | **56,912,578** |

The Group recognised provision for expected credit losses on trade receivables included in the consolidated statement of profit or loss amounting to KD 152,943 for the year ended 31 December 2018 (2017: KD 95,868) (Note 15).

**Contract balances**

| | 2018 | 2017 |
| --- | --- | --- |
| | KD | KD |
| Contract liabilities | 2,222,407 | - |

The contract liabilities in 2018 represent advances received from customers during the year to render transportation services to customers. In addition, contract liabilities include KD 2,000,000 advance payments received from customers during the year to sell and deliver them used vehicles.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 26. General and administrative expenses

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Staff costs | 3,958,194 | 4,207,388 |
| Rent | 2,461,839 | 2,481,386 |
| Professional and consultancy fees | 1,676,441 | 1,266,269 |
| Marketing, selling and distribution expenses | 620,593 | 336,125 |
| Depreciation (Note 7) | 168,480 | 175,993 |
| Vehicle and equipment maintenance | 23,319 | 326,744 |
| Others | 737,647 | 741,999 |
|  | 9,646,513 | 9,535,904 |

## 27.  Deductions

a)  Zakat

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Parent Company |  | 107,241 |
| Subsidiaries | 113,626 | 103,373 |
|  | 113,626 | 210,614 |

b)   Kuwait Foundation for Advancement of Sciences

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Parent Company | - | 88,968 |
| Subsidiaries | 102,213 | 100,578 |
|  | 102,213 | 189,546 |

c)   National Labour Support Tax

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Subsidiaries | 52,614 | 217,799 |
|  | 52,614 | 217,799 |

d)   Board of directors remuneration

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Parent Company | 75,000 | 54,000 |
| Subsidiaries | 29,000 | 29,000 |
|  | 104,000 | 83,000 |

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 28. Earnings per share attributable to Equity Holders of The Parent Company

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Earnings per share is calculated as follows: |  |  |
| Profit for the year attributable to equity holders of the Parent Company (KD) | 3,452,349 | 10,786,448 |
| Number of shares outstanding: |  |  |
| Weighted average number of paid up shares excluding treasury shares | 277,131,431 | 277,252,749 |
| Earnings per share attributable to equity holders of the Parent Company (basic and diluted) (fils) | 12.46 | 38.90 |

The earnings per share have been recalculated to reflect the bonus shares.

## 29. Segment reporting

The Group identifies its operating segments on the basis of internal reports about components of the Group that are regularly reviewed by the chief operating decision maker in order to assess its performance. Financial information about the operating segments as follows:

| 31 December 2018 | Transportation | Lease | Others | Total |
|---|---|---|---|---|
|  | KD | KD | KD | KD |
| Segment revenues | 47,388,345 | 9,741,946 | 8,253,870 | 65,384,161 |
| Segment cost of revenues | (34,469,429) | (7,819,215) | (9,475,071) | (51,763,715) |
| Segment results | 12,918,916 | 1,922,731 | (1,221,201) | 13,620,446 |
| Unallocated income | 106,130 | 5,884 | 4,221,399 | 4,333,413 |
| Unallocated expenses | (3,721,533) | (1,220,036) | (9,559,941) | (14,501,510) |
| Profit/(loss) for the year | 9,303,513 | 708,579 | (6,559,743) | 3,452,349 |
| Segment assets and liabilities |  |  |  |  |
| Segment assets | 74,958,663 | 38,607,596 | 75,285,016 | 188,851,275 |
| Segment liabilities | 37,930,046 | 29,201,893 | 55,934,283 | 123,066,222 |
| Other information |  |  |  |  |
| Purchases of property, plant and equipment | 7,099,114 | 4,736,368 | 2,112,950 | 13,948,432 |
| Depreciation of property, plant and equipment | 3,067,147 | 2,763,809 | 415,265 | 6,246,221 |
| (Gain)/loss on disposal of property, plant and equipment | (35,378) | 529,438 | - | (494,060) |
| Impairment of property, plant and equipment | 595,526 | - | - | 595,526 |

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 29.  Segment reporting (Continued)

| 31 December 2017 | Transportation | Lease | Others | Total |
|---|---|---|---|---|
| | KD | KD | KD | KD |
| Segment revenues | 52,358,978 | 7,902,066 | 4,553,600 | 64,814,644 |
| Segment cost of revenues | (39,393,172) | (9,062,801) | (3,646,362) | (52,102,335) |
| Segment results | 12,965,806 | (1,160,735) | 907,238 | 12,712,309 |
| Unallocated income | 107,981 | 5,967 | 22,549,916 | 22,663,864 |
| Unallocated expenses | (3,938,833) | (3,450,869) | (17,200,023) | (24,589,725) |
| Profit/(loss) for the year | 9,134,954 | (4,605,637) | 6,257,131 | 10,786,448 |
| | | | | |
| Segment assets and liabilities | | | | |
| Segment assets | 70,067,840 | 42,731,898 | 85,173,888 | 197,973,626 |
| Segment liabilities | 45,453,173 | 33,671,360 | 49,896,801 | 129,021,334 |
| Other information | | | | |
| Purchases of property, plant and equipment | 6,240,469 | 21,446,520 | 826,971 | 28,513,960 |
| Depreciation of property, plant and equipment | 2,441,321 | 2,914,788 | 289,218 | 5,645,327 |
| Loss on disposal of property, plant and equipment | 314,558 | 369,805 | 1,250,000 | 1,934,363 |
| Impairment of property, plant and equipment | 2,194,978 | 3,514,477 | – | 5,709,455 |

## 30.  Financial risk and capital management

The Group's activities expose it to variety of financial risks: e.g. market risk (i.e. foreign currency risk, interest rate risk and equity price risk), credit risk and liquidity risk. The Group management policies for reducing each of the risks are discussed below. The Group does not use derivative financial instruments based on future speculations.

**Significant accounting policies**
Details of the significant accounting policies and methods adopted, including the criteria for recognition, the basis of measurement and the basis on which income and expenses are recognised, in respect of each class of financial asset and financial liability are disclosed in Note 5 to the consolidated financial statements.

**30.1  Market risk**
Market risk is the risk that the fair value or future cash flows of financial instrument will fluctuate because of changes in market prices. Market risk comprises of, foreign currency risk, interest rate risk and equity price risk.

**a)  Foreign currency risk**
Foreign currency risk is the risk that the value of a financial instrument will fluctuate due to changes in foreign exchange rates. The Group undertakes certain transactions denominated in foreign currencies. Hence, exposures to exchange rate fluctuations arise. Exchange rate exposures are managed within established limits.

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 30.  Financial risk and capital management (Continued)

**30.1  Market risk (Continued)**
**a)  Foreign currency risk (Continued)**
The effect on profit and equity (due to change in fair value of assets and liabilities) as a result of change in currency rate estimated by management at (±) 5% (2017: (±) 5%), with all other variables held constant is shown below:

|  | Effect on equity | | (Effect on profit/(loss before deduction | |
|---|---|---|---|---|
|  | **2018** | 2017 | **2018** | 2017 |
|  | **KD** | KD | **KD** | KD |
| USA Dollars | – | – | **(±) 72,998** | (±) 312,963 |
| UAE Dirhams | **(±) 56,283** | (±) 116,760 | – | – |
| Qatar Riyals | **(±) (2,323)** | (±) (1,287) | – | – |
| Saudi Riyals | – | – | **(±) 891,233** | (±) 902,949 |
| Sudan Pounds | **(±) 8,618** | (±) 65,659 | – | – |

**(b)  Interest rate risk**
Interest rate risk is the risk that the value of a financial instrument will fluctuate due to changes in market interest rates. Financial instruments, which potentially subject the Group to interest rate risk, consist primarily of term loans.

The following table demonstrates the sensitivity of the consolidated statement of profit or loss to reasonably possible changes in interest rates, with all other variables held constant.

The sensitivity of the consolidated statement of profit or loss is the effect of the assumed changes in interest rates on the Group's profit before KFAS, NLST, Zakat and Directors' remuneration for one year, based on the floating rate financial liabilities held at 31 December 2018

|  | 31 December 2018 | | December 2017 31 | |
|---|---|---|---|---|
|  | / Increase decrease) in) basis points | Effect on profit for the year | / Increase decrease) in) basis points | Effect on profit for the year |
|  | **KD** | KD | **KD** | KD |
| KD 70,085,295 | **(±) %0.25** | (±) 9,531 | - | - |
| KD 74,347,850 | - | - | **(±) %0.25** | (±) 8,751 |

**(c)  Equity price risk**
Equity price risk is the risk that the value of financial instruments will fluctuate as a result of changes in equity prices. Financial instruments, which potentially subject the Group to market risk, consist principally of investments at financial assets at FVOCI and fair value through profit or loss. The Group manages this risk by diversifying its investments on the basis of the pre- determined asset allocations across various categories, continuous appraisal of market conditions and trends and management estimate of long and short term changes in fair value.
The following table demonstrates the sensitivity of the changes in fair value to reasonably possible changes in equity prices, with all other variables held constant. The estimated change in equity prices is determined at (±) 5% (2017: (±) 5%).

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 30.  Financial risk and capital management (Continued)

**30.1   Market risk (Continued)**
**(c)  Equity price risk (Continued)**

|  | Effect on other comprehensive income / (loss) | | Effect on profit or loss before deduction | |
|---|---|---|---|---|
|  | **2018** | 2017 | **2018** | 2017 |
|  | **KD** | KD | **KD** | KD |
| Financial assets at fair value through other comprehensive income ("FVOCI") | 6,274 | - | - | - |
| Financial assets available for sale | - | 72,439 | - | - |
| Financial assets at fair value through profit or loss ("FVPL") | - | - | 891,233 | 902,949 |

**30.2   Credit risk**
Credit risk is the risk that one party to a financial instrument will fail to discharge a contractual obligation causing the other party to incur a financial loss. Financial assets which potentially subject the Group to credit risk consist principally of due from related parties, trade and other receivables and bank balances.

*Trade receivables*
The Group applies the IFRS 9 simplified model of recognizing lifetime expected credit losses for all trade receivables as these items do not have a significant financing component. In measuring the expected credit losses, trade receivables have been assessed on a collective basis and grouped based on shared credit risk characteristics and the days past due.
The expected loss rates are based on the payment profile for sales over the past 48 months or ageing profile of customers over the past 1 to 2 years before 31 December 2018 and 1 January 2018 respectively as well as the corresponding historical credit losses during that period. The historical rates are adjusted to reflect current and forwarding looking macroeconomic factors affecting the customer's ability to settle the amount outstanding. However given the short period exposed to credit risk, the impact of these macroeconomic factors has not been considered significant within the reporting period.

Set out below is the information about the credit risk exposure on the Group's trade receivables using a provision matrix

| 31 December 2018 | 0-90 days | 91-180 days | 181-365 days | Above 365 days | Total |
|---|---|---|---|---|---|
|  | KD | KD | KD |  | KD |
| Expected credit loss rate (%) | 9.80% | 16.88% | 17.26% | 75.07% |  |
| Gross carrying amount | 6,564,111 | 1,040,245 | 1,119,881 | 11,409,739 | 20,133,976 |
| Expected credit losses | 643,582 | 175,613 | 193,242 | 8,565,530 | 9,577,967 |

| 31 December 2017 | 0-90 days | 91-180 days | 181-365 days | Above 365 days | Total |
|---|---|---|---|---|---|
|  | KD | KD | KD |  | KD |
| Expected credit loss rate (%) | 0.38% | 1.52% | 4.91% | 84.71% |  |
| Gross carrying amount | 14,249,205 | 1,368,630 | 326,004 | 10,004,357 | 25,948,196 |
| Expected credit losses | 54,294 | 20,780 | 15,996 | 8,474,460 | 8,565,530 |

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 30. Financial risk and capital management (Continued)

**30.2   Credit risk (Continued)**
Trade receivables are written off (i.e. derecognized) when there is no reasonable expectation of recovery. Failure to make payments within 365 days from the invoice date and failure to engage with the Group on alternative payment arrangement among others is considered indicators of no reasonable expectation of recovery and therefore is considered as credit impaired.

*Financial instruments and cash and bank balances*
The Group's bank balances measured at amortised cost are considered to have a low credit risk and the loss allowance is based on the 12 months expected loss. The Group's bank balances are placed with high credit rating financial institutions with no recent history of default. Based on management's assessment, the expected credit loss impact arising from such financial assets are insignificant to the Group as the risk of default has not increased significantly since initial recognition.

The Group's maximum exposure arising from default of the counter-party is limited to the carrying amount of due from related parties, trade and other receivables (excluding prepayments and advances) and bank balances.

*Maximum exposure to credit risk*
The carrying amount of financial assets represents the maximum credit exposure. The maximum net exposure to credit risk by class of assets at the reporting date is as follows:

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Due from related parties (Note 14) | 1,101,025 | 5,188,947 |
| Trade and other receivables (excluding prepayments and advance to suppliers) (Note 15) | 16,295,234 | 22,686,885 |
| Bank balances (Note 17) | 1,690,825 | 883,338 |
|  | 19,087,084 | 28,759,170 |

**Geographic concentration of maximum exposure to credit risk**
The maximum exposure to credit risk for financial assets at the reporting date by geographical region and industry wise sector as follows:

| | Gulf Cooperation Council ("GCC") | |
|---|---|---|
|  | 2018 | 2017 |
|  | KD | KD |
| Due from related parties (Note 14) | 1,101,025 | 5,188,947 |
| Trade and other receivables (excluding prepayments and advance to suppliers) (Note 15) | 16,295,234 | 22,686,885 |
| Bank balances (Note 17) | 1,690,825 | 883,338 |
|  | 19,087,084 | 28,759,170 |

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| *Industry sector:* |  |  |
| Corporates | 7,815,146 | 19,282,444 |
| Government | 9,581,113 | 8,593,388 |
| Banks and financial institutions | 1,690,825 | 883,338 |
|  | 19,087,084 | 28,759,170 |

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 30. Financial risk and capital management (Continued)

### 30.3 Liquidity risk

Liquidity risk is the risk that the Group will be unable to meet its liabilities when they fall due. To limit this risk, management has arranged diversified funding sources, manages assets with liquidity in mind, and monitors liquidity on a daily basis.

Ultimate responsibility for liquidity risk management rests with the Board of Directors, which has built an appropriate liquidity risk management framework for the management of the Group's short, medium and long-term funding and liquidity management requirements. The Group manages liquidity risk by maintaining adequate reserves, banking facilities and reserve borrowing facilities, by continuously monitoring forecast and actual cash flows and matching the maturity profiles of financial assets and liabilities.

The table below analyses the Group's non-derivative financial liabilities based on the remaining period at the financial position to the contractual maturity date. The amounts disclosed in the table are the contractual undiscounted cash flows.

| At 31 December 2018 | Less than year 1 | Between 1 and 2 years | Between 2 and 5 years | Over 5 years |
|---|---|---|---|---|
| | KD | KD | KD | KD |
| Term loans | 14,588,919 | 24,626,497 | 42,022,185 | 81,237,601 |
| Due to related parties | 16,083,208 | - | - | 16,083,208 |
| Trade and other payables | 19,097,923 | - | 7,791,384 | 26,889,307 |
| Contract liabilities | 2,222,407 | - | - | 2,222,407 |

| At 31 December 2017 | Less than year 1 | Between 1 and 2 years | Between 2 and 5 years | Over 5 years |
|---|---|---|---|---|
| | KD | KD | KD | KD |
| Term loans | 14,537,009 | 16,784,381 | 50,355,584 | 81,676,974 |
| Due to related parties | 18,887,189 | - | - | 18,887,189 |
| Trade and other payables | 24,878,668 | - | 5,425,749 | 30,304,417 |

### 30.4 Capital risk management

The Group's objectives when managing capital is to safeguard the Group's ability to continue as a going concern, through the optimisation of the debt and equity balance so that it can continue to provide an adequate return to shareholders and benefits for other stakeholders and provide adequate return to shareholders by pricing products and services commensurately with the level of risk.

The Group manages the capital structure and makes adjustments to it in the light of changes in economic conditions and the risk characteristics of the underlying assets. In order to maintain or adjust the capital structure, the Group may adjust the amount of dividends paid to shareholders, return capital to shareholders, issue new shares, borrow funds, or sell assets to reduce debt. No changes were made in the objectives, policies or processes during the year ended 31 December 2018.

Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 31.    Fair Values of Financial Instruments

The fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.
In the opinion of the Group's management, the estimated fair value of financial assets and liabilities are not materially different from their carrying values.

The following table provides an analysis of financial instruments that are measured subsequent to initial recognition at fair value, grouped into Levels 1 to 3 based on the degree to which the fair value is observable.

- Level 1: inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the entity can access at the measurement date.
- Level 2: inputs are inputs other than quoted prices included within level 1 that are observable for the asset or liability, either directly or indirectly.
- Level 3: inputs are those derived from valuation techniques that include inputs for the asset or liability that are not based on observable market data (unobservable inputs).

The level within which the financial asset is classified is determined based on the lowest level of significant input to the fair value measurement.
The financial assets measured at fair value in the consolidated statement of financial position are grouped into the fair value hierarchy as follows:

| 31 December  2018 | Level 3 | Total |
|---|---|---|
| | KD | KD |
| **Financial assets at fair value through other comprehensive income ("FVOCI")** | | |
| Unquoted equity securities | 84,113 | 84,113 |
| **Financial assets at fair value through profit or loss ("FVPL")** | | |
| Unquoted equity securities | 17,824,656 | 17,824,656 |
| | 17,908,769 | 17,908,769 |

| 31 December  2017 | Level 3 | Total |
|---|---|---|
| | KD | KD |
| **Financial assets at fair value through other comprehensive income ("FVOCI")** | | |
| Unquoted equity securities | 1,448,780 | 1,448,780 |
| **Financial assets at fair value through profit or loss ("FVPL")** | | |
| Unquoted equity securities | 18,058,978 | 18,058,978 |
| | 19,507,758 | 19,507,758 |

## 32.    Annual General Assembly

The Annual Ordinary General Assembly of the shareholders of the Parent Company held on 26 July 2018 approved the following:

- The consolidated financial statements of the Group for the financial year ended 31 December 2017.
- Payment of cash dividends of 5% equivalent to 5 fils per share on outstanding shares excluding treasury shares amounting to KD 1,386,264 (2016: Nil) and bonus shares of Nil (2016: 13,213,650 shares representing 5% of the outstanding shares as at 31  December 2016) distributable to the shareholders of the Parent Company's record as of the date of the Annual General Assembly meeting.
- KD 54,000 as a remuneration to be paid to the Board of Directors for the financial year ended 31 December 2017 (2016: KD 45,500).

**Kuwait and Gulf Link Transport Company K.P.S.C. and its Subsidiaries**
Kuwait
Notes to the Consolidated Financial Statements
For the year ended 31 December 2018

## 33.    Board of Directors Proposals

The Board of Directors in their meeting held on 31 March 2019 proposed bonus shares of 5 % amounting to KD 1,387,433 (2017: Nil) for the year ended 31 December 2018, and to distribute directors remuneration of KD 75,000 (2017: KD 54,000) which is subject to approval of the shareholders Annual General Assembly.

## 34.    Contingent Liabilities

|  | 2018 | 2017 |
|---|---|---|
|  | KD | KD |
| Letters of guarantee | 6,971,900 | 6,911,759 |
| Letter of credit |  | 2,551,938 |

The Group has several legal cases in progress for which management believes that none of them will have a material impact on the consolidated        financial statements taken as a whole. One of the major cases is where the Parent Company has evacuated the land of Doha port area based on the judgement issued by the Court of First Instance, advocated by the Court of Appeal, in favor of Kuwait Ports Authority ("KPA"). There is insignificant impact, in this regard, on the Group's consolidated financial position.

## 35.    Comparative Figures

Certain comparative information have been reclassified to conform to the current year's presentation. Such reclassification did not affect previously reported consolidated profit or loss, consolidated equity or opening balances of the earliest comparative period presented and accordingly a third consolidated statement of financial position is not presented.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 25 2019 ★

BROOKLYN OFFICE

DeARCY HALL,

# Exhibit C

# PORT FOCUS: KUWAIT

**54**<sup>th</sup> LARGEST MARITIME COUNTRY IN THE WORLD

with **499** km OF COASTLINE

**1,277,674 TEU** OF CARGO TRAFFIC RECORDED IN 2014

**5%** **INCREASE** IN CONTAINER HANDLING YEAR ON YEAR FY 2014

Port of Shuwaikh
Port of Kuwait

Mina Al Ahmadi (petroleum port)
Port of Shuaiba
Mina Abdulla

# PORT OPERATORS

**Shuwaikh:** Kuwait Port Authority
**Shuaiba:** Kuwait National Petroleum Company
KGL Ports International (KGL PI) - container terminals and Roll-On-Roll-Off (RORO) operations
**Mina Al Ahmadi:** Kuwait National Petroleum Company
**Mina Abdulla:** Kuwait National Petroleum Company

Total Value Re-export ($US)
## $1,861,491,559

# TOP TRADE PARTNERS

**EXPORT DESTINATIONS:**
South Korea ($15.3B)
India ($13.8B)
Japan ($11.1B)
United States ($10.1B)
China ($9.3B)

**IMPORT ORIGINS:**
China ($4.46B)
United States ($3.82B)
United Arab Emirates ($2.9B)
Japan ($2.19B)
South Korea ($2.07B)





# MAJOR EXPORTS

| | |
|---|---|
| ● Crude Petroleum | $57.5B |
| ● Refined Petroleum | $17.7B |
| ○ Petroleum Gas | $3.4B |
| ● Cyclic Hydrocarbons | $1.63B |
| ○ Acyclic Alcohols | $1.16B |
| Other | $6.01B |
| **Total Export Value** | **$87.4B** |

# MAJOR IMPORTS

| | |
|---|---|
| ● Cars | $3.8B |
| ● Refined Petroleum | $0.932B |
| ○ Petroleum Gas | $0.876B |
| ● Broadcasting Equipment | $0.864B |
| ○ Passenger & Cargo Ships | $0.856B |
| Other | $27.272B |
| **Total Import Value** | **$34.6B** |











**SOAS**
University of London


E·S·R·C
ECONOMIC & SOCIAL RESEARCH COUNCIL

Ports.com
World Bank
CIA World Factbook
MIT Observatory of Economic Complexity
UNCTAD

# Exhibit D

EXCLUSIVE

# Inside the Cutthroat World of Billion-Dollar Military Supply Contracts

A U.S. military vendor created a "ghost structure" to do business with Iran, yet the dollars keep rolling in.

BY ADAM ZAGORIN | MAY 7, 2018, 1:01 PM

T he U.S. Government Accountability Office is expected to rule soon on a disputed contract worth more than a billion dollars to supply food to American forces in the Middle East.

The big-dollar decision will mark the most recent twist in a battle over giant U.S. military logistics deals dating back nearly a decade, and includes allegations of sanctions busting, corruption, and fraud. The ruling could also prove troublesome for the Defense Department, which for years has faced criticism over its contracts with Gulf-owned logistics companies the military has used to feed deployed troops.

The latest controversy involves a contract from January of this year, when the Pentagon's Defense Logistics Agency awarded $1.38 billion for food supplies to a subsidiary of the behemoth Kuwait and Gulf Link Transport, or KGL, long a logistics linchpin for American forces in the region. Yet the award came just weeks after a top KGL lawyer acknowledged to a U.S. court that the firm had years earlier set up a "ghost structure," i.e., a company that existed in name only, as a go-between for a joint venture it had with a U.S.-sanctioned Iranian partner.

The award was also announced as two of the company's recently resigned top executives sat in a Kuwaiti jail. On Sunday, those two executives, Saed Dashti and Marsha Lazareva, were sentenced in a Kuwaiti court to 15 and 10 years in prison, respectively.

The contract has also attracted congressional attention. Shortly after the January award, Marco Rubio, the Republican senator from Florida, called on the Office of

By using this website, you agree to our use of cookies. This use includes personalization of content and ads, and traffic analytics. Review our Privacy Policy for more information.

KGL's business. A copy of Rubio's letter was obtained by the Project On Government Oversight.

In the cutthroat competition to win lucrative U.S. government business, KGL and its rivals sometimes operate on the edge of the law. But as America considers further sanctions against Iran and termination of the Obama-era nuclear pact, KGL's recent acknowledgements in testimony point to deeper problems with U.S. military contractors in the Middle East and have heightened concern in Congress.

The recent Iranian revelation isn't the first time KGL has been caught up in controversy. All told, reports of KGL's illicit ties to Iran go back years and set off a multiyear investigation by the FBI and the Pentagon's Defense Criminal Investigative Service. That joint probe appears to date back at least to 2011.

Neither agency has issued any public statement concerning the outcome or whether it remains ongoing.

The allegations revolve around KGL's relationship with the Islamic Republic of Iran Shipping Lines, known as IRISL, and affiliates, such as Valfajr, which were hit with U.S. sanctions in September 2008 for aiding Tehran's nuclear weapons and missile programs.

In 2011, the Manhattan district attorney indicted a key IRISL executive, Mohammad Moghaddami Fard, for money laundering, records falsification, and other crimes, though he never stood trial. That same year, leaked emails revealed links between Fard and senior KGL executives demonstrating that he had helped run KGL's joint ventures.

In response to questions about its Iran ties from the Pentagon, members of Congress, and a sanctions watchdog group, KGL said the allegations were part of a smear campaign and publicly declared that it had severed all business links to sanctioned entities.

At various points in 2011, Ash Carter, then an undersecretary of defense, and later secretary of defense, wrote to members of Congress from both parties saying there was "no indication that KGL Holding has violated U.S. law." KGL has consistently said the same thing.

IRISL and its subsidiaries remained sanctioned until March 2016, when the restrictions were lifted as part of the U.S.-Iran nuclear deal.

By using this website, you agree to our use of cookies. This use includes personalization of content and ads, and traffic analytics. Review our Privacy Policy for more information.

But KGL has continued to face questions, as in May 2016, when Fuad Dashti — a significant KGL shareholder and brother of its chairman — was arrested at San Francisco International Airport and charged with trying to transfer airplane parts to Iran. When he was brought to Washington for FBI interrogation, the U.S. government quietly allowed him to slip out of the country in the waning days of the Obama administration.

The Justice Department never publicly commented on the case, and a KGL lawyer said at the time that Dashti's alleged conduct was unrelated to company business.

Last year, KGL also ran afoul of authorities in Kuwait, which "blacklisted" the firm from using port or warehouse facilities that could be critical to carrying out U.S. military contracts.

---

## Last year, KGL also ran afoul of authorities in Kuwait, which "blacklisted" the firm from using port or warehouse facilities that could be critical to carrying out U.S. military contracts.

KGL is contesting the move and seeking reinstatement.

The blacklisting accompanied criminal charges against top KGL officials relating to fraud, embezzlement of government funds, the submission of false invoices, destruction of documents, and other crimes. The charges led Saed Dashti, the chairman and key member of KGL's controlling family, to step down, although he remains a large shareholder.

Yet KGL's legal issues in 2017 didn't end there.

Allegations of KGL's past business with sanctioned Iranian entities recently got a new lease on life, according to previously unreported court documents obtained by the Project On Government Oversight.

In December 2017, KGL's top lawyer — listed as Ahmed Afify Mahoud in court records — testified as part of a long-running defamation case in Pennsylvania between KGL and one of its rivals, Agility Defense & Government Services. (Agility was blocked from winning new U.S. federal contracts from 2009 until spring 2017, when criminal and civil fraud charges were resolved.)

By using this website, you agree to our use of cookies. This use includes personalization of content and ads, and traffic analytics. Review our **Privacy Policy** for more information.

The KGL lawyer agreed, in response to questioning by Agility's attorneys in the December deposition, that KGL had set up a "ghost structure." When asked about the purpose of the "ghost structure," the KGL lawyer affirmed that it was to create an intermediary that would relay communications to KGL's IRISL-affiliated joint venture partner, which fell under U.S. sanctions at the time.

KGL had previously reported ending one joint venture with Iran, but it apparently did not disclose the functioning of another. Indeed, KGL's lawyer agreed under questioning that the business continued to operate as a joint venture until at least April 2011 — well after sanctions had been imposed and its business ties with Iran were supposedly gone.

The lawyer also testified that the company, including its onetime chairman, Saed Dashti, were aware of U.S. sanctions and had made a decision to comply fully with them "as soon as possible." Yet commercial interests delayed termination of the joint company, the lawyer's testimony says.

By using this website, you agree to our use of cookies. This use includes personalization of content and ads, and traffic analytics. Review our Privacy Policy for more information.

Asked whether KGL's continued joint operation placed it in violation of U.S. sanctions, the lawyer did not answer directly, saying the matter would have to be decided by a court.

An attorney representing KGL did not reply to written questions for this article concerning the testimony of KGL's top lawyer.

Even as legal challenges to KGL multiplied, however, the company continued to score lucrative deals. The Pentagon awarded KGL its $1.38 billion food contract in mid-January. The day of the award, KGL's recently departed chairman and the other executive charged with felonies were still in a Kuwaiti jail awaiting trial. Both insisted upon their innocence.

On Jan. 16, Rubio wrote his letter asking the Pentagon's top watchdog, the Office of Inspector General, to investigate the company. Rubio, who is a member of the Senate Foreign Relations Committee, has been an advocate of sanctions targeting Iran, Venezuela, North Korea, and other countries.

So far, the Office of Inspector General has not formally replied to Rubio. A spokesman for the office offered no comment.

Rubio's letter, which cites the Project on Government Oversight's earlier reporting, asks the inspector general to probe whether KGL or its affiliates "have violated any U.S. sanctions imposed on the country of Iran," referencing "other allegations" associated with senior KGL executives, including deals with Iran.

Despite those concerns, on Feb. 28, KGL won another large contract, worth $550 million, this time for transportation services. At that point, Dashti and the second executive, Russian national Marsha Lazareva, had made bail set at roughly $10 million apiece.

Kuwait's blacklisting of KGL and the crimes of its two executives have also become the focus of a formal protest by a competitor against the award of the huge January food contract, according to unreported documents obtained by the Project On Government Oversight.

KGL's competitor Anham, another big logistics firm that has faced its own allegations concerning ties to Iran, is formally protesting the contract. Anham's protest alleges that KGL failed to disclose criminal charges leveled against its two executives. As recently as February, KGL filed an official U.S. "certification," checking a box telling the U.S. military in writing that none of its principals had been charged with or convicted of

By using this website, you agree to our use of cookies. This use includes personalization of content and ads, and traffic analytics. Review our Privacy Policy for more information.

crimes in the last three years including "embezzlement, theft, forgery, falsification or destruction of records."

Anham also alleges that KGL should have disclosed that the Kuwaiti government blacklisted the firm, which could block it from carrying out work called for in the contract.

A Washington lawyer retained by KGL declined to comment on the bid protest.

In response to concerns that KGL will be unable to execute its contractual obligations, Defense Logistics Agency spokesman Patrick Mackin wrote in an email that KGL's proposal for the food contract was evaluated based on price, technical capability, and past performance. The agency selected KGL as the winner because it represents the "best value to the government," he wrote.

Despite KGL's blacklisting, Mackin said the logistics agency continues to rely on KGL's assurances that it "maintains the capability to fully perform the requirements of the contract."

Mackin noted that regulations require awards to go only to companies deemed "responsible," a term covering integrity, business ethics, and other criteria. "DLA determined [the KGL subsidiary] to be a responsible contractor prior to the award of the contract," he said.

The logistics agency was aware of criminal allegations involving the parent company and some of its executives, he said, and the agency had "duly considered that information as part of its responsibility determination."

*This article was reported by the Project On Government Oversight (POGO), a nonpartisan watchdog group in Washington, D.C.*

**Adam Zagorin** is a journalist with the Project On Government Oversight.

TAGS: KUWAIT, MILITARY, PENTAGON

VIEW COMMENTS

By using this website, you agree to our use of cookies. This use includes personalization of content and ads, and traffic analytics. Review our **Privacy Policy** for more information.

KSA▾                                          🔍 ☰

# Kuwait's KPA blacklists KGL Logistics on violations



📅 03 December 2017 12:32 PM

**Mubasher:** Director General of Kuwait Ports Authority (KPA) Sheikh Yousef Abdullah Sabah issued a decree to blacklist KGL Logistics alongside its subsidiaries and associates.

The KPA's move was in response to the companies' violations, which were mentioned in the decree, according to the State Audit Bureau of Kuwait's report.

The blacklisted companies included KGL Logistics, KGL International for Ports, Warehousing and Transport (KGL IP), KGL Investment Company and Kuwait & Gulf Link Transport Co. (K.P.S.C.).

The decree prohibits KPA's dealing with the abovementioned companies. The blacklisted companies also were banned from

participating in KPA's public auctions, consultancy contracts, or other activities announced by Central Agency for Public Tenders.

Source: Mubasher

## Related News



UAE's Grandweld Shipyards launches 6th pilot boat for KOC

Companies Investments



LG develops world's 1st Arabic-supported AI televisions

Sector Reports



GCC ArabClicks targets 48m users to boost Egypt's e-commerce

Companies Investments



Kuwait's CMA awards market maker licence to KMEFIC

Banking and Finance

**0 Comments**

Sort by   Newest



Add a comment...

Facebook Comments Plugin

All Rights Reserved - Mubasher Info © 2005 - 2019

Terms of Service   Disclaimer   About Us   Contact Us   Advertise With Us   Decypha   IR Services   Jobs   Decypha packages

**Data is delayed 15 minutes during market session**
**This website is licensed by Saudi Arabia's Ministry of Culture and Information**
**Registration No. 1435 125 1 ث**





## Cassation court announces final verdict in favor of KGL Stevedoring & KGL Ports International

11/10/2017



*Mansour Abdal*

KUWAIT: The first administrative circuit of the Court of Cassation issued separate verdicts on the challenges Nos.1008, 1018/2016, 846/2017 Admin./1 in favor of KGL Stevedoring (KGL STV) and KGL Ports International (KGL PI). Lawyer Mansour Abdal praised the Kuwaiti Judiciary and said "The verdicts issued by the Court of Cassation ruled against the appeals filed by the Ministry of Communications (MOC) and the Kuwait Ports Authority (KPA) to the Court of Appeal, which ruled that the two of the largest companies competently operating in Shuwaikh and Shu'aiba ports, should continue to be registered as stevedoring contractors."

"The highest judicial authority in Kuwait upheld all the previous successive judgments, finalized the case completely before the MOC and KPA for both KGL STV and KGL PI, and adjudged, after confirmation of their payments of all due fees to the State, by their continuation as stevedoring contractors and by illegality and cancellation of the unreasoned or unjustified administrative orders that contradict with the law and stevedoring regulations, which were issued against the two companies under allegations of violations, breaches and derelictions. Such allegations were proven to be incorrect through the different levels of litigation. Those allegations had bad repercussions on the two companies and a negative impact on the daily business of the national commercial ports and misrepresentation of the public interest, all of which negatively impacted all sectors as discussed by the local media and followed up upon by the public over the past two years,"Abdal added.

Mansour expressed his hope that KPA will respect the issued verdicts to amend its position within the administration and acknowledge the continued registration of KGL STV and KGL PI as stevedoring contractors. In addition it should proceed to fairly compensate the aforementioned companies for their incurred losses due to the administration's actions. Also, they should withdraw their ongoing lawsuits to promote the public's interest in order to put an end to the accumulated false allegations regarding KGL STV and PI, the public and private sectors, shipping lines, merchants, and consumers; and to cease the continuing loss whether because of the massive compensations to be made by KPA after cancellation of its orders or continuation of delaying and suspending of the State's priceless facilities loss.

DeARCY HALL, J.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 2 5 2019 ★

BROOKLYN OFFICE

MISC 19 - 1638

# Exhibit E

### www.fpds.gov
### List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0001 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $25,500,000.00 |
| Date Signed: | Nov 26, 2013 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0001 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 0 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $2,996,505.71 |
| Date Signed: | Sep 19, 2014 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0001 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 1 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | Dec 12, 2013 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0001 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 1 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $2,500.00 |
| Date Signed: | Jan 27, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0001 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 2 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | Dec 12, 2013 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0001 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 2 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $5,117.52 |
| Date Signed: | Jun 4, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
### List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0001 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 3 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | Jul 1, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0001 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 4 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | Oct 6, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0001 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 5 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | -$806,011.86 |
| Date Signed: | Apr 18, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $1,325,689.00 |
| Date Signed: | Dec 10, 2014 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 0 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $4,715,498.41 |
| Date Signed: | Jul 20, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 10 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $500,000.00 |
| Date Signed: | Mar 27, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 11 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $500,000.00 |
| Date Signed: | Apr 24, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 12 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $5,000.00 |
| Date Signed: | May 30, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 13 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $2,511.46 |
| Date Signed: | Jul 3, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 14 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | Oct 18, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 15 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | -$858,109.33 |
| Date Signed: | Feb 23, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 1 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | Dec 16, 2014 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 1 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $48,000.00 |
| Date Signed: | Feb 9, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 2 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $708,014.00 |
| Date Signed: | Jun 29, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 2 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | May 4, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 3 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $387,353.00 |
| Date Signed: | Jun 29, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
### List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 3 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $500,000.00 |
| Date Signed: | May 24, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 4 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $176,259.00 |
| Date Signed: | Sep 4, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 4 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $5,000.00 |
| Date Signed: | Jul 7, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 5 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | Jul 25, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 6 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $4,356,963.37 |
| Date Signed: | Aug 11, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 7 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | Aug 17, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 8 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $600,000.00 |
| Date Signed: | Aug 26, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0002 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 9 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $5,000.00 |
| Date Signed: | Dec 13, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

**www.fpds.gov**
**List of contracts matching your search criteria**

| | | | |
|---|---|---|---|
| Contract ID: | 0003 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 0 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $2,000,000.00 |
| Date Signed: | Sep 12, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0003 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 1 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $81,600.00 |
| Date Signed: | Sep 25, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

**www.fpds.gov**
**List of contracts matching your search criteria**

| | | | |
|---|---|---|---|
| Contract ID: | 0003 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 2 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $5,000.00 |
| Date Signed: | Nov 2, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0003 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 3 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | Jan 17, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0003 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 4 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $200,000.00 |
| Date Signed: | Jan 25, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0003 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 5 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $1,060,000.00 |
| Date Signed: | Feb 8, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0003 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 6 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $350,000.00 |
| Date Signed: | May 9, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 0003 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 7 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $1,600,000.00 |
| Date Signed: | May 22, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 0003 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 8 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | Sep 10, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 9506 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $1,454,446.47 |
| Date Signed: | May 9, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 9507 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $107,487.52 |
| Date Signed: | May 9, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 9509 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $34,036.84 |
| Date Signed: | Jul 20, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 9511 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $13,050.77 |
| Date Signed: | Sep 15, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 9600 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $4,433.56 |
| Date Signed: | Oct 12, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 9601 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $12,188.79 |
| Date Signed: | Nov 1, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 9602 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $4,433.56 |
| Date Signed: | Dec 12, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | 9603 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $6,504.38 |
| Date Signed: | Jan 25, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | 9604 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $131,794.98 |
| Date Signed: | Mar 1, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

**www.fpds.gov**
**List of contracts matching your search criteria**

| | | | |
|---|---|---|---|
| Contract ID: | 9605 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $310.62 |
| Date Signed: | Mar 24, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | HTC71117F8143 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $470,153.69 |
| Date Signed: | Jul 10, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | HTC71117F8234 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $4,433.53 |
| Date Signed: | Jul 24, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | HTC71117F8240 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $81,861.15 |
| Date Signed: | Aug 11, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | HTC71117F8372 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $4,433.56 |
| Date Signed: | Sep 26, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | HTC71118F8003 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $51,635.97 |
| Date Signed: | Dec 13, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | NONE |
| Additional Reporting Description: | NONE OF THE ABOVE | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | HTC71118F8278 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $6,470.19 |
| Date Signed: | Mar 16, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | NONE |
| Additional Reporting Description: | NONE OF THE ABOVE | | |

| | | | |
|---|---|---|---|
| Contract ID: | HTC71118F8282 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $5,004.33 |
| Date Signed: | Mar 16, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | NONE |
| Additional Reporting Description: | NONE OF THE ABOVE | | |

**www.fpds.gov**
**List of contracts matching your search criteria**

| Contract ID: | HTC71118F8463 | Reference IDV: | W52P1J13D0121 |
|---|---|---|---|
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $24,261.08 |
| Date Signed: | Sep 30, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | NONE |
| Additional Reporting Description: | NONE OF THE ABOVE | | |

| Contract ID: | HTC71118F8470 | Reference IDV: | W52P1J13D0121 |
|---|---|---|---|
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $160,126.70 |
| Date Signed: | Sep 30, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | NONE |
| Additional Reporting Description: | NONE OF THE ABOVE | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | HTC71118F8774 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $107,841.08 |
| Date Signed: | Sep 27, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | NONE |
| Additional Reporting Description: | NONE OF THE ABOVE | | |

| | | | |
|---|---|---|---|
| Contract ID: | HTC71118F8778 | Reference IDV: | W52P1J13D0121 |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $4,375.91 |
| Date Signed: | Sep 27, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | NONE |
| Additional Reporting Description: | NONE OF THE ABOVE | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | 0 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Sep 27, 2013 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00001 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Oct 24, 2013 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00002 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Nov 19, 2013 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00003 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Dec 12, 2013 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

**www.fpds.gov**
**List of contracts matching your search criteria**

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00004 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Nov 17, 2014 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELO CATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00005 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Aug 14, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELO CATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00006 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Nov 30, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00007 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Dec 14, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

**www.fpds.gov**
**List of contracts matching your search criteria**

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00008 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Nov 28, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00009 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | May 30, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00010 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Aug 30, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00011 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Nov 29, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

**www.fpds.gov**
**List of contracts matching your search criteria**

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J13D0121 | Reference IDV: | - |
| Modification Number: | P00012 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Feb 13, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 9776 | Contracting Agency: | USTRANSCOM |
| Contracting Office Name: | USTRANSCOM-AQ | PSC Type: | S |
| PSC: | V114 | PSC Description: | TRANSPORTATION/TRAVEL/RELOCATION- TRANSPORTATION: STEVEDORING |
| NAICS: | 488320 | NAICS Description: | MARINE CARGO HANDLING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J14D0100 | Reference IDV: | - |
| Modification Number: | 0 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Sep 19, 2014 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J14D0100 | Reference IDV: | - |
| Modification Number: | P00001 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Oct 22, 2014 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J14D0100 | Reference IDV: | - |
| Modification Number: | P00002 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Jan 15, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J14D0100 | Reference IDV: | - |
| Modification Number: | P00003 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Apr 10, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J14D0100 | Reference IDV: | - |
| Modification Number: | P00004 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Jun 10, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J14D0100 | Reference IDV: | - |
| Modification Number: | P00005 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Jun 17, 2015 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J14D0100 | Reference IDV: | - |
| Modification Number: | P00006 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Mar 1, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

# www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J14D0100 | Reference IDV: | - |
| Modification Number: | P00007 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Sep 12, 2017 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J14D0100 | Reference IDV: | - |
| Modification Number: | P00008 | Transaction Number: | - |
| Award/IDV Type: | IDC Indefinite Delivery Contract | Action Obligation ($): | $0.00 |
| Date Signed: | Sep 10, 2018 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

**www.fpds.gov**
**List of contracts matching your search criteria**

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J18F0285 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | 0 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $1,400,000.00 |
| Date Signed: | Sep 10, 2018 | Solicitation Date: | Apr 24, 2014 |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | NONE |
| Additional Reporting Description: | NONE OF THE ABOVE | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J18F0285 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | P00001 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $0.00 |
| Date Signed: | Sep 19, 2018 | Solicitation Date: | Apr 24, 2014 |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | NONE |
| Additional Reporting Description: | NONE OF THE ABOVE | | |

**www.fpds.gov**
**List of contracts matching your search criteria**

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J18F0285 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | P00002 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $200,000.00 |
| Date Signed: | Sep 27, 2018 | Solicitation Date: | Apr 24, 2014 |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | NONE |
| Additional Reporting Description: | NONE OF THE ABOVE | | |

| | | | |
|---|---|---|---|
| Contract ID: | W52P1J18F0285 | Reference IDV: | W52P1J14D0100 |
| Modification Number: | P00003 | Transaction Number: | 1 |
| Award/IDV Type: | DO Delivery Order | Action Obligation ($): | $800,000.00 |
| Date Signed: | Nov 9, 2018 | Solicitation Date: | Apr 24, 2014 |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | W4MM USA JOINT MUNITIONS CMD | PSC Type: | S |
| PSC: | J081 | PSC Description: | MAINT/REPAIR/REBUILD OF EQUIPMENT- CONTAINERS, PACKAGING, AND PACKING SUPPLIES |
| NAICS: | 811310 | NAICS Description: | COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT (EXCEPT AUTOMOTIVE AND ELECTRONIC) REPAIR AND MAINTENANCE |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | NONE |
| Additional Reporting Description: | NONE OF THE ABOVE | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | W912D116C0002 | Reference IDV: | - |
| Modification Number: | 0 | Transaction Number: | 0 |
| Award/IDV Type: | DCA Definitive Contract | Action Obligation ($): | $193,189.00 |
| Date Signed: | Jan 25, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | 408TH HQ KUWAIT OFFICE | PSC Type: | P |
| PSC: | 5680 | PSC Description: | MISCELLANEOUS CONSTRUCTION MATERIALS |
| NAICS: | 532490 | NAICS Description: | OTHER COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT RENTAL AND LEASING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

| | | | |
|---|---|---|---|
| Contract ID: | W912D116C0002 | Reference IDV: | - |
| Modification Number: | P00001 | Transaction Number: | 0 |
| Award/IDV Type: | DCA Definitive Contract | Action Obligation ($): | -$8,189.00 |
| Date Signed: | Feb 25, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | 408TH HQ KUWAIT OFFICE | PSC Type: | P |
| PSC: | 5680 | PSC Description: | MISCELLANEOUS CONSTRUCTION MATERIALS |
| NAICS: | 532490 | NAICS Description: | OTHER COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT RENTAL AND LEASING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

## www.fpds.gov
## List of contracts matching your search criteria

| | | | |
|---|---|---|---|
| Contract ID: | W912D116C0002 | Reference IDV: | - |
| Modification Number: | P00002 | Transaction Number: | 0 |
| Award/IDV Type: | DCA Definitive Contract | Action Obligation ($): | $658.00 |
| Date Signed: | May 9, 2016 | Solicitation Date: | - |
| Contracting Agency ID: | 2100 | Contracting Agency: | DEPT OF THE ARMY |
| Contracting Office Name: | 408TH HQ KUWAIT OFFICE | PSC Type: | P |
| PSC: | 5680 | PSC Description: | MISCELLANEOUS CONSTRUCTION MATERIALS |
| NAICS: | 532490 | NAICS Description: | OTHER COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT RENTAL AND LEASING |
| Vendor DUNS: | 534714530 | Vendor Name: | KGL INTERNATIONAL FOR PORTS, WAREHOUSING & TRANSPORTATION |
| Vendor City: | KUWAIT CITY | Vendor State: | - |
| Vendor ZIP Code: | 13106 | Global DUNS Number: | 534714530 |
| Global Vendor Name: | KGL INTERNATIONAL FOR PORTS  WAREHOUSING & TRANSPORTATION | Additional Reporting Code: | - |
| Additional Reporting Description: | - | | |

DeARCY HALL, J.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 25 2019 ★

BROOKLYN OFFICE

MISC 19 - 1638

# Exhibit F



# Egypt hit by claim over cancelled container terminal project

26 November 2018

Cosmo Sanderson



Credit: iStockphoto/Jan-Otto

A Kuwaiti shareholder in a consortium that held a concession to develop, build and operate a new container terminal facility at Egypt's Damietta port has launched a US$1.1 billion claim against the state following the project's cancellation – while a related billion-dollar ICC arbitration continues.

KGL International for Ports, Warehousing, and Transport delivered a "request for amicable resolution and notice of dispute" to Egyptian authorities by hand yesterday, invoking the 2001 Egypt-Kuwait bilateral investment treaty.

KGL, an affiliate of Kuwait's KGL Logistics, was a shareholder in the Damietta International Port Company (DIPCO) consortium, which in 2006 entered a 40-year concession agreement with the state-owned Damietta Port Authority to develop, build and operate the facility at the Damietta Port, eight kilometres west of the mouth of the Nile.

The Damietta Port Authority had decided the facility was needed to accommodate the increasingly large container ships being used by international shipping firms. However, according to KHL, it "abruptly terminated" the concession agreement in 2015, depriving DIPCO and its shareholders of "a 40-year stream of revenue".

According to the notice of dispute, KGL first entered into a memorandum of understanding with the Damietta Port Authority, which is an agency of the Egyptian Ministry of Transport, in 2005. The DIPCO consortium, which features three international shipping and two investment companies, was formed the following year.

Damietta Port Authority held a 5% stake in the consortium, giving it "a direct interest in the success of the project" aside from the commerce and jobs that it would bring to Egypt. KGL eventually had a 25% share.

KGL says an initial feasibility study estimated the new terminal would cost US$544 million, although this estimate rose to US$680 million after the concession agreement was signed.

The Kuwaiti company says that the DIPCO shareholders, with the exception of the Damietta Port Authority, "did their part to finance the project," spending over US$200 million on design and construction, securing a US$480 million loan facility from two regional banks and engaging construction and consulting firms.

It says Damietta Port Authority "failed to cooperate and consistently acted unreasonably and in bad faith, including stopping work in an improper manner several times, causing significant project delays." This "significantly" drove up the costs of the project.

KGL also complains that the Damietta Port Authority "starved DIPCO of funding to continue the project" by delaying for over two years the consortium's ability to access an arranged loan facility. This loan was eventually cancelled, causing the construction contractors to stop for lack of payment.

KGL says DIPCO "worked to recover" from the "delays and cost overruns" caused by the Damietta Port Authority but that the Egyptian entity made its cooperation conditional on the consortium signing "abusive settlement agreements that imposed crushing penalties and shifted costs and responsibilities to DIPCO."

It says the termination of the project came after the overthrow of two Egyptian presidents in 2011 and 2013 created "force majeure conditions" in the country. DIPCO sought to restart the project but negotiations were in vain, it says.

As a result, KGL says it is entitled to the US$1.1 billion damages, including interest, for Egypt's failure to accord it fair and equitable treatment, imposition of discriminatory measures and illegal expropriation of its investments under the BIT.

KGL says that since the events took place it has learned from a former adviser to the Egyptian minister of transport between 2004 and 2012 that the Damietta Port Authority coordinated with another state-controlled company, the Holding Company for Maritime Land and Transport, to create obstacles to the construction of the new terminal.

This was because the company running the old container terminal at the port (in which both state-owned companies had an interest) feared competition from the new terminal, it says.

The other partners in the DIPCO consortium included French shipping company Terminal Link, the Kuwait-based United Arab Shipping Company and China Shipping Ports Development as well as investment funds GE Capital Equity Investments and AREF Investment Group, which are US and Kuwaiti respectively.

News of the treaty claim comes as a US$1.2 billion ICC claim that DIPCO launched against Damietta Port Authority over the cancellation of the concession agreement continues.

In the ICC case, *GAR* understands DIPCO is represented Crowell & Moring with <u>Karim A Youssef</u> of Youssef & Partners in Cairo as co-counsel.

The Damietta Port Authority is represented by Sarie-Eldin & Partners in Cairo, a firm known for its corporate law work, which mentions the representation on its website.

Counsel to either side in the treaty case is unknown. Egypt is typically represented by its States Lawsuits Authority, which is based in Giza outside Cairo.

Another ICC case concerning the Damietta port project recently came to an end, with South Korean group Doosan Heavy Industries and Construction winning US$72 million from DIPCO and KGL for breaches of an agreement for the supply of ship-to-shore gantry cranes. That case was heard by a Paris-seated tribunal chaired by Austrian arbitrator **Christian Dorda**, with France's **Philippe Pinsolle** and Quebec-based arbitrator **Nabil Antaki**, who has Syrian, Lebanese and Canadian nationality, as co-arbitrators.

Doosan was represented by King & Spalding, while DIPCO and KGL were represented by Crowell & Moring and Kuwaiti firm Alothman & Khalaf.


*Damietta International Port Company v Damietta Port Authority*

In the ICC claim

<u>Tribunal</u>

Unknown

<u>Counsel to Damietta International Port Company</u>

- Crowell & Moring
- Youssef & Partners

Partner <u>Karim A Youssef</u> in Cairo

<u>Counsel to Damietta Port Authority</u>

- Sarie-Eldin & Partners

---

Copyright © 2017 Law Business Research Ltd. All rights reserved. | http://www.lbresearch.com
87 Lancaster Road, London, W11 1QQ, UK | Tel: +44 207 908 1188 / Fax: +44 207 229 6910
http://www.globcompetitionreview.com | editorial@globalcompetitionreview.com

Exhibit G

MISC 19 - 1 638





## Past, Present and Future

## History & Experience

Mission

Vision

History & Experience

Liberty Maritime Corporation was founded in 1988 by Philip J. Shapiro, who continues to serve as the company's President and Chief Executive Officer. Liberty has established a worldwide reputation as a high quality and reliable dry bulk vessel and liner service operator. Our outstanding track record has been developed through years of on-time and efficient cargo delivery. Over the past 25 years, Liberty has distinguished itself as an exceptional carrier of United States origin overseas food aid shipments for various U.S. government agencies including the United States Departments of Agriculture, State and Defense. In addition, Liberty's fleet has played an integral role in carrying cargo for many multi-national commercial grain houses and remains the largest U.S. flag food aid carrier for the United Nations' World Food Program.

The entire Liberty Maritime U.S. flag operated fleet are VISA (Voluntary Intermodal Sealift Agreement) participants. The three PCTC Ro/Ro vessels operated by Liberty Global Logistics LLC, an affiliate company, also meet U.S. Maritime Security Program requirements. Liberty is recognized by various governments, commercial shippers and other groups and agencies as a preferred transporter of tracked and wheeled military equipment such as: tanks, helicopters, Humvees, MRAPs and M-ATVs. Additionally, the vessels are used to transport commercial vehicles, heavy equipment and project type cargoes.

Liberty Maritime is committed to evolving with the development of global trade as well as changing demand and trading patterns. We strive to be the most efficient, cost effective and reliable ocean transportation company.

Shipping Experience:

- Bulk Carriers
- Ro/Ros
- PCTCs
- Container Ships
- Tankers
- Tween Deckers
- Bagged and bulk liner service
- Logistics & Prepositioning
- Military and Ammunition Transportation



Exhibit H



# Liberty Global Logistics LLC
## May 30, 2019

1979 Marcus Avenue, Suite 200
Lake Success, NY 11042
Office: 516-488-8300
Fax: 516-488-8306

### Eastbound

| Eastbound | Liberty Pride Voyage 80 A2273/G2085 | Liberty Passion Voyage 18 A2274/G2086 | Liberty Promise Voyage 72 A2525/G2340 | Liberty Peace Voyage 16 A2526/G2341 | Liberty Pride Voyage 82 A2766/G2201 | Liberty Passion Voyage 20 A2767/G2202 | Liberty Promise Voyage 74 | Liberty Peace Voyage 18 |
|---|---|---|---|---|---|---|---|---|
| BEAUMONT (2E1) | 7-Apr | 27-Apr | 3-Jun | 20-Jun | 19-Jul | 4-Aug | 3-Sep | 4-Oct |
| JACKSONVILLE (1R3) | 26-Apr | 3-May | 29-May | 27-Jun | 25-Jul | 9-Aug | **** | 9-Oct |
| BRUNSWICK (1Q3) | **** | **** | **** | **** | **** | **** | 8-Sep | **** |
| CHARLESTON (1PK) | **** | 4-May | 27-May | 28-Jun | 26-Jul | 10-Aug | **** | 11-Oct |
| PHILADELPHIA (1K2) | **** | **** | **** | 1-Jul | 31-Jul | 13-Aug | 9-Sep | 14-Oct |
| WILMINGTON, DE (1H3) | 20-Apr | 8-May | 24-May | 2-Jul | 1-Aug | 14-Aug | 13-Sep | 16-Oct |
| PROVIDENCE (1E1) | **** | **** | **** | 4-Jul | **** | **** | 15-Sep | **** |
| | | | | | | | | |
| GDANSK, POLAND (JS1) | **** | **** | **** | **** | **** | **** | **** | **** |
| BREMERHAVEN, GERMANY (JF1) | **** | **** | **** | **** | **** | **** | **** | **** |
| ANTWERP, BELGIUM (JH2) | **** | **** | **** | **** | **** | **** | **** | **** |
| CASABLANCA, MOROCCO (KB1) | **** | **** | **** | **** | **** | **** | **** | **** |
| LIVORNO (LEGHORN) (KF3) | **** (M2089) | 21-May (M2090) | 21-June (M2222) | 20-Jul (M2223) | **** (M2324) | 28-Aug (M 2325) | 26-Sep (M) | 27-Oct (M) |
| THESSALONIKI, GREECE (LE1) | **** | **** | **** | **** | **** | **** | **** | **** |
| ALEXANDRIA, EGYPT (LK1) | **** | **** | **** | **** | **** | **** | **** | **** |
| VOLOS, GREECE (LE2) | **** | **** | **** | **** | **** | **** | **** | **** |
| BEIRUT, LEBANON (LH1) | 12-May | 25-May | 26-Jun | **** | 17-Aug | 2-Sep | 1-Oct | 1-Nov |
| AQABA (PE1) | 14-May | 30-May | 29-Jun | 27-Jul | 20-Aug | 5-Sep | 5-Oct | 5-Nov |
| JEDDAH (PP1) | 16-May | 1-Jun | 2-Jul | 29-Jul | 23-Aug | 7-Sep | 7-Oct | 7-Nov |
| DJIBOUTI (PB1) | **** | **** | **** | **** | **** | **** | **** | **** |
| SALALAH (PJ8) | **** | **** | **** | **** | **** | **** | **** | **** |
| KARACHI (QA1) | **** | 18-Jun | 18-Jul | **** | 23-Sep | 21-Sep | 23-Oct | 22-Nov |
| JEBEL ALI (PQ7) | 28-May | 7-Jun | 9-Jul | 5-Aug | 29-Aug | 14-Sep | 14-Oct | 14-Nov |
| HAMAD (PK7) | **** | **** | 11-Jul | **** | **** | **** | 17-Oct | **** |
| UMM SAID (PK6) | **** | **** | **** | **** | **** | **** | **** | **** |
| ABU DHABI (PQ2) | 25-May | **** | 10-Jul | **** | 30-Aug | 15-Sep | 15-Oct | **** |
| BAHRAIN (PK5) | 23-May | **** | **** | **** | **** | **** | **** | **** |
| SHUAIBAH (PN4) | 24-May | 13-Jun | 14-Jul | 10-Aug | 3-Sep | 17-Sep | 20-Oct | 18-Nov |
| DAMMAM (PF6) | **** | **** | **** | **** | **** | **** | **** | **** |
| SHUWAIKH (PN1) | **** | **** | **** | **** | **** | **** | **** | **** |
| UMM QASR (PL4) | **** | **** | **** | **** | **** | **** | **** | **** |

### Westbound

| Westbound | Liberty Promise Voyage 71 N2609 / N2243 | Liberty Peace Voyage 15 N2298 | Liberty Pride Voyage 81 N2477 | Liberty Passion Voyage 19 N2557 | Liberty Promise Voyage 73 N2859 | Liberty Peace Voyage 17 N2857 | Liberty Pride Voyage 83 | Liberty Passion Voyage 20 |
|---|---|---|---|---|---|---|---|---|
| AQABA (PE1) | 8-Apr | 17-Apr | 14-May | 30-May | 29-Jun | 27-Jul | 20-Aug | 5-Sep |
| JEDDAH (PP1) | 10-Apr | 19-Apr | 16-May | 3-Jun | 2-Jul | 29-Jul | 23-Aug | 7-Sep |
| JEBEL ALI (PQ7) | 22-Apr | 25-Apr | 28-May | 7-Jun | 9-Jul | 5-Aug | 29-Aug | 14-Sep |
| ABU DHABI (PQ2) | **** | **** | 25-May | **** | **** | **** | 30-Aug | **** |
| UMM SAID (PK6) | **** | **** | **** | **** | **** | **** | **** | **** |
| BAHRAIN (PK5) | **** | **** | **** | **** | **** | **** | **** | **** |
| SHUAIBAH (PN4) | 30-Apr | 4-May | 24-May | 13-Jun | 14-Jul | 10-Aug | 19-Sep | 17-Sep |
| KARACHI (QA1) | 27-Apr | 28-Apr | **** | 10-Jun | 18-Jul | **** | 23-Sep | 21-Sep |
| | Voyage 71ME2K | Voyage 15ME2K N2299 | Voyage 81ME2K N2478 | Voyage 19ME2K N2558 | Voyage 73ME2K N2850 | Voyage 17ME2K N2858 | Voyage 83ME2K | Voyage 19ME2K N2558 |
| PYONGTAEK, KOREA (UCB) | **** | **** | **** | **** | **** | **** | **** | **** |
| INCHON, KOREA (UC2) | **** | **** | 12-Jun | 2-Jul | 2-Aug | 27-Aug | 8-Oct | 6-Oct |
| MOKPO, KOREA (UD2) | **** | **** | **** | **** | **** | **** | **** | **** |
| ULSAN, KOREA (UD7) | **** | **** | **** | 4-Jul | 4-Aug | 29-Aug | 10-Oct | 8-Oct |
| PUSAN, KOREA (UD6) | **** | 22-May | **** | 5-Jul | 5-Aug | 30-Aug | 11-Oct | 9-Oct |
| | Voyage 71X2USA | Voyage 15X2USA F2269 | Voyage 81X2USA F2371 | Voyage 19X2USA F2557 | Voyage 73X2USA F2805 | Voyage 17X2USA F2803 | Voyage 83X2USA | Voyage 19X2USA F2557 |
| PORT HUENEME (3GA) | **** | **** | **** | **** | **** | **** | **** | **** |
| PORT ARTHUR (2E6) | **** | **** | **** | **** | **** | **** | **** | **** |
| BEAUMONT (2E1) | 3-Jun | 20-Jun | 19-Jul | 5-Aug | 3-Sep | 28-Sep | 10-Nov | 8-Nov |
| GULFPORT (2C1) | **** | 23-Jun | 20-Jul | **** | **** | **** | **** | **** |
| JACKSONVILLE (1R3) | 30-May | 27-Jun | 25-Jul | 9-Aug | 8-Sep | 3-Oct | 15-Nov | 12-Nov |
| BRUNSWICK (1Q3) | **** | **** | **** | **** | **** | **** | **** | **** |
| CHARLESTON (1PK) | 28-May | 28-Jun | 26-Jul | 10-Aug | 9-Sep | 4-Oct | 17-Nov | 14-Nov |
| PHILADELPHIA (1K2) | **** | 1-Jul | 30-Jul | 13-Aug | 13-Sep | 5-Oct | 17-Nov | 14-Nov |
| WILMINGTON, DE (1H3) | 24-May | 2-Jul | 1-Aug | 14-Aug | 15-Sep | 10-Oct | 22-Nov | 18-Nov |

*** Inducement / Transhipment Possible
****This vessel voyage will not call this port

Other Ports Available on Inducement
Schedule subject to change without notice

Contacts: Harry Hussein
VP of Sales and Marketing
Direct: 516-830-3393
Mobile: 516-673-7105
E-mail: harry@libertymar.com

David DeBoer
Manager, US Sales

Mobile: 516-673-7656
E-mail: DDeboer@libertymar.com

Matt Gehring
Logistics Manager
Direct: 516-830-3377
Mobile: 516-547-7234
E-mail: matt@libertymar.com

Russel Ramjitsingh
Sales Manager Projects and Operations
Direct: 516-830-3404
Mobile: 516-637-8639
E-mail: rr@libertymar.com

GROUP CONTACTS
E-mail: libertygl@libertymar.com
E-mail: bookings@libertymar.com
E-mail: documentation@libertymar.com
Website: www.libertygl.com

Exhibit I



# Liberty Global Logistics LLC
### Friday, May 31, 2019
### Middle East Service



| U.S. OUTBOUND | Liberty Pride Voyage 80 Max Height 5.0 m / Max Weight 150 MT | | Liberty Passion Voyage 18 Max Height 5.1 m / Max Weight 150 MT | | Glovis Superior Voyage 32 Max Height 5.0 m / Max Weight 150 MT | | Liberty Promise Voyage 72 Max Height 5.0 m / Max Weight 150 MT | | Glovis Sirius Voyage 19 Max Height 5.15 m / Max Weight 200 MT | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Date | Cut Off | Date | Cut Off | Date | Cut Off | Date | Cut Off | Date | Cut Off |
| PORT HUENEME, CA | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| FREEPORT, TX | 7-Apr | 29-Mar | 26-Apr | 18-Apr | 3-May | 26-Apr | 5-Jun | 29-May | 29-May | 22-May |
| BEAUMONT, TX | 10-Apr | 1-Apr | 28-Apr | 22-Apr | ---- | ---- | 3-Jun | 34-May | ---- | ---- |
| JACKSONVILLE, FL | 26-Apr | 18-Apr | 4-May | 26-Apr | 7-May | 30-Apr | 29-May | 22-May | 3-Jun | 24-May |
| BALTIMORE, MD | 20-Apr | 15-Apr | ---- | ---- | 10-May | 3-May | ---- | ---- | 6-Jun | 30-May |
| WILMINGTON, DE | 22-Apr | 15-Apr | 11-May | 1-May | 13-May | 6-May | 27-May | 20-May | 7-Jun | 31-May |
| PORT NEWARK, NJ | 18-Apr | 11-Apr | 7-May | 30-Apr | ---- | ---- | 23-May | 16-May | 10-Jun | 3-Jun |
| PROVIDENCE, RI | ---- | ---- | ---- | ---- | 15-May | 8-May | ---- | ---- | 12-Jun | 5-Jun |
| | ETA | T/S Port | ETA | T/S Port | ETA | T/S Port | ETA | T/S Port | ETA | T/S Port |
| LIVORNO, ITALY | ---- | | 21-May | | ---- | | 20-Jun | | ---- | |
| MERSIN, TURKEY | 10-May | | 27-May | via Beirut | 6-Jun | via Beirut | 7-Jul | via Beirut | 7-Jul | via Beirut |
| BEIRUT, LEBANON | 11-May | | 26-May | | 29-May | | ---- | | 25-Jun | |
| ALEXANDRIA, EGYPT | ---- | | 27-May | | ---- | | 27-Jun | | ---- | |
| AQABA, JORDAN | 14-May | | 30-May | | 2-Jun | | 30-Jun | | 28-Jun | |
| JEDDAH, SAUDI ARABIA | 16-May | | 1-Jun | | 4-Jun | | 3-Jul | | 1-Jul | |
| DJIBOUTI, DJIBOUTI | ---- | | ---- | | ---- | | ---- | | ---- | |
| SOHAR, OMAN | 31-May | via Jeddah | 10-Jun | via Jeddah | 10-Jun | | 15-Jul | via Jeddah | 7-Jul | |
| JEBEL ALI, UAE | 28-May | | 7-Jun | | 12-Jun | | 10-Jul | | 8-Jul | |
| ABU DHABI, UAE | 27-May | | 8-Jun | | 14-Jun | via Jebel Ali | 11-Jul | | 12-Jul | via Sohar |
| HAMAD, QATAR | 4-Jun | via Aqaba | 10-Jun | | 15-Jun | via Aqaba | 12-Jul | via Aqaba | 11-Jul | via Sohar |
| BAHRAIN, BAHRAIN | 23-May | | 14-Jun | via Jebel Ali | 16-Jun | | 25-Jul | via Jebel Ali | 11-Jul | via Sohar |
| DAMMAM, SAUDI ARABIA | 26-May | | 12-Jun | | 14-Jun | | 13-Jul | | 9-Jul | |
| KUWAIT, SHUAIBA | 24-May | | 13-Jun | | ---- | | 14-Jul | | ---- | |
| KUWAIT, SHUWAIKH | 25-May | | 15-Jun | | 16-Jun | | 22-Jul | via Jebel Ali | 11-Jul | |
| KARACHI, PAKISTAN | ---- | | 16-Jun | | ---- | | 18-Jul | | ---- | |
| UMM QASR, IRAQ | ---- | | 9-Jun | via Jebel Ali | 19-Jun | via Jebel Ali | 17-Jul | via Jebel Ali | ---- | |
| YOKOHAMA, JAPAN | ---- | | ---- | | ---- | | ---- | | ---- | |

***Vessel Schedules Are Subject to Change Without Notice***

**NOTES:**
1. UNITS AND ALL DOCUMENTATION (INCLUDING VALIDATED TITLE COPIES) MUST BE PRESENTED BY CUT OFF LISTED.
2. SOHAR, DOHA, BAHRAIN, ABU DHABI AND OTHER REGION PORTS IN THE RED SEA/PG ARE AVAILBLE AS INDUCEMENT OR TRANSHIPMENT
3. MED PORTS ARE AVAILABLE AS INDUCEMENT OR TRANSHIPMENT
4. CARGO WILL ONLY BE RECEIVED BY TERMINAL WITHIN 30 DAYS OF VESSEL SAIL DATE.
5. LGL WILL NOT ACCEPT ANY VEHICLES WITH FLOOD DAMAGE
6. ALL FAR EAST PORTS ARE AVAILABLE AS INDUCEMENTS

**PAGE 1 OF 2**

**FOR RATE QUOTES PLEASE EMAIL SALES@LIBERTYMAR.COM OR CALL (516) 488-8800**

**Harry Hussein**
VP of Sales and Marketing
Mobile: 516-673-7105
E-mail: harry@libertymar.com

**Chad Lyons**
Sales and Marketing Manager
Direct: 516-830-3412
E-mail: clyons@libertymar.com

**Rich Gisonda**
Inside Sales
Direct: 516-830-3388
E-mail: rgisonda@libertymar.com

**Dave DeBoer**
Manager, US Sales
Cell: (516) 673-7656
E-mail: ddeboer@libertymar.com

**Andrew Pirreca**
Manager Trade Strategy & Projects
Direct: 516-830-3391
E-mail: apirreca@libertymar.com

**Regina Fox**
Senior Traffic Coordinator
Direct: 516-830-3374
E-mail: rfox@libertymar.com



# Liberty Global Logistics LLC
### Friday, May 31, 2019
### Middle East Service



| U.S. OUTBOUND | Viking Destiny Voyage 1 | | Liberty Peace Voyage 16 | | Glovis Champion Voyage 41 | | Liberty Pride Voyage 82 | |
|---|---|---|---|---|---|---|---|---|
| | Max Height 5.1 m / Max Weight 150 MT | | Max Height 5.1 m / Max Weight 150 MT | | Max Height 5.15 m / Max Weight 150 MT | | Max Height 5.0 m / Max Weight 150 MT | |
| | Date | Cut Off | Date | Cut Off | Date | Cut Off | Date | Cut Off |
| PORT HUENEME, CA | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| FREEPORT, TX | ---- | ---- | 18-Jun | 11-Jun | 3-Jul | 26-Jun | 12-Jul | 5-Jul |
| BEAUMONT, TX | ---- | ---- | ---- | ---- | ---- | ---- | 13-Jul | 8-Jul |
| JACKSONVILLE, FL | ---- | ---- | 26-Jun | 19-Jun | 7-Jul | 1-Jul | 19-Jul | 12-Jul |
| BALTIMORE, MD | ---- | ---- | ---- | ---- | 11-Jul | 5-Jul | 23-Jul | 16-Jul |
| WILMINGTON, DE | 27-Jun | 20-Jun | 2-Jul | 25-Jun | 12-Jul | 5-Jul | 26-Jul | 19-Jul |
| PORT NEWARK, NJ | ---- | ---- | 29-Jun | 24-Jun | 14-Jul | 8-Jul | ---- | ---- |
| PROVIDENCE, RI | ---- | ---- | ---- | ---- | 16-Jul | 9-Jul | ---- | ---- |
| | | | | | | | | |
| | ETA | T/S Port | ETA | T/S Port | ETA | T/S Port | ETA | T/S Port |
| LIVORNO, ITALY | | | 20-Jul | | ---- | | ---- | |
| MERSIN, TURKEY | 24-Jul | via Beirut | 6-Aug | via Beirut | 10-Aug | via Beirut | 22-Aug | via Beirut |
| BEIRUT, LEBANON | 12-Jul | | 25-Jul | | 29-Jul | | 10-Aug | |
| ALEXANDRIA, EGYPT | ---- | | ---- | | ---- | | ---- | |
| AQABA, JORDAN | 15-Jul | | 29-Jul | | 1-Aug | | 13-Aug | |
| JEDDAH, SAUDI ARABIA | 18-Jul | | 31-Jul | | 3-Aug | | 15-Aug | |
| DJIBOUTI, DJIBOUTI | ---- | | ---- | | ---- | | ---- | |
| SOHAR, OMAN | 30-Jul | via Jeddah | 12-Aug | via Jeddah | 8-Aug | | 27-Aug | via Jeddah |
| JEBEL ALI, UAE | 24-Jul | | 7-Aug | | 9-Aug | | 22-Aug | |
| ABU DHABI, UAE | 29-Jul | via Jebel Ali | 8-Aug | | 14-Aug | via Sohar | 23-Aug | |
| HAMAD, QATAR | 27-Jul | via Aqaba | 10-Aug | | 13-Aug | via Sohar | 25-Aug | via Aqaba |
| BAHRAIN, BAHRAIN | 5-Aug | via Jebel Ali | 11-Aug | | 13-Aug | via Sohar | 28-Aug | |
| DAMMAM, SAUDI ARABIA | 26-Jul | | 12-Aug | | 10-Aug | | 25-Aug | |
| KUWAIT, SHUAIBA | | | 14-Aug | | ---- | | 26-Aug | |
| KUWAIT, SHUWAIKH | 28-Jul | via Jebel Ali | 19-Aug | via Jebel Ali | 12-Aug | | 3-Sep | via Jebel Ali |
| KARACHI, PAKISTAN | | | 17-Aug | | | | | |
| UMM QASR, IRAQ | 31-Jul | via Jebel Ali | 14-Aug | via Jebel Ali | ---- | | 29-Aug | via Jebel Ali |
| YOKOHAMA, JAPAN | ---- | | ---- | | ---- | | ---- | |

***Vessel Schedules Are Subject to Change Without Notice***

NOTES:
1. UNITS AND ALL DOCUMENTATION (INCLUDING VALIDATED TITLE COPIES) MUST BE PRESENTED BY CUT OFF LISTED.
2. SOHAR, DOHA, BAHRAIN, ABU DHABI AND OTHER REGION PORTS IN THE RED SEA/PG ARE AVAILBLE AS INDUCEMENT OR TRANSHIPMENT
3. MED PORTS ARE AVAILABLE AS INDUCEMENT OR TRANSHIPMENT
4. CARGO WILL ONLY BE RECEIVED BY TERMINAL WITHIN 30 DAYS OF VESSEL SAIL DATE.
5. LGL WILL NOT ACCEPT ANY VEHICLES WITH FLOOD DAMAGE
6. ALL FAR EAST PORTS ARE AVAILABLE AS INDUCEMENTS

FOR BOOKINGS, PLEASE EMAIL BOOKINGS@LIBERTYMAR.COM OR CALL (516) 488-8800
FOR RATE QUOTES PLEASE EMAIL SALES@LIBERTYMAR.COM OR CALL (516) 488-8800

| | | | | | |
|---|---|---|---|---|---|
| **Harry Hussein** | **Chad Lyons** | **Rich Gisonda** | **Dave DeBoer** | **Andrew Pirreca** | **Regina Fox** |
| VP of Sales and Marketing | Sales and Marketing Manager | Inside Sales | Manager, US Sales | Manager Trade Strategy & Projects | Senior Traffic Coordinator |
| Mobile: 516-673-7105 | Direct: 516-830-3412 | Direct: 516-830-3388 | Cell: (516) 673-7656 | Direct: 516-830-3391 | Direct: 516-830-3374 |
| E-mail: harry@libertymar.com | E-mail: clyons@libertymar.com | E-mail: rgisonda@libertymar.com | E-mail: ddeboer@libertymar.com | E-mail: apirreca@libertymar.com | E-mail: rfox@libertymar.com |

Exhibit J

MISC 19 - 1 638

https://www.usaspending.gov/#/search/ad4f9683e0035f6021a3b4c8e79f1b32

USAspending.gov | Data Lab

USASPENDING.gov

Spending Explorer | Award Search | Profiles | Download Center | Glossary

## Advanced Search

DOWNLOAD

**Filters**

Submit Search

Reset search

**Keyword**

Search by Keyword

"Liberty Global Logistics" ×

**Time Period**

Fiscal Year | Date Range

- All Fiscal Years
- FY 2019
- FY 2018
- FY 2017
- FY 2016
- FY 2015
- FY 2014
- FY 2013
- FY 2012
- FY 2011
- FY 2010
- FY 2009
- FY 2008

**Award Type**

**Agency**

**3 Active Filters:**

| KEYWORD | TIME PERIOD | PLACE OF PERFORMANCE |
|---|---|---|
| "Liberty Global Logistics" | All Fiscal Years | COUNTRY \| KUWAIT |

TABLE | TIME | MAP | CATEGORIES

Prime Awards | Sub-Awards

# Spending by Prime Award

Contracts 21 | Contract IDVs 0 | Grants 0 | Direct Payments 0 | Loans 0 | Other 0

| Award ID | Recipient Name | Start Date | End Date | Award Amount | Awarding Agency |
|---|---|---|---|---|---|
| HTC71118F8064 | LIBERTY GLOBAL LOGISTICS LLC | 9/30/2017 | 9/30/2017 | $19,015,153 | Department of Defense |
| HTC71117F8054 | LIBERTY GLOBAL LOGISTICS LLC | 3/31/2017 | 3/31/2017 | $12,623,291 | Department of Defense |
| HTC71117F8432 | LIBERTY GLOBAL LOGISTICS LLC | 8/31/2017 | 8/31/2017 | $9,273,546 | Department of Defense |
| 9500 | LIBERTY GLOBAL LOGISTICS LLC | 9/30/2015 | 9/30/2015 | $8,560,906 | Department of Defense |
| 9400 | LIBERTY GLOBAL LOGISTICS LLC | 9/30/2014 | 9/30/2014 | $8,399,856 | Department of Defense |
| HTC71118F8176 | LIBERTY GLOBAL LOGISTICS LLC | 12/31/2017 | 12/31/2017 | $7,808,505 | Department of Defense |
| HTC71118F8126 | LIBERTY GLOBAL LOGISTICS LLC | 11/30/2017 | 11/30/2017 | $6,960,121 | Department of Defense |
| HTC71118F8345 | LIBERTY GLOBAL LOGISTICS LLC | 3/31/2018 | 3/31/2018 | $5,963,026 | Department of Defense |
| HTC71118F8544 | LIBERTY GLOBAL LOGISTICS LLC | 5/31/2018 | 5/31/2018 | $5,469,358 | Department of Defense |

